## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| MAQUILACERO S.A. de C.V. and TECNICAS DE FLUIDOS S.A. de C.V., | ) ) ) ) |
| *Plaintiffs*, and | ) ) ) ) |
| PERFILES LM, S.A. DE C.V. | ) ) |
| *Consolidated-Plaintiff*, v. | ) ) ) |
| THE UNITED STATES, | ) ) |
| *Defendant*, and | ) ) ) ) |
| NUCOR TUBULAR PRODUCTS, INC., | ) ) |
| *Defendant-Intervenor*. | ) ) ) |

**NON-CONFIDENTIAL VERSION**

Consol. Court No. 23-00091

Confidential Business Proprietary Information Deleted from Pages: 24, 28, & 47 and from Exhibit 1.

## PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2

Diana Dimitriuc Quaia
John M. Gurley
Yun Gao
Mario A. Torrico

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006

September 28, 2023

AFDOCS:198886637.1

# TABLE OF CONTENTS

**Page**

I.      STATEMENT PURSUANT TO RULE 56.2(c)(1) ............................................................ 1

      A.      Administrative Determination to be Reviewed ....................................................... 1

      B.      Issues Presented ...................................................................................................... 2

            1.      Whether Commerce's Determination to Collapse Maquilacero and TEFLU Is in Accordance with Law and Supported by Substantial Evidence ......... 2

            2.      Whether Commerce's Determination to Include TEFLU's Customized Parts As In-Scope Merchandise Is in Accordance With Law and Supported by Substantial Evidence ............................................................................... 2

            3.      Whether Commerce's Rejection of the Manufacturer Code and the FURPROCESSH/U Variable Was Lawful and Supported By Substantial Evidence ................................................................................................... 3

            4.      Whether Commerce's Determination to Treat TEFLU's Sale Made Through the IMMEX Program as Home Market Sales Is Supported by Substantial Evidence and Is in Accordance with Law ................................. 3

            5.      Whether Commerce's Determination to Rely on the Cohen's *d* Test in Conducting the Differential Pricing Analysis Is Supported by Substantial Evidence and Is in Accordance with Law .................................................. 4

II.     STATEMENT OF FACTS ................................................................................................ 4

III.    STANDARD OF REVIEW .............................................................................................. 8

IV.     SUMMARY OF ARGUMENT ........................................................................................ 9

V.      ARGUMENT ................................................................................................................. 12

      A.      Commerce's Determination to Collapse Maquilacero and TEFLU Is Not In Accordance with Law and Is Not Supported by the Evidence on the Record ...... 12

            1.      Legal Framework ................................................................................... 12

            2.      Commerce's Prior Collapsing Decision .................................................. 13

            3.      Commerce Failed to Apply the Collapsing Criteria in 19 C.F.R. § 351.401(f)(1)-(2) ................................................................................. 15

            4.      Collapsing Maquilacero and TEFLU Is Not Supported By Record Evidence ............................................................................................... 17

      B.      Commerce's Determination that TEFLU's Downstream Products Were In-Scope Merchandise Was Unsupported by Substantial Evidence and Contrary to Law . 23

AFDOCS:198886637.1

# TABLE OF CONTENTS

(continued)

**Page**

1.   Legal Framework for Scope Interpretation ........................................................... 24

2.   Commerce's Determination Failed to Consider Whether Substantially Transformed LWRPT into Custom-Made Downstream Products Are Covered by the *Order* ...................................................................................................................... 26

3.   Commerce's Interpretation of the Scope is Contrary to Law ............................... 29

C.   Commerce Erred by Not Distinguishing Further Manufactured Products  In the Product Comparison Methodology ........................................................................ 33

    1.   Legal Framework ...................................................................................... 34

    2.   Commerce's Rejection of the Manufacturer Code and the FURPROCESSH/U Variable Was Contrary to Law and Unsupported by Record Evidence ......................................................................................... 35

    3.   Maquilacero Timely Proposed the Use of the FURPROCESSH/U Variable ..................................................................................................... 37

D.   Commerce's Determination to Treat TEFLU Virtual Export Sales Under the IMMEX Program as Home Market Sales Was Unsupported by Substantial Evidence and Contrary to Law ................................................................................ 38

    1.   Legal Framework ...................................................................................... 39

    2.   Maquilacero/TEFLU Knew Sales Made Through the IMMEX Program Were Destined for Export to the U.S. or a Third Country ....................... 40

E.   Commerce's Application of the Differential Pricing Methodology to Maquilacero/TEFLU's Sales Is Unlawful ............................................................. 43

1.   Legal Framework ................................................................................................... 44

2.   Commerce's Use of Cohen's *d* is Unlawful ....................................................... 46

3.   Commerce Failed to Provide a Reasonable Explanation for Applying the Cohen's *d* Test in Calculating the Denominator of the Cohen's *d* Coefficient .................. 47

AFDOCS:198886637.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Allied Tube & Conduit Corp. v. United States*,
  127 F.Supp.2d 207 (Ct. Int'l Trade 2000) ...........................................................................17

*Alloy Piping Prods., Inc. v. United States*,
  33 C.I.T. 349 (2009) ..............................................................................................................16

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)..................................................................................................................9

*CP Kelco US, Inc. v. United States*,
  949 F.3d 1348 (Fed. Cir. 2020)..............................................................................................44

*Duferco Steel, Inc. v. United States*,
  296 F.3d 1087 (Fed. Cir. 2002).................................................................................24, 25, 30

*DuPont Teijin Films USA, LP v. United States*,
  407 F.3d 1211 (Fed. Cir. 2005)................................................................................................9

*Echjay Forgings Priv. Ltd. v. United States*,
  475 F.Supp.3d 1350 (Ct. Int'l Trade 2020) ...........................................................................13

*Fabuwood Cabinetry Corp. v. United States*,
  469 F.Supp.3d 1373 (Ct. Int'l Trade 2020) .............................................................25, 30, 31

*Fedmet Res. Corp. v. United States*,
  755 F.3d 912 (Fed. Cir. 2014)................................................................................................24

*Hontex Enter., Inc. v. United States*,
  248 F.Supp.2d 1323 (Ct. Int'l Trade 2003) .....................................................................13, 19

*Hyundai Steel Co. v. United States*,
  279 F.Supp.3d 1349 (Ct. Int'l Trade 2017) ...........................................................................16

*King Supply Co. v. United States*,
  674 F.3d 1343 (Fed. Cir. 2012)..............................................................................................24

*Lasko Metal Prods. v. United States*,
  43 F.3d 1442 (Fed. Cir. 1994)................................................................................................35

*Meridian Prods., LLC v. United States*,
  851 F.3d 1375 (Fed. Cir. 2017)..............................................................................................25

AFDOCS:198886637.1

*Mid Continent Nail Corp. v United States*,
    725 F.3d 1295 (Fed. Cir. 2013)...............................................................................30

*Mid Continent Steel & Wire, Inc. v. United States*,
    31 F.4th 1367 (Fed. Cir. 2022) ..................................................................... *passim*

*Mid Continent Steel & Wire, Inc. v. United States*,
    628 F.Supp.3d 1316 (Ct. Int'l Trade 2023) ............................................................48

*Mid Continent Steel & Wire, Inc. v. United States*,
    940 F.3d 662 (Fed Cir. 2019)..................................................................................45

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...................................................................................................36

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)..................................................................................9

*NSK Ltd. v. United States*,
    346 F.Supp.2d 1312 (Ct. Int'l Trade 2004), *aff'd*, 481 F.3d 1355 (Fed. Cir.
    2007) ........................................................................................................................37

*Pakfood Pub. Co. v. United States*,
    724 F.Supp.2d 1327 (Ct. Int'l Trade 2010) ............................................................16

*Pesquera Mares Australes, Ltda. v. United States*,
    266 F.3d 1372 (Fed. Cir. 2001)................................................................................34

*Prosperity Tieh Enter. Co. v. United States*,
    965 F.3d 1320 (Fed. Cir. 2020)................................................................................13

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014)................................................................................16

*Rebar Trade Action Coal. v. United States*,
    337 F.Supp.3d 1251 (Ct. Int'l Trade 2018) ............................................................16

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990).........................................................................35, 39

*Rhone-Poulenc, Inc. v. United States*,
    927 F.Supp. 451 (Ct. Int'l Trade 1996) ....................................................................9

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*,
    776 F.3d 1351 (Fed. Cir. 2015)................................................................................25

*Solarworld Americas, Inc. v. United States*,
    353 F.Supp.3d 1315 (Ct. Int'l Trade 2018) ......................................................40, 41

AFDOCS:198886637.1

*Stein Industries v. United States*,
   365 F.Supp.3d 1364 (Ct. Int'l Trade 2019) ............................................................32

*Stupp Corp. v. United States*,
   5 F.4th 1341 (Fed. Cir. 2021) ................................................................... *passim*

*Stupp Corp. v. United States*,
   619 F.Supp.3d 1314 (Ct. Int'l Trade 2023), appeal docketed, No. 23-1663
   (Fed. Cir. Mar. 27, 2023) ........................................................................46

*Tak Fat Trading Co. v. United States*,
   396 F.3d 1378 (Fed. Cir. 2005)................................................................25

*Timken U.S. Corp. v. United States*,
   421 F.3d 1350 (Fed. Cir. 2005)................................................................44

*TMB 440AE, Inc. v. United States*,
   Ct. No. 18-00095, 2020 WL 1672841 (Ct. Int'l Trade Apr. 6, 2020) ..................27,

*Trendium Pool Products, Inc. v. United States*,
   399 F.Supp.3d 1335 (Ct. Int'l Trade 2019) ........................................26, 27, 30

*Union Steel v. United States*,
   713 F.3d 1101 (Fed. Cir. 2013)..................................................................8

*U.S. Steel Corp. v. United States*,
   179 F.Supp.3d 1114 (Ct. Int'l Trade 2016) ...................................................12, 22

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951)..............................................................................21

*Viraj Grp. v. United States*,
   476 F.3d 1349 (Fed. Cir. 2007)................................................................17

*Wonderful Chem. Indus., Ltd. v. United States*,
   259 F.Supp.2d 1273 (Ct. Int'l Trade 2003) ...................................................39

*Z.A. Sea Foods Priv. Ltd. v. United States*,
   569 F.Supp.3d 1338 (Ct. Int'l Trade 2022) ...................................................39

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..........................................................................8

19 U.S.C. § 1675(a)(2)(A)(ii) .........................................................................12

19 U.S.C. § 1677(16) ...................................................................................35

19 U.S.C. § 1677(16)(A)................................................................................34

AFDOCS:198886637.1

19 U.S.C. § 1677(16)(B)-(C) .................................................................................34

19 U.S.C. § 1677b .................................................................................................38

19 U.S.C. § 1677b(a) .............................................................................................12

19 U.S.C. § 1677f(i)(3)(A) .....................................................................................44

19 U.S.C. § 1677f-1 ...............................................................................................12

19 U.S.C. § 1677f-1(d)(1)(B) .................................................................................43

**Regulations**

19 C.F.R. § 351.225(k)(2).......................................................................................25

19 C.F.R. § 351.225(k)(l).......................................................................................25

19 C.F.R. § 351.401(f) ..................................................................................... *passim*

19 C.F.R. § 351.401(f)(1) ................................................................................ *passim*

19 C.F.R. § 351.401(f)(2) .......................................................................................14

19 C.F.R. § 351.401(f)(1)-(2) ...................................................................................2

19 C.F.R. § 351.401(f)(2)(i)-(iii) ...........................................................................13

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27345-46
    (Dep't Commerce May 19, 1997) ......................................................................13, 18

**Administrative Determinations**

*Agreement Suspending the Antidumping Duty Investigation on Sugar From
    Mexico; Preliminary Results of the 2019-2020 Administrative Review*, 87 Fed.
    Reg. 932 (Dep't Commerce Jan. 7, 2022), and accompanying Issues and
    Decision Memorandum......................................................................................41

*Certain Circular Welded Non-Alloy Steel Pipe From Mexico*, 76 Fed. Reg. 36086
    (Dep't Commerce June 21, 2011) ) (final AD results), and accompanying
    Issues and Decision Memorandum ...................................................................39

*Certain Corrosion-Resistant Steel Products From the Republic of Korea*, 84 Fed.
    Reg. 10784 (Dep't Commerce Mar. 22, 2019) (final AD results; 2016-2017) ),
    and accompanying Issues and Decision Memorandum.......................................35

