UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MAQUILACERO S.A. DE C.V. and TECHNICAS DE FLUIDOS S.A. DE C.V., | |
| Plaintiffs, | |
| and | |
| PERFILES LM, S.A. DE C.V., | No. 23-00091 |
| Consolidated Plaintiff, | NON-CONFIDENTIAL VERSION |
| v. | Business Proprietary Information Removed From Pages 35, 37 |
| THE UNITED STATES, | |
| Defendant, | |
| and | |
| NUCOR TUBULAR PRODUCTS INC., | |
| Defendant-Intervenor. | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S AND PLAINTIFF-INTERVENOR'S
RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

KRISTIN E. OLSON
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-6299
kristin.olson@usdoj.gov

*Attorneys for the United States*

OF COUNSEL

CHRISTOPHER A. KIMURA
Attorney
Office of the Chief Counsel for Trade
    Enforcement & Compliance
U.S. Department of Commerce

TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

STATEMENT PURSUANT TO RULE 56.2 ................................................................. 1

    I.     Administrative Determination Under Review ...................................... 1

    II.    Statement Of The Issues ........................................................................ 2

STATEMENT OF THE FACTS ................................................................................... 2

SUMMARY OF THE ARGUMENT ............................................................................ 5

ARGUMENT ............................................................................................................... 7

    I.     Standard Of Review ............................................................................. 7

    II.    Commerce's Decision To Continue Collapsing Maquilacero And
           TEFLU Is Supported By Substantial Evidence And In Accordance
           With Law .............................................................................................. 8

           A.     Legal Framework For Collapsing ............................................. 8

           B.     Maquilacero/TEFLU Did Not Meet The Burden To
                 Warrant Commerce To Revisit Its Prior Collapsing
                 Decision .................................................................................... 9

    III.   Commerce's Decision That TEFLU's Further Processed
           Automotive Parts Are In-Scope Merchandise Is Supported By
           Substantial Evidence And In Accordance With Law ........................... 14

           A.     Legal Framework For Scope Interpretation .............................. 14

            B.     The Plain Language Of The Scope Of The Order Describes
                 The Physical Characteristics Of TEFLU's Merchandise
                 And Contains No Exclusions ..................................................... 15

           C.     Commerce's Scope Interpretation Is Reasonable And
                 Maquilacero/TEFLU's Citations Are Inapposite..................... 18

    IV.   Commerce's Decision Not To Incorporate Distinguishing
           Variables In Its Product Comparison Methodology Is Supported
           By Substantial Evidence And Is In Accordance With The Law........... 21

           A.     Legal Framework For Commerce's Model Match
                 Methodology............................................................................. 22

           B.     Commerce's Decision Not To Use The Manufacturer Code
                 In The SAS Programming Was In Accordance With Law
                 And Not Arbitrary..................................................................... 24

            C.     Commerce's Decision Not To Use The FURPROCESSH/U
                 Variable In Its Model Match Methodology Is Supported By
                 Substantial Evidence And In Accordance With Law ............... 26

V.    Commerce's Classification Of TEFLU's IMMEX Sales As Home
      Market Sales Is Supported By Substantial Evidence And In
      Accordance With Law ...................................................................................... 30

      A.    Legal Framework For Classifying Home Market Or U.S.
            Market Sales .......................................................................................... 30

      B.    Maquilacero/TEFLU's Arguments Concerning
            Constructive Knowledge Are Waived For Failure To
            Exhaust .................................................................................................. 32

      C.    Commerce Appropriately Found That
            Maquilacero/TEFLU's IMMEX Sales Were Home Market
            Sales ...................................................................................................... 34

      D.    Cases Cited By Maquilacero/TEFLU Are Distinguishable .................... 36

VI.   Commerce's Use Of The Differential Pricing Methodology In This
      Review Is Supported By Substantial Evidence And In Accordance
      With Law ...................................................................................................... 38

CONCLUSION .......................................................................................................... 42

TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Algoma Steel Corp. v. United States*,
    865 F.2d 240 (Fed. Cir. 1989) ............................................................. 41

*Allegheny Ludlum Corp. v. United States*,
    215 F. Supp. 2d 1322 (Ct. Int'l Trade 2000) ....................................... 30, 31, 35

*American NTN Bearing Mfg. Corp. v. United States*,
    739 F. Supp. 1555 (Ct. Int'l Trade 1990) ........................................... 17

*Apex Frozen Foods Private Ltd. v. United States*,
    862 F.3d 1322 (Fed. Cir. 2017) ........................................................... 41

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ........................................................... 8

*Boomerang Tube, LLC, TMK IP-SCO v. United States*,
    856 F.3d 908 (Fed. Cir. 2017) ............................................................. 32

*Ceramica Regiomontana, S.A. v. United States*,
    636 F. Supp. 961 (Ct. Int'l Trade 1986) ............................................. 41

*China First Pencil Co. v. United States*,
    427 F. Supp. 2d 1236 (Ct. Int'l Trade 2006) ..................................... 9

*Consol. Bearings Co. v. United States*,
    348 F.3d 997 (Fed. Cir. 2003) ............................................................. 25

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ............................................................................. 7

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ............................................................................. 7, 8

*Corus Staal BV v. United States*,
    502 F.3d 1370 (Fed. Cir. 2007) ........................................................... 32

*Duferco Steel, Inc. v. United States*,
    296 F.3d 1087 (Fed. Cir. 2002) ........................................................... 14, 15, 18

*Fabuwood Cabinetry Corp. v. United States*,
    469 F. Supp. 3d 1373 (Ct. Int'l Trade 2020) ..................................... 18, 19

*Fagersta Stainless AB v. United States*,
    577 F. Supp. 2d 1270 (Ct. Int'l Trade 2008) ............................................ 23, 29

*Fedmet Res. Corp. v. United States*,
    755 F.3d 912 (Fed. Cir. 2014) .................................................................... 14

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) ...................................................................... 8

*Ghigi 1870 S.p.A. v. United States*,
    547 F. Supp. 3d 1332 (Ct. Int'l Trade 2021) ............................................. 29

*Interstate Commerce Commission v. Brotherhood of Locomotive Engineers*,
    482 U.S. 270 (1987) ...................................................................................... 11

*King Supply Co. v. United States*,
    674 F.3d 1343 (Fed. Cir. 2012) .................................................................. 15

*Koyo Seiko Co., Ltd. v. United States*,
    66 F.3d 1204 (Fed. Cir. 1995) .................................................................... 22

*Koyo Seiko Co., Ltd. v. United States*,
    516 F. Supp. 2d 1323 (Ct. Int'l Trade 2007) ............................................ 23

*Luoyang Bearing Factory v. United States*,
    240 F. Supp. 2d 1268 (Ct. Int'l Trade 2002) ............................................ 33

*Magnola Metallurgy, Inc. v. United States*,
    508 F.3d 1349 (Fed. Cir. 2007) ............................................................ 10, 11

*Manchester Tank & Equip. Co. v. United States*,
    483 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ............................................ 23

*Marmen Inc. v. United States*,
    627 F. Supp. 3d. 1312 (Ct. Int'l Trade 2023) ........................................... 41

*Maverick Tube Corp. v. United States*,
    No. 14-00229, 2015 Ct. Intl Trade LEXIS 60 (Ct. Int'l Trade June 15, 2015) .......... 32, 33

*Mid Continent Steel & Wire, Inc. v. United States*,
    31 F.4th 1367 (Fed. Cir. 2022) ............................................................. 39, 41

*New World Pasta Company v. United States*,
    316 F. Supp. 2d 1338 (Ct. Int'l Trade 2004) ............................................ 22

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)........................................................................ 8

*Pesquera Mares Australes Ltda. v. United States*,
    266 F.3d 1372 (Fed. Cir. 2001)............................................................... 22, 23

*Pokarna Engineered Stone Ltd. v. United States*,
    56 F.4th  (Fed. Cir. 2023) ............................................................................ 36

*Qindao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014)................................................................... 26

*SKF USA Inc. v. United States*,
    537 F.3d 1373 (Fed. Cir. 2008)............................................................... 22, 23

*Smith Corona Corp. v. United States*,
    915 F.2d 683 (Fed. Cir. 1990)..................................................................... 14

*Solarworld Americas, Inc. v. United States*,
    353 F.Supp.3d 1315 (Ct. Int'l Trade 2018) ............................................. 36, 37

*Stein Industries v. United States*,
    365 F. Supp. 3d 1364 (Ct. Int'l Trade 2019) ........................................... 20, 21

*Stupp Corp. v. United States*,
    5 F.4th 1341 (Fed. Cir. 2021) ............................................................ 38, 39, 41

*Stupp Corp. v. United States*,
    619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) ........................................... 39, 41

*TMB 440AE, Inc. v. United States*,
    2020 WL 1672841 (Ct. Int'l Trade Apr. 6, 2020) .................................... 18, 19

*TMB 440AE, Inc. v. United States*,
    2020 WL 7009680 (Ct. Int'l Trade Nov. 27, 2020)......................................... 20

*Trendium Pool Products, Inc. v. United States*,
    399 F. Supp. 3d 1355 (Ct. Int'l Trade 2019) .................................................. 18

*United States v. Euodia S.A.*,
    555 U.S. 305 (2009)....................................................................................... 7

*Z.A. Sea Foods Priv. Ltd. v. United States*,
    569 F. Supp. 3d 1338 (Ct. Int'l Trade 2022) .................................................. 30

STATUTES

19 U.S.C. § 1516a(b)(1)(B) ........................................................................................ 7

19 U.S.C. § 1677(16) ............................................................................................... 22

19 U.S.C. § 1677(33) ................................................................................................. 9

19 U.S.C. § 1677a .................................................................................................... 30

19 U.S.C. § 1677b .................................................................................................... 30

19 U.S.C. § 1677f-1(d)(1)(B)(i) .............................................................................. 40

28 U.S.C. § 2637(d) ................................................................................................. 32

REGULATIONS

19 C.F.R. 351.225(k)(1) ........................................................................................... 20

19 C.F.R. § 351.401(f) ............................................................................................... 8

OTHER AUTHORITIES

*Final Determination of Sales at Less Than Fair Value: Certain Hot–Rolled Carbon Steel Flat Products, Certain Corrosion Resistant Carbon Steel Flat Products, and Certain Cut–to–Length Carbon Steel Plate From Korea*,
    58 Fed. Reg. 37,176, 37,182 (July 9, 1993) ...................................................... 31

*Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Bar from Germany*,
    67 Fed. Reg. 3,159 (Dep't of Commerce Jan. 23, 2002) ............................ 12, 13

*Stainless Steel Sheet and Strip in Coils from Mexico: Final Results of Antidumping Duty Administrative Review*,
    69 Fed. Reg. 6,259 (Dep't of Commerce Feb. 10, 2004) ................................. 24

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Frozen and Canned Warmwater Shrimp from Brazil*,
    69 Fed. Reg. 76, 910 (Dep't of Commerce Dec. 23, 2004) ........................ 13, 14

*Light-Walled Rectangular Pipe and Tube from the Republic of Korea: Notice of Amended Final Determination of Sales at Less Than Fair Value*,
    73 Fed. Reg. 45403 (Dep't of Commerce August 5, 2008) ................................ 2

