NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

MAQUILACERO S.A. de C.V. and TECNICAS
DE FLUIDOS S.A de C.V.,

                       Plaintiffs,

        and,

PERFILES LM, S.A. DE C.V.

        v.

UNITED STATES,

                     Defendant,

        and,

NUCOR TUBULAR PRODUCTS, INC.,

               Defendant-Intervenor.

Before: Hon. Jennifer Choe-Groves,
              Judge

Court No. 23-00091

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Pages: 1, 14, 19, 21,
24-25, 28, 30-31, 33-34

## <u>RESPONSE TO MOTIONS FOR JUDGMENT ON THE AGENCY RECORD</u>

Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Jake R. Frischknecht, Esq.
Kimberly A. Reynolds, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Defendant-Intervenor
Nucor Tubular Products, Inc.*

Dated: January 5, 2024

Ct. No. 23-00091                                    NON-CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

Page

I.      INTRODUCTION ....................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................ 1

III.    SUMMARY OF ARGUMENT ................................................................. 4

IV.     ARGUMENT .............................................................................................. 6

      A.   Commerce's Determination to Collapse Maquilacero and TEFLU Is
          Lawful and Supported by Substantial Evidence ....................................6

      B.   Commerce's Determination that TEFLU's Further Processed
          Products Are In-Scope Merchandise Is Lawful and Supported by
          Substantial Evidence ...........................................................................14

      C.   Commerce's Rejection of the Manufacturer Code and the
          FURPROCESSH/U Variable Is Lawful and Supported by
          Substantial Evidence ...........................................................................24

      D.   Commerce's Determination to Treat TEFLU's Sales Made Through
          the IMMEX Program as Home Market Sales is Lawful and
          Supported by Substantial Evidence .....................................................28

      E.   Commerce's Determination to Rely on the Cohen's *d* Test in
          Conducting the Differential Pricing Analysis Is Lawful and
          Supported by Substantial Evidence .....................................................34

V.      CONCLUSION.......................................................................................... 38

Ct. No. 23-00091                                    NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apex Frozen Foods Priv. Ltd. v. United States*,
    144 F. Supp. 3d 1308 (Ct. Int'l Trade 2016) ..........................................35

*Apex Frozen Foods Priv. Ltd. v. United States*,
    862 F.3d 1337 (Fed. Cir. 2017)................................................................35

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)..................................................................................34

*Mid Continent Steel & Wire, Inc. v. United States*,
    31 F. 4th 1367 (Fed. Cir. 2022) ...............................................................37

*NEXTEEL Co. v. United States*,
    355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) ..........................................35

*NEXTEEL Co. v. United States*,
    392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) ..........................................35

*Pesquera Mares Australes, Ltda. v. United States*,
    266 F. 3d 1372 (Fed. Cir. 2001)..............................................................27

*Stupp Corp. v. United States*,
    5 F. 4th 1341 (Fed. Cir. 2021) ................................................35, 36, 37

*Trendium Pool Products, Inc. v. United States*,
    399 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) ................................ *passim*

*Wonderful Chem. Indus., Ltd. v. United States*,
    259 F. Supp.2d 1273 (Ct. Int'l Trade 2003) ...........................................29

*Z.A. Sea Foods Priv. Ltd. v. United States*,
    569 F. Supp.3d 1338 (Ct. Int'l Trade 2022) ...........................................29

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)......................................................................6

19 U.S.C. § 1677f-1(d)(1)(A) ....................................................................35

19 U.S.C. § 1677f-1(d)(B) .........................................................................35

**Regulations**

19 C.F.R. § 351.225(k) .......................................................................................16, 17

19 C.F.R. § 351.225(k)(1).........................................................................16, 17, 18, 21

19 C.F.R. § 351.225(k)(1)(i) and (ii) .........................................................................17

19 C.F.R. § 351.225(k)(2)(i) .....................................................................................17

19 C.F.R. § 351.401(f) ........................................................................................ *passim*

19 C.F.R. § 351.401(f)(2).....................................................................................10, 11

19 C.F.R. § 351.401(f)(2)(ii) .....................................................................................11

19 C.F.R. § 351.414(c)(1) ..........................................................................................35

**Administrative Materials**

*Aluminum Extrusions from the People's Republic of China*,
     79 Fed. Reg. 96 (Jan. 2, 2014) ..............................................................................9

*Certain Corrosion- Resistant Steel Products from the Republic of Korea*,
     84 Fed. Reg. 10,784 (Dep't Commerce Mar. 22, 2019) .......................................25

*Certain Crystalline Silicon Photovoltaic Products From Taiwan*,
     86 Fed. Reg. 49,509 (Dep't Commerce Sept. 3, 2021)........................................30

*Certain Freight Rail Couplers from Mexico*,
     88 Fed. Reg. 65,153 (Dep't Commerce Sept. 21, 2023).......................................32

*Freight Rail Couplers and Parts Thereof from Mexico*,
     88 Fed. Reg. 27,864 (Dep't Commerce May 3, 2023) .........................................32

*Heavy Walled Rectangular Welded Carbon Steel Pipe and Tubes from the*
     *Republic of Korea*, 87 Fed. Reg. 53,725 (Dep't Commerce Sept. 1, 2022) ...........36

*Light-Walled Rectangular Pipe and Tube from Mexico*,
     86 Fed. Reg. 33,646 (Dep't Commerce June 25, 2021) .........................................1

*Light-Walled Rectangular Pipe and Tube From Mexico*,
     87 Fed. Reg. 54,965 (Dep't Commerce Sept. 8, 2022)...........................................3

*Light-Walled Rectangular Pipe and Tube from Mexico*,
     84 Fed. Reg. 16,646 (Dep't Commerce Apr. 22, 2019) ........................................22

*Preliminary Decision Memorandum accompanying Sugar from Mexico*,
    87 Fed. Reg. 932 (Dep't Commerce Jan. 7, 2022) .................................................................33

*Stainless Steel Sheet and Strip in Coils from Mexico*,
    69 Fed. Reg. 6,259 (Dep't Commerce Feb. 10, 2004)...........................................................25

*Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, from
    Japan*, 56 Fed. Reg. 41,508 (Dep't Commerce Aug. 21, 1991) ...........................................27

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

## I.   **INTRODUCTION**

On behalf of Nucor Tubular Products Inc. ("Nucor Tubular" or "Defendant Intervenor"), we respectfully submit this response to the September 28, 2023 opening briefs of Maquilacero S.A. de C.V. ("Maquilacero") and Tecnicas de Fluidos S.A. de C.V. ("TEFLU") (collectively, "Plaintiffs") and Perfiles LM, S.A. de C.V. ("Consolidated Plaintiff"). *See* Pl.'s Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. (Sept. 28, 2023), ECF No. 31 ("Pl. Op. Br."). Cons. Pl. Mem. In Supp. of Rule 56.2 Mot. For J. on the Agency R. (Sept. 28, 2023), ECF No. 29 ("Perfiles Op. Br.").

## II.   **STATEMENT OF FACTS**

Maquilacero is a regular mandatory respondent in the LWRPT from Mexico reviews and before this court. Prior to the 2020-2021 review in question here, Maquilacero was a respondent in the 2018-2019 administrative review.  There, U.S. Department of Commerce ("Commerce") collapsed Maquilacero and TEFLU, meaning that Commerce treated Maquilacero and TEFLU as a single entity, and calculated a single dumping rate by using data from both companies. *See* Issues and Decision Memorandum accompanying *Light-Walled Rectangular Pipe and Tube from Mexico*, 86 Fed. Reg. 33,646 (Dep't Commerce June 25, 2021) (final results of antidumping duty admin. rev.; 2018-2019) at cmt. 9 ("*LWRPT from Mexico 18-19* IDM"). Maquilacero produces LWRPT pipe; TEFLU produces the LWRPT, mostly by [                    ] LWRPT. Letter from Arent Fox LLP to Sec'y Commerce, re: *Maquilacero S.A. de C.V.'s Section A Questionnaire Response* (Dec. 1, 2021), P.R. 36-38, C.R. 13-23 at A-3, A-5 and Exhibit A-28 ("Maquilacero Section A QR").[1] Commerce found Maquilacero and TEFLU were affiliated through common

---

[1]     Documents on the public record of the underlying administrative review are identified here as "P.R.," followed by the number assigned to the relevant document in the administrative record index filed with the Court on

ownership, have overlapping board members, and have intertwined operations.  The purpose of collapsing the two entities into one is to eliminate any manipulation of price and production between Maquilacero and TEFLU.  *LWRPT from Mexico 18-19* IDM at cmt. 9.  Plaintiffs did not appeal these results.

On October 2, 2021, Commerce initiated the 2020-2021 antidumping administrative review of the antidumping duty order on LWRPT from Mexico, that is at issue here. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 55,811 (Dep't Commerce Oct. 7, 2021), P.R. 11. Commerce selected two mandatory respondents, Maquilacero S.A. de C.V. ("Maquilacero") and Regiomontana de Perfiles y Tubos S. de R.L. de C.V. ("Regiopysta").  *See* Memorandum from J. Conniff to E. Begnal, re: *Respondent Selection* (Oct. 27, 2021), P.R. 21.

