## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MAQUILACERO S.A. de C.V. and TECNICAS DE FLUIDOS S.A. de C.V., | ) ) ) |
| *Plaintiffs*, and | ) ) ) |
| PERFILES LM, S.A. DE C.V. | ) ) |
| *Consolidated-Plaintiff*, v. | ) ) ) |
| THE UNITED STATES, | ) ) |
| *Defendant*, and | ) ) ) |
| NUCOR TUBULAR PRODUCTS, INC., | ) ) ) |
| *Defendant-Intervenor*. | ) ) ) |

**NON-CONFIDENTIAL VERSION**

Consol. Court No. 23-00091

Confidential Business Proprietary
Information Deleted from Page 15.

## REPLY BRIEF OF MAQUILACERO S.A. DE C.V. AND TECNICAS DE FLUIDOS S.A. DE C.V. TO DEFENDANT'S AND DEFENDANT-INTERVENOR'S RESPONSE BRIEFS

Diana Dimitriuc Quaia
John M. Gurley
Yun Gao
Mario A. Torrico

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006

February 9, 2024

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................ 1

II.   SUMMARY OF THE ARGUMENT .............................................................. 2

III.  ARGUMENT ................................................................................................... 4

      A.    Commerce's Collapsing Determination Is Not Supported by Substantial Evidence and Is Not In Accordance With Law ...................................................... 4

      B.    TEFLU's Further Processed Parts Are Not in-Scope Merchandise ...................... 8

            1.    The Scope Does Not Cover Downstream Products .................................... 8

            2.    Commerce's Determination Is Inconsistent with Precedent ..................... 11

      C.    Defendant's Refusal to Account for Further Processing Was In Error ............... 13

            1.    Commerce's Refusal To Include the Manufacturer Code Was Inconsistent With Past Practice ................................................................... 13

            2.    Commerce's Rejection of the FURPROCESSH/U Variable Was Contrary to Law and Unsupported by Record Evidence ......................................... 15

      D.    Commerce's Treatment of IMMEX Sales as Home Market Sales Was Unlawful 18

      E.    Commerce Unlawfully Applied the Differential Pricing Methodology to Maquilacero/TEFLU's Sales ............................................................................... 23

IV.   CONCLUSION .............................................................................................. 24

AFDOCS:199521525.1

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Bohler Bleche GmbH & Co. KG v. United States,*
    324 F.Supp 3d 1344 (Ct. Int'l Trade 2018) ...................................................16, 18

*Budd Co., Wheel & Brake Div. v. United States,*
    773 F.Supp. 1549 (Ct. Int'l Trade 1991) .............................................................20

*Burlington Truck Lines v. United States,*
    371 U.S. 156 (1962)..............................................................................................6

*Coal. of Am. Millwork Producers v. United States,*
    581 F.Supp.3d 1295 (Ct. Int'l Trade 2022) .........................................................4

*Diamond Sawblades Mfrs. Coal. v. United States,*
    37 CIT 1501 (2013), *aff'd after remand*, 809 F.3d 626 (Fed. Cir. 2015)...............20

*Duferco Steel, Inc. v. United States,*
    296 F.3d 1087 (Fed. Cir. 2002)............................................................................9

*Echjay Forgings Priv. Ltd. v. United States,*
    475 F.Supp.3d 1350 (Ct. Int'l Trade 2020) .........................................................5

*Fabuwood Cabinetry Corp. v. United States,*
    469 F.Supp.3d 1373 (Ct. Int'l Trade) ..................................................................12

*Fagersta Stainless AB v. United States,*
    577 F.Supp.2d 1270 (Ct. Int'l Trade 2008) .........................................................18

*Fedmet Res. Corp. v. United States,*
    755 F.3d 912 (Fed. Cir. 2014)..............................................................................9

*Ghighi 1870 S.p.A. v. United States,*
    547 F.Supp.3d 1332 (Ct. Int'l Trade 2021) .........................................................16

*Hormel v. Helvering,*
    312 U.S. 552 (1941)..............................................................................................20

*Hussey Copper, Ltd. v. United States,*
    834 F. Supp. 413 (Ct. Int'l Trade 1993) ..............................................................7

*Huvis Corp. v. United States,*
    525 F.Supp.2d 1370 (Ct. Int'l Trade 2007) .........................................................14

AFDOCS:199521525.1

*Luoyang Bearing Corp. v. United States*,
    347 F.Supp.2d 1326 (Ct. Int'l Trade 2004) ...........................................................20

*Magnola Metallurgy, Inc. v. United States*,
    508 F.3d 1349 (Fed. Cir. 2007)........................................................................8

*Meihua Grp. Int'l Trading (H.K.) Ltd. v. United States*,
    633 F.Supp.3d 1203 (Ct. Int'l Trade 2023) ...........................................................7

*Mid Continent Steel and Wire, Inc. v. United States*,
    31 F.4th 1367 (Fed. Cir. 2022) .......................................................................24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983)........................................................................................6

*NTN Bearing Corp. of Am. v. United States*,
    747 F.Supp. 726 (Ct. Int'l Trade 1990) ...............................................................7

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001)........................................................................6

*Stein Indus. v. United States*,
    365 F.Supp.3d 1364 (Ct. Int'l Trade 2019) ...................................................10, 12

*Stupp Corp. v. United States*,
    5 F.4th 1341 (Fed. Cir. 2021) ........................................................................23

*Trendium Pool Prods., Inc. v. United States*,
    399 F.Supp.3d 1335 (Ct. Int'l Trade 2019) .............................................9, 10, 12

*Viraj Grp. v. United States*,
    476 F.3d 1349 (Fed. Cir. 2007)........................................................................5

*Wonderful Chem. Indus. v. United States*,
    259 F.Supp.2d 1273 (Ct. Int'l Trade 2003) .........................................................21

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013)......................................................................15

*Z.A. Sea Foods Priv. Ltd. v. United States*,
    569 F.Supp.3d 1338 (Ct. Int'l Trade 2022) .........................................................21

**Federal Statutes**

19 U.S.C. § 1677(16)(B)....................................................................................15

19 U.S.C. § 1677(16)(C)....................................................................................15

19 U.S.C. § 1677b(a) ........................................................................................15

AFDOCS:199521525.1

28 U.S.C. § 2637(d) ............................................................................................19

**Regulations**

19 C.F.R. § 351.401(f) ..........................................................................................5

19 C.F.R. § 351.401(f)(1) ...........................................................................2, 5, 7, 8

19 C.F.R. § 351.401(f)(2) .............................................................................2, 5, 8

**Administrative Determinations**

*Agreement Suspending the Antidumping Duty Investigation on Sugar From Mexico*, 87 Fed. Reg. 932 (Dep't Commerce Jan. 7, 2022) (prelim results; 2019-2020), and accompanying IDM ....................................................................22