*Certain Crystalline Silicon Photovoltaic Products From Taiwan*, 79 Fed. Reg.
    76966 (Dep't Commerce Dec. 23, 2014) (final LTFV determ.), and
    accompanying Issues and Decision Memorandum..............................................39

AFDOCS:198886637.1

*Certain Freight Rail Couplers and Parts Thereof From Mexico*, 88 Fed. Reg. 27864 (Dep't Commerce May 3, 2023) (prelim. affirm. LTFV determ.), and accompanying Decision Memorandum ..................................................................40, 41

*Certain Freight Rail Couplers and Parts Thereof From Mexico*, 88 Fed. Reg. 65153 (Dep't Commerce September 21, 2023) (final affirm. LTFV determ. & neg. crit. circum.), and accompanying Issues and Decision Memorandum ....................40, 41

*Certain Frozen and Canned Warmwater Shrimp From Brazil*, 69 Fed. Reg. 76910 (Dep't Commerce Dec. 23, 2004) (final LTFV determ.), and accompanying Issues and Decision Memorandum ..............................................................12, 21, 22

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico*, 81 Fed. Reg. 47352 (Dep't Commerce July 21, 2016) (final aff. LTFV determ.), and accompanying Issues and Decision Memorandum...............................23, 37, 38

*Honey from Argentina*, 69 Fed. Reg. 30283 (Dep't Commerce May 27, 2004) (final AD results), and accompanying Issues and Decision Memorandum...........................12

*Light-Walled Rectangular Pipe and Tube from China, Korea, and Mexico*, Inv. Nos. 701-TA-449 and 731-TA-1120, USITC Pub. 4024 (Jul. 2008) (Final) ........................31

*Light-Walled Rectangular Pipe and Tube From Mexico*, 88 Fed. Reg. 15665 (Dep't Commerce Mar. 14, 2023) (final AD results; 2020-2021), and accompanying Issues and Decision Memorandum..........................................*passim*

*Light-Walled Rectangular Pipe and Tube from Mexico,* 88 Fed. Reg. 30723 (Dep't Commerce May 12, 2023) (amended final results) ......................................................2

*Light-Walled Rectangular Pipe and Tube From Mexico*, 87 Fed. Reg. 54965 (Dep't Commerce Sept. 8, 2022) (prelim. results & partial rescission of AD review; 2020-2021), and accompanying Decision Memorandum..................................6, 7, 46

*Light-Walled Rectangular Pipe and Tube from Mexico,* 86 Fed. Reg. 33646 (Dep't Commerce June 25, 2021) (final AD results; 2018-2019), and accompanying Issues and Decision Memorandum..........................................*passim*

*Light-Walled Rectangular Pipe and Tube from Mexico, the People's Republic of China, and the Republic of Korea,* 73 Fed. Reg. 45403 (Dep't Commerce Aug. 5, 2008) (AD orders & notice of am. final LTFV determ. re: Korea) ...................*passim*

*Light-Walled Rectangular Pipe and Tube from Turkey*, Inv. No. 731-TA-1121, USITC Pub. 4001 (May 2008).........................................................32

*Stainless Steel Bar From Germany*, 67 Fed. Reg. 3159 (Dep't Commerce Jan. 23, 2002) (final LTFV determ.) and accompanying Issues and Decision Memorandum...............................................................................................22

-vii-

*Stainless Steel Sheet and Strip in Coils from Mexico*, 69 Fed. Reg. 6259 (Dep't Commerce Feb. 10, 2004) (final AD results), and accompanying Issues and Decision Memorandum...........................................................................................................35

AFDOCS:198886637.1

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| MAQUILACERO S.A. de C.V. and TECNICAS DE FLUIDOS S.A. de C.V., | ) ) ) |
| *Plaintiffs*, and | ) ) **NON-CONFIDENTIAL VERSION** ) |
| PERFILES LM, S.A. DE C.V. | ) Consol. Court No. 23-00091 ) |
| *Consolidated-Plaintiff*, v. | ) Confidential Business Proprietary ) Information Deleted from Pages: 24, 28, ) & 47 and from Exhibit 1. |
| THE UNITED STATES, | ) ) |
| *Defendant*, and | ) ) ) |
| NUCOR TUBULAR PRODUCTS, INC., | ) ) |
| *Defendant-Intervenor*. | ) ) ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2**

In accordance with Rule 56.2 of the Rules of this Court and the Scheduling Order in this action, as amended, ECF No. 28, we submit this Memorandum of Law in support of the Rule 56.2 Motion for Judgment on the Agency Record on behalf of Plaintiffs Maquilacero S.A. de C.V. ("Maquilacero) and Tecnicas De Fluidos S.A. de C.V. ("TEFLU").

**I.    STATEMENT PURSUANT TO RULE 56.2(c)(1)**

**A.    Administrative Determination to be Reviewed**

The administrative determination under review is the final results determination issued by the U.S. Department of Commerce ("Commerce") finding that sales of light-walled rectangular pipe and tube ("LWRPT") from Mexico by Maquilacero and TEFLU during the period of review

2020-2021 ("POR") were made at prices below normal value. *Light-Walled Rectangular Pipe and Tube From Mexico*, 88 Fed. Reg. 15665 (Dep't Commerce Mar. 14, 2023) (final AD results; 2020-2021) ("*Final Results*"), P.R. 151, and accompanying Issues and Decision Memorandum ("*IDM*"), P.R. 146, as amended by *Light-Walled Rectangular Pipe and Tube from Mexico,* 88 Fed. Reg. 30723 (Dep't Commerce May 12, 2023) (amended final results), P.R. 160.

### B.   Issues Presented

#### 1.   Whether Commerce's Determination to Collapse Maquilacero and TEFLU Is in Accordance with Law and Supported by Substantial Evidence

No. Commerce's collapsing determination is contrary to law because Commerce failed to conduct an analysis of the collapsing factors under 19 C.F.R. § 351.401(f)(1)-(2).  Commerce's reliance on its prior collapsing determination without addressing Maquilacero's arguments on the record of this proceeding demonstrating that there is no significant potential for the manipulation of prices or production renders its determination unsupported by substantial evidence on the record.

#### 2.   Whether Commerce's Determination to Include TEFLU's Customized Parts As In-Scope Merchandise Is in Accordance With Law and Supported by Substantial Evidence

No. The *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law because Commerce unlawfully expanded the scope of the antidumping duty order by including finished downstream products sold to automotive original equipment manufacturers. While parts produced by TEFLU are further manufactured from LWRPT and therefore share basic chemical and physical characteristics with LWRPT, it is unreasonable to conclude that they amount to the same product. These auto parts are downstream products in which the LWRPT input is cut, bent, drilled, perforated and otherwise shaped to achieve a

AFDOCS:198886637.1

customized auto parts contemplated in the International Trade Commission's ("ITC") injury determination as a downstream application and not as subject merchandise. Commerce's construction of the scope language to encompass auto parts sold to automotive OEMs simply because the scope does not explicitly exclude them is an unlawful expansion of the scope language.

> **3.** **Whether Commerce's Rejection of the Manufacturer Code and the FURPROCESSH/U Variable Was Lawful and Supported By Substantial Evidence**

No. The *Final Results* are unsupported by substantial evidence on the record because Commerce's margin program failed to account for the manufacturer of the product or, alternatively, for further manufacturing. Because there are physical and commercial differences between standard LWRPT produced by Maquilacero and customized parts produced by TEFLU, Commerce's product comparison methodology led to a distorted comparison of foreign like product to the U.S. sales.

> **4.** **Whether Commerce's Determination to Treat TEFLU's Sale Made Through the IMMEX Program as Home Market Sales Is Supported by Substantial Evidence and Is in Accordance with Law**

No. The *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law because record evidence demonstrated Maquilacero/TEFLU had knowledge of the export destination of the products at the time of sale due to the nature of the IMMEX program. Commerce's determination to treat such export sales as home market sales in the normal value calculations resulted in an inaccurate dumping margin for Maquilacero/TEFLU.

AFDOCS:198886637.1

     **5.**     **Whether Commerce's Determination to Rely on the Cohen's *d* Test in Conducting the Differential Pricing Analysis Is Supported by Substantial Evidence and Is in Accordance with Law**

No. The *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law because Commerce's determination failed to provide any explanation demonstrating that the statistical assumptions underlying the Cohen's *d* test were reliable, as required by the U.S. Court of Appeals for the Federal Circuit's ("CAFC") decision in *Stupp Corp. v. United States*, 5 F.4th 1341, 1357–60 (Fed. Cir. 2021). Further, in applying the Cohen's *d* test, Commerce failed to provide any reasonable explanation for using a simple average, rather than a weighted average, when calculating the denominator of the Cohen's *d* coefficient in accordance with *Mid Continent Steel & Wire, Inc. v. United States* ("*Mid Continent II*"), 31 F.4th 1367, 1381 (Fed. Cir. 2022).

## II.    STATEMENT OF FACTS

On October 7, 2021, Commerce initiated the 2020-2021 antidumping administrative review of the antidumping duty order on LWRPT from Mexico. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 86 Fed. Reg. 55811 (Dep't Commerce Oct. 7, 2021), P.R. 11. Maquilacero was one of the two mandatory respondents selected by Commerce in the review. *See* Memorandum from J. Conniff to E. Begnal, re: Respondent Selection (Oct. 27, 2021), P.R. 21.

Maquilacero timely responded to Commerce's initial antidumping questionnaire. In its Section A questionnaire response, Maquilacero indicated that it manufactures and sells commercial LWRPT to customers in Mexico and the United States. It also explained that it sold LWRPT to its affiliated party, TEFLU, a Mexican producer of automotive parts for OEMs, who used uses LWRPT from Maquilacero and other suppliers as an input into its own production of

auto parts. Maquilacero S.A. de C.V.'s Section A Questionnaire Response at A-16 and Exhs. A-6, A-24, A-27 and A-32 (Dec. 1, 2021) ("Section A QR"), C.R. 13, 19-21, P.R. 36-38. The input LWRPT is further processed by TEFLU in its own facilities, using distinct production equipment and machinery, into a new product that is customized for a single use, in a specific automotive subassembly. *Id.* at A-31–A-35, C.R. 13, P.R. 36. Thus, the products made by TEFLU are customized to a single customer, for a single end use unlike commercial LWRPT produced by Maquilacero that is made to standard specifications and sizes. *Id.* at A-43 to A-44. The parts produced by TEFLU from LWRPT are sold as auto parts, not as LWRPT. *Id.* at A-43 to A-44.

From its first questionnaire response, Maquilacero/TEFLU explained that the parts produced by TEFLU from LWRPT are new downstream products distinct from the input LWRPT, that are not covered by the scope of the *Order. See, e.g.*, Maquilacero Section A QR at A-22, A-33 and Exhs. A-4, A-6, A-14 and A-32, C.R. 13-16, 19-21, P.R. 36-38. *See Light-Walled Rectangular Pipe and Tube from Mexico, the People's Republic of China, and the Republic of Korea,* 73 Fed. Reg. 45403 (Dep't Commerce Aug. 5, 2008) (AD orders & notice of am. final LTFV determ. re: Korea) ("*Order*").

However, because Commerce collapsed Maquilacero and TEFLU into a single entity in the previous administrative review, TEFLU timely submitted a questionnaire response containing its downstream sales of parts produced using finished LWRPT purchased from Maquilacero and other suppliers. *See* Maquilacero S.A. de C.V.'s Downstream Sales Response for Tecnicas De Fluidos S.A. de C.V. (Dec. 28, 2021) ("TEFLU Downstream QR"), C.R. 88, P.R. 57. Another affiliated party, Abinsa S.A. de C.V., a reseller and steel service center, purchased LWRPT from Maquilacero for resale to its own customers, and also provided its

5

downstream sales information to Commerce. Maquilacero S.A. de C.V.'s Downstream Sales

Response for Abinsa S.A. de C.V. (Dec. 22, 2021), C.R. 85, P.R. 56.

In the initial Sections B and C questionnaire responses, Maquilacero/TEFLU reported a

new variable (FURPROCESSH/U) to distinguish products that are further manufactured and

requested that Commerce include this variable in the control number ("CONNUM") to account

for the significant differences in the products made by TEFLU, which were further processed.