*Certain Frozen Warmwater Shrimp from Ecuador:  Final Results of Antidumping Administrative Review,*
     74 Fed. Reg. 47201 (Dep't of Commerce Sept. 15, 2009) ................................................ 23

*Certain Crystalline Silicon Photovoltaic Products from Taiwan: Final Determination of Sales at Less Than Fair Value,*
     79 Fed. Reg. 76,966 (Dep't of Commerce Dec. 2, 2014) ................................................ 31

*Aluminum Extrusions from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Recission, in Part, 2010/12,*
     79 Fed. Reg. 96 (Dep't of Commerce Jan. 2, 2014) ........................................................ 9

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico: Final Determination of Sales at Less Than Fair Value,*
     81 Fed. Reg. 47,352 (Dep't of Commerce July 21, 2016) ................................................ 13

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results and Partial Recission of Antidumping Administrative Review; 2014-2015,*
     82 Fed. Reg. 15,181 (Dep't of Commerce March 27, 2017) ............................................ 9

*Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017,*
     84 Fed. Reg. 10,784 (Dep't of Commerce March 22, 2019). .......................................... 25

*Antidumping and Countervailing Duty Orders on Light-Walled Rectangular Pipe and Tube From the People's Republic of China: Notice of Court Decision Not in Harmony With Final Scope Ruling and Notice of Amended Final Scope Ruling Pursuant to Court Decision,*
     84 Fed. Reg. 48,912 (Dep't of Commerce, Sept. 17, 2019) ............................................ 21

*Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017,*
     84 Fed. Reg. 16646 (Dep't of Commerce April 22, 2019) ............................................. 15

*Light Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2018-2019,*
     86 Fed. Reg. 33,646 (Dep't of Commerce June 25, 2021) ............................................. 12

*Certain Crystalline Silicon Photovoltaic Products From Taiwan: Final Results of Antidumping Duty Administrative Review; Partial Rescission of Antidumping Duty Administrative Review; Final Determination of No Shipments; 2019-2020,*
     86 Fed. Reg. 49509 (Dep't of Commerce Sept. 3, 2021) ................................................ 31

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
     86 Fed. Reg. 55,811 (Dep't of Commerce Oct. 7, 2021) .................................................. 2

*Light-Walled Rectangular Pipe and Tube from Mexico: Preliminary Results and Partial Rescission of the Antidumping Duty Administrative Review; 2020-2021,*
87 Fed. Reg. 54,965 (Dep't of Commerce Sept. 8, 2022). .................................................. 3

*Agreement Suspending the Antidumping Duty Investigation on Sugar From Mexico; Preliminary Results of the 2019-2022 Administrative Review,*
87 Fed. Reg. 932 (Dep't of Commerce January 7, 2022) ................................................ 34

*Agreement Suspending the Antidumping Duty Investigation on Sugar From Mexico: Final Results of the 2019-2020 Administrative Review; Correction,*
87 Fed. Reg. 42156 (Dep't of Commerce July 14, 2022) ................................................ 35

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Review; 2020-2021,*
88 Fed. Reg. 1359 (Dep't of Commerce January 10, 2023) ............................................ 17

*Certain Freight Rail Couplers and Parts Thereof From Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,*
88 Fed. Reg. 27864 (Dep't of Commerce May 3, 2023) ................................................ 37

*Light-Walled Rectangular Pipe and Tube From Mexico: Final Results of Antidumping Duty Administrative Review; 2020-2021,*
88 Fed. Reg. 15,665 (Dep't of Commerce March 14, 2023) ............................................ 1

*Certain Freight Rail Couplers and Parts Thereof From Mexico: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,*
88 Fed. Reg. 65153 (Dep't of Commerce September 21, 2023) ...................................... 38

*Light-Walled Rectangular Pipe and Tube from China, Korea, and Mexico,*
Inv. Nos. 701-TA-449 and 731-TA-1120, USITC Pub. 4024 (July 2008) ...................... 17

Defendant, the United States, respectfully responds in opposition to the motions for judgment upon the administrative record filed by plaintiffs Maquilacero S.A. de C.V. (Maquilacero) and Tecnicas de Fluidos S.A. de C.V. (TEFLU) (collectively Maquilacero/TEFLU) and consolidated plaintiff Perfiles LM, S.A. de C.V. (Perfiles), challenging the final results of the U.S. Department of Commerce's thirteenth administrative review of the antidumping duty order covering light-walled rectangular pipe and tube (LWRPT) from Mexico.[1]  The Court should deny the motion because the final results are supported by substantial evidence and are otherwise in accordance with law.

<u>STATEMENT PURSUANT TO RULE 56.2</u>

I.      <u>Administrative Determination Under Review</u>

The administrative determination under review is *Light-Walled Rectangular Pipe and Tube From Mexico: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 15,665 (Dep't of Commerce March 14, 2023) (P.R. 151), and accompanying Issues and Decision Memorandum (IDM) (collectively, Final Results) (P.R. 146), amended in *Light-Walled Rectangular Pipe and Tube From Mexico: Amended Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 30,723 (Dep't of Commerce May 12, 2023) (Amended Final) (P.R. 160), covering the period of review (POR) from August 1, 2020, through July 31, 2021.

---

[1]  In its brief filed in support of its motion for judgment on the agency record, Perfiles does not assert its own independent arguments.  Instead, Perfiles incorporates by reference the arguments made by Maquilacero and TEFLU, and argues that if "the Court agrees with the claims presented by Maquilacero and TEFLU, it should direct Commerce to recalculate the weighted-average dumping margin that was assigned to Perfiles as well."  Perfiles Br. 2-3, ECF No. 29-1.  So, in responding to the arguments asserted by Maquilacero and TEFLU, this brief also responds to the brief filed by Perfiles.

II.     Statement Of The Issues

1.      Whether Commerce's decision to continue collapsing Maquilacero and TEFLU in line with its past determinations is supported by substantial evidence and in accordance with law.

2.      Whether Commerce's determination that TEFLU's downstream auto parts are subject merchandise is supported by substantial evidence and in accordance with law.

3.      Whether Commerce's decision not to modify its computer program to account for physical and commercial differences in products made by Maquilacero and TEFLU is supported by substantial evidence and in accordance with law.

4.      Whether Commerce's classification of Maquilacero/TEFLU's virtual export sales as home market sales is supported by substantial evidence and in accordance with law.

5.      Whether Commerce's differential pricing analysis with respect to Maquilacero/TEFLU's sales is supported by substantial evidence and in accordance with law.

STATEMENT OF THE FACTS

On August 5, 2008, Commerce published the antidumping duty order on LWRPT from Mexico.  *See Light-Walled Rectangular Pipe and Tube from Mexico, the People's Republic of China, and the Republic of Korea: Antidumping Duty Orders; Light-Walled Rectangular Pipe and Tube from the Republic of Korea: Notice of Amended Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 45403 (Dep't of Commerce August 5, 2008) (order).  On October 7, 2021, after receiving timely requests for review, Commerce published the notice of initiation of the antidumping duty review.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 55,811 (Dep't of Commerce Oct. 7, 2021) (P.R. 11).  Commerce selected Maquilacero/TEFLU and Regiomontana de Perfiles y Tubos S. de R.L. de C.V. (Regiopytsa), both representing the largest volume of subject merchandise, as mandatory respondents.  *See Respondent Selection Memo* (C.R. 3) (P.R. 21).  For purposes of respondent

selection, Commerce collapsed Maquilacero and TEFLU because those entities had been collapsed in the 2018-2019 administrative review and Maquilacero/TEFLU did not contest this determination after the publication of those final results.  Commerce issued its questionnaires and supplemental questionnaires, to which Maquilacero/TEFLU and Regiopytsa submitted timely responses.

On September 8, 2022, Commerce published the preliminary results, in which it preliminarily determined that LWRPT from Mexico had been sold in the United States at less-than-fair-value during the period of review.  *Light-Walled Rectangular Pipe and Tube from Mexico: Preliminary Results and Partial Rescission of the Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 54,965 (Dep't of Commerce Sept. 8, 2022) (P.R. 111) and accompanying Preliminary Decision Memorandum (PDM) (collectively, Preliminary Results) (P.R 103).  In the Preliminary Results, Commerce continued collapsing Maquilacero and TEFLU as no record evidence led Commerce to revisit this determination.  PDM at 1.  Commerce also reclassified certain sales made by Maquilacero/TEFLU through the Manufacturing, Maquiladora and Export Services (IMMEX) program, which Maquilacero/TEFLU had reported as U.S. and third country sales, as home market sales, finding that Maquilacero/TEFLU did not demonstrate that it had sufficient knowledge at the time of export that sales reported as virtual export sales were destined for export – either to the United States or a third country.  PDM at 9.  Following the preliminary results, Commerce provided Maquilacero/TEFLU another opportunity to submit additional information to document whether TEFLU had knowledge that its IMMEX sales are consumed in Mexico prior to exportation or whether they remain subject merchandise at the time they leave Mexico.  *See* Post-Preliminary Supplemental Questionnaire Response (C.R. 206) (P.R. 116).

On March 14, 2023, Commerce published the Final Results and addressed the petitioner's and respondents' arguments raised in their administrative case and rebuttal briefs. *See* Final Results IDM; *see also* Petitioner Admin. Case Br. (C.R. 241) (P.R. 130), Petitioner Rebuttal Br. Resubmission (C.R. 248) (P.R. 141), Maquilacero/TEFLU Admin. Br. and Admin. Rebuttal Br. Resubmission (C.R. 246) (P.R. 140), and Perfiles Admin. Case Br. (P.R. 127). Maquilacero/TEFLU argued, among other things, that Commerce should not collapse Maquilacero and TEFLU, should not treat TEFLU's further-processed products as in-scope merchandise, should classify TEFLU's IMMEX sales as U.S. sales, should modify the computer programming to consider the physical and commercial differences in further-processed products, and should reconsider its use of the Cohen's *d* test. *See generally* Maquilacero/TEFLU Admin. Br. And Admin. Rebuttal Br. Resubmission. Commerce addressed each of Maquilacero/TEFLU's arguments.

In its Final Results, Commerce continued to collapse Maquilacero and TEFLU and adhered to its prior practice of not revisiting a collapsing determination unless there is a basis for revaluation, i.e., changes in ownership, management, operations, and changes in merchandise produced. *See* IDM at 6. Commerce also continued to consider TEFLU's products as in-scope merchandise. Commerce explained that absent exclusionary language or evidence that TEFLU's further processing alters the carbon make-up or cross section of the LWRPT, it is unreasonable to assume the product is not covered despite not being specifically mentioned in the scope. *Id.* at 12. Commerce also continued classifying Maquilacero/TEFLU's virtual export sales through the IMMEX program as home market sales, as Maquilacero/TEFLU's documentation provided after the Preliminary Results continued to show that these IMMEX sales were shipped to locations within Mexico and were consumed in the production of non-subject merchandise. *Id.* at 21.