Consistent with previous reviews, Maquilacero again reported that it sold LWRPT to TEFLU, an affiliated Mexican producer of subject merchandise. Maquilacero Section A QR at A-16, Exhibits A-6, A-24, A-27 and A-32. Maquilacero's questionnaire response demonstrated that there were no material changes from prior reviews in the family-held ownership, management, or corporate structure of Maquilacero and TEFLU, such that Maquilacero, TEFLU, and certain other affiliates which comprise the family held ownership group continue to be parties which "may be considered involved in the production, sale, or distribution of the merchandise under review." Issues and Decision Memorandum accompanying *Light-Walled Rectangular Pipe and Tube from Mexico,* 88 Fed. Reg. 15,665 (Dep't Commerce Mar. 14, 2023) (final results of antidumping

---

June 22, 2023, ECF No. 23. Documents in the confidential administrative record are identified by name, followed by "C.R." and the corresponding record number.

admin. rev.; 2020-2021) at 8, P.R. 146 (citing Maquilacero Section A QR at 12-17, and Exhibits A-4, A-5, A-28, and A-29) ("Final IDM").

However, to ensure accuracy, Commerce specifically asked Maquilacero in a supplemental questionnaire "whether the facts pertinent to collapsing in *LWRPT from Mexico 2018-2019* are the same in the instant POR, and, if not, that Maquilacero/TEFLU identify, explain, and support the differences." *Id.* at 7-8; Letter from Arent Fox LLP to Sec'y Commerce, re: *Maquilacero S.A. de C.V.'s First Supplemental Section A&D Questionnaire Response* (July 26, 2022) at 13-18, P.R. 92, C.R. 152-171 ("Maquilacero's SQR1"). Plaintiffs provided no evidence that its operations had changed in a way that would impact Commerce's prior analysis under 19 C.F.R. § 351.401(f) (*i.e.*, changes in ownership, management, operations, and changes in merchandise produced). Instead, Plaintiffs asserted that Commerce erred in its 2018-2019 collapsing determination and repeated legal arguments that Commerce previously considered in the 2018-2019 review. Maquilacero's SQR1 at 13-18; Final IDM at 8.

In this review, on September 8, 2022, Commerce issued its preliminary results. *Light-Walled Rectangular Pipe and Tube From Mexico*, 87 Fed. Reg. 54,965, 54,966 (Dep't Commerce Sept. 8, 2022) (prelim. results & partial rescission of antidumping admin. rev.; 2020-2021), P.R. 111 ("Preliminary Results"), and the accompanying Decision Memorandum, P.R. 103 ("PDM"); Memorandum from K. Clahane to The File, re: *Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V.'s Analysis Memorandum for the Preliminary Results* (Aug. 31, 2022), P.R. 112, C.R. 202 ("Maquilacero/TEFLU's Prelim. Analysis Memo"). Consistent with its 2018-2019 determination, and Maquilacero's concession that nothing material has changed Commerce collapsed Maquilacero and TEFLU as a single entity. PDM at 1 n.1.

Following Commerce's affirmative preliminary determination, Nucor Tubular submitted its case brief on November 15, 2022, and its rebuttal brief on November 29, 2022.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Light-Walled Rectangular Pipe and Tube from Mexico: Nucor Tubular's Case Brief* (Nov. 15, 2022); Letter from Wiley Rein LLP to Sec'y Commerce, re: *Nucor Tubular's Rebuttal Brief Resubmission* (Dec. 29, 2022) (resubmitted case brief to redact untimely factual information contained in Maquilacero's case brief), P.R. 141, C.R. 248 ("Nucor Tubular's Rebuttal Brief").

On March 14, 2023, Commerce issued the final results of the 2020-2021 administrative review of the antidumping duty order on LWRPT from Mexico.  *Light-Walled Rectangular Pipe and Tube from Mexico*, 88 Fed. Reg. 15,665 (Dep't Commerce Mar. 14, 2023) (final results of antidumping duty admin. rev.; 2020-2021), P.R. 151.  In these final results, among other items, Commerce (1) continued to collapse Maquilacero and TEFLU; (2) determined that TEFLU's products are in-scope merchandise; (3) continued to treat Plaintiffs' IMMEX sales as home market sales; (4) declined modify its model match characteristics to include a product characteristic for TEFLU's products; and (5) and maintained its differential pricing analysis for Plaintiffs.  *Id.* at cmts. 1-2, 4-6.

## III.  <u>SUMMARY OF ARGUMENT</u>

As we detail herein, Commerce's calculation of mandatory respondents' dumping margin is in accordance with law and is supported by substantial evidence.  *See e.g.*, Perfiles Op. Br. (asserting that Commerce's calculation of mandatory respondents' dumping margin was unlawful and unsupported by substantial evidence).  First, Commerce's determination to collapse Maquilacero and TEFLU in its final results was supported by substantial evidence and is in accordance with law.  The same factors Commerce identified in its previous determination to

collapse Maquilacero and TEFLU exist for 2020-2021 review period as well. Accordingly, pursuant to Commerce's practice, it need not revisit its prior collapsing determination absent new relevant facts. Maquilacero conceded that the relevant facts were not materially different in this review than in the past review. And, in any event, Commerce's determination to collapse Maquilacero is supported by substantial evidence.

Second, Commerce's determination that TEFLU's products are covered by the scope of the *Order* is supported by substantial evidence, is in accordance with law and is consistent with its past practice. Specifically, TEFLU's products fall squarely within the plain language of the scope of the *Order*, there is no language excluding further processed pipe and tube from the scope, and materials from the Petition and the investigation demonstrate that pipe and tube with additional processing were intended to be included in the scope of the *Order*.

Third, Commerce's determination to reject the manufacturer code and an additional product characteristic code (FURPROCESSH/U) to distinguish TEFLU's further processed products is supported by substantial evidence, is in accordance with law, and is consistent with Commerce's past practice. Specifically, Plaintiffs failed to meet its administrative burden showing compelling and convincing evidence that a change in model matching criteria is warranted.

Fourth, Commerce's determination that TEFLU's sales made through the Programa para la Promocion de la Industria Manufacturera Maquiladora y de Servicios de Exportacion, or IMMEX program (TEFLU's "virtual" exports or sales) is supported by substantial evidence and is in accordance with law. Specifically, Plaintiffs failed to show that they possessed sufficient knowledge at the time of sale that the sales were destined for export, thus failing to establish a required criteria for treating such sales as U.S. sales.

And fifth, Commerce's determination to apply the differential pricing analysis, including the Cohen's *d* test, was supported by substantial evidence and in accordance with law. Courts have time and again upheld this differential analysis as a reasonable interpretation of the statute. Contrary to Plaintiffs' assertions, the Federal Circuit cases cited by Plaintiff do not render Commerce's determination in this review unlawful.

## IV.   ARGUMENT

### A.   Commerce's Determination to Collapse Maquilacero and TEFLU Is Lawful and Supported by Substantial Evidence

Commerce's determination to continue to collapse Maquilacero and TEFLU as a single entity is consistent with its previous determination, is supported by substantial evidence and is otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). When Commerce treats multiple affiliated entities as a single entity, this treatment is referred to as "collapsing." Collapsing affiliates and assigning a single aggregate dumping margin prevents respondents from gaming the AD/CVD system by shipping through the affiliated company with the lowest rate. Commerce's determination should be upheld.

Plaintiffs raise two primary challenges to Commerce's collapsing determination. Specifically, that Commerce was required to undertake a full analysis of its collapsing criteria, and that evidence indicates that Commerce's collapsing determination is not supported by substantial evidence. However, as we detail below, each of Plaintiffs' arguments is flawed and Commerce's collapsing determination was consistent with 19 C.F.R. § 351.401(f), its practice, and was otherwise supported by substantial evidence.

### 1.   Commerce Did Not Fail to Apply the Collapsing Criteria Under 19 C.F.R. § 351.401(f).

The first issue before the Court is whether Commerce's determination to rely on its 2018-2019 collapsing determination was lawful and supported by substantial evidence.

Plaintiffs assert that Commerce's collapsing determination was unlawful because Commerce did not undertake a collapsing analysis pursuant to 19 C.F.R. § 351.401(f).  Pl. Op. Br. at 15-16.  At bottom, no provision of law requires Commerce to undertake its collapsing analysis when no new material facts exist concerning the relevant collapsing factors.[2]  Rather, Commerce's practice is not to reverse a collapsing determination unless there is evidence warranting such a reversal.  This practice enables administrative efficiency by allowing Commerce to rely on its prior analysis.

Consistent with its practice, Commerce invited Plaintiffs to provide information that might warrant Commerce to revisit its 2018-2019 collapsing determination, yet Plaintiffs failed to do so, and indeed, could not do so.  The evidence provided demonstrated <u>no changes</u> in ownership, management, operations, or merchandise produced that would warrant a reversal of Commerce's earlier determination.  Instead, Plaintiffs asserted that Commerce erred in its 2018-2019 collapsing determination and repeated legal arguments that Commerce previously considered in the 2018-2019 review.  Maquilacero's SQR1 at 13-18; Final IDM at 8.  Record evidence in this review continued to show Maquilacero and TEFLU are owned by the same family-held group, that there is still corporate and managerial overlap, and that Maquilacero, TEFLU, and certain other affiliates which comprise the family held ownership group continue to be parties which "may be considered involved in the production, sale, or distribution of the merchandise under review."  Final IDM at

---

[2]      To the extent that Plaintiffs are challenging Commerce's 2018-2019 collapsing determination, that opportunity has passed.  Plaintiffs had the opportunity to appeal the 2018-2019 determination but did not do so.