*Aluminum Extrusions from the People's Republic of China*, 79 Fed. Reg. 96 (Dep't Commerce Jan. 2, 2014) (final AD results & partial recission), and accompanying IDM ........................................................................................7

*Certain Corrosion-Resistant Steel Products From the Republic of Korea*, 84 Fed. Reg. 10784 (Dep't Commerce Mar. 22, 2019) (final AD results; 2016-2017), and accompanying IDM....................................................................................13

*Certain Freight Rail Couplers and Parts Thereof From Mexico*, 88 Fed. Reg. 65153 (Dep't Commerce Sept. 21, 2023) (final affirm. LTFV determ.), and accompanying IDM ......................................................................................22

*Certain Freight Rail Couplers and Parts Thereof From Mexico*, 88 Fed. Reg. 27864 (Dep't Commerce May 3, 2023) (prelim. affirm. LTFV determ.), and accompanying PDM....................................................................................22, 23

*Certain Frozen and Canned Warmwater Shrimp From Brazil*, 69 Fed. Reg. 76910 (Dep't Commerce Dec. 23, 2004) (final LTFV determ.), and accompanying IDM....................................................................................................8

*Light-Walled Rectangular Pipe and Tube From Mexico*, 88 Fed. Reg. 15665 (Dep't Commerce Mar. 14, 2023) (final AD results; 2020-2021), and accompanying IDM ..................................................................... *passim.*

*Light-Walled Rectangular Pipe and Tube from Mexico,* 88 Fed. Reg. 30723 (Dep't Commerce May 12, 2023) (amended final results) ........................................2

*Light-Walled Rectangular Pipe and Tube from Mexico*, 86 Fed. Reg. 33646 (Dep't Commerce June 25, 2021) (final AD results; 2018-2019), and accompanying IDM ......................................................................................17

AFDOCS:199521525.1

*Light-Walled Rectangular Pipe and Tube from Mexico, et. al.*, 73 Fed. Reg. 45403
    (Dep't Commerce Aug. 5, 2008) (AD orders & am. final LTFV determ. re:
    Korea) ...................................................................................................................2, 12

*Stainless Steel Sheet and Strip in Coils from Mexico*, 69 Fed. Reg. 6259 (Dep't
    Commerce Feb. 10, 2004) (final AD results), and accompanying IDM.................................13

AFDOCS:199521525.1

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MAQUILACERO S.A. de C.V. and TECNICAS DE FLUIDOS S.A. de C.V., | ) ) ) ) |
| *Plaintiffs*, and | ) ) ) |
| PERFILES LM, S.A. DE C.V. | ) ) ) |
| *Consolidated-Plaintiff*, v. | ) ) ) |
| THE UNITED STATES, | ) ) |
| *Defendant*, and | ) ) ) ) |
| NUCOR TUBULAR PRODUCTS, INC., | ) ) ) |
| *Defendant-Intervenor*. | ) ) ) |

**NON-CONFIDENTIAL VERSION**

Consol. Court No. 23-00091

Confidential Business Proprietary
Information Deleted from Page 15.

**REPLY BRIEF OF MAQUILACERO S.A. DE C.V. AND
TECNICAS DE FLUIDOS S.A. DE C.V. TO DEFENDANT'S AND DEFENDANT-
INTERVENOR'S RESPONSE BRIEFS**

## I.      INTRODUCTION

Plaintiffs Maquilacero S.A. de C.V. ("Maquilacero") and Tecnicas De Fluidos S.A. de

C.V. ("TEFLU") (collectively "Maquilacero/TEFLU") respectfully submit this reply brief in

response to the Defendant United States' Response to Plaintiff's and Plaintiff-Intervenor's Rule

56.2 Motions for Judgment on the Agency Record dated January 5, 2024, ECF Nos. 37 and 39

("Def. Br."), and Defendant-Intervenor Nucor Tubular Products, Inc.'s Response to Motions for

Judgment on the Agency Record dated January 8, 2024, ECF Nos. 40 and 41 ("Def.-Int. Br.").

For the reasons provided in Plaintiff's Memorandum of Law in Support of Motion for

1

Judgment on the Agency Record Pursuant to Rule 56.2 dated September 28, 2023, ECF Nos. 31 and 32 ("Pls. Br.") the U.S. Department of Commerce's ("Commerce") final results of the 2020-2021 ("POR") administrative review of light-walled rectangular pipe and tube ("LWRPT") from Mexico are not supported by substantial evidence on the record and contrary to law. *Light-Walled Rectangular Pipe and Tube From Mexico*, 88 Fed. Reg. 15665 (Dep't Commerce Mar. 14, 2023) (final AD results; 2020-2021) ("*Final Results*"), P.R. 151, and accompanying IDM ("*IDM*"), P.R. 146, as amended by *Light-Walled Rectangular Pipe and Tube from Mexico,* 88 Fed. Reg. 30723 (Dep't Commerce May 12, 2023) (amended final results), P.R. 160.

## II.     SUMMARY OF THE ARGUMENT

Commerce's determination to collapse Maquilacero and TEFLU relies on scant evidence and an incomplete review of the regulatory factors and is thus contrary to law and unsupported by record evidence. While Defendant and Defendant-Intervenor argue that Commerce was not required to consider Maquilacero's arguments against collapsing, Commerce did make a determination that it was appropriate to collapse the two entities based on the record of this review.  That determination overlooks important collapsing factors under 19 C.F.R. § 351.402(f)(1)-(2) and fails to address Maquilacero/TEFLU's arguments rooted in the record of this review, demonstrating no significant potential for the manipulation of prices or production.

Second, Commerce's determination that auto parts produced TEFLU from LWRPT remain in-scope merchandise subject to the antidumping duty order on light walled rectangular pipe and tube from Mexico is contrary to law and unsupported by the record evidence. *Light-Walled Rectangular Pipe and Tube from Mexico, et. al.*, 73 Fed. Reg. 45403 (Dep't Commerce Aug. 5, 2008) (AD orders & am. final LTFV determ. re: Korea) ("*Order*").  Defendant and Defendant-Intervenor offer an erroneous reading of the scope language that seeks to incorporate

AFDOCS:199521525.1

downstream products made from LWRPT regardless of the amount of further processing performed on the input LWRPT.  Through the further processing, the parts sold by TEFLU become downstream products customized for a single customer and application and thus no longer LWRPT.  Defendant's position that TEFLU's auto parts are in-scope merchandise because the scope does not expressly exclude them is an unlawful expansion of the scope.