*See* Maquilacero S.A. de C.V.'s Section B Questionnaire Response at B-22 (Dec. 17, 2021)

("Section B QR"), C.R. 25, P.R. 50; *see also* TEFLU Downstream QR at BA2-15, C.R. 88, P.R.

57.  To this end, Maquilacero/TEFLU included a second control number in the sales databases

(CONNUM2H/U) for Commerce to use to distinguish the further manufactured products. *See id.*

On July 26, 2022, Maquilacero submitted its responses to Commerce's supplemental A-D

questionnaire. Maquilacero S.A. de C.V.'s First Supplemental Sections A&D Questionnaire

Response (July 26, 2022) ("A-D SQR"), C.R. 152-157, P.R. 92.  In its response,

Maquilacero/TEFLU explained that certain sales made by TEFLU under the Mexican IMMEX

program, also referred to as "virtual exports", were invoiced to customers located outside of

Mexico. *Id.* at 39.  While these sales were delivered to a location in Mexico, by virtue of the

IMMEX program, Maquilacero expected them to be exported and thus treated them as export

sales. *See id.*

On September 8, 2022, Commerce issued the preliminary results calculating an

antidumping duty rate of 3.11% for Maquilacero. *Light-Walled Rectangular Pipe and Tube From*

*Mexico*, 87 Fed. Reg. 54965, 54966 (Dep't Commerce Sept. 8, 2022) (prelim. results & partial

rescission of AD review; 2020-2021) ("*Preliminary Results*"), P.R. 111, and the accompanying

Decision Memorandum ("*PDM*"), P.R. 103, and Memorandum from K. Clahane to The File, re:

6

Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V.'s Analysis Memorandum for the Preliminary Results (Aug. 31, 2022) ("*Prelim. Analysis Memo*"), C.R. 202, P.R. 112.

In the *Preliminary Results*, Commerce collapsed Maquilacero and TEFLU despite the clear differences in products, production facilities, customers and operations. *PDM* at 1 n.1, P.R. 103. Commerce did not address Maquilacero/TEFLU's argument that the products made by TEFLU are outside the scope of the *Order* and asked no questions about these products, nor did Commerce use a further processing characteristic in the CONNUM as proposed by Maquilacero/TEFLU or explain its decision to disregard this information. *Id.*

In response to a second supplemental questionnaire, Maquilacero/TEFLU submitted additional information with respect to sales of products made by TEFLU under the IMMEX program, along with numerous examples of the auto parts sold by TEFLU to its OEM customers and the documentation needed to make these sales. *See* Maquilacero S.A. de C.V.'s Post-Preliminary Supplemental Questionnaire Response (Oct. 5, 2022) ("Post-Prelim. SQR"), C.R. 207-219, P.R. 119.

On November 15, 2022, Maquilacero/TEFLU filed its case brief, and on November 22, 2022, Maquilacero/TEFLU filed its rebuttal brief responding to arguments raised by Nucor Tubular Products Inc. ("Nucor"). The case and rebuttal briefs were then resubmitted on November 29, 2022 at the request of Commerce to redact certain information identified as untimely new factual information. *See* Resubmission of Maquilacero S.A. de C.V.'s Case and Rebuttal Briefs (Dec. 29, 2022) ("Case Br." and "Rebuttal Br."), C.R. 246, P.R. 140.

Commerce issued the *Final Results* on March 14, 2023, calculating an antidumping duty margin of 9.20% for Maquilacero/TEFLU. In the *Final Results*, Commerce (1) determined that

AFDOCS:198886637.1

TEFLU's downstream products are within the scope of the *Order*; (2) declined to adopt  the FURPROCESSH/U variable or make the computer programming changes suggested by Maquilacero/TEFLU; (3) continued to collapse Maquilacero and TEFLU in the margin calculation; (4) continued to treat TEFLU's sales made under the IMMEX program  as home market sales; and (5) declined to revise to Cohen's *d* methodology applied in the differential pricing analysis to comply with recent CAFC precedent. *See IDM* at 5-15, 18-31 ( Cmts. 2, 5, 1, 4 and 6), P.R. 146.

## III.    STANDARD OF REVIEW

This Court must remand any administrative determination by Commerce which is "unsupported by substantial evidence on the record" as a whole or is "otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

When reviewing whether Commerce's actions are unsupported by substantial evidence, the Court assesses whether the agency action is "unreasonable" given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Substantial evidence represents "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005).

When reviewing Commerce's statutory interpretations, the Court applies the two-part framework set forth in the Supreme Court's opinion in *Chevron*. *Union Steel v. United States*, 713 F.3d 1101, 1106–07 (Fed. Cir. 2013) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842–43 (1984)). Under *Chevron*, to determine whether an agency's interpretation of the statute is entitled to deference, the court conducts a two-part test. Under the first prong of this test, where Congress has spoken directly to the question at issue, the court and

AFDOCS:198886637.1

the agency must give effect to the unambiguously expressed intent of Congress. *See Chevron*, 467 U.S. at 842–43. If, however, the statute is vague or silent on an issue, the court upholds Commerce's interpretation so long as the interpretation is reasonable. *See id*. at 843.

This Court has found Commerce's determinations unlawful "where Commerce has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. v. United States*, 927 F.Supp. 451, 454 (Ct. Int'l Trade 1996).

## IV.   SUMMARY OF ARGUMENT

This case involves a Mexican producer of LWRPT, Maquilacero, and its affiliated producer of auto parts, TEFLU.  The only reason why an automotive parts manufacturer is involved in an administrative review of an antidumping duty order on welded pipe and tube and constrained to report sales of custom-designed automotive parts as if they were LWRPTis two-fold: (1) the mere fact of TEFLU's affiliation with Maquilacero, a producer of LWRPT and (2) Commerce's unreasonable expansion of the scope language beyond LWRPT to cover any downstream products that contain LWRPT.

To be clear, this is not Commerce's position in other scope proceedings and this Court has cautioned Commerce that downstream finished products made from subject merchandise are not the same as subject merchandise.  While Commerce is treating TEFLU's auto parts as in-scope merchandise based on the theory that the scope does not expressly exclude auto parts, that scope interpretation is contrary to law.  Plaintiffs respectfully ask that Commerce's unlawful scope interpretation be remanded with instruction to find that auto parts made by TEFLU from LWRPT are not covered by the scope.

9

Commerce's erroneous scope determination is responsible for other calculation errors to Maquilacero/TEFLU's margin in this review.  First, Commerce determined to collapse Maquilacero and TEFLU.  The collapsing determination is contrary to law because it is not supported by a collapsing analysis that addresses the criteria under 19 C.F.R. § 351.401(f)(1). Other than the references to overlap in ownership and management between Maquilacero and TEFLU, two of the collapsing criteria, it is not reasonably discernible what evidence Commerce relied upon for this determination. Commerce simply relied on its initial collapsing determination of Maquilacero and TEFLU in the 2018-2019 review without addressing many of Maquilacero's arguments challenging the basis for collapsing in this review. Nor did Commerce provide a reasonable explanation of how Commerce's extension of its collapsing practice in this case is consistent with past practice.  Thus, the collapsing determination is contrary to law and unsupported by substantial evidence on the record.

Next, after including TEFLU's downstream parts as in-scope merchandise, Commerce failed to use CONNUMs that are suited for such a broad interpretation of the scope language. Commerce's decision to ignore further processing in the model matching methodology fails to ensure a fair comparison between export price and normal value. Maquilacero produces standard commercial LWRPT, while TEFLU produces customized auto parts using LWRPT as inputs by cutting, drilling, perforating, and/or bending to meet customers' stringent specification. Commerce's product comparison methodology fails to account for the significant commercial and physical differences between standard LWRPT produced by Maquilacero and customized auto parts produced by TEFLU resulting in distorted margin calculations.

Third, Commerce's decision to treat TEFLU's sales made through Mexico's IMMEX program as home market sales is unsupported by substantial evidence on the record. The

10

IMMEX program is a Mexican tax regime that allows a foreign company to purchase inputs from Mexico free from domestic value added tax as long as the inputs are used at its Mexican facility to produce an end product for export outside of Mexico. Due to nature and mechanism of the IMMEX program, TEFLU knew the parts it sold to its customers authorized to participate in the IMMEX program will be ultimately exported to the U.S. or a third country. Commerce's determination to treat such export sales as home market sales resulted in an inaccurate dumping margin for Maquilacero/TEFLU.

Finally, Commerce's differential pricing methodology in this review  is contrary to law. Commerce's failed to provide any explanation demonstrating that the statistical assumptions underlying the Cohen's *d* test were reliable, as required by the CAFC's decision in *Stupp*, 5 F.4th at 1357–60. In applying the Cohen's *d* test, Commerce also failed to provide any reasonable explanation for using a simple average, rather than a weighted average, when calculating the denominator of the Cohen's *d* coefficient in accordance with *Mid Continent II*, 31 F.4th at 1381.

For all of these reasons, Plaintiffs respectfully ask the Court to remand the *Final Results*.

AFDOCS:198886637.1

## V.     ARGUMENT

### A.     Commerce's Determination to Collapse Maquilacero and TEFLU Is Not In Accordance with Law and Is Not Supported by the Evidence on the Record

#### 1.     Legal Framework

The statute requires Commerce to determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise.  19 U.S.C. § 1677f-1. Commerce has developed a practice of collapsing affiliated producers, treating them as a single exporter or producer for purposes Commerce's dumping margin calculation, when certain conditions are met. *See* 19 C.F.R. § 351.401(f)(1); 19 U.S.C. §§ 1675(a)(2)(A)(ii) and 1677b(a). Commerce's regulations state that:

> {T}he Secretary will treat two or more affiliated *producers* as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes *that there is a significant potential for the manipulation* of price or production.

19 C.F.R. § 351.401(f)(1) (emphasis added).

While the regulation specifically applies to affiliated producers, Commerce has developed a policy of also collapsing non-producing affiliates, but only where there is concern regarding production or price manipulation.  *See U.S. Steel Corp. v. United States*, 179 F.Supp.3d 1114, 1135-6 (Ct. Int'l Trade 2016) (upholding Commerce's collapsing of an exporter with its affiliated producers); *Certain Frozen and Canned Warmwater Shrimp From Brazil*, 69 Fed. Reg. 76910, 76912 (Dep't Commerce Dec. 23, 2004) (final LTFV determ.), and accompanying Issues and Decision Memorandum at 12-15 ("*Shrimp from Brazil IDM*") (collapsing the exporter and a processor of subject merchandise); *Honey from Argentina*, 69 Fed. Reg. 30283 (Dep't Commerce May 27, 2004) (final AD results), and accompanying Issues and Decision Memorandum at 28 (collapsing of affiliated resellers) .

12

To determine whether there is a significant potential for the manipulation of price or production, Commerce "may consider" the following "non-exhaustive" list of factors: (1) the level of common ownership; (2) the extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and (3) whether operations are intertwined, for example, through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers. 19 C.F.R. § 351.401(f)(2)(i)-(iii).

Even under this expanded collapsing practice that affects also non-producers, Commerce must still find that the potential for manipulation must be "significant."  "As the Federal Circuit recently noted, '{w}hen Commerce promulgated 19 CFR § 351.401(f), it emphasized that collapsing requires a "significant" potential for manipulation,' not merely '*any* potential for price manipulation.'" *Echjay Forgings Priv. Ltd. v. United States*, 475 F.Supp.3d 1350, 1374 (Ct. Int'l Trade 2020) (quoting *Prosperity Tieh Enter. Co. v. United States*, 965 F.3d 1320, 1323 (Fed. Cir. 2020) and *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27345-46 (Dep't Commerce May 19, 1997) (final rule) ("*Preamble*").  When making a collapsing determination, Commerce must find "evidence that there is more than the 'mere possibility' that significant potential for manipulation could occur."  *See Hontex Enter., Inc. v. United States*, 248 F.Supp.2d 1323, 1345 n.19 (Ct. Int'l Trade 2003) (citation omitted).

## 2.     Commerce's Prior Collapsing Decision

Commerce determined to collapse Maquilacero and TEFLU in the 2018-2019 administrative review, which is the last proceeding in which Commerce reviewed Maquilacero individually.[1]  *See Light-Walled Rectangular Pipe and Tube from Mexico,* 86 Fed. Reg. 33646

---

[1] In the 2019-2020 review, Maquilacero was not selected as a mandatory respondent.