Commerce also declined to adjust its computer programming to include a further processing variable to differentiate between the products produced by Maquilacero and TEFLU, explaining that adding a further processing variable would alter Commerce's definition of the control number (CONNUM) and the model match methodology. *Id.* at 25. Pursuant to its practice, Commerce found that no compelling reasons existed to warrant a model match methodology change. *Id*. at 25-26. Commerce also declined to adjust its differential pricing analysis, finding that Maquilacero/TEFLU's cited case precedent does not preclude Commerce from applying the Cohen's *d* test to Maquilacero/TEFLU or require modification for the Final Results. *Id.* at 28-31.

On May 12, 2023, Commerce issued amended final results to correct a ministerial error raised by Regiopytsa. *See* Amended Final. This suit followed.

<u>SUMMARY OF THE ARGUMENT</u>

Commerce's decision to continue collapsing Maquilacero and TEFLU is supported by substantial evidence and in accordance with law. Commerce has a consistent practice of continuing to collapse entities in subsequent reviews unless there is evidence that a change has occurred in the underlying relationship between the collapsed entities. Maquilacero/TEFLU did not present such evidence to warrant a revisiting of the collapsing determination, which Maquilacero/TEFLU did not contest in litigation before either this Court or a United States-Mexico-Canada Agreement (USMCA) panel. Therefore, Commerce's decision to continue collapsing is appropriate.

Commerce's decision to consider TEFLU's products as in-scope merchandise is supported by substantial evidence and in accordance with law. Maquilacero/TEFLU's record submissions do not indicate that TEFLU's further-processed products fall outside of the scope's product description. The findings of the NAFTA binational panel's review of the 2016-2017 administrative review, the International Trade Commission's (ITC) report, and the original

investigation's petition support this conclusion.  Further, Maquilacero/TEFLU's case citations are inapposite and unconvincing as they cover highly different scopes or contain language that in fact supports Commerce's determination.  Therefore, Commerce's decision to continue finding TEFLU's further-processed products within the scope is appropriate.

Commerce's decision not to modify the SAS programming to incorporate additional variables in its product comparison methodology is supported by substantial evidence and in accordance with law.  Once Commerce has established a model-match methodology, it uses consistent and uniform model-matching criteria for respondents in antidumping proceedings and has a longstanding practice not to modify that methodology in subsequent proceedings unless there are compelling reasons to do so.  Maquilacero/TEFLU has not provided a reason for Commerce to stray from the existing physical characteristics of the model-match methodology that were established in the prior segment of the proceeding.  Maquilacero/TEFLU did not timely raise and support with evidence its request to change the model-match methodology at an early enough stage of the review for Commerce to consider whether it would be appropriate to make such a change.

Commerce's classification of TEFLU's IMMEX sales as home market sales is supported by substantial evidence and in accordance with law.  Commerce's practice is to determine whether the respondent knew or should have known at the time of sale that the subject merchandise was destined for export.  First, Maquilacero/TEFLU's arguments concerning constructive knowledge and the nature of U.S. Free Trade Zones (FTZ) are waived for failure to exhaust.  At no point before Commerce did Maquilacero/TEFLU argue that the record establishes that it had constructive knowledge of export, or that Commerce must consider the FTZ nature of the IMMEX program as a factor in classifying home market versus U.S. sales.

Second, record evidence does not demonstrate that Maquilacero/TEFLU had knowledge of export at the time of sale but instead shows that TEFLU's merchandise was incorporated into non-subject automobile and industrial merchandise within Mexico. Thus, it was appropriate to classify these sales as home market sales.

Lastly, Commerce's use of the Cohen's *d* test is in accordance with law and substantial evidence. Maquilacero/TEFLU contends that decisions of this Court and the Court of Appeals for the Federal Circuit require Commerce to address certain statistical criteria to use the Cohen's *d* test as used here. Maquilacero/TEFLU misconstrues the requirements of its cited case law, as none of these decisions require Commerce to do as Maquilacero/TEFLU argues. Rather, these cases have requested that Commerce further explain its reliance on the use of the Cohen's *d* analysis and how it may disregard certain statistical criteria in doing so. This Court and the Court of Appeals for the Federal Circuit have not invalidated the use of Cohen's *d*, nor have these cases implemented any new requirements on Commerce's analysis.

ARGUMENT

I.    Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence upon the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B); *United States v. Euodia S.A.*, 555 U.S. 305, 316 n.6 (2009).

"Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, a party challenging Commerce's determination under the

7

substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

The possibility of drawing two inconsistent conclusions from the evidence in the record does not preclude Commerce's determination from being supported by substantial evidence. *Consolo*, 383 U.S. at 620. Moreover, Commerce is accorded particular deference in antidumping and countervailing duty determinations. *See, e.g.*, *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.").

II.   **Commerce's Decision To Continue Collapsing Maquilacero And TEFLU Is Supported By Substantial Evidence And In Accordance With Law**

Maquilacero/TEFLU argues that Commerce improperly collapsed them in the 2018-2019 administrative review and that Commerce failed to address the requirements for collapsing in the current review. However, Commerce reasonably determined not to revisit the decision because there is no record evidence detailing a change in the relationship between Maquilacero and TEFLU since the uncontested 2018-2019 decision.

A.   Legal Framework For Collapsing

Pursuant to 19 C.F.R. § 351.401(f)(1), Commerce will collapse two or more affiliated producers as a single entity where (1) those producers have production facilities for similar or identical products that would not require substantial retooling of either facility to restructure manufacturing priorities and (2) {Commerce} concludes that there is a significant potential for

the manipulation of price or production.  Affiliated persons and producers are defined pursuant

to the criteria under 19 U.S.C. § 1677(33).  Once Commerce makes a collapsing determination,

Commerce's practice is to continue collapsing the entities in subsequent reviews.  IDM at 6-7

(citing *Aluminum Extrusions from the People's Republic of China: Final Results of Antidumping

Duty Administrative Review and Recission, in Part, 2010/12*, 79 Fed. Reg. 96 (Dep't of

Commerce January 2, 2014) and accompanying IDM at Comment 4 (*Aluminum Extrusions from

China*); *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results and

Partial Recission of Antidumping Administrative Review; 2014-2015*, 82 Fed. Reg. 15,181

(Dep't of Commerce March 27, 2017) and accompanying IDM at Comment 4).  If parties

provide a basis to do so, Commerce may reevaluate the collapsing determination.  *Id*.  The basis

for Commerce's reevaluation standard is "{investigating} whether there were any changes

during the POR in ownership, management, operations, and changes in merchandise produced."

*Id*. at 7 (citing *Aluminum Extrusions from China* at Comment 4).

> **B.**     **Maquilacero/TEFLU Did Not Meet The Burden To Warrant Commerce To
>            Revisit Its Prior Collapsing Decision**

Commerce's determination to collapse Maquilacero/TEFLU is in accordance with law

and supported by substantial evidence.  As an initial matter, Maquilacero/TEFLU is incorrect

that Commerce was required to revisit its collapsing decision made in the 2018-2019

administrative review.  Under Commerce's well-established practice, Commerce does not revisit

a prior collapsing decision unless a respondent can provide evidence of a change in the

relationship to warrant a reevaluation.  *See China First Pencil Co. v. United States*, 427 F. Supp.

2d 1236 (Ct. Int'l Trade 2006) (describing Commerce's practice and upholding Commerce's

decision to continue to collapse China First and Three Star into a single entity).  Commerce

considers "whether there were any changes during the POR in ownership, management,

operations, and changes in merchandise produced."  IDM at 7 (citing *Aluminum Extrusions from China* at Comment 4).

Consistent with its established practice, Commerce requested that Maquilacero/TEFLU state whether facts pertinent to the previous collapsing decision were the same in the instant review and, if not, that Maquilacero/TEFLU identify, explain, and support the differences.  *See* IDM at 8 (citing Maquilacero's First Supplemental Questionnaire Response (C.R. 152) (P.R. 92) at 13-18).  However, Maquilacero/TEFLU did not provide information indicating that the relationship between Maquilacero and TEFLU had changed since Commerce's analysis in the 2018-2019 administrative review.  Therefore, Commerce continued to collapse Maquilacero/TEFLU in accordance with its prior collapsing determination.

Maquilacero/TEFLU argues that Commerce deviated from its practice of treating each segment of a proceeding as an "independent proceeding with a separate record."  *See* Maquilacero/TEFLU Br. at 16, ECF No. 31.  Although the Government does not disagree with this principle, Maquilacero/TEFLU does not identify any factual differences between the instant case and the 2018-2019 administrative review that would warrant a different conclusion. Moreover, Commerce reasonably declined to perform a *de novo* collapsing analysis in the underlying review.  Indeed, the Federal Circuit has held in an analogous context that Commerce need not revisit prior determinations where no new evidence or changed circumstances have been presented, even in instances where parties allege clear legal error.  In *Magnola Metallurgy, Inc. v. United States*, 508 F.3d 1349 (Fed. Cir. 2007), the Federal Circuit found that the Supreme Court has ruled on this exact question:

> {W}here a party petitions an agency for reconsideration on the ground of 'material error,' *i.e.*, on the same record that was before the agency when it rendered its original decision, 'an order which merely denies rehearing of…{the prior} order is not itself

reviewable.

*Id.* (citing *Interstate Commerce Commission v. Brotherhood of Locomotive Engineers*, 482 U.S.

270, 280 (1987)).  The Federal Circuit held that the Supreme Court distinguished agency refusal

to consider a prior decision based on new evidence or changed circumstances from a refusal to

reconsider based on material error.

> {W}here no new data but only 'material error' has been put
> forward as the basis for reopening, an appeal places before the
> courts precisely the same substance that could have been brought
> there by appeal from the original order…"  Denying judicial
> review to petitions to reconsider earlier agency actions based only
> on error in the original decision prevents an "agency's permitting,
> or {a} litigant's achieving, perpetual availability of review by the
> mere device of filing a suggestion that the agency has made a
> mistake and should consider the matter again.

*Id.* (citing *Interstate Commerce Commission*, 482 U.S. at 281).  The Federal Circuit concluded

that, with respect to trade remedies cases, "{t}he case before us is even clearer than {*Interstate*

*Commerce Commission*} because here, unlike {*Interstate Commerce Commission*}, the

underlying statute does not provide for reconsideration in cases of 'material error.'"  *Id*.  If new

facts or evidence show that the original determination was erroneous, Commerce will revisit its

determination on the basis of such evidence.  *Id*. at 1358.

In the 2018-2019 administrative review collapsing determination, Commerce found that

Maquilacero and TEFLU should be collapsed and treated as a single entity because they are

affiliated through common ownership, they have overlapping board members, and they have

intertwined operations.  Further, Commerce found that the fact that TEFLU's processing does

not change the products' physical characteristics resulting in different control numbers (or

CONNUMs) indicated a potential for restructuring of certain manufacturing priorities.  IDM at 7

(citing *Light Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping*

*Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 33,646 (Dep't of Commerce June 25,

2021) (2018-2019 administrative review), and accompanying IDM at Comment 9).  The record evidence on which Maquilacero/TEFLU relies indicates that no changes occurred in the relationship between the two companies since Commerce conducted its 2018-2019 analysis.  *See* IDM at 8 (citing Maquilacero/TEFLU Section A Questionnaire Response (C.R. 17) (P.R. 36) at A-16-A-17 and Maquilacero/TEFLU's Admin. Rebuttal Br. at 11-13).  Specifically, it shows that Maquilacero and TEFLU are owned by the same family-held group, that there is still corporate and managerial overlap, and that Maquilacero, TEFLU, and certain other affiliates which comprise the family held-ownership group continue to be parties which "may be considered involved in the production, sale, or distribution of the merchandise under review."  *See* IDM at 8 (citing Maquilacero/TEFLU Section A Questionnaire Response at 12-17, and Exhibits A-4, A-5, A-28, and A-29).  Instead of attempting to show how these facts constitute a change warranting reconsideration of Commerce's prior determination, Maquilacero/TEFLU asserts that Commerce's decision to collapse Maquilacero and TEFLU in the 2018-2019 administrative review was incorrect, presenting the same arguments in this review as it did then. Maquilacero/TEFLU Br. at 13-23.