8 (citing Maquilacero Section A QR at 12-17, and Exhibits A-4, A-5, A-28, and A-29). In short, the evidence provided by Plaintiffs in this administrative review was not indicative of any changes that would warrant a reversal of the prior collapsing determination.  Accordingly, Commerce did not need to undertake a full collapsing analysis.

Commerce considered the evidence submitted by Plaintiffs in this review, but did not find that it demonstrated any changes to TEFLU or Maquilacero's, "ownership, management, operations {or} . . . merchandise produced."  Accordingly, Commerce had no reason to conduct another collapsing analysis for this review, and appropriately relied on its prior collapsing decision.

Further, unlike Plaintiffs' claims, Commerce treated this proceeding as an independent proceeding with a separate record.  Indeed, Commerce explicitly asked Plaintiffs for any information during this POR that would justify Commerce revisiting its prior collapsing determination.  *See* Maquilacero's SQR1 at 13-18.  Maquilacero provided no material new evidence.  A review of the lack of new information led Commerce to the independent determination that during the POR, there was no new evidence that warranted a reevaluation of its prior collapsing determination.  *See* Pl. Op. Br. at 16 (citing *Hyundai Steel Co. v. United States*, 279 F. Supp.3d 1349, 1372 (Ct. Int'l Trade 2017)); *see also*, Final IDM at 8 (citing Maquilacero's Section A QR at 12-17, and Exhibits A-4, A-5, A-28, and A-29). Accordingly, Plaintiff's reliance on *Qingdao Sea-Line Trading Co. v. United States* is inapposite, as there were no "different facts in the record" that would have allowed for "different conclusions." Pl. Op. Br. at 16 (citing *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014)).  As Commerce explained, "treating parties of a collapsed entity differently could allow manipulation by the parties to obtain different rates for its members, other than the single rate assigned to the collapsed entity." Final IDM at 7 (citing Issues and Decision Memorandum accompanying

*Aluminum Extrusions from the People's Republic of China*, 79 Fed. Reg. 96 (Jan. 2, 2014) (final

results of antidumping duty admin. rev. and rescission, in part, 2010/12) at cmt. 4).  Accordingly,

Commerce's determination to collapse TEFLU and Maquilacero in its final determination was in

accordance with law and should be upheld.

### 2. Commerce's Analysis of the Section 351.401(f) Criteria is Supported by Substantial Evidence.

Under 19 C.F.R. § 351.401(f), Commerce must treat "two or more affiliated producers as

a single entity where those producers have production facilities for similar or identical products

that would not require substantial retooling of either facility in order to restructure manufacturing

priorities and the {Department} concludes that there is a significant potential for the manipulation

of price or production."  The regulation further provides a non-exhaustive list of factors that

Commerce *may* consider in identifying a significant potential for the manipulation of price or

production:

(i)     The level of common ownership;

(ii)    The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and

(iii)   Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

As detailed below, Commerce's determination was consistent with 19 C.F.R. § 351.401(f) and was

based on substantial evidence.

Plaintiffs readily admit TEFLU was an affiliated party during the underlying review and

do not take issue with Commerce's analysis of that factor.  *See* Pl. Op. Br. at 18 (citing Final IDM

at 9).  Rather, Plaintiffs argue that evidence does not support a finding that the criteria in Section

351.401(f)(1)-(2) have been met.

Plaintiffs assert that the criteria in section 351.401(f)(1) are not met because there is no similarity between Maquilacero's and TEFLU's products or their facilities and that TEFLU cannot produce LWRPT. Pl. Op. Br. at 17. These arguments are distractions from the basic fact that both companies produce in-scope products. Moreover, these arguments have previously been rejected. At bottom, Plaintiffs did not provide any new information that suggests "any changes during the POR in ownership, management, operations, and {…} merchandise produced." Final IDM at 7 (citing *Aluminum Extrusions from China* IDM at cmt. 4); *see also*, *LWRPT from Mexico 2018-2019* IDM at 25 (summarizing Maquilacero's arguments from the 2018-2019 review, which included that "Collapsing of Maquilacero and TEFLU is not warranted because TEFLU has no production facilities to produce pipe and tube."). As Commerce has previously explained, that TEFLU does not have production facilities to produce LWRPT is not dispositive to whether TEFLU and Maquilacero have "production facilities for similar or identical products" for purposes of satisfying the criteria under Section 351.401(f)(1). Final IDM at 7. Rather, "because TEFLU performs further processing of in-scope merchandise . . . the processing of which does not change the product's physical characteristics resulting in different product matching control numbers. . . . there is a potential for the restructure of certain manufacturing priorities." Final IDM at 7 (citing *LWRPT from Mexico 2018-2019* IDM at cmt. 9).

With respect to the criteria under section 351.401(f)(2), Plaintiffs assert that Commerce's finding of intertwined operations is not supported by record evidence. Pl. Op. Br. at 18. Plaintiffs maintain that Maquilacero and TEFLU have separate and independent businesses with little to no overlap, *id.* at 18-19, but utterly fail to address the salient point that there is "a significant potential for manipulation of price and production between Maquilacero and TEFLU because of their high degree of affiliation." Final IDM at 7 (citing *LWRPT from Mexico 2018-2019* IDM at cmt. 9).

Specifically, Commerce determined there was managerial overlap between Maquilacero and TEFLU satisfying 19 C.F.R. § 351.401(f)(2)(ii) and also found that Maquilacero and TEFLU to have intertwined operations.  *See LWRPT from Mexico 2018-2019* IDM at 28-29. Taken together, an "analysis of the non-exhaustive factors under 19 C.F.R. § 351.401(f)(2) showed a significant potential for manipulation of price or production." *Id.*  Further, contrary to Plaintiffs' assertion, record evidence indicates that both companies remain under common control of certain entities at a significant level of common ownership and managerial overlap.  *See, e.g.*, Maquilacero Section A QR at A-3, A-13, A-16 and Exhibits A-4 and A-5.

Plaintiffs' argument is also based on the incorrect premise that TEFLU is not a producer of LWRPT and is thus not capable of price manipulation.  This is simply wrong. The products TEFLU sold to its customers are the same class or kind of LWR tubing covered by the Order. Plaintiffs further assert that TEFLU does not produce LWRPT and cannot produce LWRPT without, essentially, building a pipe and tube mill.  Pl. Op. Br. at 20-21; Maquilacero SQR1 at 15. Yet, TEFLU's further processing does not result in an out-of-scope product. Moreover, Maquilacero fails to consider the totality of the circumstances.  For example, as Commerce previously determined, pursuant to 19 C.F.R. § 351.401(f), Maquilacero and TEFLU can switch the role of producer and seller between the two companies without substantial retooling of Maquilacero's facilities.  Nucor Tubular's Rebuttal Br. at 17 (citing *LWRPT from Mexico 18-19* IDM at 28 (internal cites omitted)).

Commerce further noted that while it agrees "that TEFLU does not have a production facility that has the capability to produce the LWRPT that Maquilacero produces," there is nothing "preventing TEFLU from purchasing Maquilacero's in scope products and reselling them in the home market or to the United States without further processing," and "nothing preventing

Maquilacero from purchasing TEFLU's further processed in-scope merchandise and reselling it in the home market or to the United States." *LWRPT from Mexico 2018-2019* IDM at 28 (internal cites omitted).  Accordingly, based on the "totality of the circumstances," "the high degree of affiliation between the companies, the managerial overlap, and the companies' intertwined operations," Commerce found a significant potential for the manipulation of price or production between Maquilacero and TEFLU. *Id*. at 29.  Commerce further found that, "while TEFLU may not have exported subject merchandise directly to the United States, it had knowledge that its in-scope further processed LWRPT was being sold in the United States," and consistent with agency practice to treat exporting entities as well as producers and exporters as a single entity, Commerce determined "a significant potential for manipulation of price or production due to TEFLU making U.S. sales of subject merchandise." *Id.*

Consistent with the evidence above, and considering that record evidence *in this review* is consistent with that of the 2018-2019 review, Commerce's determination to continue to collapse the two entities consistent with its prior 2018-2019 determination is reasonable and supported by substantial evidence.

### 3.    Commerce's Determination is Consistent with its Prior Practice

Finally, contrary to Plaintiffs' claims, Commerce's determination to collapse Maquilacero and TEFLU is consistent with Commerce's practice.  *See e.g.*, Pl. Op. Br. at 19-23.  Specifically, Plaintiffs asserts that Commerce's determination is inconsistent with *Shrimp from Brazil* and *SSB from Germany*.  *Id*.  Commerce has previously considered — and rejected — Maquilacero's claims that its decision to collapse Maquilacero and TEFLU is inconsistent with agency precedent. Final IDM at 7 (citing *LWRPT from Mexico 2018-2019* IDM at cmt. 9).