Third, Commerce's refusal to modify its SAS program to preserve the manufacturer distinctions in matching sales of LWRPT produced by Maquilacero and the further manufactured parts made by TEFLU is inconsistent with Commerce's practice in the last review.  Commerce unreasonably rejected the use of a further processing characteristic by claiming that Maquilacero/TEFLU did not fully develop its argument at an early stage of the review despite information on the new characteristic being provided from the first questionnaire response.  The statute and precedent support making a change to product characteristics in order to ensure an accurate comparison of the foreign like products to the U.S. sales.

Fourth, record evidence demonstrates that Maquilacero/TEFLU had knowledge of the intended export destination of the parts sold through the IMMEX program due to the nature of that program.  Commerce's treatment of these virtual exports as home market sales resulted in an inaccurate margin calculation for Maquilacero/TEFLU and should be remanded.

Finally, Commerce's differential pricing analysis with respect to Maquilacero/TEFLU's sales is contrary to law because Commerce's application of the Cohen's $d$ test was found to be unlawful by the Court of Appeals for the Federal Circuit ("CAFC").

AFDOCS:199521525.1

III.    **ARGUMENT**

A.    **Commerce's Collapsing Determination Is Not Supported by Substantial Evidence and Is Not In Accordance With Law**

Defendant's brief suffers from the same flaws as Commerce's *Final Results*:  it summarily rejects Maquilacero's arguments that it was incorrectly collapsed with TEFLU in the 2020-2021 review under the erroneous assumption that Maquilacero is relitigating the facts on the record of the 2018-2019 review. Def. Br. at 8, 10, 12.  Instead, Maquilacero argues that collapsing Maquilacero and TEFLU is contrary to law and unsupported by substantial evidence on the record of the 2020-2021 review.  Pls. Br. at 16-20.  In the *Final Results*, Commerce discussed its collapsing determination for Maquilacero and TEFLU in the prior review, *IDM* at 7, P.R. 146, but went on to assert that the evidence *on this record* also supports collapsing:

> In addition, *in this review*, record evidence continues to show Maquilacero and TEFLU are owned by the same family-held group, that there is still corporate and managerial overlap, and that Maquilacero, TEFLU, and certain other affiliates which comprise the family held-ownership group continue to be parties which "may be considered involved in the production, sale, or distribution of the merchandise under review.
>
> …
>
> As discussed herein, *we continue to find that*, based on the "totality of circumstances," it is appropriate to treat Maquilacero and TEFLU as a single entity.

*Id.* at 8 (emphases added) (citation omitted).

Under Commerce's regulations, there are "three preconditions for collapsing: (1) entities must be 'affiliated'; (2) they must have 'production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities'; and (3) there must exist 'a significant potential for the manipulation of price or production.'" *Coal. of Am. Millwork Producers v. United States*, 581 F.Supp.3d 1295, 1303 (Ct.

Int'l Trade 2022), citing 19 C.F.R. § 351.401(f)(l).  To determine whether there is

> a significant potential for the manipulation of price or production, the factors {Commerce} may consider include:
>
> (i) The level of common ownership;
>
> (ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and
>
> (iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

19 C.F.R. § 351.401(f)(2).

As seen from the language first quoted, other than the references to overlap in ownership and management between Maquilacero and TEFLU, which are only two of the collapsing criteria at 19 C.F.R. § 351.401(f), it is not reasonably discernible what legal test and what evidence Commerce relied upon for its collapsing determination.

The second test under 19 C.F.R. § 351.401(f)(1) - whether TEFLU's facilities would require retooling to produce similar products to Maquilacero's - is completely missing from Commerce's discussion.  *IDM* at 8-9, P.R. 146.  However, "the {CAFC} upheld Commerce's finding that no substantial retooling was required among collapsed companies." *Echjay Forgings Priv. Ltd. v. United States*, 475 F.Supp.3d 1350, 1370 (Ct. Int'l Trade 2020), citing *Viraj Grp. v. United States*, 476 F.3d 1349, 1358-59 (Fed. Cir. 2007).  Commerce cited no evidence that Maquilacero and TEFLU have production facilities for similar or identical products nor addressed Maquilacero's arguments to the contrary.  Indeed, in its questionnaire response and in its administrative case brief, Maquilacero explained that there is no similarity or overlap in the products produced by Maquilacero and TEFLU, nor in the facilities that produce them. Maquilacero's First Supplemental Sections A&D Questionnaire Response at 14-15, Exhs. S-3, S-

13, S-14 (July 26, 2022) ("A-D SQR"), C.R. 152, 154, P.R. 92.  TEFLU does not have the capability to produce LWRPT because it lacks any pipe or tube mills and thus it could not produce any welded tubing without purchasing and installing a complete pipe mill. *Id.* at 14; *see* Maquilacero's Section A Questionnaire Response at Exh. S-32 (Dec. 1, 2021), C.R. 21, P.R. 38. Conversely, Maquilacero does not possess any of the equipment used by TEFLU to process the LWRPT tube into a custom-designed part. *Id.*

Thus, Commerce's determination that Maquilacero and TEFLU satisfied the collapsing requirements failed to address important factors in the regulation, failed to discuss the evidence raised by Maquilacero nor offer an adequate explanation of its conclusion in light of the record evidence. *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001); "{T}he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Defendant and Defendant-Intervenor spend considerable time arguing that Maquilacero/TEFLU did not provide information indicating that the relationship between Maquilacero and TEFLU had changed since the original collapsing determination and thus Commerce was not required to conduct an analysis. Def. Br. at 10, 12; Def.-Int. Br. at 7.  Aside from the fact that Commerce actually conducted a collapsing analysis on this record, Defendant's claims that the record is unchanged from the 2018-2019 review is wrong.  The record of the current review contains a new set of questionnaire responses providing POR-specific information on Maquilacero's and TEFLU's different products, customers, production processes. Pls. Br. at 19-20 (citing record evidence demonstrating differences in sales process and no overlap in

6

customers, production, facilities).  Thus, by Commerce's own standard of requiring changes in

"ownership, management, operations and merchandise produced," Def. Br. at 9-10, citing

*Aluminum Extrusions from the People's Republic of China*, 79 Fed. Reg. 96 (Dep't Commerce

Jan. 2, 2014) (final AD results & partial recission), and accompanying IDM at Cmt 4, the record

of the 2020-2021 review is different.  This evidence is relevant to the third prong of the

collapsing test – whether there is a significant potential for the manipulation of price or

production in this review, 19 C.F.R. § 351.401(f)(1), - because it explains why

Maquilacero/TEFLU are not interchangeable.  Contrary to Defendant-Intervenor's speculation,

there are technical and commercial reasons, see Pls. Br. at 18-20, refuting the conclusion that

Maquilacero and TEFLU can switch the roles of producer and seller.  This evidence detracts

from Commerce's cursory conclusion that there is significant potential for manipulation.