(Dep't Commerce June 25, 2021) (final AD results; 2018-2019), and accompanying Issues and Decision Memorandum at 27-31 (Cmt. 9) ("*2018-2019 Final IDM*").

In that initial determination, Commerce stated that "while 19 CFR 351.401(f) applies only to producers, Commerce has found it instructive in determining whether non-producers should be collapsed and has used the criteria outlined in the regulation in its analysis." *Id*. at 28. In applying the criteria at Section 351.401(f)(1), Commerce recognized that TEFLU is not a producer of LWRPT and does not have facilities to produce pipe and tube, but hypothesized that

> because TEFLU performs further processing of in-scope merchandise, the input which is purchased from Maquilacero, and the processing of which does not change the product's physical characteristics resulting in different CONNUMs, there is a potential for the restructure of certain manufacturing priorities.

*2018-2019 Final IDM* at 28.

Therefore, implicit in Commerce's determination is the erroneous conclusion that Maquilacero and TEFLU have the potential to manipulate production priorities. In applying Section 351.401(f)(2), Commerce found Maquilacero and TEFLU affiliated and made the following additional findings: (1) the level of common ownership was significant; (2) there was managerial overlap between Maquilacero and TEFLU and (3) they had intertwined operations during the POR. *Id.* at 30. "Taken together, our analysis of the non-exhaustive factors under 19 CFR 351.401(f)(2) showed a significant potential for manipulation of price or production." *Id*. at 29.

> Commerce purported to exemplify such potential for manipulation by stating that
>
> we do not see on the record anything preventing TEFLU from purchasing Maquilacero's in-scope products and reselling them in the home market or to the United States without further processing. Similarly, there is nothing preventing Maquilacero from purchasing TEFLU's further processed in-scope merchandise and reselling it in the home market or to the United States.

*Id.*

14

Finally, relying on its practice of collapsing producers and their *exporters*, Commerce found that there exists a significant potential for the manipulation of prices or production even though TEFLU did not export subject merchandise directly to the U.S., but had knowledge that some of its parts were sold to the U.S.  *Id.* at 30.

### 3.   Commerce Failed to Apply the Collapsing Criteria in 19 C.F.R. § 351.401(f)(1)-(2)

In the *Final Results*, Commerce relied on the 2018-2019 collapsing determination and continued to treat Maquilacero and TEFLU as part of a single entity also in this administrative review. *IDM* at 8-9, P.R. 146.  Commerce stated that it will normally revisit a collapsing determination where information on the record indicates that the relationship has changed.  *Id*. at 9.  According to Commerce, the record evidence here allegedly indicates that there have been no changes to the relationship between Maquilacero and TEFLU since Commerce first made the decision to collapse the companies.  *Id.*  Consequently, Commerce rested on its prior determination and did not incorporate an analysis of the collapsing criteria in 19 C.F.R. § 351.401(f) despite Maquilacero's arguments that the prerequisite findings for collapsing are not met. *Id*. at 5-6, 9.

In response to Commerce's request that Maquilacero/TEFLU state whether the facts pertinent to the collapsing determination in the 2018-2019 review have remained the same, Maquilacero provided a discussion of the evidence on this record in light of the factors in Section 351.401(f), arguing that the legal tests for collapsing have not been met. *See* A-D SQR at 13-18, C.R. 152, P.R. 92; *see also* Case Br. at 17-26, C.R. 246, P.R. 140.

The 2018-2019 collapsing determination was an expansion of Commerce's collapsing practice to collapse a producer of subject merchandise (Maquilacero) with its affiliated home market customer that *is not* a *producer*, *exporter* nor *distributor/reseller* of LWRPT, but a

producer of value-added downstream products (TEFLU).  As Maquilacero timely raised its

objections to the collapsing determination in its questionnaire response and again in its case

brief, Commerce should have revisited its determination based on arguments and evidence

referenced in this review.  *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387

(Fed. Cir. 2014) ("{E}ach administrative review is a separate exercise of Commerce's authority

that allows for different conclusions based on different facts in the records.") Commerce's

practice is to treat each segment of an antidumping proceeding as an independent proceeding

with a separate record, which then leads to independent determinations.  Commerce's

determinations are based "upon the record of the relevant segment of the proceeding, not

previous segments."  *Hyundai Steel Co. v. United States*, 279 F.Supp.3d 1349, 1372 (Ct. Int'l

Trade 2017) (quoting *Pakfood Pub. Co. v. United States*, 724 F.Supp.2d 1327, 1342 (Ct. Int'l

Trade 2010)).  "{E}ven assuming Commerce's determinations at issue are factually identical {to

a prior segment}, as a matter of law a prior administrative determination is not legally binding on

other reviews before this court."  *Pakfood*, 724 F.Supp.2d at 1342 (quoting *Alloy Piping Prods.,

Inc. v. United States*, 33 C.I.T. 349, 358-59 (2009)).

Other than citing the affiliation of Maquilacero and TEFLU and the shared managerial

oversight of the two companies, which Maquilacero did not contest, Commerce cited no

evidence that Maquilacero and TEFLU have production facilities for similar or identical products

or that there is a significant potential for the manipulation of price or production in this review.

*IDM* at 8-9, P.R. 146.

Because Commerce did not address all the collapsing criteria, its determination is not in

accordance with law.  *Rebar Trade Action Coal. v. United States*, 337 F.Supp.3d 1251, 1257 (Ct.

Int'l Trade 2018) (remanding Commerce's determination where it deviated from its practice on

incorporating the criteria at section 351.401(f) without explanation).  The Court should remand the *Final Results* for Commerce to apply its collapsing analysis to the facts of this review.

4.      **Collapsing Maquilacero and TEFLU Is Not Supported By Record Evidence**

In the *Final Results*, Commerce responded to Maquilacero's arguments with conclusory statements that failed to address the facts raised by Maquilacero that demonstrate why the regulatory test at 19 C.F.R. § 351.401(f) is not met.  *IDM* at 8-9, P.R. 146 (citing the degree of affiliation, overlap in management but presuming that operations are intertwined).  As discussed below, the requirements for collapsing have not been met.

a.      **The Criteria in Section 351.401(f)(1) Are Not Met**

Under 19 C.F.R. § 351.401(f)(1) Commerce may collapse affiliated producers that have "production facilities for similar or identical products."  *See Allied Tube & Conduit Corp. v. United States*, 127 F.Supp.2d 207, 221 (Ct. Int'l Trade 2000) (holding that a finding that affiliated parties have production facilities to produce similar or identical products is "necessary but not sufficient to warrant the collapsing of two or more companies." *Id.* at 222). The CAFC has interpreted this requirement to refer to the products of the collapsed entities.  *Viraj Grp. v. United States*, 476 F.3d 1349, 1356 (Fed. Cir. 2007) (holding that the second factor under § 351.401(f) "requires similarity in the products produced, not in the facilities that produce them.")

Here, there is no similarity in the products produced by Maquilacero and TEFLU, nor in the facilities that produce them. A-D SQR at 14-15, Exhs. S-3, S-13, S-14, C.R. 152, 154, P.R. 92.  Similar to the 2018-2019 review, TEFLU does not have the capability to produce LWRPT. *See* Section A QR at Exh. S-32, C.R. 21, P.R. 38.  It does not have pipe or tube mills and thus it could not produce any welded tubing without undergoing significant changes to its

AFDOCS:198886637.1

manufacturing facility, specifically purchasing and installing a complete pipe and tube mill. A-D SQR at 14, C.R. 152, P.R. 92.

In the 2018-2019 collapsing determination, Commerce found that "there is a potential for the restructure of certain manufacturing priorities" by virtue of TEFLU processing input LWRPT from Maquilacero. *2018-2019 Final IDM* at 28. Commerce never explains how TEFLU's "manufacturing priorities" could be "restructured" so as to produce commercial LWRPT. Nor did Commerce explain why it would be reasonable to assume that an auto parts manufacturer that sells customized, valued added products to the automotive OEM industry would abandon that business in order to sell its raw material, commodity LWRPT, to Maquilacero's clients. Common sense dictates that scenario is simply implausible. But even if it were plausible, it would involve TEFLU installing an entire pipe mill which is inconsistent with the regulation's requirement of "no substantial retooling." Thus, TEFLU does not meet the requirement at Section 351.401(f)(1) and should not be collapsed with Maquilacero.

### b.    The Criteria in Section 351.401(f)(2) Are Not Met

The first two criteria at section 351.401(f)(2) instruct Commerce to consider whether a producer has common ownership and management with the affiliated company. Maquilacero does not contest Commerce's findings that there is common ownership and managerial overlap between Maquilacero and TEFLU. *IDM* at 9, P.R. 146. However, "collapsing requires a finding of more than mere affiliation." *Preamble*, 62 Fed. Reg. at 27345.

In the *Final Results*, Commerce made the conclusory statement that Maquilacero and TEFLU have intertwined operations, without citing any information on the record. *IDM* at 9, P.R. 146. As explained, Maquilacero and TEFLU do not have overlapping operations and Maquilacero is not involved in the production and pricing of TEFLU's products. A-D SQR at

18

13-18, C.R. 152, P.R. 92.  Although Maquilacero and TEFLU share a common owner in Grupo

ABX, the two companies are separate legal entities with separate production facilities, separate

personnel and no overlapping production. *See* Section A QR at Exh. A-3, C.R. 13, P.R. 36.  The

record does not show that Maquilacero and TEFLU work in a coordinated fashion in establishing

prices or terms of production.  To the contrary, the sales process for each company is very

different given that Maquilacero and TEFLU sell different products to different customers. *See*

*id.* at A-29-A-31 (Maquilacero), A-32-A-35 (TEFLU), Exhs. A-10, A-11, A-14, C.R. 13-16, P.R.

36.  While Maquilacero sells to TEFLU the raw material input, LWRPT, TEFLU purchases

LWRPT from other suppliers as well, as needed.  *See* TEFLU Downstream QR at Exh. BA2-7,

C.R. 88, P.R. 57.  Maquilacero and TEFLU cannot sell to the same customers or produce the

same products interchangeably.  Indeed, the record shows no overlap between Maquilacero's and

TEFLU's customers. Section B QR at Exh. B-6, C.R. 25, P.R. 50; TEFLU Downstream QR at

Exh. BA2-6, C.R. 88, P.R. 57.  Therefore, Commerce's statement of intertwined operations is

not supported by record evidence.

      To collapse entities, Commerce must rely on evidence that there is a *significant* potential

for price manipulation, and although this standard does not require evidence of actual price

manipulation, Commerce must find "more than the 'mere possibility' that significant potential

for manipulation could occur." *Hontex,* 248 F.Supp.2d at 1345 n.19 (without a clear explanation

as to where the significant potential for manipulation might arise or how a particular producer

might control export or pricing decisions, Commerce had no substantial basis to support its

collapsing determination).

      In the 2018-2019 collapsing determination, *2018-2019 Final IDM* at 27-31, Commerce

alleged there was "a significant potential for manipulation of price or production" speculating

AFDOCS:198886637.1

that TEFLU at any time can resell Maquilacero's in-scope LWRPT in Mexico or the US and vice-versa that Maquilacero could sell TEFLU's products. *Id*. at 29. This explanation is refuted by the record and does not demonstrate *significant* potential for price manipulation. The first scenario, of TEFLU acting as a reseller to Maquilacero would make no economic sense, because, as noted above, TEFLU produces and sells a higher value product that commands higher prices. The second scenario, of Maquilacero selling TEFLU's products, is commercially impossible, as explained at length and demonstrated by the voluminous production and sales information showing the qualification process that TEFLU must complete in order to sell to OEM customers. *See* A-D SQR at 13-18, Exh. S-40, C.R. 152, 155, P.R. 92; Post Prelim. SQR at Exhs. 2S-6, 2S-7, C.R. 207-217, P.R. 119; Section A QR at A-32-A-35, C.R. 13, P.R. 36.