Maquilacero/TEFLU also argues that the "2018-2019 collapsing determination was an expansion of Commerce's collapsing practice."  Maquilacero/TEFLU Br. at 15-16; 21-23. However, Commerce explained in the final results why its determination comported with its past practice.  In support of its claim that Commerce should not have collapsed the two companies, Maquilacero/TEFLU cites *Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Bar from Germany,* 67 Fed. Reg. 3,159 (Dep't of Commerce January 23, 2002) (*Stainless Steel Bar from Germany*), and accompanying IDM at Comment 15.  That case is distinguishable because the respondents in that case did not have managerial overlap except for

two common members of supervisory boards, there was no information indicating the two

companies shared sales information, were involved in each others' production or pricing

decisions, or shared facilities or employees, and the companies lacked a common corporate

history.  IDM at 9 (citing *Stainless Steel Bar from Germany*, 67 Fed. Reg. 3,159, and

accompanying IDM at Comment 15).  Maquilacero/TEFLU also asserts that Commerce's

practice is to use the arm's length test to test affiliates sales rather than collapsing.

Maquilacero/TEFLU Br. at 23 (citing *Heavy Walled Rectangular Welded Carbon Steel Pipes*

*and Tubes From Mexico: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg.

47,352 (Dep't of Commerce July 21, 2016) (*Heavy Walled Rectangular Welded Carbon Steel*

*Pipes and Tubes From Mexico*), and accompanying IDM at Comment 2).  Here, Commerce

chose not to rely on the arm's length test because, contrary to the facts of *Heavy Walled*

*Rectangular Welded Carbon Steel Pipes and Tubes From Mexico* where collapsing was

inappropriate as the relationship was purely based on affiliation, there were more factors here

that supported collapsing.  IDM at 8 (citing *Heavy Walled Rectangular Welded Carbon Steel*

*Pipes and Tubes From Mexico* IDM at Comment 2).  Lastly, Commerce's citation to the analysis

in *Shrimp from Brazil* is appropriate as both cases involved similar facts, *i.e.*, the management of

one company was largely controlled by the owners and managers of the affiliate.  IDM at 9

(citing *Notice of Final Determination of Sales at Less Than Fair Value: Certain Frozen and*

*Canned Warmwater Shrimp from Brazil*, 69 Fed. Reg. 76, 910 (Dep't of Commerce December

23, 2004) (*Shrimp from Brazil*), and accompanying IDM at Comment 5).  19 C.F.R.

§ 351.401(f)(2)(iii) requires that Commerce examine "whether 'operations are intertwined, such

as through the sharing of sales information, involvement in production and pricing decisions, the

sharing of facilities or employees, or significant transactions between the affiliated {parties}.'"

*Id*. (citing *Shrimp from Brazil* IDM at Comment 5).  As such, Commerce found in *Shrimp from Brazil* that there was significant potential for manipulation of price or production between the two respondents.  *Id*.  In the 2018-2019 administrative review of LWRPT, there was a producer of LWRPT and an affiliated processor with intertwined operations and managerial overlap, which were the same factors present in *Shrimp from Brazil* that warranted a collapsing decision. *Id*.

Because Maquilacero/TEFLU has not provided evidence of a change in the relationship between the collapsed entities, or any new facts or changed circumstances to show that Commerce's collapsing decision was erroneous, Commerce's decision to continue collapsing Maquilacero and TEFLU is supported by substantial evidence and in accordance with law.

III.   Commerce's Decision That TEFLU's Further Processed Automotive Parts Are In-Scope Merchandise Is Supported By Substantial Evidence And In Accordance With Law

Maquilacero/TEFLU argues that Commerce's treatment of TEFLU's sales of downstream automotive parts as sales of in-scope merchandise is unlawful. Maquilacero/TEFLU Case Br. at 23-33.  Specifically, Maquilacero/TEFLU argues that Commerce failed to consider the extent of TEFLU's further processing of the LWRPT into "distinct, downstream products that no longer meet the description" of the scope,  *id*. at 26, and that Commerce's rationale is contrary to law.  *Id*. at 26-33.  As set forth below, these arguments lack merit.

A.   Legal Framework For Scope Interpretation

The Federal Circuit has made clear that the language of Commerce's final order defines the scope.  *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002) (citing *Smith Corona Corp. v. United States*, 915 F.2d 683, 685 (Fed. Cir. 1990)); *see also Fedmet Res. Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014) (citing *King Supply Co. v. United*

*States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012)) ("The plain language of a countervailing or antidumping duty order is 'paramount' in determining whether particular products are included within its scope.")).  Although "the petition, factual findings, legal conclusions, and preliminary orders" may "aid" Commerce's analysis, "they cannot substitute for the language of the order itself."  *Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010); *see also Duferco Steel*, 296 F.3d at 1095.  While Commerce is afforded deference to its interpretation of the antidumping duty orders, it may not interpret an order so as to change the scope of that order nor can it interpret the order in a manner contrary to its terms.  *Fedmet Res. Corp.*, 755 F.3d at 918 (citing *Duferco Steel*, 296 F.3d at 1095).

B.       The Plain Language Of The Scope Of The Order Describes The Physical
Characteristics Of TEFLU's Merchandise And Contains No Exclusions

Maquilacero/TEFLU contends that Commerce failed to consider the threshold question of whether TEFLU's automotive components continue to be LWRPT or whether the parts represent distinct downstream products outside the scope.  Maquilacero/TEFLU Case Br. at 26.  However, Commerce did address this threshold question by finding that the plain language of the scope supports a finding that TEFLU's downstream automotive parts are in-scope merchandise. Notably, Maquilacero/TEFLU raised these identical arguments in the 2016-17 administrative review and before a NAFTA panel, which affirmed Commerce's interpretation of the scope.  *See Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 16646 (Dep't of Commerce April 22, 2019), and accompanying IDM (2016-17 administrative review IDM) at Comment 2; *and* USA-MEX-2019-1904-01 at 10 (June 27, 2022) (NAFTA Panel Ruling).

The scope of the order covers "carbon quality light-walled rectangular pipe and tube, of rectangular (including square) cross section, having a wall thickness of less than 4 mm."  *See*

order at 45,404.  Maquilacero/TEFLU reported that TEFLU's product undergoes a process of

"saw-cutting, laser cutting-to-length, drilling, preformation, and/or bending."  IDM at 12-13

(citing Maquilacero/TEFLU Admin. Br. at 1-2).  These processes and specifics of TEFLU's

product, to which Maquilacero/TEFLU dedicates a large portion of its argument, do not exceed

the physical or chemical compositions listed in the scope of the order.  IDM at 13 (citing 2016-

2017 administrative review IDM at 9, and Maquilacero/TEFLU Br. at 28-29).  As explained in

the 2016-17 administrative review IDM:

> The specifications of the subject merchandise that the downstream
> affiliate sold during the POR do not exceed the quantity, by
> weight, of the elements listed in the scope language regarding
> carbon quality.  Additionally, the wall thickness of downstream
> sales is less than 4 mm.

2016-17 administrative review IDM at 9.  A binational NAFTA panel considered

Maquilacero/TEFLU's similar arguments in the 2016-17 review and ruled in Commerce's favor.

The panel affirmed Commerce's determination that the scope does not state or imply that a

product ceases to be LWRPT because it has undergone further processing "according to the

dictates of a particular LWRPT-using industry or application."  NAFTA Panel Ruling at 11.  The

NAFTA panel found that the petition in the original investigation supported Commerce's

decision that any product that meets the physical characteristics of the scope is covered

regardless of whether it is produced "to ASTM, proprietary or other industry specification."

NAFTA Panel Ruling at 11-12.  Commerce made the same finding in this review.  *See* IDM at

13 (citing Antidumping Duty Petition on Light-Walled Rectangular Pipe and Tube from Korea,

Mexico, and the People's Republic of China and Turkey and Countervailing Duty Petition on

Light-Walled Rectangular Pipe and Rube from the People's Republic of China, dated June 27,

2007).  Commerce also determined that the ITC Report was highly relevant to the interpretation

of the LWRPT scope; further, the NAFTA panel agreed that this report supported Commerce's

determination as it defined LWRPT is an intermediate product with "many end-use applications," including "fences, gates, hand rails, furniture, sports equipment, and automotive equipment."  IDM at 13 (citing *Light-Walled Rectangular Pipe and Tube from China, Korea, and Mexico*, Inv. Nos. 701-TA-449 and 731-TA-1120, USITC Pub. 4024 (July 2008) (ITC Report) at 3-4); NAFTA Panel Ruling at 11-12.  Ultimately, the NAFTA panel found that "LWRPT net of processing by Maquilacero's affiliate may have been stamped, bent, and/or hole-drilled, but Commerce committed no legal error in finding that it remained LWRPT."  NAFTA Panel Ruling at 13.  Likewise, Commerce made no error in the immediate review in finding that, although the LWRPT undergoes some further processing, it does not cease being LWRPT per the scope's language.  *See* IDM at 13.

With respect to Maquilacero/TEFLU's reliance on the fact that its further processed parts are classified under Harmonized Tariff Schedule of the United States (HTSUS) subheadings not listed under the scope of the order after the further processing, the plain language of the scope explains that "HTSUS subheadings are provided for convenience and Customs purposes."  IDM at 14 (citing *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Review; 2020-2021*, 88 Fed. Reg. 1359 (Dep't of Commerce January 10, 2023) and *American NTN Bearing Mfg. Corp. v. United States*, 739 F. Supp. 1555 (Ct. Int'l Trade 1990)).

In light of the scope's dispositive language and the other above-noted sources providing aid to Commerce's analysis, Commerce appropriately concluded that TEFLU's further-processed products do not fall outside of the scope.

C.    Commerce's Scope Interpretation Is Reasonable And Maquilacero/TEFLU's
      Citations Are Inapposite

Maquilacero/TEFLU claims that Commerce's scope interpretation is contrary to law.

Maquilacero/TEFLU disputes Commerce's finding that "absent exclusionary language…'it is

not reasonable to conclude that simply because a particular type of LWRPT is not specifically

mentioned in the scope, that the product is not covered."  IDM at 12.  However, the citations

Maquilacero/TEFLU uses in its attempt to undermine this conclusion are distinguishable or

otherwise unpersuasive.