First, Plaintiffs continue to assert that the facts in *SSB from Germany* were more favorable for collapsing than they are in the review at issue here, but that Commerce chose not to collapse these entities.   However, each administrative review is an independent, fact-intensive inquiry. Second, contrary to Plaintiffs' claims, Commerce's determination in *Shrimp from Brazil* was not solely based on a finding that the collapsed entities could "easily switch" roles, but was also based on Commerce's finding of "several elements of control that the seller held over the producer." Pl. Op. Br. at 21 (citing Issues and Decision Memorandum accompanying *Certain Frozen and Canned Warmwater Shrimp From Brazil*, 69 Fed. Reg. 76,910 (Dep't Commerce Dec. 23, 2004) (final less than fair value deter.) at 14-15).   Similarly, this administrative review also "involves a producer of subject pipe, Maquilacero, and an affiliated processor, TEFLU, which have intertwined operations and managerial overlap." Final IDM at 9.

**4.     Commerce's Determination to Decline Reliance on the Arm's-Length Test is Lawful**

Finally, Commerce's determination to decline reliance on the arm's-length test rather than collapsing Maquilacero and TEFLU is consistent with Commerce's practice.   The purpose of the arm's length test is to test whether specific sales between affiliates need to be adjusted to reflect market transactions. The arm's length test looks to past transactions, but does nothing to address the ongoing threat of manipulation due to the high degree of affiliation. Although Commerce previously declined to collapse Maquilacero with an affiliate in *HWRPT from Mexico* because the analysis was "based on affiliation alone," *see* Final IDM at 8 (citing Issues and Decision Memorandum accompanying *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Mexico*, 81 Fed. Reg. 47,352 (Dep't Commerce, July 21, 2016) (final deter. of sales at less than fair value) at cmt. 2), that is not the case here for a separate order, LWRPT from Mexico.  As Commerce found, evidence demonstrates the significant potential for manipulation of price or

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED     **NON-CONFIDENTIAL VERSION**

production, intertwined operations, and managerial overlap, which is decidedly more than making

"a finding of {} mere affiliation." Final IDM at 6 (citing Nucor Tubular's Rebuttal Brief).

Commerce's determination to continue to collapse Maquilacero and TEFLU is lawful, supported by substantial evidence, and is also consistent with agency practice. Commerce's collapsing determination should thus be upheld.

### B.   Commerce's Determination that TEFLU's Further Processed Products Are In-Scope Merchandise Is Lawful and Supported by Substantial Evidence

Commerce's treatment of TEFLU's products as in-scope merchandise is lawful, supported by substantial evidence and consistent with its practice. As an initial matter, TEFLU's products are essentially [                    ] LWRPT. Maquilacero's Section A QR at Exhibit A-28. Commerce's determination should be upheld because the products are within scope. As Commerce explained, Plaintiffs have failed to demonstrate that TEFLU's products do not meet the physical description of the scope. Accordingly, given that there is no exclusionary language in the scope for further processed products, and that the petition and investigation contemplated including these products in the scope, Commerce correctly treated TEFLU's products as in-scope merchandise.

Plaintiffs raise three primary challenges to Commerce's determination. As we detail below, each of these challenges fail. <u>First</u>, Plaintiffs claim that Commerce's determination to treat TEFLU's products as in-scope merchandise is unlawful because Commerce's interpretation of the scope contradicts court decisions and "essentially extends the coverage of the scope to any further processed product that contains LWRPT." Pl. Op. Br. at 30. However, Plaintiffs misunderstand the legal framework of Commerce's analysis, and further ignore facts on the record that support Commerce's determination and distinguish the present case from those cited by Plaintiffs. <u>Second</u>,

Plaintiffs assert that Commerce did not consider whether "substantially transformed" LWRPT that is made into auto parts is covered by the *order*. Pl. Op. Br. at 26. Plaintiffs' assertions are misplaced. The facts of this review did not warrant Commerce to consider the end-use of TEFLU's products. Commerce indeed considered Plaintiffs' questions, and explained why despite their end-use TEFLU's products are covered by the *Order*. Third, and finally, Plaintiffs argue that Commerce's determination to include TEFLU's products within the scope is arbitrary and capricious when considering Commerce's determination in the *PCS Scope Ruling*. Pl. Op. Br. at 32-33. However, Commerce has repeatedly rejected this claim and the *PSC Scope Ruling* is not dispositive to the facts at issue here.

> For the Court's reference, the scope of the *Order* in relevant part reads as follows:
>
> The scope of this *Order* covers certain welded carbon-quality light-walled steel pipe and tube, of rectangular (including square) cross section, having a wall thickness of less than 4 mm.
>
> The term carbon-quality steel includes both carbon steel and alloy steel which contains only small amounts of alloying elements. Specifically, the term carbon-quality includes products in which none of the elements listed below exceeds the quantity by weight respectively indicated. . . .
>
> The description of carbon-quality is intended to identify carbon-quality products within the scope. The welded-carbon quality rectangular pipe and tube subject to the *Order* is currently classified under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7306.61.50.00 and 7306.61.70.60. This tariff classification is provided for convenience and Customs purposes; however, the written description of the scope of the *Order* is dispositive.

Final IDM at 4.

### 1.     Commerce's Determination that TEFLU's Further Processed Products Are In Scope Merchandise is Lawful

Plaintiffs are correct that Commerce "enjoys considerable latitude in clarifying orders {but that} it may not change the original scope of its orders through the interpretive process." Pl. Op. Br. at 25 (citing *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382-83 (Fed. Cir. 2005).

Plaintiffs are also correct that "{s}cope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." Pl. Op. Br. at 30 (quoting *Duferco*, 296 F.3d at 1089). However, Plaintiffs are incorrect in their assertion that Commerce is somehow changing the original scope of the *Order* by determining that TEFLU's products, based off a plain language interpretation and materials from the petition and investigation, are squarely within the scope of the *Order*. Accordingly, the scope of the *Order* can be reasonably interpreted to include TEFLU's products.

The legal framework for determining whether a product is within the scope of an order is governed by a three-step analysis as set forth in Commerce's regulations at 19 C.F.R. § 351.225(k). *See Meridian Products LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017). *See also*, *Trendium Pool Products, Inc. v. United States*, 399 F. Supp.3d 1335, 1338 (Ct. Int'l Trade 2019). Pursuant to section 351.225(k), Commerce's analysis starts with the plain language of the order itself. 19 C.F.R. § 351.225(k)(1); *see also*, Pl. Op. Br. at 24 (citing *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014) ("the plain language of a countervailing or antidumping order is 'paramount' in determining whether particular products are included within its scope.")). Specifically, 19 C.F.R. § 351.225(k)(1) provides:

> In determining whether a product is covered by the scope of the order at issue, the Secretary will consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive.

If the scope language presents some ambiguity, the materials described at 19 C.F.R. § 351.225(k)(1)(i) and (ii) can be considered to determine whether the products in question are within the scope of the *Order*. *See* 19 C.F.R. § 351.225(k)(1). If the question is not resolved by reviewing the factors in (k)(1), only then will Commerce consider the factors in (k)(2) of

Commerce's regulations.  19 C.F.R. § 351.225(k)(2)(i).  The factors in paragraph (k)(2)(i) include physical characteristics, end use, channels of trade, and advertising and display.

Consistent with Commerce's regulations and court precedent, Commerce will only reach the third step of this analysis if the first two steps do not resolve the scope question.  *Meridian*, 851 F.3d at 1381. *See also*, *Trendium* 399 F. Supp 3d at 1338. As we detail below, record evidence and a plain language interpretation of the scope demonstrates that TEFLU's products are reasonably within the scope of the *Order*.  To the extent that the scope language in the *Order* is not dispositive, TEFLU's products are correctly considered in the scope of the order consistent with the factors enumerated in 19 C.F.R. § 351.225(k)(1).

Plaintiffs assert that Commerce failed to consider the "threshold question" of whether TEFLU's products are LWRPT "an intermediate product with many potential end-use applications," or, whether the parts are "distinct downstream products outside the scope of the Order." Pl. Op. Br. at 26.  This is not the threshold question with the facts at question here.  Rather, the question is whether, based on the language of the *Order*, the merchandise in question is reasonably subject to the *Order*.  *See* 19 C.F.R. § 351.225(k).  Essentially, Plaintiffs' overarching argument is that the extent of further manufacturing and the distinct end-use for TEFLU's products are dispositive to a finding that TEFLU's products are not within the scope of the Order.  However, within the context of the scope analysis, further manufacturing and end use are only dispositive in limited factual circumstances.

The first instance is where there is explicit exclusionary language in the scope concerning further processed products, or the product under consideration.  Final IDM at 14 (citing *King Supply*, 674 F.3d 1343, 1349 (Fed. Cir. 2012)) ("{t}he requisite clear exclusionary language must leave no reasonable doubt that certain products were intended to be outside the scope of the

antidumping duty order based solely on the end-use of those products."). And second, when the language of the scope is ambiguous, and the materials referenced under section 351.225(k)(1) indicate that the particular product or class of products was not considered by the parties to the petition or investigation as being included in the scope of the Order.

As we detail below, neither of these factual circumstances are present here.  Rather, TEFLU's products fit squarely within the plain language of the scope of the *Order*.  Further, to the extent that there is any ambiguity, the materials provided under section 351.225(k)(1) indicate that the particular product or class of products *was* considered by the parties to the petition and investigation as being included in the scope of the Order.  Accordingly, Plaintiffs' reliance on *Trendium* and *TMB 440 AE* to support their proposition that the extent of TEFLU's further processing renders them outside the scope of the *Order* is misplaced.  Pl. Op. Br. at 26-27. Specifically, in each case, there was specific language that contemplated the exclusion of certain further processed products.  And in *Trendium* there was also no underlying evidence from the materials included in 351.225(k)(1) that the parties intended to include the downstream product in the scope of the Order.  *Trendium* at 1344-45.