Commerce's reliance on its past collapsing determination, together with its statements that the

same conclusions continue to be valid on this record, does not meet the substantial evidence

standard.  "Although Commerce is traditionally granted broad discretion in its selection of

methodology to implement the {antidumping and countervailing duty statutes}, Commerce may

not abuse its discretion and its choice of methodology may not be arbitrary." *Hussey Copper,*

*Ltd. v. United States*, 834 F. Supp. 413, 418–19 (Ct. Int'l Trade 1993) (citing *NTN Bearing Corp.*

*of Am. v. United States*, 747 F.Supp. 726, 736 (Ct. Int'l Trade 1990)); *see also Meihua Grp. Int'l*

*Trading (H.K.) Ltd. v. United States*, 633 F.Supp.3d 1203, 1215 (Ct. Int'l Trade 2023)

(Commerce's failure to conduct a collapsing analysis for the period of review was an abuse of

discretion).

The cases cited by Defendant supporting the view that Commerce may reasonably

decline to perform a collapsing analysis are inapposite because they address a situation where

parties sought to rely on the record of a previous proceeding.  Def. Br. at 10-11, citing *Magnola Metallurgy, Inc. v. United States,* 508 F.3d 1349 (Fed. Cir. 2007).  Here, Maquilacero/TEFLU do not rely on the 2018-2019 record to establish their claim, but grounded their arguments in the evidence for the 2020-2021 review. Moreover, Commerce has addressed the record of this review. *IDM* at 8, P.R. 146.

Defendant's reliance on *Certain Frozen and Canned Warmwater Shrimp From Brazil*, 69 Fed. Reg. 76910 (Dep't Commerce Dec. 23, 2004) (final LTFV determ.), and accompanying IDM at Cmt. 5 ("*Shrimp IDM*"), is erroneous.  Def. Br. at 13-14. Defendant makes the false statement that the factors in *Shrimp from Brazil* are present in this case, but the facts are very different: Commerce collapsed a non-producing seller with an affiliated producer of the subject merchandise (called a processor) who was controlled by the seller.  *Shrimp IDM* at 12-15. Here, Maquilacero and TEFLU produce different products for different markets and neither company controls the other.  The evidence in this review does *not* show that the regulatory tests for collapsing, 19 C.F.R. § 351.401(f)(1)-(2) have been met.

**B.     TEFLU's Further Processed Parts Are Not in-Scope Merchandise**

**1.     The Scope Does Not Cover Downstream Products**

Defendant-Intervenor erroneously claims that TEFLU's further manufactured products meet the plain language of the scope because they "meet the physical and chemical characteristics as described in the scope." Def.-Int. Br. at 19.  Defendant-Intervenor's contention is wrong. The plain language of the scope describes pipe and tube, making no reference to downstream products or auto parts, such as those produced by TEFLU. Pls.'s Br. at 23.

Following Defendant-Intervenor's read of the scope to its logical conclusion, any downstream product that merely contains LWRPT would be covered by the scope. Such a broad

8

and misguided interpretation contravenes established precedent holding that "{t}he plain language of a countervailing or antidumping order is 'paramount' in determining whether particular products are included within its scope." *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014) (citation omitted).

As Defendant-Intervenor recognized, "{s}cope orders may be interpreted as including subject merchandise *only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it*." Def.-Int. Br. at 16 (emphasis added) (citing *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002)). Therefore, TEFLU's auto parts can only be included in the scope if it is reasonable to do so based on the record of the investigation.

There is nothing on the record of the original investigation indicating that petitioners "intended to include *finished downstream products* such as automobile parts in the scope." *See* Pls.'s Br. at 31 (emphasis added) (citing Maquilacero/TEFLU Admin. Br. and Admin. Rebuttal Br. Resubmission, Case Br. at 7 (Dec. 29, 2022) ("Case Br." and "Rebuttal Br."), C.R. 246, P.R. 140. Defendant-Intervenor claims that, because the scope "does not contain any language excluding further processed products," the scope must include TEFLU's automotive parts. Def.-Int. Br. at 19-20.  Such an interpretation is firmly precluded by the CAFC's opinion in *Duferco*, which made clear that Commerce cannot include products within the scope of an order based on the fact "that there {was} no language in the orders specifically excluding these products." 296 F.3d at 1095; *see Trendium Pool Prods., Inc. v. United States*, 399 F.Supp.3d 1335, 1342 (Ct. Int'l Trade 2019) ("{B}ecause the plain language of the *Order* does not discuss downstream products and the Government can point to no evidence on the record of consideration of downstream products within the *Petition* … or the ITC {International Trade Commission}

9

investigation, they are reasonably interpreted to be excluded from the scope of the *Order*.").

While seemingly recognizing this fallacy, Defendant and Defendant-Intervenor contend that downstream products were part of the underlying investigation by conflating end-uses of LWRPT, which are mentioned in the underlying investigation, with downstream products, which are not. Def.-Int. Br. at 21-22; Def. Br. at 16-17. The Court has expressly cautioned against this practice when interpreting scope orders. In *Trendium*, the Court noted that, "{i}f the court were to adopt Commerce's interpretation of the *Order* -- that any downstream product discussed during the underlying ITC investigation in terms of end-usage should be covered by the scope of the *Order* -- then an array of finished consumer products … would be covered." 399 F.Supp.3d at 1345; *see also Stein Indus. v. United States*, 365 F.Supp.3d 1364, 1372 (Ct. Int'l Trade 2019) (noting a clear distinction between arguing that products are outside the scope based on end use and arguing that products are outside the scope because they are "*downstream products dedicated to particular uses{.}*" (citation omitted)). Therefore, Defendant-Intervenor's references to LWRPT's "end uses" in the underlying investigation (Def.-Int. Br. at 21) cannot be read to mean that all these downstream products made from LWRPT, such as "furniture, sports equipment and automotive equipment" are included within the scope of the *Order* (citation omitted). *See Trendium*, 399 F.Supp.3d at 1345 (discussing the end uses of corrosion resistant steel in the Petition and ITC Final Determination did not mean that the scope included downstream products).

Arguing for a broad scope interpretation, Defendant-Intervenor also cites to language from the petition stating that "any product that meets physical characteristics of the scope is covered regardless of whether it is produced to 'an ASTM, proprietary or other industry specification.'" Def.-Int. Br. at 22 (citation omitted). There is nothing remarkable about this

AFDOCS:199521525.1

statement, except that Defendant-Intervenor misinterprets it to mean that "so long as a product meets the physical and chemical characteristics of the scope, it does not matter whether it is further processed for a specific industry or end-use customer." *Id.* As many of these physical and chemical characteristics derive from the steel, a piece of LWRPT will maintain these characteristics when it is processed into an auto-part. Defendant-Intervenor's interpretation of the scope language is absurd as it would include in the scope both the LWRPT and other products that may include a piece of LWRPT, such as a treadmill, office desk, car seat, etc. This erroneous interpretation is exactly the type of overreach that *Trendium*, *Stein* and *Duferco* seek to address.