Specifically, each OEM customer has a rigorous qualification process for their suppliers, that involves an Advanced Product Quality Planning (APQP) and a Production Part Approval Process (PPAP). *See* Section A QR at A-32, A-33, Exh. A-14, C.R. 13, 15-16, P.R. 36. As part of this qualification process, TEFLU makes a request for production part approval with its OEM customer, which includes various steps in which TEFLU analyzes the customer's drawing, demonstrates that it has the technical capability to produce the parts, the necessary machines, the step-by-step process that will be used and the control measures in place. *Id.* Once the OEM customer approves the PPAP and the parts are accepted by the OEM, TEFLU will commence production and the parts will be delivered based on a specified schedule and volume. *Id.* Only an approved party with a PPAP in place can sell that part to that specific OEM customer. Without first going through this onerous qualification processes required by the OEM customers, Maquilacero cannot take on TEFLU's role. Similarly, and as discussed below, TEFLU would

20

require not just significant retooling, but acquiring and installing an entire pipe and tube mill before it could produce LWRPT. A-D SQR at 14-16, C.R. 152, P.R. 92.

In the *Final Results*, Commerce provides no explanation for its conclusory finding of significant potential of price manipulation other than "the totality of the circumstances." *IDM* at 9, P.R. 146.  Commerce's arguments here fail because the factors in the regulation have not been established.  *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (noting that "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

        **c.**       **The Collapsing Determination Is Inconsistent with Agency Practice**

Commerce has no practice of collapsing a producer of subject merchandise with an affiliated entity that does not produce subject merchandise but produces a value added downstream product.  None of the cases cited in the *Final Results* present a scenario that is comparable.  *Shrimp from Brazil*, the main precedent that Commerce relies on, involved a very different set of facts. *See Shrimp from Brazil IDM* at 11-15.  Commerce collapsed a seller (CIDA), who owned production equipment but was not currently producing goods, with its affiliated processing company located on the same premises (Produmar) that processed raw shrimp into frozen shrimp, i.e. the subject merchandise.  *Id.*

Commerce determined that these two entities could easily switch roles, but also found several elements of control that the seller held over the producer. *Id.* at 14-15. ("{B}ecause Produmar has a fully functioning facility for producing the subject merchandise, which is located on the same premises as and is controlled by CIDA, the role of producer and seller could easily switch … without substantial retooling at either company"). The relationships between the two entities, including CIDA's control, that Produmar processed shrimp only for CIDA, and CIDA

exported shrimp by using Produmar's export sanitary certificate, supported Commerce's finding of a significant potential for price manipulation. *Id.* at 15. There is nothing in this record showing that either Maquilacero or TEFLU exercise control over the other. Further, as discussed, no real possibility exists of TEFLU and Maquilacero switching roles.

In *U.S. Steel,* Commerce collapsed an exporter with two producers after determining that all three companies shared sales information and coordinated export pricing decisions. *See* 179 F.Supp.3d at 1137. Commerce's determination was based on the fact that the entities were clearly coordinated and working together in a manner that created the significant potential for manipulation. But in this case the record does not support such a relationship between Maquilacero and TEFLU.

In other cases, the Department has declined to collapse affiliated parties even where there was a high level of common ownership, shared directors, and evidence of intertwined operations. *See Stainless Steel Bar From Germany*, 67 Fed. Reg. 3159 (Dep't Commerce Jan. 23, 2002) (final LTFV determ.) ("*SSB from Germany*") and accompanying Issues and Decision Memorandum at Cmt. 15. While Commerce tries to distinguish *SSB from Germany* by stating that respondents did not have common ownership and managerial overlap, that is unavailing. The two respondents in *SSB from Germany* were not collapsed even though both companies were almost wholly-owned by the same corporate parent, had two common board members between them, owned production facilities for the subject merchandise, shared common affiliated suppliers and sold merchandise to each other. *Id.* Their operations were more intertwined than those of Maquilacero and TEFLU and yet Commerce reached a very different collapsing determination.

AFDOCS:198886637.1

Moreover, Commerce has declined to collapse Maquilacero and a non-producing affiliate explaining that "{t}he Department does not have a general practice of collapsing a respondent with its affiliated home market customers, but rather, as in this case, it performs the arm's-length test to determine whether the sales transactions between the affiliates are useable in a dumping analysis." *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico*, 81 Fed. Reg. 47352 (Dep't Commerce July 21, 2016) (final aff. LTFV determ.), and accompanying Issues and Decision Memorandum at 15. The Department should reach the same result here, relying on the arm's length test, rather than collapsing Maquilacero and TEFLU.

In sum, Commerce's collapsing practice and the factual record here do not support an affirmative collapsing determination for Maquilacero and TEFLU and thus the Court should remand this determination to Commerce.

**B.     Commerce's Determination that TEFLU's Downstream Products Were In-Scope Merchandise Was Unsupported by Substantial Evidence and Contrary to Law**

Commerce's treatment of downstream automotive parts made by TEFLU as in-scope merchandise represents an unlawful expansion of the *Order*. The plain language of the scope describes pipe and tube, not auto parts.  The scope language makes no mention of downstream products that incorporate LWRPT or of custom-made automotive parts. Rather, the scope of the *Order* provides in relevant part:

> The merchandise subject to these orders is certain welded carbon quality light–walled steel pipe and tube, of rectangular (including square) cross section, having a wall thickness of less than 4 mm.
>
> ....
>
> The welded carbon-quality rectangular pipe and tube subject to these orders is currently classified under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7306.61.50.00 and 7306.61.70.60. While HTSUS subheadings are provided for convenience and Customs purposes, our written description of the scope of these orders is dispositive.

23

*Order,* 73 Fed. Reg. at 45404.

The scope language above describes the LWRPT produced and sold by Maquilacero. Section A QR at Exhs. A-24, A-25, C.R. 19-20, P.R. 36-37.  However, as discussed *supra*, the scope description does not accurately describe the products sold by TEFLU, which are auto parts made from in-scope LWRPT.

While the LWRPT that Maquilacero sold to TEFLU could be described using standard sizes, length, and weight, s*ee* Maquilacero Section A QR at Exhibit A-27, the products that TEFLU sells to its OEM customers are described as [

]. *See id*. at Exhs. A-6 and A-32, C.R. 13, 21, P.R. 36, 38; *see* Post-Prelim. SQR at Exh. 2S-7, C.R. 217, P.R. 119. These parts are identified by a unique part number assigned by the OEM customer and have a dedicated use as auto parts. *Id*.; *see also* TEFLU Downstream QR at Exh. BA2-4, C.R. 88, P.R. 57.  Commerce's treatment of these products as LWRPT is on its face wrong in light of the production and sales documents on the record that identify them as auto parts.

### 1.      Legal Framework for Scope Interpretation

"The plain language of a countervailing or antidumping order is 'paramount' in determining whether particular products are included within its scope." *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014), citing *King Supply Co. v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012).

"Scope orders may be interpreted as including subject merchandise **only if** they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002) (emphasis added). When construing the scope of an order, Commerce may interpret, but not enlarge, the

AFDOCS:198886637.1

scope of the order as determined in the original investigations. *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005), citing *Duferco*, 296 F.3d at 1097. "If the scope is unambiguous, it governs." *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (footnote omitted).  In reviewing the scope language, Commerce must begin with the scope language in the order itself, and if that language does not conclusively resolve the issue, it may then interpret that scope language considering the descriptions of the merchandise in the petition, the initial investigation, and the determinations of Commerce and the ITC. 19 C.F.R. § 351.225(k)(l); *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015) (citing *Duferco*, 296 F.3d at 1097). The CAFC has indicated, however, that these latter sources are not a substitute for identifying actual language in the scope of the orders that may be reasonably interpreted to cover the merchandise in question. *Duferco*, 296 F.3d at 1097 ("{A} predicate for the interpretive process is language in the order that is subject to interpretation"). While Commerce enjoys considerable latitude in clarifying orders, it may not change the original scope of its orders through the interpretive process. *See Tak Fat,* 396 F.3d at 1382-83. "{P}roducts included in the scope of an order must be covered by the underlying investigations; the scope cannot extend to a *distinct, downstream product* that was not a part of the underlying investigation." *Fabuwood Cabinetry Corp. v. United States*, 469 F.Supp.3d 1373, 1389 (Ct. Int'l Trade 2020) (emphasis added).

Where the descriptions of the merchandise are not dispositive, Commerce will consider the five additional criteria set forth in 19 C.F.R. § 351.225(k)(2).

AFDOCS:198886637.1

2.      **Commerce's Determination Failed to Consider Whether Substantially Transformed LWRPT into Custom-Made Downstream Products Are Covered by the *Order***

In the *Final Results*, Commerce determined that the automobile parts produced by TEFLU were subject to the *Order*. *IDM* at 12, P.R. 146. In particular, Commerce indicates that "the further processing of in-scope merchandise by {TEFLU} does not necessarily render the merchandise outside the scope of the *Order*." *Id.* Commerce's determination, however, failed to consider the extent of TEFLU's further processing of the LWRPT into distinct, downstream products that no longer meet the description of the LWRPT under the scope. *See* TEFLU Downstream QR at 6, 24, C.R. 88, P.R. 57.

In particular, the threshold question that Commerce failed to address was whether the automotive components made by TEFLU continue to be LWRPT, an intermediate product with many potential end-use applications, or whether the parts represent distinct *downstream products* outside the scope of the *Order*. *See, e.g.*, Section A QR at Exh. A-6, C.R. 13, P.R. 36.

In *Trendium Pool Products, Inc. v. United States*, the CIT remanded a scope ruling by Commerce which found that corrosion-resistant steel ("CORE") incorporated into a finished downstream product (*i.e.,* above ground pools) remained subject to the antidumping duty order on CORE. 399 F.Supp.3d 1335 (Ct. Int'l Trade 2019). The CIT found that the downstream product was not covered by the scope of the order because the processing performed on the input CORE –

> {was} so extensive and particular to the product's use as pool walls that the CORES {was} no longer CORES for the purposes of a scope determination. Put another way, the amount of processing the *CORES components underwent transformed them from a raw input into a finished product, with the only practical use as an above-ground pool*.

*Id.* at 1343 (emphasis added).

AFDOCS:198886637.1

Among the grounds for remand, the CIT noted that the processing of the CORE transformed it into a *specific product*, did not overlap in use with the typical CORES products, and occupied a different market from CORES products. *Id.* at 1343-44.  This is precisely how TEFLU and its customers describe TEFLU's products. Each auto part is customized for a specific customer and a specific subassembly and has no other possible use.  *See* Section A QR at A-32-A-35, C.R. 13, P.R. 36; A-D SQR at 5, 152, P.R. 92.  The record contains information on each part sold by TEFLU in this review, including the further processing operations for each part, the name of the part and the subassembly in which it will be incorporated, as determined by the customer. *See* TEFLU Downstream QR at Exh. BA2-4, C.R. 88, P.R. 57; *see also* Post-Prelim. SQR at Exh. 2S-7, C.R. 217, P.R. 119.

In *TMB 440AE, Inc. v. United States*, the CIT remanded Commerce's determination finding a specialized seamless product covered by the antidumping duty order on certain seamless pipe from the People's Republic of China.  Ct. No. 18-00095, 2020 WL 1672841, at *1 n.2 (Ct. Int'l Trade Apr. 6, 2020). The CIT reasoned that although plaintiff's pipe meets the dimensional specifications of the ASTM A-53 standard listed in the order, Commerce was not free to ignore plaintiff's evidence showing that the pipe was specialized beyond the listed standard. *Id.* at *5.The CIT also directed Commerce to consider evidence showing that the pipe was used in a "niche market" and that it was different from the pipe covered by the order based on its "chemical specifications, additional finishing, tighter dimensional tolerances, more exacting storing and packaging, and customization…." *Id* at *6.

Similarly, here, Maquilacero has provided substantial information to demonstrate that TEFLU's automotive components are finished downstream products with the only practical use as automotive components. *See, e.g.,* Section A QR at Exh. A-6, C.R. 13, P.R.