As Maquilacero/TEFLU notes, the Government does not disagree with the principle that

"{s}cope orders may be interpreted as including subject merchandise only if they contain

language that specifically includes the subject merchandise or may be reasonably interpreted to

include it."  Maquilacero/TEFLU Br. at 30 (citing *Duferco Steel*, 296 F.3d at 1089).  As

explained above, the scope continues to cover TEFLU's products and to the extent that TEFLU's

products differ from Maquilacero's LWRPT, the language can be reasonably interpreted to

include them.

Maquilacero/TEFLU also relies on *Trendium Pool Products, Inc. v. United States*, 399 F.

Supp. 3d 1355 (Ct. Int'l Trade 2019), to support its argument.  In *Trendium*, the Court held that

the processing performed on an in-scope item may be "so extensive and particular to {a given}

use" as to place it outside of the scope.  *Trendium Pool Products, Inc.*, 399 F. Supp. 3d at 1343.

However, as explained in the NAFTA panel ruling, "*Trendium* of course does not, and could not

hold that *every* instance of processing has this result."  NAFTA Panel Ruling at 13 (emphasis in

original).  The panel noted that an analysis of sufficient transformation to prevent the scope from

being applicable "is a case- and context-specific question."  *Id*.  Further, the panel found that the

type of further processing in *Trendium* "differs markedly" from TEFLU's further processing.  *Id*.

at 13.  The same rationale applies to Maquilacero/TEFLU's reliance on *Fabuwood Cabinetry Corp.*, *TMB 440AE, Inc.*, and the *PCS Scope Ruling* as these proceedings concern scope language covering vastly different products than LWRPT such as wooden cabinetry, seamless pipe, and cut-to-length steel plate.  *See* Maquilacero/TEFLU Br. at 30-33 (citing *Fabuwood Cabinetry Corp. v. United States*, 469 F. Supp. 3d 1373 (Ct. Int'l Trade 2020); *TMB 440AE, Inc.*, No. 18-00095, 2020 WL 1672841 (Ct. Int'l Trade Apr. 6, 2020); and Memorandum, *Antidumping and Countervailing Duty Orders on Certain Carbon Alloy Steel Cut-to-Length Plate from Austria, Belgium, Brazil, the People's Republic of China, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, the Republic of South Africa, Taiwan, and Turkey: Scope Ruling Request* (October 11, 2017) (*PCS Scope Ruling*)).

Aside from the notably different scopes and products at issue in these cases, they are also distinguishable for other reasons.  Maquilacero/TEFLU argues that *Fabuwood Cabinetry Corp.* stands for the proposition that the products subject to the scope of an order must have also been covered by the underlying investigation.  *Fabuwood Cabinetry Corp.*, 469 F. Supp. 3d at 1389. In *Fabuwood Cabinetry Corp.*, the Court was concerned that Commerce had expanded the language of the scope to cover merchandise, *i.e.*, furniture and furniture parts, that was defined in the ITC's investigation as a "source of demand" of the subject merchandise, *i.e.*, hardwood plywood.  *Id*.  Here, in contrast, Commerce has found TEFLU's product to be covered by the literal language of the scope and supported that determination by reference to the ITC Report and other evidence.

Likewise, in *TMB 440AE*, the Court remanded Commerce's determination in a scope ruling related to a specialty pipe product.  *See TMB 440AE, Inc.*, No. 18-00095, 2020 WL 1672841 (Ct. Int'l Trade Apr. 6, 2020).  Specifically, this Court identified evidence in the

investigation that indicated that the investigation was intended to cover "commodity pipe" and determined that Commerce could not ignore these references.  *Id*. at *6.  Therefore, the Court remanded for Commerce to conduct a complete analysis of the interpretive sources under 19 C.F.R. § 351.225(k)(1).  Maquilacero/TEFLU also fails to note that, in the subsequent remand, Commerce performed the additional analysis and continued to find that the specialty pipe in question was within the scope—a decision that was upheld by this Court.  *See TMB 440AE, Inc. v. United States*, 2020 WL 7009680 (Ct. Int'l Trade Nov. 27, 2020).  In this case, there is no indication that the scope's language was intended to cover only a specific type of LWRPT, *i.e.*, basic pipe or further processed pipe.  To the contrary, Commerce's examination of (k)(1) sources such as the petition and the ITC Report indicates that the subject LWRPT can have a variety of end uses and that further processing does not necessarily take subject LWRPT outside of the scope.  *See* IDM at 12-14.

In the *PCS Scope Ruling*, Maquilacero/TEFLU highlights certain language while overlooking Commerce's finding that "the ITC report and the petition are instructive to determine that such 'downstream' products are not included in the scope."  *PCS Scope Ruling* at 7.  The ITC Report and the petition in this proceeding, as explained above, indicate that TEFLU's products remain subject to the scope.

Maquilacero/TEFLU's reliance on *Stein Industries v. United States*, 365 F. Supp. 3d 1364 (Ct. Int'l Trade 2019) is similarly unavailing.  Maquilacero/TEFLU cites *Stein Industries* for the proposition that "{t}he ITC's discussion…{does} not reasonably suggest that all LWR pipe and tube…remains within the scope no matter the…shape or degree of further manufacturing."  Maquilacero/TEFLU Br. at 32 (citing *Stein Industries*, 365 F. Supp. 3d at 1373).  However, Commerce found on remand in *Stein Industries* that the products covered by the inquiry did not

exhibit a rectangular cross-section at the time of importation and, thus, were not covered by the

scope. IDM at 13 (citing *Antidumping and Countervailing Duty Orders on Light-Walled*

*Rectangular Pipe and Tube From the People's Republic of China: Notice of Court Decision Not*

*in Harmony With Final Scope Ruling and Notice of Amended Final Scope Ruling Pursuant to*

*Court Decision*, 84 Fed. Reg. 48,912 (Dep't of Commerce, Sept. 17, 2019), and accompanying

Final Results of Redetermination Pursuant to Court Remand at 6.). Maquilacero/TEFLU does

not argue that any attachments are welded to TEFLU's merchandise such that Maquilacero's

products no longer exhibit a rectangular cross-section, and as such *Stein Industries* is

distinguishable. IDM at 12-14. Further, the Court in *Stein Industries* stated only that the ITC

Report does "not reasonably suggest that *all* LWR pipe and tube" remain subject to the scope

regardless of the degree of further processing. *Stein Industries*, 365 F. Supp. 3d at 1373

(emphasis added). Commerce did not find in the underlying review that *all* further-processed

LWRPT should be covered. Rather, Commerce conducted a case-specific assessment and

determined that TEFLU's further-processed LWRPT remains subject to the scope.

 In sum, because Maquilacero/TEFLU has not demonstrated that Commerce's

determination that TEFLU's further-processed products are in-scope is unreasonable,

Commerce's determination should be sustained.

IV.  Commerce's Decision Not To Incorporate Distinguishing Variables In Its Product
     Comparison Methodology Is Supported By Substantial Evidence And Is In Accordance
     With The Law

 Maquilacero/TEFLU argues that Commerce erred in not distinguishing TEFLU's further

manufactured products from Maquilacero's non-further manufactured products in its product

comparison methodology. Maquilacero/TEFLU Br. at 33-37. Specifically, Maquilacero/TEFLU

first contends that Commerce's rejection of the manufacturer code and the FURPROCESSH/U

variable as part of its comparison methodology was contrary to law and unsupported by

substantial evidence.  *Id*. at 35-37.  Second, Maquilacero/TEFLU contends that its proposal for

the use of the FURPROCESSH/U variable for consideration was timely raised.  *Id*. at 37-38.

Both claims are unavailing.

    A.    <u>Legal Framework For Commerce's Model Match Methodology</u>

To establish a dumping margin, whether in an initial investigation or a subsequent

administrative review, Commerce must first identify the "foreign like product" that will form the

basis for comparison to merchandise exported to the United States.  19 U.S.C. § 1677(16); *see*

*also Pesquera Mares Australes Ltda. V. United States*, 266 F.3d 1372, 1375 (Fed. Cir. 2001).

Because Congress has not mandated the precise methodology by which Commerce must identify

the "foreign like product," it has implicitly delegated that authority to Commerce.  *Id*. at 1384.

This Court has held that Commerce's model match methodology is entitled to *Chevron*

deference.  *Koyo Seiko Co., Ltd. v. United States*, 66 F.3d 1204, 1209 (Fed. Cir. 1995).

Commerce has "considerable discretion" to define the "foreign like product" in an antidumping

proceeding.  *SKF USA Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008).  Thus,

Commerce's choice of matching methodology should be upheld if it constitutes a permissible

construction of that statute.  *Koyo Seiko*, 66 F.3d at 1209-10.

In *New World Pasta Company v. United States*, 316 F. Supp. 2d 1338, 1352 (Ct. Int'l

Trade 2004), the Court explained that, in defining a "foreign like product" for purposes of 19

U.S.C. § 1677(16)(A), "Commerce is constrained both by statute and by its own past practice."

As a result, the Court found that Commerce must base product-matching criteria on "physical

characteristics," and recognized that Commerce's practice is to consider only "meaningful" or

"significant" physical differences.  *Id*. (quoting 19 U.S.C. § 1677(16)(A)).  In determining what

is "meaningful" or "significant," the Court acknowledged that Commerce looks at both "price

differences in the marketplace and cost differences which may reflect different production

processes." *Id*. at 1353-54 (citation omitted).  Moreover, "{i}dentical" products do not have to

be exactly the same.  Rather, "merchandise should be considered to be identical despite the

existence of minor differences in physical characteristics, if those minor differences are not

commercially significant." *Pesquera Mares*, 266 F.3d at 1384.  Commerce determines what

constitutes "commercially significant" physical differences on a case-by-case basis.  *See*

*Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270, 1279 (Ct. Int'l Trade 2008).

Once Commerce has established a model-match methodology, it uses consistent and

uniform model-matching criteria for respondents in antidumping proceedings and has a

longstanding practice not to modify that methodology in subsequent proceedings unless there are

"compelling reasons" to do so.  *Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d

1309, 1315 (Ct. Int'l Trade 2020) (citing *SKF USA*, 537 F.3d at 1380, *Koyo Seiko*, 516 F. Supp.

2d, 1331-32 (2007), *aff'd*, 551 F.3d 1286 (Fed. Cir. 2008); and *Fagersta*, 577 F. Supp. 2d at

1276-77).  Commerce considers compelling reasons to exist if a party proves by "compelling and

convincing evidence" that the existing model-matching criteria "are not reflective of the

merchandise in question," that there have been changes in the relevant industry, or that "there is

some other compelling reason present which requires a change." *Fagersta*, 577 F. Supp. 2d at

1277 (citation omitted).  If an interested party wishes to request a change to Commerce's model-

match methodology, it must do so early enough in the proceeding to permit parties the

opportunity to comment and for Commerce's consideration.  *See Certain Frozen Warmwater*

*Shrimp from Ecuador:  Final Results of Antidumping Administrative Review*, 74 Fed. Reg. 47201

(Dep't of Commerce Sept. 15, 2009), and accompanying IDM at Comment 3 (discussing

Commerce's practice to only accept arguments for changes to the model-match methodology

when raised early on a proceeding).