Indeed, a Binational Panel established under NAFTA recently affirmed Commerce's determination that TEFLU sales were appropriately within the scope of the review.  Final IDM at 15 (citing *Light Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review*; 2016-2017, USA-MEX-2019-1904-01 at 10 (June 27, 2022) ("NAFTA Panel Ruling")).  The Panel explained that "{a}s a matter of straightforward interpretation, the scope language here does not state or imply that a product ceases to be 'pipe and tube' simply because it has undergone some processing according to the dictates of a particular LWRPT-using industry or application." *See* NAFTA Panel Ruling at 10.  The Panel also concluded

**BUSINESS PROPRIETARY INFORMATION**
**HAS BEEN DELETED**

that it "{did} not see the scope language as ambiguous." *Id*. Ultimately, the Panel found that Commerce's decision was a "reasonable interpretation of the pertinent scope language and a reasonable way of applying the regulation." *Id*. at 13. *See also*, Final IDM at 15.

### 2. Substantial Evidence Demonstrates that TEFLU's Products Meet the Plain Language Definition of the Scope of the Order

TEFLU's products, albeit further manufactured, plainly meet the physical and chemical characteristics as described in the scope. As Commerce explained, "the specifications of {TEFLU's} further-processed product did not exceed the physical or chemical specifications listed in the scope of the Order." Final IDM at 13. Indeed, the [            ] Plaintiffs provided as an attachment to their case brief make clear that the TEFLU products at issue are in-scope merchandise. *See* Nucor Tubular's Rebuttal Br. at 4. Although Plaintiffs' claim that "bending and drilling alters the cross section of the input LWRPT" they "provided no evidence to support a determination that the further processing resulted in the product falling outside the carbon quality, wall thickness, or cross section specifications of the scope of the Order." Final IDM at 13 (citing Maquilacero's Section A QR at A-47 to A-48).

Additionally, Plaintiffs' assertion that the absence of "auto parts" or further processed products in the scope of the order means that auto parts are not within the scope of the Order, is fundamentally flawed. Pl. Op. Br. at 23. As Commerce explained in both the underlying review and the 2016-2017 administrative review,

> absent exclusionary language or evidence that the further processing alters the carbon make-up or cross section of the LWRPT, "it is not reasonable to conclude that simply because a particular type of LWRPT is not specifically mentioned in the scope that the product is not covered."

Final IDM at 12 (citing *Light Walled Rectangular Pipe and Tube from Mexico*, 84 Fed. Reg. 16,646 (Dep't Commerce Apr. 22, 2019) at cmt. 2). Here, the scope does not contain any language

excluding further processed products.  Final IDM at 4.  Accordingly, the question is whether the auto parts fall outside of the scope as described in the *Order*.  Specifically, "outside the carbon quality, wall thickness, or cross section specifications of the scope of the Order."  Final IDM at 13 (citing Maquilacero's Section A QR at A-47 to A-48). Plaintiffs provided no evidence to indicating that TEFLU's products do not meet plain language description of the scope of the *Order*.  Further, Commerce also explained that while end-use of the merchandise can be relevant in certain instances, "the Federal Circuit has held that the end-use of a product is normally relevant where there is clear exclusionary language in a scope."  Final IDM at 14 (citing *King Supply*, 674 F.3d at 1349). Here, "the scope of the Order includes no language excluding LWRPT based on end use." Final IDM at 14.

Finally, Plaintiffs reference to the change in the HTSUS classifications for TEFLU's products from the HTSUS classifications referenced in the order, is unpersuasive.  Plaintiffs assert that the change constitutes a substantial transformation, taking the products outside the scope of the Order, and cite to substantial transformation rulings concerning pipe and tube products.  Pl. Op. Br. at 28-29.  As an initial matter, the substantial transformation test is a customs concept with no application here. Def. Int. Rebuttal Br. at 7.  Commerce's substantial transformation analysis is only relevant in a country-of-origin determination when the question is whether subject merchandise has been substantially transformed in a third country such that it is no longer within the scope of the order. *Id*.  Moreover, the scope makes clear that the "HTSUS subheadings are provided for convenience and Customs purposes.  It is the written description of the scope of the Order is dispositive."  Final IDM at 14.  Accordingly, "so long as TEFLU's further processed merchandise meets the plain language of the scope . . . it is considered in scope, regardless of which HTSUS subheading the merchandise is imported." *Id*.  Additionally, even though Plaintiffs

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

assert that the CBP rulings are "indicative of the extent of processing between the input LWRPT and the resulting auto parts at issue", Plaintiffs provide no explanation or evidence as to the similarity of those CBP rulings, the Scope at issue under this *Order*, and TEFLU's products. *See e.g.*, Pl. Op. Br. at 28-29.

### 3. The Interpretive Materials at Section 351.225(k)(1) Demonstrate that Further Processed Products Were Considered by the Parties in the Scope of the Order

Plaintiffs are incorrect that TEFLU's products are a "distinct, downstream product that was not a part of the underlying investigation." Pl. Op. Br. at 25 (citing *Fabuwood Cabinetry Corp. v. United States*, 469 F. Supp.3d 1373, 1389 (Ct. Int'l Trade 2020)). Rather, based on the materials enumerated in 19 C.F.R. § 351.225(k)(1), TEFLU's products ([          ] for use in autos), although further processed, were indeed considered in the underlying investigation.

As Commerce has explained:

the product description of LWRPT in the petition states that subject merchandise is used in a variety of applications and that its primary uses include "fencing, window guards, and railing for the construction industry." The petition states that LWRPT is also used as parts of "furniture, athletic equipment, store shelving, towel racks, agricultural equipment frames and other similar items." The petition further states that any product that meets physical characteristics of the scope is covered regardless of whether it is produced to "an ASTM, proprietary or other industry specification." Similarly, the ITC Report states that LWRPT is an intermediate product with "many end-use applications," including "fences, gates, hand rails, furniture, sports equipment, and automotive equipment."

Issues and Decision Memorandum accompanying *Light-Walled Rectangular Pipe and Tube from Mexico*, 84 Fed. Reg. 16,646 (Dep't Commerce Apr. 22, 2019) (final results of antidumping duty admin. rev.; 2016-2017) at 9 (internal citations omitted) ("2016-2017 IDM"); *see also*, Final IDM at 13. Commerce has also explained:

During the investigation phase of this proceeding, Commerce received a request to exclude pre-primered subject merchandise. Commerce found, based on the

language of the scope, that it was "clear that there {wa}s no intention to make exceptions for products whose use may be restricted due to further processing."

2016-2017 IDM at 9-10 (internal citations omitted); *see also*, Nucor Tubular's Rebuttal Br.

Accordingly, substantial record evidence demonstrates that further processed products were considered in the Petition and the ITC investigation and can be reasonably interpreted to be included within the *Order*.   Plaintiffs thus mischaracterize Commerce's reliance on the paragraph (k)(1) materials as limited to the ITC reference that merely references the merchandise's end-uses Pl. Op. Br. at 31 (citing Final IDM at 13 (quoting *Light-Walled Rectangular Pipe and Tube from China, Korea, and Mexico*, Inv. Nos. 701-TA-449 and 731-TA-1120, USITC Pub. 4024 (July 2008) (Final) ("LWRPT ITC Report")) at 13).   In doing so, Plaintiffs incorrectly rely upon *Trendium*, *Fabuwood*, and *Stein Industries*. Pl. Op. Br. at 30-32.

As an initial matter, in each of the proceedings underlying these three cases, the scope included language that contemplated excluding certain further processed products.  Accordingly, the facts of those cases are distinguishable from the facts here.  However, in any event, unlike in *Trendium*, *Fabuwood*, and *Stein Industries*, Commerce did not only rely on ITC language that "merely discuss{ed} end uses of LWRPT in the ITC final determination."  *Id*. at 31. Rather, as noted above, the petition states "that any product that meets physical characteristics of the scope is covered regardless of whether it is produced to 'an ASTM, proprietary or other industry specification.'" Final IDM at 13. This suggests that so long as a product meets the physical and chemical characteristics of the scope, it does not matter whether it is further processed for a specific industry or end-use customer.  It is thus not true that "the scope of the *Order* would be greatly expanded to cover not only LWRPT but also any downstream products." Pl. Op. Br. at 32.  Rather, further processed products are only included in the scope of the *Order* when they meet the physical and chemical characteristics as described in the scope.

TEFLU's products fit squarely within the scope of the *Order*, there is no exclusionary language pertaining to further processed products, and the petition and investigation contemplated further processed products in the scope of the *Order*. Accordingly, Commerce need not consider the end-use of the product. *See e.g.*, Final IDM at 13-14. Commerce undertook a legal analysis consistent with its regulations and determined, based on substantial evidence that TEFLU's products are covered by the scope of the *Order*.

### 4.      Commerce's Determination is Not Arbitrary or Capricious

Plaintiffs assert that Commerce's determination to include TEFLU's products as in scope merchandise is arbitrary and capricious with a separate Order concerning further processed cut-to-length plate. Specifically, Plaintiffs point to *Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, Brazil, the People's Republic of China, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, the Republic of South Africa, Taiwan, and Turkey* to support its claim. As Commerce explained,

> In LWRPT from Mexico 2016-2017, we found that the scope language and case specifics of the PCS Scope Ruling are not applicable to Maquilacero's further processed LWRPT because the PSC Scope Ruling concerned different AD orders than LWRPT (specifically cut-to-length plate), which have different scope language.