## 2.   Commerce's Determination Is Inconsistent with Precedent

Defendant-Intervenor incorrectly dismisses Maquilacero's reliance on the *PSC Scope Ruling*, which excluded a downstream product made from in-scope merchandise, stating that it "involved a different Order, for a different product, that had a different scope language." Def.-Int. Br. at 23-24 (citing *Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, et al.:* Scope Ruling Request at 3 (Oct. 11, 2017) (ACCESS barcode 3628547) ("*PSC Scope Ruling*")); Case Br. at 11-12, C.R. 246, P.R. 140. The *PSC Scope Ruling* is particularly instructive as it involved steel plate that was further processed into a new downstream product (*i.e.*, mold base parts), that the ITC identified as a downstream application (similar to this case) and was thus excluded from the scope. Pls. Br. at 33. Thus, Defendant-Intervenor's dismissal of the *PSC Scope Ruling* is unpersuasive.

In finding that TEFLU's products are covered by the scope, Commerce argued that "absent exclusionary language … 'it is not reasonable to conclude that simply because a particular type of LWRPT is not specifically mentioned in the scope, that product is not covered." IDM at 12 (citation omitted); *see also*, Pls. Brief at 29. Defendant's and Defendant-

Intervenor's attempts to distinguish the cases cited by Maquilacero are unsuccessful. For example, Defendant-Intervenor claims that *Trendium*, *Fabuwood*,[1] and *Stein Industries* are distinguishable because "underlying these three cases, the scope included language that contemplated excluding certain further processed products." Def.-Int. Br. at 22. The argument seems to suggest that the scope exclusions in these orders determined whether further processed products were covered by the scope. This argument misconstrues the Court's findings in each case and is plainly wrong. In *Trendium*, the product at issue was corrosion-resistant steel ("CORE") and the scope exclusions were for types of certain plated, coated or clad CORE – not for downstream products *made from* CORE.  The Court's finding that the product was excluded did not turn on these exclusions but on the degree of further processing: "Trendium's substantial processing …, creates a finished product fit only for use in Trendium's pools. … the processing is sufficient to bring Trendium's product outside the scope of the Order." *Trendium*, 399 F.Supp 3d at 1344.

Defendant-Intervenor's reference to *Stein* is particularly baffling given that *Stein* interpreted the same scope language that is at issue in this case. *Orders*, 73 Fed. Reg. at 45403. In *Stein*, the Court remanded Commerce's scope determination that found that the *Order* covered "downstream products made with subject LWR pipes or tubes." *Stein*, 365 F.Supp.3d at 1372. The Court's determination rested in part on the fact that the underlying record (i.e., the ITC report) discussing "end uses" of LWRPT "was not reasonably read to suggest that all LWR pipe and tube further manufactured for one of the identified uses remain{ed} within the scope{.}" *Stein* at 1373.

In sum, Defendant and Defendant-Intervenor's expansive interpretation of the scope of

---

[1] *Fabuwood Cabinetry Corp. v. United States*, 469 F.Supp.3d 1373 (Ct. Int'l Trade).

AFDOCS:199521525.1

the *Order* finds no support in the cases above which did not find downstream products to be covered by the scope.

### C.     Defendant's Refusal to Account for Further Processing Was In Error

#### 1.     Commerce's Refusal To Include the Manufacturer Code Was Inconsistent With Past Practice

Maquilacero's request for Commerce to use the "Manufacturer" variable (MFRH/U) in the margin program would have allowed Commerce to preserve the distinction between manufacturers and account for the physical and commercial differences between commercial LWRPT (produced by Maquilacero) and further processed downstream products (produced by TEFLU). As "manufacturer" is a variable in the questionnaire, it is not unusual for Commerce to utilize this variable to account for different manufacturers in its product comparison methodology. Pls. Br. at 35 (citing *Stainless Steel Sheet and Strip in Coils from Mexico*, 69 Fed. Reg. 6259 (Dep't Commerce Feb. 10, 2004) (final AD results), and accompanying IDM at 35-38 ("*SSSS from Mexico*") and *Certain Corrosion-Resistant Steel Products From the Republic of Korea*, 84 Fed. Reg. 10784 (Dep't Commerce Mar. 22, 2019) (final AD results; 2016-2017), and accompanying IDM at Cmt. 13 ("*CORE from Korea*"). Defendant and Defendant-Intervenor dismiss *SSSS from Mexico* and *CORE from Korea* arguing that the cases concerned third-country or U.S. manufacturing and involved no collapsed entities. Def. Br. at 24-26; Def.-Int. Br. at 25.

Defendant's and Defendant-Intervenor's dismissal of this precedent is short-sighted. While there are factual differences between those cases and the facts here, they illustrate Commerce's flexibility to address unusual scenarios to ensure an accurate margin calculation. Both cases involved unusual scenarios where Commerce determined it was appropriate to use the manufacturer code in its product comparison methodology. *SSSS from Mexico* at 35-38; *CORE from Korea* at Cmt. 13. Similarly here, the facts involve an unusual scenario where Commerce

13

determined to collapse a producer of LWRPT and a further processor of LWRPT with the result that in the collapsed database the same CONNUM will include both further processed and not further processed LWRPT, generating inaccurate margins. *IDM* at 6, P.R. 146. Preserving the manufacturer distinction in the SAS programming would avoid such distortion. Therefore, Commerce should adopt the MFRH/U code because the usual circumstances in this case —*i.e.*, collapsing a producer and further processor—warrant such inclusion.

A more compelling reason to account for the manufacturer in the margin program can be found in the 2018-2019 review where Commerce included the manufacturer variable while *simultaneously collapsing* Maquilacero and TEFLU. Pls. Br. at 36. Defendant attempts to justify Commerce's change in this review by claiming that it "provided a reasonable explanation for not doing so here – namely, the fact that Maquilacero/TEFLU are a collapsed entity." Def. Br. at 25-26. However, Maquilacero and TEFLU were collapsed also in the 2018-2019 review, yet Commerce adopted distinct manufacturer codes for Maquilacero and TEFLU. Pls. Br. at 36. Hence, Commerce's explanation is wrong and inadequate. "Commerce is required to explain *why* it is changing course, not merely *that* it is changing course." *Huvis Corp. v. United States*, 525 F.Supp.2d 1370, 1380 (Ct. Int'l Trade 2007).

Despite Maquilacero's legitimate claim for consistency, Defendant frames the ask as "'an attempt{} to insert the manufacturer as an additional physical characteristic' in the model-match criteria." Def. Br. at 26 (citation omitted). This is not a back-door attempt or an illegitimate request. Rather, Maquilacero's request simply mirrors Commerce's practice in the prior review when the fact that Maquilacero and TEFLU were collapsed did not impact Commerce's decision to use a manufacturer code.