27

36. For example, invoices for these products show the product description and unique item
number for the part,  subassembly and end use, *i.e.* [

                                    ] as assigned by the OEM customer. Maquilacero Post-Prelim. SQR at Exhs.
2S-6.1, 2S-6.2 and 2S-7, C.R. 207-213, 217, P.R. 119. Information on the record also shows that
TEFLU's products do not overlap in use with typical LWRPT. *See* Section A QR at Exhs. A-6,
A-14, C.R. 13, 15-16, P.R. 36. TEFLU's parts are  sold in conformity with the drawings,
tolerances and specifications requested by the OEM customer, whereas Maquilacero's LWRPT
is sold based on commercial specifications and standard sizes.  *See id.* at Exh. A-10, C.R. 14,
P.R. 36 (providing a sales trace and a price list) and Exh. A-24, C.R. 19, P.R. 36 (providing
Maquilacero's brochure). In short, Maquilacero and TEFLU produce different products for
altogether separate market segments: with Maquilacero producing "off-the-shelf" LWRPT and
TEFLU producing customized parts for automotive OEMs. *Id.* at Exhs. A-27, A-32, C.R. 20, 21,
P.R. 36, 38.

 Further, the products sold by TEFLU to its OEM customers are not the same class or kind
as in-scope LWRPT classified under HTSUS heading 7306. Rather, these parts underwent
substantial transformation into auto parts classified under HTS Headings [

].  *See* Case Br. at 10, C.R. 246, P.R. 140.  While the LWRPT subject to the *Order* is
classified in HTSUS subheadings 7306.61.5000 and 7306.61.7060, the downstream product may
not be classified in Heading 7306 of the HTSUS.  Explanatory Note 73.06 of the HTSUS
explains that

   the heading excludes....(f) tubes, pipes and hollow profiles made up into specific
   identifiable articles, *e.g.*, those prepared for use in structures (heading 73.08),
   tubular sections of central heating radiators (heading 73.22), exhaust manifolds
   for internal combustion piston engines (heading 84.09), other machinery parts
   (Section XVI), exhaust boxes (silencers) and exhaust pipes of vehicles of Chapter

87 (*e.g.*, heading 87.08 or 87.14), saddle pillars and frames for cycles (heading 87.14).

*See* TEFLU Downstream QR at BA2-7, C.R. 88, P.R. 57.

As demonstrated on the record, the LWRPT here was transformed by TEFLU into parts that are specific identifiable articles sold and exported with a different name and tariff classification. *See* Case Br. at 10, C.R. 246, P.R. 140, identifying specific auto parts and their tariff classification.

U.S. Customs and Border Protection ("CBP") has issued rulings indicating that processing operations can substantially transform tubing that is normally classified under heading 7306 of the HTSUS. In one ruling CBP found that the process of bending, which changed the pipe into a pipe fitting, changed its tariff heading (from 7306 to 7307). *See* HQ H213699 (July 26, 2013). In another ruling, CBP determined that tubing processed into an automotive part was no longer classifiable in heading 7306 as pipe and tube. *See* HQ 560667 (Feb. 20, 1998) ("{T}he finished connectors are dedicated for use solely in a motor vehicle, and as such are clearly identifiable as connectors in brake lines or gas lines of motor vehicles, we find EN 73.06 persuasive in determining that the finished connectors are not classifiable in heading 7306, HTSUS.")

While Commerce summarily dismissed Maquilacero's discussion of the CBP rulings as non-binding, *see IDM* at 14, P.R. 146, these sources are at the very least indicative of the extent of processing between the input LWRPT and the resulting auto parts at issue and their recognition by CBP as different products from the input LWRPT.

### 3.      Commerce's Interpretation of the Scope is Contrary to Law

In reaching its determination that TEFLU's products are covered by the scope, Commerce explained that "absent exclusionary language … 'it is not reasonable to conclude that

simply because a particular type of LWRPT is not specifically mentioned in the scope, that product is not covered.'" *Id.* at 12. This interpretation of the scope is fundamentally flawed, in direct conflict with numerous court decisions and essentially extends the coverage of the scope to any further processed product that contains LWRPT.

In *Duferco*, the court made clear that "{s}cope orders may be interpreted as including subject merchandise ***only if*** they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." 296 F.3d at 1089 (emphasis added); *see also Trendium*, 399 F.Supp.3d at 1339, citing *Mid Continent Nail Corp. v United States*, 725 F.3d 1295, 1301 (Fed. Cir. 2013) (noting that, even "when merchandise is facially covered by the literal language of the order, it may be outside the scope 'if the order can reasonably be interpreted so as to exclude it.'"). In *Trendium,* the CIT noted that nowhere in the scope of the order at issue did it state that it covered "downstream products such as cars, appliances, or pools." 399 F.Supp.3d at 1342. Because the scope of the order did not discuss any downstream products and the Government could not point to evidence on the record that downstream products were considered either in the Petition or ITC investigation, the CIT concluded that the downstream products "were reasonably interpreted to be excluded from the scope of the *Order*." *Id*.

Similarly, in *Fabuwood*, the CIT held that Commerce's scope ruling must be consistent with the ITC's injury investigation and that Commerce had expanded the scope of the original order at issue to cover furniture and furniture parts.  469 F.Supp.3d at 1389.  In remanding the case, the Court explained that the "products included in the scope of an order *must be covered by the underlying investigations*; the scope cannot extend to a distinct, downstream product that was not part of the underlying investigation." *Id.* (emphasis added).

Similarly, the Court should find here that Commerce erred in including TEFLU's downstream automotive products as covered by the scope. *See IDM* at 12, P.R. 146. Similar to *Trendium* , the scope of the *Order* makes no mention of any downstream products such as automotive parts. *Id.* at 4. Commerce can only include TEFLU's automotive products if it is reasonable to do so based on the record of the underlying investigation. Here, there is nothing on the record of the original investigation that demonstrates that Petitioners intended to include finished downstream products such as automobile parts in the scope of the investigation. *See* Case Br. at 7, C.R. 246, P.R. 140 (citing *Light-Walled Rectangular Pipe and Tube from China, Korea, and Mexico*, Inv. Nos. 701-TA-449 and 731-TA-1120, USITC Pub. 4024 (Jul. 2008) (Final) ("*LWRPT ITC Report*"); Maquilacero Supplemental QR at Exhibit S-14.

Merely discussing the end uses of LWRPT in the ITC Final Determination "cannot be interpreted as proof that the parties contemplated that finished products would be subject to the scope of the *Order*." *Trendium*, 399 F.Supp.3d at 1345 ("If the court were to adopt Commerce's interpretation of the *Order* -- that any downstream product discussed during the underlying ITC investigation in terms of end-usage should be covered by the scope of the *Order* -- then an array of finished consumer products with CORES inputs would be covered{.}." *Id.*)

Commerce's reference to the *LWRPT ITC Report* for the proposition that "LWRPT is an intermediate product, with 'many end-use applications,' including 'fences, gates, hand rails, furniture, sports equipment, and *automotive equipment*," makes the same mistake that the Courts in *Trendium* and *Fabuwood* have explicitly cautioned against. *IDM at* 13 (quoting *LWRPT ITC Report* at 13). Although the ITC referenced automotive equipment in the underlying investigation as an end-use application, *see Light-Walled Rectangular Pipe and Tube from Turkey*, Inv. No. 731-TA-1121, USITC Pub. 4001, at II-5 (May 2008) (Final), this cannot be read

31

that finished auto parts were intended to be included within the scope of the *Order*. The CIT in

*Stein Industries v. United States*, addressed this very fallacy , noting:

> The ITC's discussion of the types of end-use products in which LWR pipe and tube is used is not reasonably read to suggest that all LWR pipe and tube further manufactured for one of the identified uses *remains within the scope no matter the downstream product's shape or the degree of further manufacturing*.

365 F.Supp.3d 1364, 1373 (Ct. Int'l Trade 2019).

If the Court allows Commerce's flawed reasoning to stand, the scope of the *Order* would

be greatly expanded to cover not only input LWRPT but also any downstream products,

irrespective of the degree of further processing, that have any touchpoints with fences, gates,

handrails, furniture, sports equipment, and automobiles.

Commerce's unprecedented expansion of the scope language in this case is also

inconsistent with its more reasonable scope interpretation in the *PSC Scope Ruling*, where

Commerce recognized that preconfigured and standardized precision parts with pre-drilled holes

and fittings for mold bases used in plastic injection molding machines were outside the scope of

the *orders* on cut-to-length ("CTL") plate.  *See* Case Br. at 11-12, C.R. 246, P.R. 140 (citing

Memorandum from J. Doyle to J. Maeder, re: *Antidumping and Countervailing Duty Orders on

Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, Brazil, the People's

Republic of China, France, the Federal Republic of Germany, Italy, Japan, the Republic of

Korea, the Republic of South Africa, Taiwan, and Turkey:* Scope Ruling Request (Oct. 11, 2017),

ACCESS barcode 3628547 ("*PCS Scope Ruling*"). While Commerce cited in relevant part the

ITC's report from the investigation, stating that "machine parts" were within the list of possible

downstream products manufactured using *CTL Plate*, it correctly recognized that "machine

parts" are distinct from the CTL Plate from which they are made.  *See* Case Br. at 11-12, C.R.

246, P.R. 140.

AFDOCS:198886637.1

Commerce reasoned as follows:

> Based on this language, we find that machine parts, or machinery, is not CTL plate, but **instead a different downstream product that is produced from CTL plate**. We find that the language of the ITC report and the petition are instructive to determine that such "downstream" products are not included in the scope of the *Orders*.
>
> …
>
> Even though PCS's mold base parts are processed in the manner described in the scope and meets the dimensional requirements described in the scope, **the totality of the processing results in a downstream product otherwise removed from the merchandise described in the scope**, different from merely processed CTL place intended to be covered by the scope of the *Orders*.

*PCS Scope Ruling* at 7 (emphasis added).

Although the exact same reasoning and conclusion should apply to LWRPT and "auto parts," Commerce here reached the opposite conclusion. Instead, it summarily dismissed the *PSC Scope Ruling* on the basis that it "concerned different AD orders than LWRPT (specifically cut-to-length plate), which have a different scope language." *IDM* at 14, P.R. 146. While the *PSC Scope Ruling* did concern a different antidumping order with a different scope language, that is a poor justification for Commerce's unlawful scope interpretation in this case. The *PSC Scope Ruling* involved a steel input product (similar to LWRPT) that was further processed into a different downstream product (similar to TEFLU's downstream products) that the ITC has identified as a downstream application (also similar to this case). Commerce's scope interpretation in this case is arbitrary and capricious and should be remanded.

### C.   Commerce Erred by Not Distinguishing Further Manufactured Products In the Product Comparison Methodology

In the *Final Results* Commerce rejected Maquilacero's request to modify the SAS programing to take account of whether TEFLU or Maquilacero was the manufacturer of the product, in the event Commerce continues to collapse Maquilacero and TEFLU. *IDM* at 24, P.R. 146. Maquilacero argued that Commerce can account for the manufacturer by relying on the

33

variable FURPROCESSH/U, which was reported by Maquilacero in order to account for the physical and commercial differences between LWRPT produced by Maquilacero and the downstream parts produced by TEFLU. Case Br. at 14-15, C.R. 246, P.R. 140.  Commerce's position was that as a result of collapsing the companies there is a single entity Maquilacero/TEFLU as the manufacturer and thus declined to implement the manufacturer distinction. *Id.*  Commerce also rejected the use of the FURPROCESSH/U variable as a physical characteristic in the margin calculations. *IDM* at 25, P.R. 146.  The Court should remand this determination because Commerce's rejection of the FURPROCESSH/U characteristic was erroneous and was based on a flawed review of the record.

### 1.    Legal Framework

The statute requires that "a fair comparison shall be made between the export price or constructed export price and normal value."  *See* 19 U.S.C. § 1677b(a).  The statute defines "foreign like product" in descending order of preference, beginning with: "{s}ubject merchandise and other merchandise, which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise." 19 U.S.C. § 1677(16)(A).  Similarly, the statute defines merchandise which is similar to the subject merchandise. 19 U.S.C. § 1677(16)(B)-(C). Because the statute is silent with respect to the methodology that Commerce uses to identify foreign like products which are identical or similar to the subject merchandise, Commerce has considerable discretion in developing an appropriate "model match" methodology to identify identical or similar merchandise sold in the comparison market. *See Pesquera Mares Australes, Ltda. v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001).  Notably, Commerce has interpreted the word "identical" in the statute to mean the same with minor differences in physical characteristics which are commercially insignificant. *Id.*

AFDOCS:198886637.1

The statute provides several alternatives for determining foreign like product, but common to all of them is the requirement that the products are produced in the same country by the same person as the subject merchandise. *See* 19 U.S.C. § 1677(16).  The manufacturer variable in Commerce's questionnaire ("MFRH/U") is one of the several programming and methodological tools by which Commerce seeks to satisfy its legal obligation to "determine margins as accurately as possible." *See Lasko Metal Prods. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994) (quoting *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).