B.      Commerce's Decision Not To Use The Manufacturer Code In The SAS
        Programming Was In Accordance With Law And Not Arbitrary

Maquilacero/TEFLU contends that Commerce has in prior proceedings, including the

2018-19 administrative review of this same order, included manufacturer code as a variable in

the SAS programming and that Commerce arbitrarily departed from its practice in this review.

Maquilacero/TEFLU Br. at 35-36.  However, the proceedings relied on by Maquilacero/TEFLU

are distinguishable and Commerce has adequately explained its decision not to rely on a

manufacturer code variable in this review.

In the final results, Commerce rejected Maquilacero/TEFLU's proposal to account for the

manufacturer code in its SAS programming.  Because Commerce collapsed Maquilacero and

TEFLU and treated them as a single entity for purposes of the review, Commerce found that

there is "but one manufacturer of this in-scope merchandise, namely, Maquilacero/TEFLU."  *See*

IDM at 24.   Therefore, Commerce reasonably found that there was no basis to differentiate

between different producers in the collapsed entity.  IDM at 24-25.

Commerce also distinguished the instant case from those cited by Maquilacero/TEFLU.

Commerce explained that Maquilacero/TEFLU's cited cases involved distinguishable issues

concerning third country or U.S. manufacturing, and do not involve collapsed entities.  In

*Stainless Steel Sheet and Strip in Coils from Mexico*, the manufacturer code was used to evaluate

whether products purchased from non-Mexican producers qualified as foreign-like products.

IDM at 27 (citing *Stainless Steel Sheet and Strip in Coils from Mexico: Final Results of*

*Antidumping Duty Administrative Review*, 69 Fed. Reg. 6,259 (Dep't of Commerce February 10,

2004) and accompanying IDM at Comment 13).  Here, a manufacturer code is unnecessary as no

issues of evaluating non-Mexican purchases and whether they qualify as foreign-like products

are present.  In *CORE from Korea*, Commerce was reviewing whether the manufacturer for U.S.

sales was incorrectly reported and how that affected the comparison with home market sales prices for the purposes of calculating a margin.  *See Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 10,784 (Dep't of Commerce March 22, 2019) (*CORE from Korea*) and accompanying IDM at Comment 13.  Commerce was not evaluating, nor making any determinations about, whether it was appropriate to treat further-processed products in the country as produced by a separate manufacturer.  IDM at 26 (citing *CORE from Korea*).  Lastly, neither case addressed the specific concern that Commerce identified in the final results – namely, that there is no basis to differentiate between manufacturers within a single collapsed entity.

Maquilacero/TEFLU also argues that it was arbitrary for Commerce to include a manufacturer variable in the 2018-19 administrative review and not here.  However, Commerce's treatment of the manufacturer field was not raised by parties in that review and indeed Commerce rejected a related argument requesting that it account for further processing in its model match hierarchy.  *See* IDM at 27.  Where "analysis shows that Commerce acted differently in this case than it has *consistently* acted in similar circumstances without reasonable explanation, then Commerce's actions will have been arbitrary."  *See Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (emphasis added).  In this instance, Maquilacero/TEFLU has not cited any other comparable administrative decisions outside of the 2018-19 review to show that Commerce has consistently incorporated a manufacturer variable in the manner proposed by Maquilacero/TEFLU.  Moreover, although Commerce may have used the manufacturing code in the 2018-19 administrative review for Maquilacero/TEFLU, Commerce provided a reasonable explanation for not doing so here – namely, the fact that

Maquilacero/TEFLU are a collapsed entity.  As Maquilacero/TEFLU recognizes in its briefing, each administrative review is a distinct proceeding with its own record.  Maquilacero/TEFLU Br. at 15 (citing *Qindao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014)).  On this record, Commerce reasonably declined to use the manufacturer code in its SAS programming.

Accordingly, because Maquilacero/TEFLU has failed to prove Commerce acted arbitrarily in not using a manufacturer code or that Commerce is bound by a previous administrative decision, Commerce's decision is in accordance with law.

C.     Commerce's Decision Not To Use The FURPROCESSH/U Variable In Its Model Match Methodology Is Supported By Substantial Evidence And In Accordance With Law

Maquilacero/TEFLU further requests that this Court remand the proceeding back to Commerce with instructions to incorporate a FURPROCESSH/U variable into the model-match methodology to account for TEFLU's role in the production process.  *Id*. at 33-35.  In particular, Maquilacero contends that, because Commerce did not account for the differentiation between Maquilacero's and TEFLU's distinct products, it introduced distortion into the model-match methodology and Maquilacero/TEFLU's margin.  Maquilacero/TEFLU Br. at 36.

Maquilacero/TEFLU's request to add a FURPROCESSH/U variable to the model-match methodology's physical characteristic control numbers (CONNUMs) lacks merit.  As an initial matter, Commerce found that Maquilacero/TEFLU's request to use a further processing variable constituted an "attempt{} to insert the manufacturer as an additional physical characteristic" in the model-match criteria.  IDM at 25.  But as noted above, Commerce appropriately declined to differentiate between producers within a collapsed entity.  Additionally, Commerce reasonably found that Maquilacero/TEFLU did not provide a compelling reason for Commerce to stray from the existing physical characteristics of the model-match methodology that were established

earlier in the proceeding.  *Id.* at 25.  Lastly, Maquilacero/TEFLU did not timely raise its request to alter the model-match methodology's CONNUMs.

Commerce addressed similar arguments by Maquilacero/TEFLU in the 2018-2019 administrative review of the same product and came to the same conclusion to not alter the model-match criteria.  *Id.*, 2018-2019 administrative review IDM at Comment 1.  In the 2018-2019 review, Commerce determined that "Maquilacero had failed to satisfy the high factual threshold necessary to include further processing as a product characteristic in the established model matching criteria for {light walled rectangular pipe and tube}."  2018-2019 administrative review IDM at 9.  Similarly, Commerce determined that the further processing was "performed only on a limited number of {control numbers} that the collapsed Maquilacero/TEFLU entity sold during the POR," and that Maquilacero/TEFLU failed to provide the "compelling and convincing evidence" necessary to require that Commerce revisit the model-matching criteria. *Id.*.  Maquilacero/TEFLU does not identify new facts or its arguments that have changed since the 2018-2019 administrative review.   Accordingly, Maquilacero/TEFLU's arguments to request the insertion of a further processing variable fall short.

In addition, Maquilacero/TEFLU did not timely raise its request for a further processing variable at an early enough stage, with additional evidence and information, for Commerce to consider making a change to its model-match criteria.  IDM at 26-27.   Commerce found that Maquilacero/TEFLU "first explained its reported 'further processing' field…in its first supplemental questionnaire response."  *Id.* (citing Maquilacero/TEFLU First Supplemental Questionnaire Response at 4-6 (C.R. 152) (P.R. 92)).  Commerce then found that "{t}he explanation provided by Maquilacero/TEFLU described the nature and steps of the further processing…{but} it did not include evidence or argument suggesting or supporting the

consideration." *Id*.

Maquilacero/TEFLU argues that it timely raised the argument that Commerce should incorporate the further-processing variable, citing its responses to the initial questionnaire and supplemental questionnaire responses and the fact that petitioners did not indicate there was insufficient time for comment.  Maquilacero/TEFLU Br. at 37-38 (citing Maquilacero/TEFLU Section B Questionnaire Response at B-21 (C.R. 25) (P.R. 50), Maquilacero/TEFLU Section C Questionnaire Response at C-17-18 (C.R. 28) (P.R. 51), Downstream Questionnaire Response at BA2-24 (C.R. 88) (P.R. 57), and Maquilacero/TEFLU First Supplemental Questionnaire Response at 17).  As a preliminary note, it is up to Commerce to determine whether arguments that the model-match criteria must be revisited are timely raised—the petitioner's lack of comment on this issue is irrelevant.  As for its claims that it timely raised these arguments for Commerce's consideration, what Maquilacero/TEFLU provided in the cited questionnaire responses did not constitute argument or compelling and convincing evidence.  Rather, Maquilacero/TEFLU simply included the further processing field in its responses, *see* Maquilacero/TEFLU Section B Questionnaire Response at B-21 *and* Maquilacero/TEFLU Section C Questionnaire Response at C-17-18, and on one occasion included a perfunctory sentence asking Commerce to include the characteristic "to account for physical and commercial differences" between Maquilacero's and TEFLU's products.  Downstream Questionnaire Response at BA2-24.

Commerce requires that interested parties who recommend a change to the model-match criteria must do so at an early stage of the proceeding and provide "convincing and compelling evidence" warranting that change.  *See* 2018-2019 administrative review IDM at 9 (notifying Maquilacero/TEFLU that "it may raise the issue at an early stage in the future segment and

provide additional evidence and information for Commerce to consider"); *see also Fagersta*, 577 F. Supp. 2d at 1277 (citation omitted). However, in its initial questionnaire submissions in this review, Maquilacero/TEFLU failed to provide or cite to the necessary compelling and convincing evidence for Commerce to conduct its analysis of whether the model-matching criteria "are not reflective of the merchandise in question," that there have been changes in the relevant industry, or that "there is some other compelling reason present which requires a change." *Fagersta*, 577 F. Supp. 2d at 1277 (citation omitted). Further, Maquilacero/TEFLU attempted no discussion of commercial significance within the context of the model-match criteria in any of its questionnaire responses outside of perfunctory references to "physical and commercial differences" without further explanation. Maquilacero/TEFLU was required to develop its argument to change the model-match criteria at an early stage of the proceeding but did not do so, opting to only describe the nature and steps of its proposed further processing variable in its first supplemental response while raising detailed arguments for the first time in its administrative case brief after the publication of the preliminary results. Because these arguments were not developed for Commerce's consideration at an early stage of the proceeding, the Court should not consider them now. *See Ghigi 1870 S.p.A. v. United States*, 547 F. Supp. 3d 1332, 1334 (Ct. Int'l Trade 2021) (sustaining decision not to modify model match criteria where party did not raise arguments "during the questionnaire phase, when Commerce could have considered its claims" and collected further factual information).

Maquilacero/TEFLU was aware of Commerce's practice for requests to change the model-match methodology following the 2018-2019 administrative review as well as the fact its arguments and evidence at the time did not satisfy the necessary high factual threshold. 2018-2019 administrative review IDM at Comment 1. Now, Maquilacero/TEFLU attempts to

incorporate the commercially significant analysis as part of their brief in the context of "well-documented differences." Maquilacero/TEFLU Br. at 37. However, the time to do this was during the questionnaire phase. This Court should find that Commerce's determination that Maquilacero/TEFLU failed to provide evidence or argument to support its request for a further processing variable is supported by substantial evidence and in accordance with law.

V.    Commerce's Classification Of TEFLU's IMMEX Sales As Home Market Sales Is
      Supported By Substantial Evidence And In Accordance With Law

Maquilacero/TEFLU argues that Commerce should not have treated TEFLU's sales made under the IMMEX program as home market sales. Maquilacero/TEFLU Br. at 38-43. Maquilacero/TEFLU claims that substantial evidence demonstrated that it had knowledge of the export destination at the time of sale, therefore Commerce should have treated these "virtual export" sales as U.S. sales for the purposes of calculating an accurate dumping margin. *Id.* As set forth below, these arguments lack merit.