Final IDM at 14. Additionally, the scope language in the *PSC Scope Ruling* explicitly contemplated excluding certain further processed products. Final IDM at 14; *see also*, *Antidumping and Countervailing Duty Orders on Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, Brazil, the People's Republic of China, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, the Republic of South Africa, Taiwan, and Turkey: Scope Ruling Request* (Oct. 11, 2017) (ACCESS barcode 3628547) at 3 ("*PSC Scope Ruling*"). That is not the case here. While Plaintiffs continue to disagree with Commerce's

**BUSINESS PROPRIETARY INFORMATION**
                          **HAS BEEN DELETED**

decision, they provide no basis for Commerce to conclude otherwise.  The *PSC Scope Ruling* involved a different Order, for a different product, that had different scope language.  Plaintiffs have not shown that the purported similarities between the scope ruling and the current scope question in the context of this administrative review render Commerce's determination in this proceeding arbitrary and capricious.

### C.    Commerce's Rejection of the Manufacturer Code and the FURPROCESSH/U Variable Is Lawful and Supported by Substantial Evidence

Plaintiffs' arguments that Commerce erred by rejecting the manufacturer code, and the FURPROCESSH/H variable to account for further manufactured products in the product comparison methodology, are wrong.  Indeed, Plaintiffs' arguments are an obvious attempt to make TEFLU's [          ] sales not match Maquilacero's [          ] U.S. sales.  Commerce has previously established the physical characteristics for this product, and pursuant to its practice, will not alter these characteristics unless a party presents specific "compelling and convincing evidence."  Final IDM at 25. Identifying the manufacturer is not a physical characteristic. Plaintiffs' argument is an end-run around Commerce's established model matching characteristics and Plaintiffs have not met their burden to establish the factual record on which the argument relies.

#### 1.    Commerce's Rejection of the Manufacturer Code Is Lawful and Supported by Substantial Evidence

Plaintiffs assert that Commerce's rejection of the manufacturer code is arbitrary with Commerce's 2018-2019 administrative review results.  Pl. Op. Br. at 36.  As Commerce explained, in this review, Commerce continued to collapse Maquilacero and TEFLU – meaning that they constitute a single entity.  Final IDM at 24.  Accordingly, "there is no distinction between Maquilacero and TEFLU {rather} there is only the single entity of Maquilacero/TEFLU as the

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

'manufacturer' of the merchandise sold in the home and U.S. markets which forms the basis of Commerce's dumping analysis." *Id.*

Further, the decisions relied upon by Plaintiffs are unsupportive of Plaintiffs' claim. Specifically, Plaintiffs point to *Stainless Steel Sheet and Strip in Coil from Mexico* ("*SSSS from Mexico*") and *Corrosion-Resistant Steel Products from the Republic of Korea* ("*CORE from Korea*"). *See* Final IDM at 27.  Notably, neither case uses a company's reporting of an unsolicited product characteristics as a proxy for manufacturer. Issues and Decision Memorandum accompanying *Stainless Steel Sheet and Strip in Coils from Mexico*, 69 Fed. Reg. 6,259 (Dep't Commerce Feb. 10, 2004) (final results of antidumping duty admin. rev.) at cmt. 13 ("*SSSS from Mexico* IDM"); Issues and Decision Memorandum accompanying *Certain Corrosion- Resistant Steel Products from the Republic of Korea*, 84 Fed. Reg. 10,784 (Dep't Commerce Mar. 22, 2019) (final results of antidumping duty admin. rev.; 2016-2017) at cmt. 13 ("*CORE from Korea* IDM"). Additionally, both cases concerned third-country or U.S. manufacturing, which is not at issue here. *See* Final IDM at 27.  In *SSSS from Mexico* a respondent purchased foreign origin material that fit the product description of the Order that underwent minor further processing that did not substantially transform the product such that its country of origin was Mexico (*i.e.,* in the scope of the review). *See SSSS from Mexico* IDM at 36-37. The manufacturer code was needed to exclude the out-of-scope product. *Id*. at 37.  Because Maquilacero/TEFLU [

] that case is inapposite here. Similarly, in *CORE from Korea*, the use of a manufacturer field addressed subject merchandise that was further processed in the United States. *CORE from Korea* IDM at 63-64. As Maquilacero/TEFLU [

], *CORE from Korea* is fundamentally different from the present case. Accordingly, no modification to account for the manufacturer field is necessary.

> **2.  Commerce's Rejection of the FURPROCESSH/U Variable Is Lawful and Supported by Substantial Evidence**

As Plaintiffs recognize, "Commerce has considerable discretion in developing an appropriate 'model match' methodology to identify identical or similar merchandise sold in the comparison market." Pl. Op. Br. at 34 (citing *Pesquera Mares Australes, Ltda. v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001)); *see also* Final IDM at 25. Commerce's established practice is to refrain from revisiting its model matching criteria in an administrative review proceeding unless: (1) there is evidence that the existing criteria no longer properly reflects the merchandise in question; (2) there have been industry changes to the product that merit a modification; or (3) there exists another compelling reason to make a change. Final IDM at 25-26 (citing *SKF USA Inc. v United States*, 800 F. Supp.2d 1316, 1354, 1363 (Ct. Int'l Trade 2011)). Thus, while not ruling out the possibility of changing the model-match criteria in a given proceeding, Commerce has established a high factual threshold that must be overcome before it determines that a change in the model-match criteria is warranted. *Id*. at 26. Inherent in this practice is the notion that the model match criteria should be consistent across administrative reviews so that the parties have a predictable means of determining possible product matches in current as well as future administrative review proceedings. *See* Issues and Decision Memorandum accompanying *Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, from Japan*, 56 Fed. Reg. 41,508 (Dep't Commerce Aug. 21, 1991) (final results of antidumping duty admin. rev.) at cmt. 1. Indeed, the U.S. Court of Appeals for the Federal Circuit has recognized that not only would it be impractical for Commerce to account for every physical characteristic of merchandise, but it would also "frustrate the purpose of the {antidumping} statute," enabling "market manipulation" to avoid antidumping duties. *Pesquera Mares Australes, Ltda. v. United States*, 266 F.3d 1372, 1383, 1385 (Fed. Cir. 2001), (citing the Court of International Trade decision on appeal) (citation omitted).

NON-CONFIDENTIAL VERSION

In previous administrative reviews of this Order, Commerce has explained that while it will "consider changes to the model matching criteria if an interested party requests a change to the model matching criteria . . . the burden is on the party requesting the change . . . to provide compelling and convincing evidence demonstrating that such a change is warranted." *See, e.g., LWRPT from Mexico 18-19* IDM at 7-8. Commerce has also explained that it is not merely enough to show that the experience of a single respondent warrants a change in criteria, as a change in methodology impacts all parties participating in the proceeding. *Id.* at 9 ("The further processing that TEFLU performs does not involve the subject merchandise in general but rather is part of the specific experience of one respondent . . .").

Plaintiffs have repeatedly requested that Commerce modify its model matching criteria and Commerce has repeatedly found that Plaintiffs have failed to establish that such modification is warranted. Final IDM at 24-27; *LWRPT From Mexico AD AR 2018-2019* IDM at 6-9. As Commerce has explained (1) there is no evidence that the existing criteria no longer reflect the merchandise in question; (2) there have not been industry changes that warrant modification; and (3) there are no other compelling reasons for the change.

Specifically, Plaintiffs contend that instead of using the manufacturer as reported in its database, that Commerce should use the field "FURPROCESSHU/H" to assign the manufacturer. That Plaintiffs are suggesting that Commerce treat the manufacturer by whether the product was further processed (*i.e.,* using the "FURTHERPROCESSH/U" field), underscores that Plaintiffs were asking Commerce to modify its model match criteria to include further processing, which it has repeatedly declined to do. *See e.g.*, Letter from Arent Fox LLP to Sec'y Commerce, re: Maquilacero S.A. de C.V.'s Downstream Sales Response for Tecnicas De Fluidos S.A. de C.V.

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**

(Dec. 28, 2021) at BA2-15, P.R. 56, C.R. 85-87 ("TEFLU Downstream Sales Response"); *see also*, Nucor Tubular's Rebuttal Br. at 12.

Plaintiffs did not demonstrate that any of these circumstances existed, and failed to meet the evidentiary burden required for Commerce to change its model match criteria. Specifically, Plaintiffs' argument centers on its proposition that this characteristic is needed to account for physical and commercial differences between Maquilacero's and TEFLU's products as a result of further processing. While Plaintiffs have long maintained TEFLU's automotive parts as having been substantially transformed into a different product, Commerce has specifically determined these parts fall within the scope of the Order. *See e.g.,* Final IDM at 13. The processing TEFLU performs – [                                                                    ] – is also quite basic in nature. Maquilacero Section A QR; Maquilacero's SQR1 at 15-16.

Accordingly, Plaintiffs provided no information that warranted a change to Commerce's prior model match characteristics, including establishing that that further processing is a salient physical characteristic that necessitates the inclusion in the model matching criteria. Commerce correctly declined to modify its model match criteria to account for the manufacturer field.