14

NON-CONFIDENTIAL VERSION

**2.      Commerce's Rejection of the FURPROCESSH/U Variable Was Contrary to Law and Unsupported by Record Evidence**

Defendant opposes Maquilacero's request for a further processing characteristic to be added to the CONNUM arguing that it has not met the high factual threshold required for a change to model matching. *Id.* at 27. Yet, this record is replete with evidence of the commercially significant differences between TEFLU's further processed products and Maquilacero's LWRPT. Pl.'s Br. at 34, 36-37. As detailed in Maquilacero's opening brief, these two product groups are sold to different customers and are characterized by significant differences in prices and production costs. *Id.* at 36-37. There are clear differences in costs between these product groups because the further processed parts made by TEFLU report an additional cost called PROC_COSTH, Maquilacero's Downstream Sales Response for TEFLU at BA2-49, Exh. BA2-11 (Dec. 28, 2021) ("TEFLU Downstream QR"), C.R. 88, P.R. 57, *in addition to* the full costs reported by Maquilacero to produce the LWRPT. The sales databases contain clear price differences, which is normal because TEFLU sells a custom-made part and Maquilacero sells the commercial quality input LWRPT. Defendant-Intervenor indirectly concedes this fact when it frames Maquilacero's request as "an obvious attempt to make TEFLU's [          ] sales not match Maquilacero's [          ] U.S. sales." Def.-Int. Br. at 24. However, Commerce's existing CONNUM construction makes no difference for further processed parts made by TEFLU. Plaintiffs' proposed addition of a FURPROCESSH/U variable would only ensure greater accuracy in identifying the foreign like product that is the most similar to the subject merchandise, in accordance with 19 U.S.C. §§ 1677(16)(B) or (C), and a fair comparison between export price and normal value under the statute, 19 U.S.C. § 1677b(a). Contrary to Defendant's position, this is a compelling case and one consistent with the overall purpose of the AD statute to determine margins as accurately as possible. *Yangzhou Bestpak*

*Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013).

In similar cases, the Court held price and cost differences to be determinative factors in assessing whether to modify a model-match criteria. In *Bohler Bleche GmbH & Co. KG v. United States*, the Court held that the model-match methodology was unreasonable based on the cost differences in making and pricing certain steel cut-to-length plates. 324 F.Supp 3d 1344, 1350 (Ct. Int'l Trade 2018). The Court noted that "there {were} a number of product pairs within individual CONNUMs with differences in variable costs well above 20%." *Id*. at 1351. The Court explained that Commerce's methodology essentially treated as "identical" products that customers would view as commercially distinct in both utility and value. *Id*. at 1350. On remand, Commerce adopted the alternative model-matching methodology proposed by respondents – *i.e.*, CONNUM2, which replaced Quality Field with a GRADE field. *Bohler Bleche GmbH & Co. KG, v. United States*, Consol. Court No. 17-00163, Slip Op. 18-86 (July 9, 2018), final results of redetermination pursuant to court remand (A-433-812) (Oct. 9, 2018), ECF 55. Given the many differences observed in the record between commercial LWRPT and further processed LWRPT, this Court should hold that Commerce's methodology was unreasonable and contrary to law.

Defendant's focus on the timeliness of when Maquilacero requested a change to the model-match criteria is an attempt to side-step the substantive questions with Commerce's methodology. Def. Br. at 27-29. Defendant claims that "Maquilacero/TEFLU was required to develop its argument to change the model-match criteria at an early stage of the proceeding but did not do so{.}" *Id.* at 29, citing *Ghighi 1870 S.p.A. v. United States*, 547 F.Supp.3d 1332, 1334 (Ct. Int'l Trade 2021). Defendant's reliance on *Ghighi* is inapposite because respondents in that case raised issues with the model-match methodology after the "questionnaire period and verification were complete{.}" *Id*. at 1334. The Court stressed that respondents had the

opportunity to contact Commerce regarding the model-match criteria and propose alternate methods of reporting content or shape. *Id.* at 1334. By contrast, Maquilacero raised issues with the model matching criteria in initial questionnaire responses, supplemental responses, case briefs and proposed a further-processed characteristic. Pls. Br. at 37-38 (citing to Maquilacero's Section B Questionnaire Response at B-21 (Dec. 17, 2021), C.R. 25, P.R. 50, and Maquilacero's Section C Questionnaire Response at C-17-18, (Dec. 17, 2021), C.R. 28, P.R. 51, reporting variable 3.7 – Further Processing (FURPROCESSH)).

TEFLU's Downstream sales response stated clearly:

> The further manufacturing characteristics are included in the CONNUMs reported in Field CONNUM2H. The Department should include this characteristic in the CONNUM to account for the physical and commercial differences between commercial LWRPT sold by Maquilacero and the product sold by TEFLU, which has been transformed into an automotive part.

TEFLU Downstream QR at BA2-24, C.R. 88, P.R. 57.

Therefore, the facts at hand are readily distinguishable from *Ghighi*.

Defendant then seemingly attempts to create a new standard, without any guidance, that respondents are required "to develop {their} argument to change the model-match criteria at an early stage of the proceeding," finding that Maquilacero did not do so here.  Def. Br. at 29; *IDM* at 26, P.R. 146. Defendant's argument is problematic because in the 2018-2019 administrative review Commerce refused to address the model-match criteria because it was not raised prior to the preliminary results and invited parties to "raise the issue at an early stage in {a} future segment." *Light-Walled Rectangular Pipe and Tube from Mexico*, 86 Fed. Reg. 33646 (Dep't Commerce June 25, 2021) (final AD results; 2018-2019), and accompanying IDM at 8-9. Even though Maquilacero reported the additional characteristics in all questionnaire responses, following Commerce's invitation, Defendant now is moving the goalposts claiming it was not

early enough. This is inconsistent with other cases where respondents have routinely placed information on the record related to the model-match criteria at all stages, including in supplemental responses and later developed arguments in briefing. For example, in *Fagersta Stainless AB v. United States*, the respondent provided evidence to demonstrate that physical differences warranted a change to the model-matching criteria, including in supplemental questionnaire responses. 577 F.Supp.2d 1270, 1278 (Ct. Int'l Trade 2008). Similarly, in *Bohler*, plaintiffs proposed an addition to the model-matching criteria in their questionnaire responses, after Commerce had revised its model-matching methodology. The Court ruled that that the "model-matching methodology was {not} a closed issue{.}" 324 F.Supp.3d at 1352.

For these reasons, Defendant's attempt to reject Maquilacero's argument on timeliness grounds in unfounded. Maquilacero respectfully moves the Court to remand this issue to Commerce to incorporate a new product characteristic.