### 2.     Commerce's Rejection of the Manufacturer Code and the FURPROCESSH/U Variable Was Contrary to Law and Unsupported by Record Evidence

In its standard programming, Commerce has adopted the MFRH/U code for purposes of implementing this requirement, building this variable into the product concordance and the differential pricing test where necessary.  *See e.g. Stainless Steel Sheet and Strip in Coils from Mexico*, 69 Fed. Reg. 6259 (Dep't Commerce Feb. 10, 2004) (final AD results), and accompanying Issues and Decision Memorandum at 35-38 ( Detailing how the Department relied on the MFR field to preserve a distinction critical to the dumping calculations – agreeing with the respondent that the material the respondent identified using two different MFR codes did not represent a duplicate CONNUM); *see also Certain Corrosion-Resistant Steel Products From the Republic of Korea*, 84 Fed. Reg. 10784 (Dep't Commerce Mar. 22, 2019) (final AD results; 2016-2017), and accompanying Issues and Decision Memorandum at Comment 13. (In which the Department relied on the MFR code and modified its SAS program to identify the correct manufacturer in the product comparison methodology.)

AFDOCS:198886637.1

In the 2018-2019 administrative review Commerce included the manufacturer and prime variables used in the downstream sales database of the SAS program, thereby building these variables into the product comparison methodology to ensure an accurate comparison of the products produced by Maquilacero and TEFLU. Rebuttal Br. at 14 & n.45, C.R. 246, P.R. 140, citing *2018-2019 Final Results* and Memorandum from S. Brummitt to The File, re: Final Results Margin Calculation for Maquilacero S.A. de C.V. at 12 (Jun. 21, 2021). Commerce did not dispute this fact. *IDM* at 27, P.R. 146. As Commerce collapsed Maquilacero and TEFLU in the 2018-2019 review, while relying on the MFRH/U variable to calculate the margin, its decision here to reject the MFRH distinction in this review is arbitrary. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

Commerce's broad interpretation of the scope of the *Order* seeks to cover two different product groups, commercial LWRPT not further manufactured, and the further manufactured auto parts produced by TEFLU. These two product groups are characterized by significant differences in prices and production costs, yet the CONNUM methodology applied treats them as if they were "identical" because the CONNUM does not account for any further processing. The lack of differentiation between further manufactured and non-further manufactured products introduces a distortion into Commerce's model match methodology that has resulted in the calculation of a distorted margin for Maquilacero/TEFLU.

The fundamental flaw in this approach is that within the CONNUMs defined by Commerce there will be both further processed products (produced by TEFLU) and non-further processed products (produced by Maquilacero). Depending on the number and types of processing steps done on each TEFLU product compared to the Maquilacero product, there will be significant differences in VCOM and in prices. As discussed at length in the previous

AFDOCS:198886637.1

sections, and as supported by the extensive production and sale documents describing TEFLU's products, *see e.g.* Post-Prelim. SQR at Exhs. 2S-6, 2S-7, C.R. 207-217, P.R. 119, TEFLU's further manufactured products and Maquilacero's LWRPT cannot be considered "identical" to one another. There are well-documented differences between TEFLU's products and Maquilacero LWRPT that cannot be described as "commercially insignificant." To cure this product-matching problem, Maquilacero has proposed a straightforward addition to the CONNUM methodology to bring it in line with the product-matching methodologies used in proceedings involving similar products and the same respondent. *See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Mexico*, 81 Fed. Reg. 47352 (Dep't Commerce July 21, 2016) (final aff. LTFV determ.).  Proposed CONNUM2H/U adds field PROCESSH/U to the control number to allow Commerce to differentiate between further processed and not further processed products.  By rejecting this proposal, Commerce failed to meet the statutory mandate "to determine dumping margins as accurately as possible." *NSK Ltd. v. United States*, 346 F.Supp.2d 1312, 1333 (Ct. Int'l Trade 2004), *aff'd*, 481 F.3d 1355 (Fed. Cir. 2007).

### 3.    Maquilacero Timely Proposed the Use of the FURPROCESSH/U Variable

There was no legitimate reason for Commerce to ignore the FURPROCESSH/U variable on procedural grounds. Although Commerce states that Maquilacero's arguments proposing to use this variable are "untimely," the record shows that Maquilacero raised the issues early in the review, in the initial questionnaire responses and each supplemental response.  *See* Section B QR at B-21, C.R. 25, P.R. 50, and Maquilacero S.A. de C.V.'s Section C Questionnaire Response at C-17-18 (Dec. 17, 2021), C.R. 28, P.R. 51, reporting variable 3.7 – Further Processing (FURPOCESSH).  In TEFLU's  downstream sales response, we reported variable 3.7 – Further Processing and stated:

> The further manufacturing characteristics are included in the CONNUMs reported in Field CONNUM2H. The Department should include this characteristic in the CONNUM to account for the physical and commercial differences between commercial LWRPT sold by Maquilacero and the product sold by TEFLU, which has been transformed into an automotive part.

TEFLU Downstream QR at BA2-24, C.R. 88, P.R. 57.

Maquilacero again raised this issue in the first supplemental response, *see* A-D SQR at 17, C.R. 152, P.R. 92.  Maquilacero further discussed the issue in its case and rebuttal briefs.  *See e.g.* Case Br. at 10, C.R. 246, P.R. 140.  Therefore, Commerce's claim that the issue was raised untimely is simply erroneous.  The justification that "interested parties were not provided an opportunity to comment on Maquilacero's proposal early on in the instant review" is baseless because Maquilacero identified this issue and reported the FURPROCESSH/U since its initial responses and Petitioners made no claim that there was insufficient time to consider Maquilacero's proposal. Commerce's reasoning for rejecting the use of the FURPROCESSH/U variable to distinguish between further processed and not further processed products is factually wrong. *IDM* at 24-27, P.R. 146.

Commerce has an obligation to make fair, accurate, and reasonable dumping margin calculations. 19 U.S.C. § 1677b.  The only way to meet that obligation is to use the additional FURPROCESSH/U variable proposed by Maquilacero.

**D.    Commerce's Determination to Treat TEFLU Virtual Export Sales Under the IMMEX Program as Home Market Sales Was Unsupported by Substantial Evidence and Contrary to Law**

In the *Final Results*, Commerce unlawfully treated TEFLU sales made under the IMMEX program, also referred to as "virtual exports", as home market sales. *IDM* at 21, P.R. 146. Substantial record evidence demonstrated Maquilacero/TEFLU's knowledge of the export destination at the time of sale. Nevertheless, Commerce treated such export sales as home market

sales in the normal value calculations, and in doing so, calculated an inaccurate final weighted average dumping margin for Maquilacero/TEFLU in contravention of its legal mandate to calculate antidumping duty margins "as accurately as possible." *Rhone Poulenc*, 899 F.2d at 1191. As explained below, Commerce's determination was unsupported by substantial evidence and not in accordance with law.

### 1. Legal Framework

In determining whether a sale should be classified as a U.S. sale, Commerce typically relies on the "knowledge test" to determine whether the producer knew or should have known, at the time of a sale, whether or not the subject merchandise will be exported. *Z.A. Sea Foods Priv. Ltd. v. United States*, 569 F.Supp.3d 1338, 1352-53 (Ct. Int'l Trade 2022). Commerce's established practice is to consider documentary or physical evidence that the producer knew or should have known its goods were destined for the U.S., because this type of evidence is more probative, reliable and verifiable than unsubstantiated statements or declarations. *Wonderful Chem. Indus., Ltd. v. United States*, 259 F.Supp.2d 1273, 1280 n.4 (Ct. Int'l Trade 2003). *See also Certain Crystalline Silicon Photovoltaic Products From Taiwan*, 79 Fed. Reg. 76966 (Dep't Commerce Dec. 23, 2014) (final LTFV determ.), and accompanying Issues and Decision Memorandum at 33 ("{T}he standard for making a knowledge determination is that the producer must have reason to know *at the time of the sale* that the *specific sale* of subject merchandise was destined for the United States") (emphasis in original); *Certain Circular Welded Non-Alloy Steel Pipe From Mexico*, 76 Fed. Reg. 36086 (Dep't Commerce June 21, 2011) (final AD results), and accompanying Issues and Decision Memorandum at 4-6. Thus, Commerce's established practice examines both actual knowledge ("knew") and constructive knowledge ("should have known") at the time of sale.

AFDOCS:198886637.1

Commerce has recently considered similar facts involving the IMMEX program and found that, given the nature and purpose of the IMMEX program, "{the respondent} knew and should have known, that its freight rail couplers sold into the IMMEX program ultimately were meant for export, rather than domestic consumption." *See Certain Freight Rail Couplers and Parts Thereof From Mexico*, 88 Fed. Reg. 27864 (Dep't Commerce May 3, 2023) (prelim. affirm. LTFV determ.) ("*Freight Rail Couplers*"), and accompanying Decision Memorandum at 11 ("*Freight Rail Couplers PDM*"), unchanged in 88 Fed. Reg. 65153 (Dep't Commerce September 21, 2023) (final affirm. LTFV determ. & neg. crit. circum.), and accompanying Issues and Decision Memorandum ("*Freight Rail Couplers IDM*").

This Court found that Commerce's inclusion of certain sales destined for Mexico, shipped via U.S. Free Trade Zones ("FTZ"), as U.S. sales was unlawful. *Solarworld Americas, Inc. v. United States*, 353 F.Supp.3d 1315, 1323 (Ct. Int'l Trade 2018). The Court found that evidence on the record established that the sales were to customers in Mexico; the merchandise was shipped to addresses of U.S. FTZs, with no actual U.S. customers identified and no evidence that the merchandise entered the U.S. customs territory for sale. *Id.*

## 2. Maquilacero/TEFLU Knew Sales Made Through the IMMEX Program Were Destined for Export to the U.S. or a Third Country

The IMMEX program is a Mexican tax regime that provides incentives for foreign companies to manufacture goods in Mexico without paying value added tax ("VAT") as long as the goods are exported. A-D SQR at 39-40 and Exhibit S-44, C.R. 152, 156, P.R. 92. Under the IMMEX program, TEFLU sells customized parts to foreign OEM customers participating in the IMMEX program. *Id.* at 39-40. The sales transactions are between TEFLU and the foreign customer, while shipments of goods are delivered to the foreign customer's facility located in Mexico. *Id.* at Exhibit S-44, C.R. 152, P.R. 92. While TEFLU's parts are not physically

40

presented for clearance to a Mexican Customs office, both an import declaration (called "pedimento") and an export declaration ("pedimento") must be presented for compliance with Mexican Customs Law. *Id*. at Exhibit S-44, C.R. 156, P.R. 92. Because these products sold to the IMMEX companies are used to produce good destined for exportation outside of Mexico, and no VAT is collected as otherwise required for all domestic sales, TEFLU considers these sales as export sales in its normal course of business, also referred to as virtual exports. *Id*.

In the *Final Results*, Commerce treated TEFLU's virtual exports sales as home market sales and included these sales in the normal value calculation. *IDM* at 21, P.R. 146. According to Commerce, "Maquilacero/TEFLU's copious documentation does not demonstrate 'knowledge' of export because, while supplying affidavits, testimony, and billing addresses, it has explicitly stated that it is unable to provide 'direct documentation showing the export of the final product.'" *Id* at 23 (citation omitted). Thus, Commerce's determination focused only on TEFLU's *actual* knowledge of the export destination. Commerce failed to evaluate the second prong – constructive knowledge – in applying the "knowledge" test. Commerce ignored substantial record evidence discussing the nature and purpose of the IMMEX program that established TEFLU's knowledge at the time of sale that the merchandise in question was ultimately destined for export to the U.S. or a third country.

Commerce's reliance on *Sugar from Mexico* is inapposite. *Id.* at 21. In *Sugar from Mexico*, Commerce examined the IMMEX program and concluded that "subject merchandise sold to IMMEX customers that was further manufactured into non-subject merchandise, and, thus, were consumed in Mexico, were determined to be home market sales." *Id.* at 21-22. *See also Agreement Suspending the Antidumping Duty Investigation on Sugar From Mexico;*

AFDOCS:198886637.1

*Preliminary Results of the 2019-2020 Administrative Review*, 87 Fed. Reg. 932 (Dep't

Commerce Jan. 7, 2022), and accompanying Issues and Decision Memorandum at 8.