A.    Legal Framework For Classifying Home Market Or U.S. Market Sales

When calculating a respondent's weighted-average dumping margin, Commerce must determine the universe and classification of the respondent's sales during the period of review. *See* PDM at 9 (discussing product comparisons). Commerce "employs a knowledge test under 19 U.S.C. § 1677b to determine whether a producer 'knew or should have known that the merchandise was ... for home consumption' such that the sales should be included in the home market database, and under 19 U.S.C. § 1677a to determine whether a producer 'knew or should have known, at the time of a sale, whether or not the subject merchandise will be exported' such that the sale price should be considered the U.S. purchase price." *Z.A. Sea Foods Priv. Ltd. v. United States*, 569 F. Supp. 3d 1338, 1352-53 (Ct. Int'l Trade 2022) (quoting *Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1331 (Ct. Int'l Trade 2000)). "In determining

whether the producer knew or should have known that the subject merchandise will be exported,

Commerce looks in part to the place where the product is 'consumed'" *Allegheny*, 215 F. Supp.

2d at 1332.  Merchandise sold in the home market, even if ultimately destined for export, is

'consumed' in the home market if it is used there to produce non-subject merchandise prior to

exportation." *Id.* (citing, *e.g.*, *Final Determination of Sales at Less Than Fair Value: Certain*

*Hot–Rolled Carbon Steel Flat Products, Certain Corrosion Resistant Carbon Steel Flat*

*Products, and Certain Cut–to–Length Carbon Steel Plate From Korea*, 58 Fed. Reg. 37,176,

37,182 (July 9, 1993)).

When evaluating knowledge, Commerce considers documentary or physical evidence

that the producer knew or should have known its goods were destined for the United States.  *See*

*Certain Crystalline Silicon Photovoltaic Products from Taiwan: Final Determination of Sales at*

*Less Than Fair Value*, 79 Fed. Reg. 76,966 (Dep't of Commerce Dec. 2, 2014) and

accompanying IDM at 33 ("{T}he standard for making a knowledge determination is that the

producer must have reason to know *at the time of the sale* that the *specific sale* of subject

merchandise was destined for the United States{.}" (emphasis in original)).  Commerce has

clarified that "{s}worn statements made well after the time of the specific sales at issue {are} not

relevant to the analysis of whether {the producer} had reason to know at the time of sale that

specific sales of subject merchandise were destined for the U.S."  *Certain Crystalline Silicon*

*Photovoltaic Products From Taiwan: Final Results of Antidumping Duty Administrative Review;*

*Partial Rescission of Antidumping Duty Administrative Review; Final Determination of No*

*Shipments; 2019-2020*, 86 Fed. Reg. 49509 (Dep't of Commerce September 3, 2021), and

accompanying IDM at 9.  Further, a general knowledge or belief on the part of the first party in

the sales chain that the next party generally sells some products to the United States would not

meet the standard for the knowledge test. *Id*.

B.   Maquilacero/TEFLU's Arguments Concerning Constructive Knowledge Are
     Waived For Failure To Exhaust

Maquilacero/TEFLU argues that Commerce failed to apply the "constructive knowledge"

prong of its two-prong test, with the first prong being actual knowledge, in determining whether

the producer knew at the time of sale that the subject merchandise was destined for the United

States.  Maquilacero/TEFLU Case Br. at 41.  Maquilacero/TEFLU also argues that Commerce

did not consider the export-oriented nature and purpose of the IMMEX program.

However, the Court should decline to entertain these arguments as Maquilacero/TEFLU

has failed to exhaust its administrative remedies with respect to these arguments.  Congress has

directed that "the Court of International Trade shall, where appropriate, require the exhaustion of

administrative remedies."  28 U.S.C. § 2637(d).  This statute "indicates a congressional intent

that, absent a strong contrary reason, the court should insist that parties exhaust their remedies

before the pertinent administrative agencies."  *Boomerang Tube, LLC, TMK IP-SCO v. United

States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502 F.3d

1370, 1379 (Fed. Cir. 2007)).  Further, "general policies underlying the exhaustion

requirement—protecting administrative agency authority and promoting judicial efficiency"—

would be negated if the Court were to consider arguments raised for the first time in judicial

proceedings.  *Corus Staal*, 502 F.3d at 1379 (internal quotation and citation omitted).  For these

reasons, the Court should "generally take{} a 'strict view' of the requirement that parties exhaust

their administrative remedies before {Commerce} in trade cases."  *Id*.  Additionally, this Court

has found that an issue has not been exhausted where a party fails to flesh out an issue in its

briefings before Commerce and chooses instead to flesh it out fully in its Court brief.  *Maverick*

*Tube Corp. v. United States*, No. 14-00229, 2015 Ct. Intl Trade LEXIS 60, at *10-12 (Ct. Int'l

Trade June 15, 2015) ("The court is not persuaded that Maverick could not 'seek administrative

remedy' by fleshing out its argument of the issue in its rebuttal brief before Commerce rather

than here, and therefore finds the issue has not been administratively exhausted."). An exception

to the exhaustion requirement is possible only if exhaustion would have been "futile," the

relevant matter is a "pure question of law," an intervening court decision would affect the

agency's action, or a party had no reason to believe the agency would not follow established

precedent. *Luoyang Bearing Factory v. United States*, 240 F. Supp. 2d 1268, 1297 n.26 (Ct. Int'l

Trade 2002) (citing authorities). None of these exceptions apply here.

In the case brief that it filed with Commerce during the administrative review,

Maquilacero/TEFLU argued that it had actual knowledge that its products were destined for the

United States. Maquilacero/TEFLU Admin Br. at 28, PDF 41 ("TEFLU provided

documentation on the record confirming its knowledge of the ultimate destination of the part.")

and Maquilacero/TEFLU Admin. Rebuttal Br. at 8, PDF 151 ("{I}nformation on the record

shows that TEFLU knew, at the time of the sale, that the parts sold to an IMMEX customer will

be incorporated into a product for export{.}"). At no point in its case brief did

Maquilacero/TEFLU contend, as it does now, that it also had constructive knowledge based

generally on the nature and purpose of the IMMEX program. *See generally*

Maquilacero/TEFLU Admin Br. Accordingly, the Court should find that Maquilacero/TEFLU

failed to exhaust its administrative remedies with respect to this argument. Moreover, none of

the exceptions to the exhaustion doctrine apply as raising this argument would not have been

"futile," it is not a "pure question of law," nor did Commerce depart from established precedent.

C.     Commerce Appropriately Found That Maquilacero/TEFLU's IMMEX Sales
       Were Home Market Sales

In any event, pursuant to its practice of determining whether the producer knew or should

have known at the time of sale that the subject merchandise was destined for the United States,

Commerce appropriately found that Maquilacero/TEFLU's IMMEX sales were home market

sales.  IDM at Comment 4.  Although Maquilacero/TEFLU provided a number of documents and

physical evidence which it claims shows it had knowledge of export, Commerce found that

Maquilacero/TEFLU was "unable to definitively demonstrate that TEFLU's products are

exported to the United States, rather than being consumed into a downstream product in

Mexico."  *Id*. at 22.  Instead, Commerce found that the information provided by

Maquilacero/TEFLU indicates that "the products were shipped to locations within Mexico and

were consumed in the production of non-subject merchandise" (*i.e.*, automobiles and other

industrial products) and that there was "no information that indicates that TEFLU's IMMEX

sales were destined for the United States in their original form."  *Id.* at 21.

The fact that Maquilacero/TEFLU knew that its IMMEX customers were producing

downstream non-subject merchandise prior to export out of the IMMEX program is significant.

Under Commerce's practice, subject merchandise is considered to be "consumed" in the home

market where it is incorporated into non-subject merchandise.  For example, in *Sugar from

Mexico*, Commerce considered a similar set of facts in which subject merchandise was sold to

IMMEX customers and was incorporated into non-subject merchandise before leaving the

IMMEX and, thus, were consumed in Mexico and classified as home market sales.  *Agreement

Suspending the Antidumping Duty Investigation on Sugar From Mexico; Preliminary Results of

the 2019-2022 Administrative Review*, 87 Fed. Reg. 932 (Dep't of Commerce January 7, 2022)

and accompanying PDM, unchanged in *Agreement Suspending the Antidumping Duty*

*Investigation on Sugar From Mexico: Final Results of the 2019-2020 Administrative Review; Correction*, 87 Fed. Reg. 42156 (Dep't of Commerce July 14, 2022) and accompanying IDM (*Sugar from Mexico*); *see also Allegheny*, 215 F. Supp. 2d at 1332 (holding that the same merchandise cannot be consumed twice and "{m}erchandise sold in the home market, even if ultimately destined for export, is 'consumed' in the home market if it is used there to produce non-subject merchandise prior to exportation").

Here, Commerce followed its prior treatment of the IMMEX program and adequately explained the reasons for its determination with citations to record evidence.  For example, Commerce found that information for one IMMEX sale did not prove knowledge because, while the invoice included a billing address for [          ], the delivery address was [            ]. *See* Maquilacero/TEFLU Preliminary Analysis Memorandum at 5-6 (C.R. 202) (P.R. 112) (citing Maquilacero/TEFLU First Supplemental Questionnaire Response at Exhibit S-45). Further, the "pedimento," an export clearance document provided by Maquilacero/TEFLU as evidence, only included addresses in Mexico.  *Id*.  Commerce also determined that, following Maquilacero/TEFLU's post-preliminary supplemental questionnaire response, "although it was aware that parts sold to IMMEX customers were destined to be incorporated into various automobiles and other industrial products (*i.e.*, non-subject merchandise) for export{,}" Maquilacero/TEFLU "point{ed} to no information that indicate{d} that TEFLU's IMMEX sales were destined for the United States."  *Id*. at 21.  Rather, Maquilacero/TEFLU's "explanations and documentation indicate that the products were shipped to locations within Mexico and were consumed in the production of non-subject merchandise."  *Id*. (citing Maquilacero/TEFLU's Post-Preliminary Supplemental Questionnaire Response at 5-8).  When asked about the final destination of the merchandise, "Maquilacero/TEFLU was unable to provide documentation

beyond the customs clearance form, which {Commerce} already deemed insufficient for illustrating knowledge of the final destination." IDM at 22 (citing Maquilacero/TEFLU's Post-Preliminary Supplemental Questionnaire Response at 7, and Maquilacero/TEFLU Preliminary Analysis Memorandum at 5-6). Moreover, the descriptions of its documentation that Maquilacero/TEFLU provide in its briefing confirm that it did not have knowledge that TEFLU's products sold through IMMEX were destined for the United States or were not consumed in the production of out-of-scope merchandise. *See* Maquilacero/TEFLU Br. at 43. Commerce considered Maquilacero/TEFLU's record evidence and came to the reasonable conclusion that it did not know or have reason to know that TEFLU's products sold through the IMMEX program were destined for the United States. Lastly, to the extent Court must choose between two possible yet inconsistent conclusions concerning Maquilacero/TEFLU's evidence, Commerce's interpretation is favored. *See Pokarna Engineered Stone Ltd. v. United States*, 56 F.4th 1354, 1349 (Fed. Cir. 2023) ("{W}here two different, inconsistent conclusions may be reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review.").