D.     **Commerce's Determination to Treat TEFLU's Sales Made Through the IMMEX Program as Home Market Sales is Lawful and Supported by Substantial Evidence**

Plaintiffs assert that Commerce's determination to treat TEFLU's IMMEX Program sales as home market sales is unsupported by substantial evidence because Maquilacero/TEFLU had knowledge of the export destination at the time of sale. Pl. Op. Br. at 38. There are two issues with Plaintiffs' argument. First, Plaintiff did not demonstrate through supporting documentation that it had knowledge at the time of the sale, of that export's specific destination. Second, substantial evidence shows that Plaintiffs' sales through the IMMEX Program were consumed in

NON-CONFIDENTIAL VERSION

Mexico in the production of non-subject merchandise before being exported from Mexico, which renders them home market sales. Final IDM at 22 (citing Letter from ArentFox Schiff LLP to Sec'y Commerce, re: Light-Walled Rectangular Pipe and Tube from Mexico; Maquilacero's S.A. de C.E's Post-Preliminary Supplemental Questionnaire Response (Oct. 5, 2022) at 6-8, P.R. 119; C.R. 207-219) ("Maquilacero PSQR"); *see also* Maquilacero/TEFLU's Prelim. Analysis Memorandum at 5-6.

As Plaintiffs correctly point out, when determining whether a sale should be considered a U.S. sale, Commerce relies on a "knowledge test" to determine whether the producer knew or should have known at the time of sale whether the subject merchandise would be exported, such that the sale price should be considered the U.S. purchase price. *Z.A. Sea Foods Priv. Ltd. v. United States*, 569 F. Supp.3d 1338, 1352-53 (Ct. Int'l Trade 2022). Commerce applies a similar test for home market sales, assessing whether a producer knew or should have known that the merchandise was for home consumption. *See* Maquilacero/TEFLU's Prelim. Analysis Memo at 5 (citing *Z.A. Sea Foods*, 569 F. Supp. 3d at 1352-53).

When conducting the "knowledge test" Commerce considers documentary or physical evidence that a producer knew or should have known at the time of sale because this type of evidence is more probative, reliable and verifiable than unsubstantiated statements or declarations. *Wonderful Chem. Indus., Ltd. v. United States*, 259 F. Supp.2d 1273, 1280 n.4 (Ct. Int'l Trade 2003). A general knowledge or belief that the next party in the sales chain generally sells some products to the United States does not meet this standard. *See* Issues and Decision Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products From Taiwan*, 86 Fed. Reg. 49,509 (Dep't Commerce Sept. 3, 2021) (final results of antidumping duty admin. rev., partial rescission of antidumping duty admin. rev.; final deter. of no shipments; 2019-2020) at 9 ("*Solar*

BUSINESS PROPRIETARY INFORMATION
                HAS BEEN DELETED

*from Taiwan 19-20 AR IDM*"). A producer's speculation that the goods might ultimately have been destined for export to the United States is also insufficient for a knowledge determination. *Id.* Commerce will disregard unsubstantiated statements or declarations when applying the knowledge test. *See e.g., Solar from Taiwan 19-20 AR IDM* at 9. Commerce has clarified that, "{s}worn statements made well after the time of the specific sales at issue {are} not relevant to the analysis of whether {the producer} had reason to know at the time of sale that specific sales of subject merchandise were destined for the U.S." *Id.*

> **1.     Plaintiffs Did Not Demonstrate that They had Sufficient Knowledge at the Time of Sale that IMMEX Sales Were Destined for Export**

Plaintiffs assert that substantial evidence demonstrates that Plaintiffs had "knowledge of the export destination at the time of the sale." Pl. Op. Br. at 38. However, as Commerce lawfully determined, substantial evidence demonstrated the opposite – that Plaintiffs did not have knowledge of the export destination at the time of the sale. Final IDM at 22.

Plaintiffs rely on evidence submitted in the form of invoices, import and export declarations ("pedimentos"), affidavits, testimony, and the general "nature and function" of the IMMEX program. *See e.g.*, Pl. Op. Br. at 41-42. However, Plaintiffs admit that they cannot provide "direct documentation showing the export of the final product." Final IDM at 23 (quoting Maquilacero's PSQR at 7). Despite Plaintiffs' assertion that it provided information that indicated that it "should have known" its sales were destined for the U.S. market, *see* Pl. Op. Br. at 42, Plaintiffs did not provide any *documentation* supporting this assertion.

There is nothing on the record indicating that Plaintiffs had knowledge at the time of sale that the specific sales of LWRPT were destined for export. Specifically, "while the invoice includes a billing address for [          ], the delivery address is [              ]," and the "pedimento" was for a single sale and only includes addresses in Mexico. *See*

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Maquilacero/TEFLU's Prelim. Analysis Memo at 6.  Commerce noted that, "Maquilacero/TEFLU have made an assumption as to the final destination of the subject merchandise based on the billing address of the company, but there is no record evidence that a company with a billing address in the United States or outside of the United States is shipping the merchandise to the United States." *Id*.  Following its Preliminary Results, Commerce gave Maquilacero/TEFLU another opportunity to show that it had knowledge that TEFLU's "virtual sales" were destined for the United States or other third country locations.  *See* Maquilacero's PSQR at 6.  Although Plaintiffs provided documentation for additional IMMEX sales, this documentation failed to show that Maquilacero/TEFLU knew or should have known that TEFLU's IMMEX sales were exported.  To the contrary, the documentation demonstrated that Maquilacero/TEFLU knew that the IMMEX sales were being internally consumed in Mexico.  Indeed, Maquilacero indicated that it had to ask its customers for the ultimate end use of the goods using Maquilacero/TEFLU's input to complete its post-preliminary questionnaire response. Maquilacero PSQR at 8 and Exhibit 2S-5 (showing [                                                                        ]).

Finally, the general "nature and function" of the IMMEX program without any other documentation indicating knowledge of export origin is insufficient to establish knowledge. Plaintiffs assert that the nature and function of the IMMEX program provides Plaintiffs with knowledge that it knew or should have known that its products were destined for export.  Pl. Op. Br. at 40, 42-43.  Specifically, Plaintiffs rely on a recement preliminary determination, *Freight Rail Couplers from Mexico*, that also considered the IMMEX program. *Id*. at 40 (citing *Freight Rail Couplers and Parts Thereof from Mexico*, 88 Fed. Reg. 27,864 (Dep't Commerce May 3, 2023) (prelim. affirm. less than fair value deter. & neg. critical circumstances), and accompanying

Preliminary Decision Memorandum ("*Freight Rail Couplers PDM*")).   However, Plaintiffs'

reliance is entirely misplaced.

In *Freight Rail Couplers*, Commerce recognized that the respondent knew or should have

known that its sales made into the IMMEX program were made for export rather than domestic

consumption.   *Freight Rail Couplers* PDM at 11.   However, in that proceeding, Commerce

explicitly distinguishes the facts of *Freight Rail Couplers* from the final determination of this

review.   Specifically, Commerce stated that "*downstream manufacturing* {is} a distinguishing

factor between this proceeding from others involving sales into the IMMEX program."   Issues and

Decision Memorandum accompanying *Certain Freight Rail Couplers from Mexico*, 88 Fed. Reg.

65,153 (Dep't Commerce Sept. 21, 2023) (final affirm. deter. of sales at less than fair value and

neg. deter. of critical circumstances) at 12 (emphasis added). Commerce goes on to say:

> In *LWRPT from Mexico Final* and *Sugar from Mexico*, Commerce stated that
> downstream manufacturers that turned the subject merchandise into non-subject
> merchandise undergirded the finding of consumption in the home market.
> However, in this investigation, Commerce has found that attachment to a freight
> railcar does not turn a freight rail coupler into non-subject merchandise.

*Id*. at 13.   Accordingly, *Freight Rail Couplers* does not support Plaintiffs' assertion.   Rather, as

detailed next, the relevant question is whether Plaintiffs products were consumed into non-subject

merchandise in Mexico before being exported.

### 2.      Substantial Evidence Demonstrates that Plaintiffs' IMMEX Sales Were Consumed in Mexico

As noted, the second relevant question is whether the IMMEX sales remain subject

merchandise at the time they leave Mexico.   Commerce addressed IMMEX sales in *Sugar from*

*Mexico*, explaining that when merchandise under consideration is manufactured into downstream

products it is consumed in Mexico.   *Preliminary Decision Memorandum accompanying Sugar*

*from Mexico*, 87 Fed. Reg. 932 (Dep't Commerce Jan. 7, 2022) (agreement suspending the

BUSINESS PROPRIETARY INFORMATION
                                        HAS BEEN DELETED

antidumping inv.; prelim. results of 2019-2020 admin. rev.) at 8 (unchanged in final) (citations

omitted) ("Where the sugar is further manufactured into non-subject merchandise and consumed

in Mexico, the sale of the sugar may properly be treated as a home market sale (and by extension

may be used as a basis for normal value).").  Although Plaintiffs assert that *Sugar from Mexico* is

"inapposite" they do not explain why, but simply summarize the court's finding.  *See* Pl. Op. Br.

at 41.