### D.   Commerce's Treatment of IMMEX Sales as Home Market Sales Was Unlawful

Commerce treated TEFLU's sales made under the IMMEX program, referred to as "virtual exports", as home market sales. *IDM* at 21, P.R.146. As discussed in Maquilacero/TEFLU's opening brief, Commerce's classification of TEFLU's virtual export sales as home market sales was contrary to law. Pls. Br. 38-43. Specifically, the IMMEX program is a Mexican tax regime that allows a foreign company to purchase inputs from Mexico free from domestic value added tax ("VAT") as long as the inputs are used at its Mexican facility for export production. *Id.* at 40. Due to the nature and mechanism of the IMMEX program, TEFLU knew the parts it sold to its customers authorized to participate in the IMMEX program will be ultimately exported to the U.S. or a third country. *Id.* Commerce discounted substantial record evidence establishing that sales made into the IMMEX program are ultimately destined for

export rendering its determination unsupported by substantial evidence and contrary to law.

### 1. Maquilacero/TEFLU Did Not Fail to Exhaust Administrative Remedies With Respect to Constructive Knowledge

Defendant acknowledges that Maquilacero/TEFLU objected to Commerce's classification of TEFLU's virtual export sales as home market sales without success. Def.'s Br. at 33. However, focusing on the alleged lack of discussion of constructive knowledge of the ultimate destination of the sales at issue, Defendant claims that Maquilacero/TEFLU "has failed to exhaust its administrative remedies with respect to these arguments." *Id.* at 32. This erroneous argument simply elevates form over substance.  Although Maquilacero did not use the exact words "constructive knowledge" it addressed this issue at length. *Id.*

Maquilacero/TEFLU initially reported TEFLU's virtual export sales as U.S. and third country sales.  A-D SQR at 42, C.R. 152, P.R. 92. Commerce disagreed with Maquilacero/TEFLU and reclassified the virtual exports sales as home market sales. *Prelim Decision Memo*, at 6. While Maquilacero complied with Commerce's instruction by reporting these virtual export sales as home market sales, Maquilacero's Post-Preliminary Supplemental Questionnaire Response at 12 (Oct. 5, 2022) ("Post-Prelim. SQR"), C.R. 207, P.R. 119, Maquilacero/TEFLU raised objection to Commerce's classification and provided substantial evidence demonstrating its knowledge of the ultimate export destination. *Id*. at 5-6. At the briefing stage, Maquilacero/TEFLU again contested Commerce's treatment of TEFLU's virtual export sales as home market sales.  Case Br. at 26, and Rebuttal Br. at 7, C.R. 246, P.R. 140. Therefore, the question of whether Maquilacero/TEFLU has knowledge of the ultimate destination of the virtual export sales was squarely raised in the administrative case brief.

The Court will only require the exhaustion of administrative remedies "*where appropriate*." 28 U.S.C. § 2637(d) (emphasis added). An argument satisfies the exhaustion

requirement "if it alerts the agency to the argument with reasonable clarity and avails the agency

with an opportunity to address it." *Luoyang Bearing Corp. v. United States*, 347 F.Supp.2d 1326,

1352 (Ct. Int'l Trade 2004), citing *inter alia*, *Hormel v. Helvering*, 312 U.S. 552 (1941). An

understated argument may be exhausted if it formed the foundation of an objection below.

*Diamond Sawblades Mfrs. Coal. v. United States,* 37 CIT 1501, 1520-1521 (2013), *aff'd after*

*remand*, 809 F.3d 626 (Fed. Cir. 2015) (The Court accepted argument that was assumed in claim

made before the agency.)

Here, Maquilacero/TEFLU throughout its submissions explained that TEFLU knew the

parts it sold through the IMMEX program are destined for export markets. A-D SQR at 42, C.R.

152, P.R. 92, and Post-Prelim. SQR at 6, Exh. 2S-11, C.R. 207, 217, P.R. 119. Maquilacero also

raised arguments arising out of Commerce's reclassification of TEFLU virtual export sales as

home market sales in its administrative briefs. Maquilacero Case Br. at 26, and Maquilacero

Rebuttal Br. at 7, C.R. 246, P.R. 140,. Therefore, this is not an instance where a party made no

attempt to raise its argument before the agency. *See e.g.*, *Budd Co., Wheel & Brake Div. v.*

*United States*, 773 F.Supp. 1549, 1555 (Ct. Int'l Trade 1991). Whether Maquilacero/TEFLU has

actual knowledge or constructive knowledge of the export destination was raised in the

questionnaire responses and briefs. As such, the underlying record is adequate for judicial

review.

## 2.    Commerce Unlawfully Found That Maquilacero/TEFLU's Virtual Export Sales Were Home Market Sales

Both Defendant and Defendant-Intervenor argue that Maquilacero/TEFLU did not

provide documentation demonstrating that virtual export sales were definitively destined for

export, therefore Maquilacero/TEFLU failed to meet the standard for the knowledge test. Def.

Br. at 34-36; Def.-Int. Br. at 30-31. Maquilacero/TEFLU does not dispute that it did not have

direct documentation showing the export of the final product in which its parts were incorporated. Pls. Br. at 42-43. Rather, Maquilacero/TEFLU's submitted substantial record evidence demonstrating that it "should have known" the parts sold to an IMMEX customer will be incorporated into a product for the export markets, thereby satisfying the second prong – constructive knowledge of the "knowledge" test. *Id*. at 41-42.

Neither Defendant nor Defendant-Intervenor contest to the fact that the IMMEX program allows Mexican producers procure inputs free from domestic VAT as long as the finished product are exported outside of Mexico. A-D SQR at 39-40, Exh. S-44, C.R. 152, 156, P.R. 92. TEFLU's knowledge that its parts will be ultimately sold outside of Mexico is evident by operation of the Mexican law. *Id.* Instead, both Defendant and Defendant-Intervenor argue that TEFLU's parts are considered to be "consumed" in the home market where it is incorporated into non-subject merchandise, and imply that such "consumption" invalidate TEFLU's knowledge of the export sales. Def. Br. at 34-35; Def.-Int. Br. at 32-34. The argument is wrong. The law requires Commerce to examine whether Maquilacero/TEFLU "knew" or "should have known" the destination of its sales, not whether Maquilacero/TEFLU's sales are consumed in the home market. *Z.A. Sea Foods Priv. Ltd. v. United States*, 569 F.Supp.3d 1338, 1352-53 (Ct. Int'l Trade 2022); *Wonderful Chem. Indus. v. United States*, 259 F.Supp.2d 1273, 1280 n.4 (Ct. Int'l Trade 2003).