> In *Freight Rail Couplers*, Commerce explained that
>
> We acknowledge that we did not expressly reference the knowledge test in *Sugar from Mexico*, but it addressed the same program as here, and we find that its general focus on consumption in the home market…
>
> …
>
> Amsted's claims that its knowledge ends at the ship-to addresses of Mexican OEM customers do not establish that Amsted knew or should have known that freight rail couplers sold to those OEMs were for consumption in Mexico. This lack of knowledge beyond the OEM address may be relevant for the question of whether IMMEX sales are U.S. sales—a question similar to that at issue in some of the administrative proceedings and judicial rulings cited by Amsted—**but it does not establish that the IMMEX sales should be treated as home market sales**.

*Freight Rail Couplers IDM* at 12 (emphasis added).

Second, the nature and function of the IMMEX program cannot be ignored in evaluating

TEFLU's knowledge of export of the subject sales. In *Freight Rail Coupler from Mexico*,

Commerce examined sales made under the IMMEX program and found that "sales in the

IMMEX program are taking place under a distinct tax regime established specifically for the

ultimate export of finished goods." *See Freight Rail Couplers PDM* at 11. Given the nature and

purpose of the IMMEX program, Commerce found the respondent knew or should have known

its sales made into the IMMEX program ultimately were meant for export, rather than domestic

consumption. *Id.*. This Court has also considered the nature of an FTZ program as one of the

factors in determining whether sales should be properly classified as U.S. sales. *Solarworld*, 353

F.Supp.3d at 1323.

In this case, while TEFLU did not have direct documentation showing the export of the

final product, TEFLU knew, at the time of sale, that parts sold to an IMMEX customer will be

AFDOCS:198886637.1

incorporated into a product for export – to the United States or other export markets - by operation of the Mexican law. Post-Prelim. SQR at 5-7, C.R. 207, P.R. 119. TEFLU's documentation showed that (1) both TEFLU and its customer know the parts are used for specific subassemblies destined to be exported outside of Mexico under the IMMEX program; (2) TEFLU communicates directly with its U.S. or third country customers regarding the price, sales terms and technical specifications of the parts; (3) TEFLU  invoices its IMMEX customers in the U.S. or the third countries directly and receives payment in USD from a foreign bank. *Id.* at Exhs 2S-6.1-2S-6.5, C.R. 207-216, P.R. 119.

In sum, the function and purpose of the IMMEX program in this case are the same as examined by Commerce in *Freight Rail Couplers*. In this case, Commerce discounted substantial record evidence establishing that sales made into the IMMEX program are ultimately destined for export, deviating from *Freight Rail Couplers* without providing a reasoned explanation. Therefore, Commerce's determination is unsupported by substantial evidence and contrary to law.

### E.     Commerce's Application of the Differential Pricing Methodology to Maquilacero/TEFLU's Sales Is Unlawful

Despite recent decisions calling into question Commerce's differential pricing methodology, in the *Final Results*, Commerce made no change to the Cohen's *d* test applied as part of its differential pricing methodology to determine whether Maquilacero/TEFLU's U.S. prices differ significantly among purchasers, regions, or period of time ("targeted dumping") pursuant to 19 U.S.C. § 1677f-1(d)(1)(B). *IDM* at 28-30, P.R. 146. Commerce continued to use a simple average, rather than a weighted-average, when calculating the denominator of the Cohen's *d* coefficient in applying the Cohen's *d* test. *Id.*

AFDOCS:198886637.1

The statute mandates Commerce to "include in a final determination…an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the …review…concerning the establishment of dumping." 19 U.S.C. § 1677f(i)(3)(A). Commerce "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005). "{T}he required explanation must reasonably tie the determination under review to the governing statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding." *CP Kelco US, Inc. v. United States*, 949 F.3d 1348, 1356 (Fed. Cir. 2020).

Commerce provided no explanation as to the statistical assumptions underlying the Cohen's *d* test; further, in applying the Cohen's *d* test, Commerce failed to provide any reasonable explanation of why it used a simple average rather than a weighted-average when calculating the denominator of the Cohen's *d* coefficient. As explained below, Commerce's determination was contrary to law.

### 1.    Legal Framework

In *Stupp*, the CAFC remanded Commerce's differential pricing analysis over concerns about the use of statistical methodologies when certain preconditions for their use are not met. 5 F.4th at 1357–60. The Court expressed "significant concerns relating to Commerce's application of the Cohen's *d* test … in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances." *Id.* at 1357. The Court determined that Commerce's use of the Cohen's *d* test is not reasonable in such circumstances. *Id.* at 1360. Specifically, the interpretive cutoffs – which were developed by Professor Cohen – are only

AFDOCS:198886637.1

meaningful under the assumptions that the groups being compared contain normally distributed data, are sufficiently large, and of roughly equal variances." *Id.* at 1357-58. If the Cohen's *d* test is applied to data that do not meet the statistical assumptions, the test could produce an "upward bias in the calculated effect size," which would tend to inflate pass rates, skew application of Commerce's ratio test and meaningful difference test, and ultimately, artificially inflate dumping margins. *Id.* at 1359.

More recently, in *Mid Continent II*, the CAFC found that Commerce's current application of the Cohen's *d* test is unlawful. 31 F.4th at 1381.  The CAFC vacated and remanded for the second time Commerce's calculation of the Cohen's *d* coefficient. *Id.* At issue in *Mid Continent II* was Commerce's methodology to calculate the denominator of the Cohen's *d* coefficient as the simple average of the standard deviations of the test group and the comparison group, rather than a weighted average. *Id.* at 1377.

The CAFC first remanded Commerce's calculation of the pooled standard deviation within the Cohen's *d* test on October 3, 2019, for Commerce to explain its decision to use a simple average to calculate the pooled standard deviation in the calculation of the Cohen's *d* coefficient. *Mid Continent Steel & Wire, Inc. v. United States* ("*Mid Continent I*"), 940 F.3d 662 (Fed Cir. 2019). On remand for the second time, the CAFC again found that Commerce has not adequately justified its adoption of a simple average to calculate the denominator of the Cohen's *d* coefficient. *Mid Continent II*, 31 F.4th at 1381. The court stated:

> It has departed from those teachings about how to calculate the denominator of Cohen's *d,* specifically in deciding to use simple averaging when the groups differ in size. And its explanations for doing so fail to meet the reasonableness threshold (a deferential one, in recognition of expertise) for the reasons we have set forth.
>
> We must remand for further proceedings before Commerce in light of the identified deficiencies—as we did in this matter in 2019 regarding the simple-averaging choice and as we did in *Stupp* regarding other aspects of Commerce's

45

use of Cohen's *d*. Commerce must either provide an adequate explanation for its choice of simple averaging or make a different choice, such as use of weighted averaging or use of the standard deviation for the entire population.

*Id.* at 1381.

### 2. Commerce's Use of Cohen's *d* is Unlawful

In the *Preliminary Results*, Commerce applied the "Cohen's *d* test" in the first stage of the differential pricing analysis. *PDM* at 7, P.R. 103. Commerce interpreted the results of Cohen's *d* as though the statistical assumptions are met. *Id.* Commerce provided no explanation to account for the Court's concerns to justify its application of the Cohen's *d* test based on Maquilacero/TEFLU's data. *Id.* Specifically, Commerce did not demonstrate whether the data groups being compared are sufficiently large, whether the data groups being compared have normal distribution, or whether the data groups being compared are of roughly equal variances. *Stupp*, 5 F.4th at 1357-1358.

In the *Final Results*, Commerce acknowledged that, in *Stupp*, the CAFC requested that "Commerce provide additional clarification to determine 'whether Commerce's application of the Cohen's *d* test to the data in {that} case violated the assumptions of normality, sufficient observation size, and roughly equal variances associated with that test.'" *IDM* at 30, P.R. 146 (citation omitted) (alteration in original). Nevertheless, Commerce continued to provide no explanation demonstrating such statistical assumptions are indeed satisfied to justify its use of Cohen's *d* test based on record evidence in this review. *Id.* Rather, Commerce relied on the subsequent CIT decision upholding its remand redetermination in *Stupp* to justify the validity of Cohen's *d* test in this review. *Id.*, citing *Stupp Corp. v. United States*, 619 F.Supp.3d 1314 (Ct. Int'l Trade 2023), appeal docketed, No. 23-1663 (Fed. Cir. Mar. 27, 2023). Commerce's final determination failed to resolve concerns articulated by the CAFC in *Stupp*. Therefore,

Commerce's application of Cohen's *d* test to calculate Maquilacero's margin was contrary to law.

### 3. Commerce Failed to Provide a Reasonable Explanation for Applying the Cohen's *d* Test in Calculating the Denominator of the Cohen's *d* Coefficient

In the *Preliminary Results*, Commerce calculated the denominator of the Cohen's *d* coefficient by taking the simple average of the standard deviations of the test and comparison groups, which causes an inflated Cohen's *d* coefficient when the two groups were compared. Case Br. at 33, C.R. 246, P.R. 140.

In *Mid Continent II*, the CAFC found that a simple average can be used to calculate the denominator of the Cohen's *d* coefficient only "when the groups are equal in size but a weighted average formula {must be used} when the groups are of different size." 31 F.4th at 1379.

The record demonstrates that the overwhelming majority of the test and base groups used by Commerce were not of equal size. Indeed, in the region and the time period calculations, the total based group quantities are [                    ] the test group quantities; and in the purchaser calculation, the base group is [                    ] than the test group. *Final Analysis Memo* at Attachment 4 (Final Margin Calculation Output), C.R. 256, P.R. 149. An excerpt of the Cohen's *d* calculation output and a summary of the Cohen's *d* group sizes are provided at **Exhibit 1**.

Despite criticism by the CAFC in *Mid Continent II*, Commerce did not provide a justification for its use of a simple average in calculating the denominator of the Cohen's *d* coefficient in this review. *IDM* at 30-31, P.R. 146. Commerce appeared to justify its adoption of the simply average methodology by relying on the remand redetermination of *Mid Continent II*, in which Commerce explained that "{it} provided further explanation to the CIT consistent with the remand order based entirely on the academic literature relied upon by the Federal Circuit to

47

support the use of a simple average to calculate the denominator of the Cohen's *d* coefficient." *Id.* at 31. However, Commerce's narrow interpretation of *Mid Continent II* in the remand redetermination was once again rejected by the CIT. *Mid Continent Steel & Wire, Inc.* v. *United States*, 628 F.Supp.3d 1316, 1324-1325 (Ct. Int'l Trade 2023). The Court found that Commerce misconstrued the CAFC's mandate by taking a new approach which focusses on the academic literature to justify its adopting of the simple average methodology. *Id.* Contrary to Commerce's explanation, as the CAFC found in *Mid Continent II*, "Commerce's claim that academia supports the simple average appears to be contradicted by the literature itself." *Id*. at 1326.

Also here, Commerce failed to indicate whether the comparison groups and test groups were of approximately equal size to warrant the use of a simple average methodology; nor did Commerce provide any justification for departing from the academic literature to use a weighted average methodology as articulated by the CAFC in *Mid Continent II*. Therefore, Commerce's use of a simple average in calculating the denominator of the Cohen's *d* coefficient was contrary to law and should be remanded.

Respectfully submitted,

**/s/ Diana Dimitriuc Quaia**
Diana Dimitriuc Quaia
John M. Gurley
Yun Gao
Mario A. Torrico

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6291
Fax: (202) 857-6395
Email: diana.dimitriuc-quaia@afslaw.com

*Attorneys for Maquilacero S.A. de C.V. and*
*Tecnicas De Fluidos S.A. de C.V.*

Dated: September 28, 2023

AFDOCS:198886637.1

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiff's Brief in Support of its 56.2 Motion filed on September 21, 2023, complies with the word limitation requirement. The word count for Plaintiffs' 56.2 Brief, as computed by ArentFox Schiff LLP's word processing system is 13,963.


  **/s/ Diana Dimitriuc Quaia**
Diana Dimitriuc Quaia

AFDOCS:198886637.1

# EXHIBIT 1

**This Exhibit Is Not Susceptible to Public Summarization**