D.    Cases Cited By Maquilacero/TEFLU Are Distinguishable

Maquilacero/TEFLU argues that Commerce's determination contravenes its past practice, but the citations upon which it relies are distinguishable. First, Maquilacero/TEFLU's reliance on *Solarworld Americas, Inc. v. United States*, 353 F.Supp.3d 1315 (Ct. Int'l Trade 2018), is inapposite to the case at hand. In *Solarworld*, this Court found that Commerce had ignored record evidence indicating that sales were destined for Mexico. *Id*. at 1323. The Court noted a number of documents and physical evidence, including documentation "generated at the time of sale list{ing} Mexico as the ultimate ship to destination and a Mexican entity as the notify party, meaning that a Mexican entity was the intended recipient of the merchandise." *Id*. at 1322. The

Court ultimately determined the "evidence on the record establishes sales to customers in Mexico…with no actual United States customers identified and no evidence showing that merchandise entered the United States customs territory for sale." *Id*. at 1323. Maquilacero/TEFLU cites this case for the proposition that Commerce acts unlawfully if it includes sales as part of the market where the FTZ is located if it is shipped via an FTZ. Maquilacero/TEFLU's Br. at 40.  Maquilacero/TEFLU also argues that the Court in *Solarworld* considered the nature of an FTZ as one of the factors in determining whether sales are properly classified.  *Id.* at 42.  However, the Court in *Solarworld* did not make these determinations and ruled purely on the evidence provided by the respondent.  The evidence highlighted by the Court in *Solarworld* is also distinguishable from the evidence presented here, which, as noted above, contains [                                      ].  Lastly, the present case concerns subject merchandise consumed within the IMMEX program in the production of non-subject merchandise while the solar cells and modules in *Solarworld* remain in-scope despite the cells being made into panels in a third country.  *See* IDM at 22.  As noted above, this distinction is material under Commerce's practice.  Accordingly, the Court should find Maquilacero/TEFLU's reliance on *Solarworld* to be inapposite.

Maquilacero/TEFLU also relies heavily on *Freight Rail Couplers from Mexico* in making its IMMEX arguments.  *See* Maquilacero/TEFLU Br. at 39-43 (citing *Certain Freight Rail Couplers and Parts Thereof From Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 88 Fed. Reg. 27864 (Dep't of Commerce May 3, 2023), and accompanying PDM, unchanged in *Certain Freight Rail Couplers and Parts Thereof From Mexico: Final Affirmative Determination of Sales*

*at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 88 Fed.

Reg. 65153 (Dep't of Commerce September 21, 2023), and accompanying IDM (collectively,

*Freight Rail Couplers*)).  However, this proceeding is distinguishable from *Freight Rail*

*Couplers* in that the freight rail couplers remained subject merchandise despite being attached to

a freight railcar while in the IMMEX program.  *Freight Rail Couplers* IDM at 12-13.  Because

the freight rail couplers continued to be subject merchandise despite their incorporation into non-

subject merchandise, they were not consumed into non-subject merchandise within the IMMEX

program before export and were thus considered exports.  *Id*.  Maquilacero/TEFLU attempts to

frame the *Freight Rail Couplers* IDM language to say that sales made in the IMMEX program

cannot be treated as home market sales.  However, this is inaccurate, because Commerce in

*Freight Rail Couplers* recognized that there are past cases where Commerce has treated IMMEX

sales as home market sales.  However, Commerce also explained that these cases (including the

instant case and *Sugar from Mexico*) involved "downstream manufacturers that turned the

subject merchandise into non-subject merchandise" and thus consumed the product in the home

market.  *See id.*  Therefore, *Freight Rail Couplers* does not stand for the proposition that

IMMEX sales inherently cannot be considered home market sales when the subject merchandise

is consumed in the production of non-subject merchandise.  Therefore, the Court should find

Maquilacero/TEFLU's reliance on *Freight Rail Couplers* misplaced.

VI.   Commerce's Use Of The Differential Pricing Methodology In This Review Is Supported
      By Substantial Evidence And In Accordance With Law

Maquilacero/TEFLU argues that Commerce's use of the Cohen's *d* test in this review

was unlawful because Commerce "failed to resolve concerns articulated by the {Federal Circuit}

in *Stupp*."  Maquilacero/TEFLU Br. at 46-47 (citing *Stupp Corp. v. United States*, 5 F.4th 1341

(Fed. Cir. 2021) (*Stupp*)).  Maquilacero/TEFLU specifically argues that "Commerce did not

demonstrate whether the data groups{…}are sufficiently large{…}have normal distribution{…}or{…}are of roughly equal variances." *Id.* (citing *Stupp*, 5 F.4th at 1357-58). Because Commerce did not provide such a demonstration, Maquilacero/TEFLU requests this Court remand the final results.   Likewise, Maquilacero/TEFLU argues that Commerce's use of a simple average in this case is contrary to the Federal Circuit's decision in *Mid Continent II*. *Id.* at 47-48 (citing *Mid Continent Steel & Wire, Inc., v. United States*, 31 F.4th 1367 (Fed. Cir. 2022)).  Maquilacero/TEFLU misconstrues the requirements of the Federal Circuit's holding in *Stupp* and *Mid Continent*, and Commerce's use of the Cohen's *d* test here does not warrant a remand.

In *Stupp*, the Federal Circuit did not reject Commerce's use of the Cohen's *d* test but invited further explanation:

> We therefore remand to give Commerce and opportunity to explain whether the limits on the use of the Cohen's *d* test prescribed by Professor Cohen and other authorities were satisfied in this case or whether those limits need not be observed when Commerce uses the Cohen's *d* test in less-than-fair-value adjudications.  In that regard, we invite Commerce to clarify its argument that having the entire universe of data rather than a sample makes it permissible to disregard the otherwise-applicable limitations on the use of the Cohen's *d* test.

*Stupp*, 5 F.4th at 1360.  As Commerce noted in the final results in this case, Commerce has since affirmed its use of the Cohen's *d* test and the remand results were upheld by this Court.  *See* IDM at 30 (citing *Stupp Corp. v. United States*, 619 F. Supp, 3d 1314 (Ct. Int'l Trade 2023), appeal docketed).  In particular, this Court sustained Commerce's reasoning that "its Cohen's *d* analysis does not operate in a vacuum, and must be considered with the ratio test and meaningful difference test," which are also part of Commerce's differential pricing analysis.  *Stupp*, 619 F. Supp. 3d at 1321.  In this context, "even if the Cohen's *d* values of small test groups were less accurate than for large test groups, this difference does not by itself render Commerce's use of

Cohen's test unreasonable, because the ratio test and meaningful difference test compensate for inaccuracies." *Id.*

Commerce provided a similar explanation in this case, explaining that the purpose of the Cohen's *d* test is to "examine{} whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods."  PDM at 7; *see also* IDM at 29.  Further, Commerce explained that the Cohen's *d* test is only one part of the differential pricing analysis, along with the ratio test and the meaningful difference test.  PDM at 7-8.  Specifically, after applying the Cohen's *d* test to determine whether prices "differ significantly" across region, time period, or customer, Commerce then applies the ratio test to "assess{} the extent of the significant price differences for all sales measured by the Cohen's *d* test."  *Id*. at 7.  If 66 percent or more of the value of total sales pass the Cohen's *d* test, Commerce will consider the average-to-transaction method for all sales; if 33 to 66 percent of the value of total sales pass the Cohen's *d* test, Commerce will consider using the average-to-transaction method for the sales that passed the Cohen's *d* test; and if fewer than 33 percent of the value of total sales pass the Cohen's *d* test, then Commerce will not consider an alternative to the average-to-average method.  *Id*. at 7-8.  Even then, Commerce requires a "meaningful difference" in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method only, before applying an alternative to the average-to-average method.  *Id*.

Thus, as explained above, the sole purpose of the Cohen's *d* test in Commerce's differential pricing analysis is to determine whether prices "differ significantly" across region, time period, and customer.  *Id*. at 7.  The "pattern" of U.S. prices that Commerce must find under 19 U.S.C. § 1677f-1(d)(1)(B)(i) is determined by the ratio test, and Commerce's application of

the ratio test and meaningful difference test operate together with its application of the Cohen's *d*

test to avoid exaggeration of dumping margins considered by the Federal Circuit. *Id*. at 7-8. The

Federal Circuit has sustained both the ratio test and the meaningful difference test in

Commerce's differential pricing analysis. *See Stupp*, 5 F.4th at 1354-56; *see also Apex Frozen*

*Foods Private Ltd. v. United States*, 862 F.3d 1322 (Fed. Cir. 2017). Moreover, in *Marmen Inc.*

*v. United States*, 627 F. Supp. 3d. 1312, 1322 (Ct. Int'l Trade 2023), this Court held "that

Commerce's use of a population, rather than a sample, in the application of the Cohen's *d* test

sufficiently negates the questionable assumptions about thresholds that were raised in *Stupp*."

Commerce's explanations support the reasonableness of Commerce's use of the Cohen's *d* test

as a component of the differential pricing analysis, particularly when considered alongside the

ratio test and meaningful difference test. *See Stupp Corp.*, 619 F. Supp 3d at 1328 (citing

*Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (Ct. Int'l Trade 1986));

*Marmen*, 627 F. Supp 3d at 1322.

Maquilacero/TEFLU similarly misconstrues the Federal Circuit's opinion in *Mid*

*Continent*. In *Mid Continent*, the Federal Circuit stated that:

> Commerce needs a reasonable justification for departing from what
> the acknowledged literature teaches about Cohen's *d*. It has
> departed from those teachings about how to calculate the
> denominator of Cohen's *d*, specifically in deciding to use simple
> averaging when groups differ in size.

*Mid Continent*, 31 F.4th at 1381. The issue was remanded for Commerce to provide an

explanation for its choice of simple averaging or to make a different choice. *Id*. The

Federal Circuit has not invalidated Commerce's methodology, Commerce is continuing

to defend this methodology on remand, and no final decision by this Court has been made

in the *Mid Continent* cases. Therefore, there is not yet binding precedent. *See Algoma*

*Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989) (explaining that one

judge on the Court of International Trade is not bound by decisions of another judge on

the Court).  Accordingly, the Court should find that Commerce's uses of the Cohen's $d$

test is supported by substantial evidence and in accordance with law.

CONCLUSION

For these reasons, the Court should deny plaintiffs' motions for judgment on the agency

record and sustain Commerce's final results in their entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

 s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL

CHRISTOPHER KIMURA
Staff Attorney
Office of the Chief Counsel for
Trade Enforcement & Compliance
U.S. Department of Commerce

s/ Kristin E. Olson
KRISTIN E. OLSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Ben Franklin Station
P.O. Box 480
Washington, D.C. 20044
(202) 307-6299
kristin.olson@usdoj.gov

January 5, 2024

*Attorneys for the United States*

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Defendant's Response to Plaintiff and Plaintiff-Intervenor's Rule 56.2 Motions for Judgment on the Agency Record, filed on January 5, 2024, complies with the word limitation requirement. The word processing software used to prepare this brief indicates there are a total of 12,267 words, excluding the portions of the brief identified in the rules.

<u>s/ Kristin E. Olson</u><br>
Kristin E. Olson