    As Commerce correctly found, Plaintiffs submitted no evidence that TEFLU's sales are

ultimately exported to the United States as anything besides [                ] or other [

    ] that are [                                    ].  Final IDM at 21-22; *see also*, Nucor

Tubular's Rebuttal Br. at 26.  Indeed, Commerce explicitly provided Plaintiffs the "opportunity to

submit evidence concerning whether TEFLU had knowledge that its IMMEX sales are consumed

in Mexico prior to exportation or whether they remain subject merchandise at the time they leave

Mexico."  *Id.* at 21 (citing Maquilacero's PSQR at 5-8).  In response, Plaintiffs explained that

"TEFLU is aware that the parts it sells are intended to be incorporated into various automobiles

and other industrial products." Maquilacero's PSQR at 6.  The supporting documentation Plaintiffs

provided indicate that the [                        ] that incorporates Maquilacero/TEFLU's

LWRPT is [                                ] United States. *Id.* at Exhibit 2S-

5. In other words, Plaintiffs admit that the products at issue [

                                ]. *Id.* at Exhibit 2S-11.  *See also*, *id.* at

Exhibit S2-6.6 (showing that LWRPT was [

        ] Mexico, such as [                ]).

    Further, in their case brief, Plaintiffs stated that "TEFLU knew, at the time of the sale, the

parts sold to an IMMEX customer will be incorporated into a product for export − to the United

BUSINESS PROPRIETARY INFORMATION
                    HAS BEEN DELETED

States or other export markets," explaining that certain parts will be incorporated into a [

                                                                ] that is later exported to

the United States or into subassemblies for other automobiles (*i.e.*, non-subject merchandise). *See*

Maquilacero's Case Br. at 28; Final IDM at 21.

     Accordingly, substantial evidence demonstrated that Plaintiffs were "unable to definitively

demonstrate that TEFLU's products are exported to the United States, rather than being consumed

into a downstream product in Mexico prior to export." Final IDM at 22. Consistent with

Commerce's practice in *Sugar from Mexico*, Commerce correctly treated Plaintiffs' IMMEX sales

as home market sales.

### E.    Commerce's Determination to Rely on the Cohen's *d* Test in Conducting the Differential Pricing Analysis Is Lawful and Supported by Substantial Evidence

     Commerce's use of a simple rather than a weighted-average when calculating the

denominator of the Cohen's *d* coefficient is lawful. Contrary to Plaintiffs' claims, the CAFC

determinations cited by Plaintiff do not render Commerce's determination unlawful.

     The differential pricing analysis, including the Cohen's *d* test, is a reasonable method to

fulfill Commerce's statutory and regulatory mandates. As Commerce explained, there is nothing

in the statute "that mandates how Commerce measures whether there is a pattern of prices that

differ significantly or how Commerce explains why the A-to-A method cannot account for such

differences." Final IDM at 28. Rather, given the statutes' ambiguity on this question, Commerce

is afforded significant discretion when carrying out the purpose of the statute. Final IDM at 29

(citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)). As

Commerce detailed, and consistent with other proceedings, Commerce's use of the Cohen's *d* test

in the differential pricing analysis is reasonable and is in accordance with law. Final IDM at 29.

Under the statute, Commerce generally calculates a dumping margin by comparing the weighted-average of normal value to the weighted-average of U.S. prices (the A-A method). 19 U.S.C. § 1677f-1(d)(1)(A). However, the statute also authorizes Commerce to compare the weighted-average of normal values to individual U.S. transactions (the A-T method) where Commerce determines there is a "pattern" of U.S. prices that "differ significantly among purchasers, regions or periods of time" and Commerce "explains why such differences cannot be taken into account using" the A-A method. 19 U.S.C. § 1677f-1(d)(B); 19 C.F.R. § 351.414(c)(1). Commerce developed the differential pricing analysis, which is composed of the Cohen's *d* test, the ratio test, and the meaningful difference test to address these statutory requirements. Preliminary Decision Memorandum accompanying *Heavy Walled Rectangular Welded Carbon Steel Pipe and Tubes from the Republic of Korea*, 87 Fed. Reg. 53,725 (Dep't Commerce Sept. 1, 2022) at 4-6. Courts time and again have upheld this differential analysis as a reasonable interpretation of the statute. *See, e.g.*, *NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1354-57, 1359 (Ct. Int'l Trade 2019); *NEXTEEL Co. v. United States*, 392 F. Supp. 3d 1276, 1293-97 (Ct. Int'l Trade 2019); *Apex Frozen Foods Priv. Ltd. v. United States*, 144 F. Supp. 3d 1308, 1314-37 (Ct. Int'l Trade 2016); *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1344-51 (Fed. Cir. 2017).

Contrary to Plaintiffs' assertion, in *Stupp*, the Federal Circuit did not reject any aspect of the analysis, but merely invited Commerce to provide additional clarification concerning "the limits on the use of the Cohen's *d* test . . . {and invited} Commerce to clarify its argument that having the entire universe of data rather than a sample makes it permissible to disregard the otherwise-applicable limitations on the use of the Cohen's *d* test." *Stupp Corp. v. United States*, 5 F.4th 1341, 1360 (Fed. Cir. 2021). *See also*, Final IDM at 30. On remand from *Stupp*, Commerce

accepted the Federal Circuit's invitation and provided a robust explanation for Commerce's Cohen's *d* test.  *See generally* Final Results of Redetermination Pursuant to Ct. Remand, *Stupp Corp. v. United States*, No. 15-00334 (Ct. Int'l Trade Apr. 4, 2022), ECF No. 208-1 ("*Stupp*, Final Results of Redeter.").  As Commerce noted, the court has upheld Commerce's remand determination as sufficiently addressing the Federal Circuit's concerns. Final IDM at 30 (citing *Stupp Corp. v. United States*, Court No. 15-00334, Slip. Op. 23-23 (Ct. Int'l Trade 2023)).

Plaintiffs contend that Commerce's final determination in this review is unlawful because it "failed to resolve concerns articulated by the CAFC in *Stupp*." Pl. Op. Br. at 46.  More specifically, that Commerce was required to explain how the statistical assumptions at issue in Stupp are satisfied, in order to Commerce's use of Cohen's *d* in this review. As an initial matter, Plaintiffs placed no factual evidence on the record of this review that calls into question the statistical viability of the Cohen's *d* test as a whole or as applied to Maquilacero's data. In addition, as Commerce explained at length in its remand redetermination, the assumptions of normality, equal variance and sample size are simply not relevant to the Commerce's application of the Cohen's *d* test in Commerce's differential pricing analysis. Final Results of Redetermination Pursuant to Ct. Remand, *Mid Continent Steel & Wire, Inc. v. United States*, No. 15-00213 (Ct. Int'l Trade Nov. 10, 2022), ECF No. 186-1 at 43 ("Mid Continent Final Results of Redeter.") (stating the assumptions "are only necessary when dealing with statistical samples or sampled data, whereas the application of the Cohen's d test in Commerce's Differential Pricing Analysis does not involve samples or estimates, but rather involves the entire population of prices, which obviates the need for these assumptions to measure the statistical significance of the difference in the means.").

Moreover, under no plausible interpretation of *Stupp* did the Court impose a requirement that Commerce demonstrate that a respondent's data meet the assumptions. Final IDM at 30. Even if such a requirement did exist, it would have been Plaintiffs' obligation to make the argument and demonstrate the issue. Yet, in the underlying review, Plaintiffs made no such demonstration or argument. Furthermore, as Commerce's remand redetermination in *Stupp* clarified, even if Maquilacero had provided evidence or argument, the Cohen's *d* test would still be valid because Commerce is evaluating an entire population. *Stupp*, Final Results of Redeter. at 10, 13, 16. *See also*, Final IDM at 30.

Plaintiffs also point to *Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367 (Fed. Cir. 2022), for the proposition that the Federal Circuit found that Commerce's application of the Cohen's *d* test is unlawful. Pl. Op. Br. at 45, 47-48. But, similar to their arguments concerning *Stupp*, Plaintiffs misrepresent the case law. In *Mid Continent*, the Federal Circuit remanded an appeal concerning Commerce's use of a simple average, rather than a weighted average in the Cohen's *d* denominator calculation, finding that the Department had not offered a sufficient explanation. *See* Final IDM at 30-31 (citing *Mid Continent*, 31 F.4[th] at 1381). On remand, Commerce continued to defend the use of a simple average in a fulsome explanation. Mid Continent Final Results of Redeter. Although Plaintiffs acknowledge that these remand results have been further remanded, this does not render the Cohen's *d* test and Commerce's application of it in this review, as unlawful. Pl. Op. Br. at 48. Accordingly, Commerce's continued use of a simple average in its Cohen's *d* denominator calculations is not unlawful.

**NON-CONFIDENTIAL VERSION**

## V.   <u>CONCLUSION</u>

For the reasons discussed above Nucor Tubular respectfully requests that this Court affirm in full the final results of Commerce's 2020-2021 administrative review of the LWRPT antidumping duty order.

Respectfully submitted,

/s/ *Robert E. DeFrancesco, III*

Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Jake R. Frischknecht, Esq.
Kimberly A. Reynolds, Esq.

W ILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000
*Counsel for Nucor Tubular Products, Inc.*

Dated: January 5, 2024

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(l), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Response to Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 11,311 words.

_/s/ Robert E. DeFrancesco, III_
(Signature of Attorney)

Robert E. DeFrancesco, III
(Name of Attorney)

Nucor Tubular Products, Inc.
(Representative Of)

January 5, 2024
(Date)