Defendant and Defendant-Intervenor place heavy emphasis that "consumption in the home market" determines the classification of IMMEX sale as home market sales. Def. Br. at 34-35; Def.-Int. Br. at 32-34.  That argument is based on two Commerce determinations, *Sugar from*

AFDOCS:199521525.1

*Mexico*[2] and *Freight Rail Couplers from Mexico*, where Commerce made different and inconsistent conclusions with respect to the treatment of IMMEX sales. *Id.* Defendant and Defendant-Intervenor's attempt to distinguish *Freight Rail Couplers from Mexico* but treat *Sugar from Mexico* as analogous, based on whether the subject merchandise is consumed in the home market, is misguided. Whether the subject merchandise is consumed in the home market bears no relevance to Maquilacero/TEFLU's knowledge that IMMEX sales must be ultimately exported outside of Mexico. There is no legal basis supporting Commerce's rationale that the "consumption in the home market" test supersedes the "knowledge test."

As here, the nature and function of the IMMEX program cannot be ignored in evaluating TEFLU's knowledge of the export destination of the sales. In *Freight Rail Couplers from Mexico*, Commerce reconsidered the application of the knowledge test in *Sugar from Mexico*. ("We acknowledge that we did not expressly reference the knowledge test in *Sugar from Mexico*{.}")  *Certain Freight Rail Couplers and Parts Thereof From Mexico*, 88 Fed. Reg. 65153 (Dep't Commerce Sept. 21, 2023) (final affirm. LTFV determ.) ("*Freight Rail Couplers*"), and accompanying IDM at 12. Unlike *Sugar from Mexico*, in *Freight Rail Couplers* Commerce examined sales made under the IMMEX program and found that "sales in the IMMEX program are taking place under a distinct tax regime established specifically for the ultimate export of finished goods." *See Certain Freight Rail Couplers and Parts Thereof From Mexico*, 88 Fed. Reg. 27864 (Dep't Commerce May 3, 2023) (prelim. affirm. LTFV determ.), and accompanying PDM at 11. Given the nature and purpose of the IMMEX program, Commerce found the respondent knew or should have known its sales made into the IMMEX

---

[2] *Agreement Suspending the Antidumping Duty Investigation on Sugar From Mexico*, 87 Fed. Reg. 932 (Dep't Commerce Jan. 7, 2022) (prelim results; 2019-2020), and accompanying IDM.

AFDOCS:199521525.1

program ultimately were meant for export, rather than domestic consumption. *Id.* The function and purpose of the IMMEX program in this case are the same as examined by Commerce in *Freight Rail Couplers*. Commerce's most recent view of the IMMEX program in *Freight Rail Couplers* is in line with Maquilacero/TEFLU's arguments presented in its brief. Therefore, we respectfully request that the Court remand the issue to Commerce for further explanation.

> **E.** **Commerce Unlawfully Applied the Differential Pricing Methodology to Maquilacero/TEFLU's Sales**

Defendant and Defendant-Intervenor fail to respond to Maquilacero/TEFLU's argument that Commerce did not provide any explanation for the statistical assumptions that justify application of the Cohen's *d* test in this review. Pls. Br. at 46-48. Defendant and Defendant-Intervenor assert that in *Stupp*, the CAFC did not reject Commerce's use of the Cohen's *d* test but invited further explanation. Def. Br. at 39-40. Def.-Int. Br. at 35-36. The fact remains that Commerce's methodology as applied in the *Final Results* is contrary to law. In *Stupp Corp. v. United States*, the CAFC held that when an agency purports to apply a mathematical tool, it must apply that tool in a manner consistent with the tool's assumptions. 5 F.4th 1341 (Fed. Cir. 2021). As the Court explained,

> Professor Cohen derived his interpretive cutoffs under certain assumptions. Violating those assumptions can subvert the usefulness of the interpretive cutoffs, transforming what might be a conservative cutoff into a meaningless comparator.

*Id.* at 1360.

The CAFC concluded that "the evidence and arguments before us call into question whether Commerce's application of the Cohen's *d* test to the data in this case violated the assumptions of normality, sufficient observation size, and roughly equal variances associated with that test." *Id.* The CAFC therefore remanded this case to give Commerce an opportunity to explain "whether the limits on the use of the Cohen's *d* test prescribed by Professor Cohen and

AFDOCS:199521525.1

other authorities were satisfied in this case or whether those limits need not be observed when Commerce uses the Cohen's *d* test in less-than-fair-value adjudications." *Id.*

In the *Final Results*, Commerce failed to provide any explanation to resolve the CAFC's concerns articulated in *Stupp*.  Pls. Br. at 46. Instead, Commerce simply applied the Cohen's *d* test as if the statistical assumptions are met. *Id.*

Similar to the arguments regarding *Stupp*, Defendant and Defendant-Intervenor point to the remand proceeding in *Mid Continent*, on remand from the CAFC and pending before the Court as a justification for Commerce's continued use of a simple average in calculating the Cohen's *d* denominator in this review. Def. Br. at 41-42, Def.-Int. Br. at 37. This simplistic argument lacks merit and plainly ignores the CAFC's mandate that a simple average can be used to calculate the denominator of the Cohen's *d* coefficient only "when the groups are equal in size but a weighted average formula {must be used} when the groups are of different size." *Mid Continent Steel and Wire, Inc. v. United States*, 31 F.4th 1367, 1379 (Fed. Cir. 2022). As explained in Maquilacero/TEFLU's brief, the record demonstrates that the overwhelming majority of the test and base groups used by Commerce in the Cohen's *d* test were not of equal size. Pls. Br. at 47, Exh. 1. Commerce's *Final Results* failed to provide any explanation justifying its use of the simple average methodology, and therefore is contrary to case law and unsupported by substantial record evidence. Consistent with *Stupp* and *Mid Continent*, the Court should remand this issue to Commerce for further explanation.

## IV.    CONCLUSION

For the reasons discussed in Maquilacero's Opening Brief and as described above, the *Final Results* should be remanded for Commerce to reconsider its analysis and revisit the factual record.

24

Respectfully submitted,

**/s/ Diana Dimitriuc Quaia**
Diana Dimitriuc Quaia
John M. Gurley
Yun Gao
Mario A. Torrico

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6291
Fax: (202) 857-6395
Email: diana.dimitriuc-quaia@afslaw.com
*Attorneys for Maquilacero S.A. de C.V. and*
*Tecnicas De Fluidos S.A. de C.V.*

Dated: February 9, 2024

25

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that its Reply Brief filed on February 9, 2024, complies with the word limitation requirement. The word count for Plaintiffs' Reply Brief, as computed by ArentFox Schiff LLP's word processing system is 6,965.


 **/s/ Diana Dimitriuc Quaia**
Diana Dimitriuc Quaia

AFDOCS:199521525.1