Slip Op. 24-107

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MAQUILACERO S.A. DE C.V. AND TECNICAS DE FLUIDOS S.A. DE C.V., | |
|       Plaintiffs, | |
| and | |
| PERFILES LM, S.A. DE C.V., | |
|       Consolidated Plaintiff, | Before: Jennifer Choe-Groves, Judge |
| v. | Consol. Court No. 23-00091 |
| UNITED STATES, | |
|       Defendant, | |
| and | |
| NUCOR TUBULAR PRODUCTS INC., | |
|       Defendant-Intervenor. | |

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's final results in the 2020–2021 administrative review of the antidumping duty order on light-walled rectangular pipe and tube from Mexico.]

Dated:  October 4, 2024

Diana Dimitriuc-Quaia, John M. Gurley, Mario A. Torrico, ArentFox Schiff LLP, of Washington, D.C., and Yun Gao, ArentFox Schiff LLP, of New York, N.Y., for Plaintiffs Maquilacero S.A. de C.V. and Tecnicas De Fluidos S.A. de C.V. Leah N. Scarpelli also appeared.

Jeffrey M. Winton, Michael J. Chapman, Amrietha Nellan, Vi N. Mai, Jooyoun Jeong, and Ruby Rodriguez, Winton & Chapman PLLC, of Washington, D.C., for Consolidated Plaintiff Perfiles LM, S.A. de C.V.

Franklin E. White, Jr., Assistant Director, and Kristin E. Olson, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director. Of counsel on the brief was Christopher Kimura, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C. Kara M. Westercamp also appeared.

Alan H. Price, Robert E. DeFrancesco, III, Jake R. Frischknecht, and Kimberly A. Reynolds, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenor Nucor Tubular Products, Inc.

Choe-Groves, Judge:  Plaintiffs Maquilacero S.A. de C.V. ("Maquilacero")

and Tecnicas de Fluidos S.A. de C.V. ("TEFLU") (collectively, "Plaintiffs") filed

this action pursuant to 19 U.S.C. § 1675 contesting the final results in the 2020–

2021 administrative review of the U.S. Department of Commerce ("Commerce")

in Light-Walled Rectangular Pipe and Tube from Mexico ("Final Results"), 88

Fed. Reg. 30,723 (Dep't of Commerce May 12, 2023) (amended final results of

antidumping duty admin. review; 2020–2021), PR 160, and accompanying Issues

and Decision Memorandum for the Final Results of Antidumping Duty

Administrative Review, 2020–2021: Light-Walled Rectangular Pipe and Tube

from Mexico (Dep't of Commerce Mar. 7, 2023) ("Final IDM"), PR 146.[1]

On August 5, 2008, Commerce published an antidumping duty order on

light-walled rectangular pipe and tube from Mexico, the People's Republic of

China, and the Republic of Korea.  Light-Walled Rectangular Pipe and Tube from

Mexico, the People's Republic of China, and the Republic of Korea, 73 Fed. Reg.

45,403 (Dep't of Commerce Aug. 5, 2008) (notice of amended final determination

of sales at less than fair value) ("Order").

Maquilacero, Perfiles y Herrajes LM, S.A. de C.V. ("Perfiles"), and

Regiomontana de Perfiles y Tubos S.A. de C.V. ("Regiopytsa") participated in

Commerce's administrative reviews for the years 2016–2017 and 2018–2019.  See

Final Results, 88 Fed. Reg. 30,723; Light-Walled Rectangular Pipe and Tube from

Mexico ("LWRPT from Mexico 2018–19 Final Results"), 86 Fed. Reg. 33,646

(Dep't of Commerce Jun. 25, 2021) (final results of antidumping duty admin.

review; 2018–2019), and accompanying Issues and Decision Memorandum

("LWRPT from Mexico 2018–19 Final IDM"); Light-Walled Rectangular Pipe and

Tube from Mexico ("LWRPT from Mexico 2016–17 Final Results"), 84 Fed. Reg.

---

[1]  Citations to the administrative record reflect the public administrative record
("PR") and confidential administrative record ("CR") document numbers.  ECF
Nos. 46, 47.

16,646 (Dep't of Commerce Apr. 22, 2019) (final results of antidumping duty

admin. review; 2016–2017), and accompanying Issues and Decision Memorandum

("LWRPT from Mexico 2016–17 IDM").

Commerce conducted this administrative review for the period from August

1, 2020 through July 31, 2021.  Initiation of Antidumping and Countervailing Duty

Admin. Reviews, 88 Fed. Reg. 55,811, 55,813 (Dep't of Commerce Oct. 7, 2021),

PR 11.

Commerce selected Maquilacero/TEFLU (collapsed as a single entity) and

Regiopytsa as the mandatory respondents in the review.  See Commerce's 2020–

2021 Antidumping Duty Admin. Review of Light-Walled Rectangular Pipe and

Tube from Mexico: Respondent Selection ("Resp. Selection Mem.") (Oct 27,

2021), PR 21.  Plaintiffs submitted their questionnaire responses.  Sec. A

Questionnaire Resp. Maquilacero S.A. de C.V. ("Maquilacero's Sec. A QR"), PR

36–38, CR 13–21; Sec. B Questionnaire Resp. Maquilacero S.A. de C.V.

("Maquilacero's Sec. B QR"), PR 50, CR 25; Section C Questionnaire Resp.

Maquilacero S.A. de C.V. ("Maquilacero's Sec. C QR"), PR 51, CR 28;

Maquilacero S.A. de C.V.'s Downstream Sales Submission of Tecnicas De

Fluiodos S.A. de C.V. ("Maquilacero's Downstream Sales Resp."), PR 57, CR 88;

Resp. Maquilacero S.A. de C.V.'s First Suppl. Sec. A & D Questionnaire Resp.

("Maquilacero's First Suppl. Sec. A & D QR") (July 26, 2022), PR 92, CR 152–
57.

On September 8, 2022, Commerce published its preliminary determination.
Light-Walled Rectangular Pipe and Tube from Mexico ("Preliminary Results"), 87
Fed. Reg. 54,965 (Dep't of Commerce Sept. 8, 2022) (prelim. results and part.
rescission of the antidumping duty admin. review; 2020–2021), PR 111, and
accompanying Decision Memorandum for the Preliminary Results of Antidumping
Duty Administrative Review ("PDM"), PR 103.  Commerce determined
preliminarily that Plaintiffs made sales of subject merchandise at prices below
normal value during the period of review, continued to collapse and treat
Maquilacero and TEFLU as a single entity, classified certain sales made by
Maquilacero/TEFLU through the Program for the Promotion of Manufacturing,
Maquiladora, and Expert Services ("IMMEX" or "IMMEX Program") as home
market sales, and applied a differential pricing analysis.  See PDM at 1, 5–9.

The Parties submitted additional briefing.  Maquilacero's Post-Prelim.
Suppl. QR, PR 119, CR 207–19; Resubmission of Maquilacero's Admin. Case and
Rebuttal Brs., PR 140, CR 246; Resubmission of Nucor's Admin. Rebuttal Br., PR
141, CR 248.

Commerce published its final determination on March 14, 2023 and issued
its amended Final Results and Final IDM on May 12, 2023 to correct a ministerial

error raised by Regiopytsa.  Final Results, 88 Fed. Reg. 30,723; Light-Walled

Rectangular Pipe and Tube from Mexico, 88 Fed. Reg. 15,665 (Dep't of

Commerce Mar. 14, 2023) (final results of antidumping duty admin. review; 2020–

2021); Final IDM.  Commerce continued to collapse Maquilacero and TEFLU,

considered TEFLU's further processed products as in-scope merchandise under the

antidumping order, continued to classify Maquilacero/TEFLU's virtual export

sales through the IMMEX Program as home market sales, declined to adjust

Commerce's computer programming to include a further processing variable to

differentiate between the products produced by Maquilacero and TEFLU, and

declined to adjust its differential pricing analysis or its application of the Cohen's *d*

test.  Final IDM at 9–10, 22–23, 26–28.

Plaintiffs filed this action pursuant to 19 U.S.C. § 1675 contesting

Commerce's Final Results.  See Compl., ECF No. 7.

Before the Court is Plaintiffs' Motion for Judgment on the Record Pursuant

to USCIT Rule 56.2.  Pls.' Mot. J. Agency R. Mem. Law Supp. Mot. J. Agency R.

Pursuant USCIT R. 56.2 ("Plaintiffs' Motion" or "Pls.' Br."), ECF Nos. 31, 32.

Also before the Court is Consolidated Plaintiff Perfiles LM, S.A. de C.V.'s

("Consolidated Plaintiff" or "Perfiles") Motion for Judgment on the Agency

Record.  Mot. Consol. Pl. J. Agency R. ("Consolidated Plaintiff's Motion" or

"Consol. Pl.'s Mot."), ECF No. 29; <u>see also</u> Br. Perfiles LM, S.A. de C.V. Supp. R. 56.2 Mot. J. Agency R. ("Consol. Pl.'s Br."), ECF No. 29-1.[2]

Defendant United States ("Defendant") filed Defendant's Response to Plaintiff's and Plaintiff-Intervenor's Rule 56.2 Motions for Judgment on the Agency Record.  Def.'s Resp. Pl.'s Pl.-Interv.'s R. 56.2 Mots. J. Agency R. ("Def.'s Resp."), ECF No. 37, 39.  Defendant-Intervenor Nucor Tubular Products, Inc. ("Defendant-Intervenor" or "Nucor") filed Defendant-Intervenor's Response to Motion for Judgment on the Agency Record.  Def.-Interv.'s Resp. Mots. J. Agency R. ("Def.-Interv.'s Resp."), ECF Nos. 40, 41.[3]  Plaintiffs filed their reply brief.  Reply Br. Def. Def.-Interv.'s Resp. Br. ("Pls.' Reply Br."), ECF Nos. 44, 45.

Oral argument was held on June 26, 2024.  Oral Arg., ECF No. 53. Plaintiffs filed with the Court excerpts from the joint appendix that were referenced during oral argument.  Resp. Court Request, ECF Nos. 54, 55.

For the following reasons, the Court remands the <u>Final Results</u>.

---

[2] Perfiles y Herrajes LM, S.A. de C.V. incorporates by reference all arguments made by Plaintiffs in challenging the <u>Final Results</u>.  <u>See</u> Consol. Pl.'s Br. at 2–3 ("We understand that Maquilacero and TEFLU are making arguments in their brief to the Court . . . we will not repeat those explanations, but incorporate them by reference.").

[3] The Court granted Defendant-Intervenor's Consent Motion for Errata, ECF No. 42, for corrections to be deemed made without physical substitution of Defendant-Intervenor's Response to Motions for Judgment on the Agency Record.  Order (Jan. 17, 2024), ECF No. 43.

Consol. Court No. 23-00091                                              Page 8

## ISSUES PRESENTED

The Court reviews the following issues:

1.      Whether Commerce's determination that TEFLU's further processed products are in-scope merchandise is supported by substantial evidence and in accordance with law;

2.      Whether Commerce's determination to collapse Maquilacero/TEFLU is supported by substantial evidence and in accordance with law;

3.      Whether Commerce's rejection of the manufacturer code and the further processing variable in its model match methodology is supported by substantial evidence and in accordance with law;

4.      Whether Commerce's determination to treat TEFLU's sales made through the IMMEX program as home market sales is supported by substantial evidence and in accordance with law; and

5.      Whether Commerce's determination to rely on the Cohen's *d* test in conducting the differential pricing analysis is in accordance with law and supported by substantial evidence.

## JURISDICTION

The Court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi), and 28 U.S.C. § 1581(c). The Court will hold unlawful any determination found to be unsupported by

substantial evidence on the record or otherwise not in accordance with law.  19

U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.        Scope Determination

#### A.        Legal Framework for Scope Determination

The descriptions of merchandise covered by the scope of an antidumping or

countervailing duty order must be written in general terms, and questions may arise

as to whether a particular product is included within the scope of an order.  See 19

C.F.R. § 351.225(a).  When such questions arise, Commerce's regulations direct it

to issue scope rulings that clarify whether the products are in scope or out of scope.

Id.  Commerce is guided by case law and agency regulations in their scope rulings.

See Meridian Prods., LLC v. United States ("Meridian Prods."), 851 F.3d 1375,

1381 (Fed. Cir. 2017); 19 C.F.R. § 351.225.

Commerce's inquiry must begin with the relevant scope language.  See, e.g.,

OMG, Inc. v. United States, 972 F.3d 1358, 1363 (Fed. Cir. 2020).  If the scope

language is unambiguous, "the plain meaning of the language governs."  Id.  If the

language is ambiguous, however, Commerce interprets the scope with the aid of

the sources set forth in 19 C.F.R. § 351.225(k)(1).  Meridian Prods., 851 F.3d at

1382.  If the (k)(1) sources do not dispositively answer the question, Commerce

may consider the (k)(2) factors under 19 C.F.R. § 351.225(k)(2).  Id.

Commerce may consider the following interpretive sources under 19 C.F.R. § 351.225(k)(1) to determine whether merchandise is covered by the scope of an order:

    (A)  The descriptions of the merchandise contained in the petition pertaining to the order at issue;

    (B)  The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue;

    (C)  Previous or concurrent determinations of the Secretary, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and

    (D)  Determinations of the Commission pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation.

19 C.F.R. § 351.255(k)(1).  Secondary interpretive sources include any other determinations of the Secretary or the Commission not identified above, rulings or determinations by U.S. Customs and Border Protection ("Customs"), industry usage, dictionaries, and any other relevant record evidence.  Id.  If there is a conflict between these secondary interpretive sources and the primary interpretive sources of this section, the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue.  Id.

It is well-established that "Commerce cannot 'interpret' an antidumping order so as to change the scope of th[e] order, nor can Commerce 'interpret' an

order in a manner contrary to its terms." <u>Eckstrom Indus., Inc. v. United States</u>, 254 F.3d 1068, 1072 (Fed. Cir. 2001).  When a party challenges a scope determination, the Court must determine whether the scope of the order "contain[s] language that specifically includes the subject merchandise or may be reasonably interpreted to include it."  <u>Duferco Steel, Inc. v. United States</u> ("<u>Duferco</u>"), 296 F.3d 1087, 1089 (Fed. Cir. 2002).

### B.    Plain Language of the Scope Order

The scope language of the <u>Order</u> in this case states in relevant part:

> The merchandise subject to these orders is certain welded carbon quality light-walled steel pipe and tube, of rectangular (including square) cross section, having a wall thickness of less than 4 mm.

> The term carbon-quality steel includes both carbon steel and alloy steel which contains only small amounts of alloying elements.  Specifically, the term carbon-quality includes products in which none of the elements listed below exceeds the quantity by weight respectively indicated: 1.80 percent of manganese, or 2.25 percent of silicon, or 1.00 percent of copper, or 0.50 percent of aluminum, or 1.25 percent of chromium, or 0.30 percent of cobalt, or 0.40 percent of lead, or 1.25 percent of nickel, or 0.30 percent of tungsten, or 0.10 percent of molybdenum, or 0.10 percent of niobium, or 0.15 percent vanadium, or 0.15 percent of zirconium.

> The description of carbon-quality is intended to identify carbon-quality products within the scope.  The welded carbon-quality rectangular pipe and tube subject to these orders is currently classified under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7306.61.50.00 and 7306.61.70.60.  While HTSUS subheadings are provided for convenience and Customs purposes, our written description of the scope of these orders is dispositive.

Order, 73 Fed. Reg. at 45,404.

Commerce did not mention in the Final IDM whether the scope language

was unambiguous, or whether Commerce needed to examine any (k)(1) or (k)(2)

sources under 19 C.F.R. § 351.225.  Commerce did not clearly articulate any

determinations analyzing the plain scope language of the Order.  In its Final IDM,

Commerce stated merely that, "We disagree with Maquilacero/TEFLU and

continue to find that TEFLU's further processed merchandise is within the scope

of the [Order]."  Final IDM at 12.  Commerce did not purport to conduct a (k)(1)

analysis, but in "finding that TEFLU's merchandise is within the scope of the

Order," Commerce mentioned the following sources in its scope analysis: a

previous scope ruling by Commerce (LWRPT from Mexico 2016–17 Final IDM),

the Petition, a report by the International Trade Commission ("ITC"), and a ruling

by a panel appointed by the North American Free Trade Agreement ("NAFTA")

for this dispute in the underlying investigation.  Id. at 12–15; see Antidumping and

Countervailing Duty Orders on Certain Carbon Alloy Steel Cut-to-Length Plate

from Austria, Belgium, Brazil, the People's Republic of China, France, the Federal

Republic of Germany, Italy, Japan, the Republic of Korea, the Republic of South

Africa, Taiwan, and Turkey: Scope Ruling Request (October 11, 2017) ("PCS

Scope Ruling"); Letter, Antidumping Duty Petition on Light-Walled Rectangular

Pipe and Tube from Korea, Mexico, and the People's Republic of China and

Turkey and Countervailing Duty Petition on Light-Walled Rectangular Pipe and

Tube from the People's Republic of China (June 27, 2007) ("Petition")[4]; Light-

Walled Rectangular Pipe and Tube from Turkey, Inv. No. 731-TA-1121, USITC

Pub. 4001 (May 2008) (Final) ("ITC Report"); Light Walled Rectangular Pipe and

Tube from Mexico: Final Results of Antidumping Duty Administrative Review;

2016–2017, USA-MEX-2019-1904-01 at 10 (June 27, 2022) ("NAFTA Panel

Ruling").

### C.    Parties' Contentions

In light of Commerce's failure to articulate either a plain language scope

analysis or a (k)(1) analysis in the Final IDM, Defendant and Defendant-Intervenor

argue post hoc in their briefs that the Court should sustain Commerce's plain

language analysis, and that Commerce's examination of (k)(1) sources was

appropriate.  Def.'s Resp. at 14–18; Def.-Interv.'s Resp at 14–24.  Although

Commerce did not articulate such analyses in its Final IDM or Final Results, the

Court examines Commerce's determinations within the plain language and (k)(1)

contexts.

Plaintiffs contend that Commerce's determination was not in accordance

with law because the plain language of the scope described only pipe and tube,

---

[4]  Commerce did not provide any other identifying citations for the Petition in the
Final Results or previous administrative reviews.  The Petition was not placed on
the record filed with the Court.

with no references to downstream products or automotive parts, and Commerce's

determination unlawfully expanded the Order.  See Pls.' Br. at 23; Pls.' Reply at 8.

Plaintiffs concede that Maquilacero produces in-scope pipe and tube and sells such

merchandise to TEFLU for further processing into automotive parts.  Pls.' Br. at

24.  Plaintiffs argue that because TEFLU manufactures custom-made auto parts

made from in-scope light-walled rectangular pipe and tube provided by

Maquilacero, TEFLU's downstream products are not in scope.  Id. at 23–24.

Plaintiffs explain that the plain language of the scope order describes light-walled

rectangular pipe and tube of standard sizes, lengths, and weight, while TEFLU

sells automotive parts that are custom-made for original equipment manufacturer

("OEM") customers and have a dedicated use as auto parts.  Id. at 24.  Plaintiffs

note further that:

> [T]he products sold by TEFLU to its OEM customers are not the same
> class or kind as in-scope [light-walled rectangular pipe and tube]
> classified under HTSUS heading 7306.  Rather, these parts underwent
> substantial transformation into auto parts classified under [different]
> HTS Headings.

Id. at 28.  For these reasons, Plaintiffs assert that Commerce's determination that

TEFLU's downstream products are within the scope of the Order based on the

plain scope language is not in accordance with law and not supported by

substantial evidence.  See id. at 23–33; see also Order.

Defendant and Defendant-Intervenor contend that the plain language of the

scope of the Order (and the interpretative sources pursuant to 19 C.F.R.

§ 351.225(k)) support Commerce's determination that TEFLU's products are in-

scope merchandise.  Def.'s Resp. at 21–26; Def.-Interv.'s Resp. at 15–19.

Commerce stated that TEFLU's merchandise is within the scope of the

Order because:

> *[A]bsent exclusionary language* or evidence that the further processing
> alters the carbon make-up or cross section of the [light-walled
> rectangular pipe and tube], "it is not reasonable to conclude that simply
> because a particular type of [light-walled rectangular pipe and tube] is
> not specially mentioned in the scope, that product is not covered."

Final IDM at 12 (quoting LWRPT from Mexico 2016–17 Final IDM) (emphasis

added).  Commerce further explained that there is no language excluding light-

walled rectangular pipe and tube based on end-use restrictions.  See id. at 14

(citing King Supply Co. LLC v. United States ("King Supply"), 674 F.3d 1343

(Fed. Cir. 2012)).

### D.    Commerce's Scope Ruling Based on Plain Language Must Be Remanded

The scope language at issue here covers certain welded carbon quality light-

walled steel pipe and tube, of rectangular (including square) cross section, having a

wall thickness of less than 4 mm.  Order, 73 Fed. Reg. at 45,404.

The Court notes at the outset that remand is required for Commerce to determine whether Plaintiffs' further manufactured products are outside the scope based on the further processing of the merchandise.  Commerce determined incorrectly that TEFLU's products met the description of subject merchandise in the Order and proceeded to consider whether the scope contained exclusionary language based on further processing and end use.  See Final IDM at 12 ("absent exclusionary language or evidence that the further processing alters the carbon make-up or cross section of the [light-walled rectangular pipe and tube], 'it is not reasonable to conclude that simply because a particular type of [light-walled rectangular pipe and tube] is not specifically mentioned in the scope, that product is not covered.").

Commerce instead should have considered: *whether TEFLU's further manufactured products, which are light-walled rectangular pipe and tube that underwent a process of saw-cutting, laser cutting-to-length, drilling, perforation, bending, or other further processing, were downstream products outside of the scope.*  Plaintiffs argue that "the plain language of the scope describes pipe and tube, not auto parts."  Pls.' Br. at 23.  TEFLU's automotive parts and other products were bent, pressed, or had holes drilled in them during manufacturing, which Plaintiff argues caused the products to become distinct, downstream products that no longer met the scope's description of the light-walled rectangular

pipe and tube.  <u>Id.</u> at 23–24.  On remand, Commerce must reconsider whether TEFLU's imported automotive and other parts are downstream products that no longer meet the description of the scope as welded carbon-quality light-walled steel pipe and tube, of rectangular (including square) cross section, having a wall thickness of less than 4 mm.

Defendant cites <u>King Supply</u> for the proposition that the plain language of an order is paramount in determining whether particular products are included within the scope.  <u>See</u> Def.'s Resp. at 14–15.  While Defendant is correct that the plain language of an order is significant to the scope inquiry, Defendant's reliance on <u>King Supply</u> is inapposite here because that case addressed a scope order with an end-use restriction, but the <u>Order</u> in this case does not contain an end-use restriction.  <u>See</u> <u>King Supply</u>, 674 F.3d at 1348 ("End-use restrictions in [antidumping] orders, while appropriately utilized in certain cases, are disfavored because they can be difficult to enforce.").  Thus, an end-use restriction analysis is inapplicable in this case.

It is apparent that Commerce's plain language determination focuses on *silence* in the scope language of the <u>Order</u>.  In other words, because the <u>Order</u> neither includes nor excludes automotive parts or other downstream products, Commerce determined that it was reasonable to consider TEFLU's products in-scope.

It is well-established that subject merchandise may be included in-scope only if the scope language specifically includes the merchandise or may be reasonably interpreted to include it.  Duferco, 296 F.3d at 1089.

Commerce's position that the *silence* of the scope language permits Commerce to interpret TEFLU's products as within the scope of the Order is the opposite of the well-established principle set forth in Duferco.  The Court agrees with Plaintiffs' argument that Commerce's position would allow the agency to read *any* product into the scope of an order if the scope language is silent, which is contrary to the principle articulated in Duferco.  Here, the plain scope language does not mention automobile parts or downstream products, and thus it is not in accordance with law for Commerce to have determined that the plain scope language suggests that the products were in-scope based on the silence of the Order.

Similarly, Commerce asserts that a product may be interpreted as in-scope as long as there is no language excluding such product.  This is not a reasonable principle that complies with the Duferco standard and the Court cannot sustain Commerce's plain language determination in this regard.

In addition, the Order mentions that:

[T]he welded carbon-quality rectangular pipe and tube subject to the Order is currently classified under the Harmonized Tariff Schedule of the United States [HTSUS] subheadings 7306.61.50.00 and

> 7306.61.70.60.     While HTSUS subheadings are provided for
> convenience and Customs purposes, our written description of the
> scope of these orders is dispositive.

Order, 73 Fed. Reg. at 45,404.  Although the HTSUS headings mentioned in the

Order may not be dispositive, Plaintiffs explained at oral argument that TEFLU's

custom-made, downstream products are classified under HTSUS headings other

than those listed in the Order.  See Oral Arg. at 28:09:31–34:25:55.  The fact that

TEFLU's products are classified in HTSUS headings other than those listed in the

Order supports the Court's conclusion that Commerce's plain language

determination is not in accordance with law.

The Court observes that the scope language in the Order makes no reference

to downstream products or automotive parts, nor does Commerce cite any

language suggesting that downstream products or automotive parts may be

reasonably included within the scope of the Order under the Duferco standard.

Instead, the scope language refers only to "certain welded carbon-quality light-

walled steel pipe and tube, of rectangular (including square) cross section, having a

wall thickness of less than 4 mm."  Order.  The scope language does not suggest

that downstream products or automotive parts should be included in-scope.

The scope language's silence and lack of exclusionary provisions do not

permit Commerce to conclude, based upon a plain language reading of the scope

provision, that TEFLU's further processed automotive products fall within the

scope of the <u>Order</u>.  For these reasons, the Court remands Commerce's plain

language scope determination.

### E.    Commerce's Analysis Regarding Further Processing of Merchandise is Not in Accordance With Law

Commerce failed to answer the appropriate question in its Final IDM.

Commerce should have focused its inquiry on whether TEFLU's further processed

products became downstream products that rendered the products out of scope.

The U.S. Court of Appeals for the Federal Circuit ("CAFC") has explained

that the question of whether a product "meets the order's physical specifications

*only begins* the inquiry."  <u>A.L. Patterson, Inc. v. United States</u>, 585 F. App'x 778,

784–85 (Fed. Cir. 2014) (unpublished) (emphasis added) (holding that although

Patterson's steel coil rod facially fell within the language of the order at issue,

Commerce failed to offer substantial evidence that the merchandise fell within the

domestic industry that the ITC investigated and did not sufficiently address

contrary evidence that the merchandise was physically distinguishable from the

merchandise that the Petitioner intended to be covered by the order).

The Court of International Trade ("CIT") has held similarly that the scope

language of the <u>Order</u> may not be reasonably interpreted to suggest that "all light-

walled rectangular pipe and tube further manufactured for one of the identified

uses remains within the scope regardless of the downstream product's shape or the

degree of further manufacturing." See Stein Indus. Inc. v. United States ("Stein"),

43 CIT __, __, 365 F. Supp. 3d 1364, 1373 (2019).  Subject merchandise may fall

out of the ambit of an order based on how much processing has been performed on

such merchandise, whether the further processed products are realistically

interchangeable with the merchandise covered by the scope, and whether the ITC

investigated the industry of the further processed product.  These are questions that

Commerce must address on remand.

The court has recognized a distinction between a "finished product" that

falls outside of an antidumping order and an intermediate product that stays within

the scope of an antidumping order.  Depending on the amount of further processing

performed on a product, when an intermediate good (also called an input, raw

material, unfinished good, or upstream product) has been processed into a

"finished product" (also called a downstream product), such product may be

outside the scope of an antidumping order.  See, e.g., Trendium Pool Prod., Inc. v.

United States, 43 CIT __, __, 399 F. Supp. 3d 1335 (2019); PCS Scope Ruling;

Rubbermaid Com. Prod. LLC v. United States, 39 CIT __, __, 2015 WL 4478225,

at *4 (July 22, 2015) (holding that subject merchandise was out of scope by the

express "finished merchandise" exclusion); see also Dillinger France S.A. v.

United States, 42 CIT __, __, 350 F. Supp. 3d 1349, 1357 n.3 (2018) (defining

"downstream" as "in or toward the latter stages of a usually industrial process or

the stages (such as marketing) after manufacture."); <u>Bell Supply Co., LLC v. United States</u>, 348 F. Supp. 3d 1281, 1289 (discussing the terms "upstream production" and "downstream production" as to the substantial transformation factor of "nature and sophistication of processing in the country of exportation").

### 1.    Description of TEFLU's Merchandise

Plaintiffs describe TEFLU's merchandise as follows: Maquilacero manufactures and sells commercial light-walled rectangular tube produced to ASTM A-513, the Standard Specification for Electric-Resistance-Welded Carbon and Alloy Steel Mechanical Tubing, to customers in the home market and the United States.  Compl. ¶ 10; <u>see also</u> Final IDM at 13.  Maquilacero's affiliated party, TEFLU, is a Mexican producer of automotive parts for original equipment manufacturers that uses light-walled rectangular tube produced by Maquilacero as an input into its own production of auto parts or other end products.  Compl. ¶ 10. The input light-walled rectangular tube is further processed by TEFLU in its own facilities, using distinct production equipment and machinery, into a new product that is customized for a single use, in a specific automotive subassembly.  <u>Id.</u>  The products made by TEFLU are customized to a single customer for a single end use in a specific subassembly, unlike commercial pipe and tube produced by Maquilacero that are made to standard specifications and sizes.  <u>Id.</u>  TEFLU's custom-made automotive parts are sold and purchased based on a production parts

approval process ("PPAP"), a detailed process that the supplier must undergo at the

request of the customers.  Oral Arg. at 24:16–24:44.  TEFLU's products are cut by

laser, cut to length, drilled, notched, bent, and pressed.  Id. at 24:44–25:13.

### 2.    Further Processing

During oral argument, the Parties disagreed whether TEFLU's merchandise

were intermediate or finished products, and the amount of processing that must

occur for such products to be considered out of scope.

Plaintiffs contended that TEFLU's merchandise were manufactured into

finished automobile parts that customers referred to by names other than pipe and

tube, and the subassembly and parts to which the products pertained were

dedicated to a single, final use.  See id. at 38:38–38:51.

Defendant asserted that TEFLU's merchandise were considered only

intermediate products, absent the addition of further materials or other processes

performed on TEFLU's goods.  See id. at 1:02:17–1:03:15.  Defendant

acknowledged that the automotive parts produced by TEFLU underwent additional

design and testing, along with meeting specific architectural or engineering

requirements, but Defendant argued that these processes of cutting by laser or saw,

drilling, perforating, or bending of TEFLU's products, were not sufficient to

change their chemical or physical nature to render them outside the scope.  Id.

Defendant analogized TEFLU's further processing of its custom parts to a piece of

paper being bent and folded, arguing that TEFLU's products, like a piece of paper, would remain the same in nature regardless of the processes described, and would continue to be a product that met the physical description of the language in the scope.  See id.  Defendant also suggested that the finished product would be an automobile, rather than TEFLU's products, even if their end use was within an automobile.  See id. at 1:09:10–1:09:44.

Defendant-Intervenor argued that TEFLU's products were intermediate goods, rather than finished products, because the manufactured parts were not "plug and play" products in an automobile.  See id. at 1:30:42–1:32:49. Defendant-Intervenor suggested that after the parts were attached to an automobile, TEFLU's products would then be substantially transformed into a finished product. See id. at 01:09:10–01:09:44.  Defendant's and Defendant-Intervenor's arguments are unconvincing and misplaced.

Questions that Commerce must address instead are: *(1) whether TEFLU's further processed products were within an industry that was investigated by the ITC when the ITC determined that certain pipe and tube caused material injury or threat of material injury to domestic producers; and (2) whether TEFLU's further processed products were interchangeable with the pipe and tube covered under the scope.*  See A.L. Patterson, 585 F. App'x at 784–86 (concluding that "Patterson presented evidence showing that coil rod is a distinct domestic market that the

Commission did not investigate" and noting that the petition did not mention coil

or any uses of coil rod, no domestic producers of coil rod were named in the

petition, and there was no evidence that the petitioner intended to cover coil rod in

the petition due to competition from imports); see also TMB 440AE, Inc. v. United

States, No. 18-00095, 44 CIT __. __, 2020 WL 1672841, at *2–7 (Apr. 6, 2020)

(stating that "[b]y the text of the Orders alone without the context of the

investigation, AEC pipe would appear to fall within their scope" and remanding for

Commerce to conduct a complete and fair review of the petition and the ITC

investigation to determine whether the orders were intended to cover AEC's type

of pipe, and to determine whether AEC's pipe was interchangeable with the types

of pipe covered by the Orders).

      In the Final IDM, Commerce described TEFLU's further manufactured

merchandise as "[light-walled rectangular pipe and tube] [which] undergoes a

process of 'saw-cutting, laser cutting-to-length, drilling, perforation and/or

bending.'"  Final IDM at 12.  Commerce determined that the specifications of

TEFLU's further processed product did not exceed those listed in the scope of the

Order.  Id. (citing LWRPT from Mexico 2016–17 Final IDM).  Commerce

determined that TEFLU's further manufactured merchandise was within the scope

of the Order based on physical or chemical specifications, the ITC Report, the

Petition, and NAFTA Panel Ruling.  See id. at 12–15.  Commerce's narrow focus

on the physical and chemical specifications of TEFLU's products is incorrect;

Commerce must instead examine the ITC's investigation into the industry of

TEFLU's further manufactured products and the interchangeability of TEFLU's

products with the merchandise covered by the scope.

Despite its cursory conclusions that TEFLU's products were in-scope due to

their physical properties, Commerce failed to address substantial record evidence

of approximately 83 different custom parts that were manufactured by TEFLU for

several OEM customers.  See Maquilaero's Sec. A QR at Ex. A-6; Maquilacero's

Post-Prelim. Suppl. QR at Ex. 2S-7.  These products included seat assemblies,

hinges for the trunk of an automobile, articulated arms of an excavator, a cabin

frame for a tractor, trunk lids, and racks for 3-D printing machines, among other

various products.[5]  See Pls.' Br. at 24, 28; Oral Arg. at 45:42–46:02.  Many of

these customized parts were further processed into distinct shapes and sizes for

both automobile and non-automobile manufacturers.  For example, TEFLU

manufactured a decklid hinge gooseneck, which was twisted into a curved shape

with holes punched throughout the product.  See Maquilacero's Sec. A QR at Ex.

A-6.

---

[5] During oral argument, Plaintiffs waived the confidentiality of TEFLU's products
and the HTSUS codes under which such products were categorized.  See Oral Arg.
at 34:18–37:33.

The Court observes that this case is analogous to Stein, in which the court remanded Commerce's determination that a merchandising bar and adjustable welded mounted bar kit were within the scope based on the scope language in the Order and the subject ITC report. Stein, 365 F. Supp. 3d at 1371–74. The Stein court reasoned that Commerce failed to address the argument that the subject merchandise were outside of the scope based on the lack of uniform cross section and that the subject ITC report could not be reasonably interpreted by Commerce to suggest that both intermediate and downstream products were within the scope. Id. On remand, Commerce determined that the subject merchandise were out of scope. See Stein Indus. Inc. v. United States, 385 F. Supp. 3d 1380 (2019) (judgment sustaining remand results).

As in Stein, Commerce determined here that the ITC Report reflected that light-walled rectangular pipe tube was an intermediate product with a variety of end uses, whereas Plaintiffs, being the challenging parties, contend that further processing of the subject merchandise rendered the downstream products outside of the scope of the Order. Commerce must consider on remand the degree to which each of TEFLU's approximately 83 products were processed by saw-cutting, laser cutting-to-length, drilling, perforation, bending, or other further manufacturing processes, and whether such further processing rendered each of the approximately 83 products outside the scope of the Order as downstream products,

particularly within the context of the Petition and the ITC investigation, and

comparing the interchangeability of TEFLU's further processed products with the

pipe and tube covered under the <u>Order</u>.

　　　The present case is also analogous to <u>Trendium,</u> in which the court

concluded that merchandise that were processed enough to no longer be considered

intermediate products may fall outside the scope of an antidumping order.

<u>Trendium</u>, 43 CIT at __, 399 F. Supp. 3d at 1337.  Trendium had requested a scope

inquiry clarifying that its pool products, partially made from corrosion resistant

steel ("CORES") from Italy and the People's Republic of China ("China"), did not

fall within the antidumping duty order for CORES from Italy and China.  <u>Id.</u>

Commerce determined that Trendium's pool products were covered by the scope

order, and Trendium argued that the plain language of the antidumping order did

not cover downstream products.  <u>Id.</u>  The <u>Trendium</u> order included the following

language:

> Subject merchandise also includes corrosion-resistant steel that has
> been further processed in a third country, including but not limited to
> annealing, tempering, painting, varnishing, trimming, cutting,
> punching and/or slitting or *any other processing that would not
> otherwise remove the merchandise from the scope* of the [antidumping
> order].

<u>Id.</u> at 1340 (emphasis added) (citing <u>Certain Corrosion-Resistant Steel Products</u>

<u>From India, Italy, Republic of Korea and the People's Republic of China</u>, 81 Fed.

Reg. 48,387, 48,389, App. I (Dep't of Commerce July 25, 2016) (countervailing

duty order).  The court held that the antidumping order only covered CORES from

Italy and China, not finished pool products that could no longer be used as raw

input, with Trendium's processing "so extensive and particular to the product's use

as pool walls that the CORES is no longer CORES for the purposes of a scope

determination" and that "the amount of processing the CORES components

underwent transformed them from a raw input into a finished product, with the

only practical use as an above-ground pool." Id. at 1343.

Additionally, the CIT has also recognized that specialized products that are

not "realistically interchangeable" with covered merchandise may be excluded

from an antidumping order.  See TMB 440AE, 44 CIT at __, 2020 WL 1672841, at

*5.

Thus, on remand, under the principles articulated in A.L. Patterson, Stein,

Trendium, and TMB 440AE, Commerce must examine TEFLU's further processed

products to determine whether the amount of processing transformed them from a

raw input into a downstream product, whether TEFLU's further processed products

were within an industry that was investigated by the ITC when the ITC determined

that certain pipe and tube caused material injury or threat of material injury to

domestic producers, and whether TEFLU's further processed products were

realistically interchangeable with the raw input of light-walled rectangular pipe and

tube of rectangular cross section having a wall thickness of less than 4 mm.

    Plaintiffs contend that the record evidence demonstrates that TEFLU's

products have been processed from raw light-walled rectangular pipe into finished,

downstream products for specific customers.  Pls.' Br. at 27–28.

    Plaintiffs highlight Maquilacero's First Supplemental Sections A & D

Questionnaire Response, asserting that each automotive part is assembled for a

specific customer and a specific subassembly with no other possible use.  Id. at 27

(citing Maquilacero's First Suppl. Sec. A & D QR at 5).  Maquilacero's First

Supplemental Sections A & D Questionnaire Response described TEFLU's further

processing of raw light-walled rectangular pipe tube, in relevant part:

> [T]he products sold by TEFLU undergo further processing of the [light-walled rectangular pipe tube] from Maquilacero, using production steps that are specific to each part.  No two auto parts produced by TEFLU are the same, but they are customized, therefore the processing steps differ from product to product. . . .. The processes TEFLU undertakes include cutting with laser and/or punching, bending tapping and drilling/perforating the tube using dedicated equipment in order to make the [light-walled rectangular pipe tube] tubing into parts for the automotive industry.  For some parts, the processing by TEFLU consists of cutting the tubing to the customer's specification, using sophisticated laser cutting machines.  Please see Exhibit S-3 for the processing operations and the machines used by TEFLU.

Consol. Court No. 23-00091                                           Page 31

Maquilacero's First Suppl. Sec. A & D QR at 5; see also id. at Ex. S-3

(photographs of the facility and machines used by TEFLU to process light-

walled rectangular pipe tube).

  In support of its argument that TEFLU's products are customized,

Plaintiffs also contend that Maquilacero's Section A Questionnaire

Response demonstrated that TEFLU's products do not overlap in use with

typical light-walled rectangular pipe tube.  Pls.' Br. at 28 (citing

Maquilacero's Sec. A QR at Ex. A-6).  During oral argument, Plaintiffs

asserted that Exhibit A-6 of Maquilacero's Section A Questionnaire

Response showed five sample products produced by TEFLU, with each

product specifically made for a different OEM customer: a "decklid hinge

gooseneck" (used for a trunk of a car), a "tubing steel upper 40 LH," a front

axle product, a tube front boom for a tractor, and a frame.  See

Maquilacero's Sec. A QR at Ex. A-6; Resp. Court Request.  Plaintiffs argue

that these five products were visibly different and custom-made for

corresponding customers, and were processed by saw-cutting, laser cutting-

to-length, drilling, perforating and/or bending to some degree.  Id.  Plaintiffs

cite additional examples of the types of products sold by TEFLU, such as

automotive parts and racks for 3-D printing machines, in Maquilacero's

Post-Preliminary Supplemental Questionnaire Response.  Pls.' Br. at 28

(citing Maquilacero's Post-Prelim. Suppl. QR at Ex. 2S-7). The
photographs in these documents demonstrated that some of these parts had
multiple cuts, were cut at specific angles, had holes drilled, or had cuts with
prongs at the ends of the pipes. Maquilacero's Post-Prelim. Suppl. QR at
Ex. 2S-7.

Plaintiffs assert that TEFLU's products were sold in conformity with
drawings and specifications by the OEM customers, whereas Maquailacero's
products were sold based on commercial specifications and standard sizes, and
Plaintiffs cite to sales information and other documentation on the record that
detract from Commerce's determination. Pls.' Br. at 28 (citing Maquilacero's Sec.
A QR at Exs. A-10, A-14, A-24, A-32; Maquilacero's Post-Prelim. Suppl. QR at
2S-6.1–2S-6.2). Sales information in Maquilacero's Section A Questionnaire
Response showed that TEFLU's parts were identified by part number, by their
function, and by the subassembly of the final product, while Maquilacero's parts
did not have any such identification. Maquilacero's Sec. A QR at Exs. A-10
(sample documentation for a U.S. sale of light-walled rectangular pipe tube by
Maquilacero), A-14 (sample documentation for a sale from Maquilacero to
TEFLU, a sale of customized parts to a customer from TEFLU, and a sample
PPAP). Other documentation in Maquilacero's Section A Questionnaire Response
and Maquilacero's Post-Preliminary Supplemental Questionnaire Response

included a flowchart of TEFLU's production process, which showed the steps

taken from producing a raw material to a finished good; a brochure describing the

activities, final products, and processing operations performed by TEFLU; and

invoices from TEFLU's virtual export sales (also known as "pedimentos"),

showing the different parts sold to different customers.  Pls.' Br. at 28 (citing

Maquilacero's Sec. A QR at Exs. A-24, A-32; see also Resp. Court Request

(including Maquilacero's Post-Prelim. Suppl. QR at Exs. 2S-6.1–2S-6.7)).

In the Final IDM, Commerce failed to address this substantial contrary

evidence suggesting that TEFLU's further processing of the raw light-walled

rectangular pipe tube resulted in TEFLU's 83 products becoming customized,

downstream products.  Accordingly, Commerce's determination that all of

TEFLU's products fall within the scope of the Order is in not accordance with law

or supported by substantial evidence.

### F.    Commerce's Analysis of the (k)(1) Factors Must Be Remanded

As noted earlier, Commerce did not mention in the Final Results that (k)(1)

sources should be considered in this case, although it is apparent that Commerce

considered certain sources in the Final IDM.  Nor did Commerce conduct a

complete and full review of the (k)(1) sources, both positive and negative, to

determine whether downstream products were intended to be covered in the scope

of the Order.  Commerce made cursory conclusions with minimal citations and
failed to include most of the documents on the record before the Court.

Defendant and Defendant-Intervenor contend that the interpretative sources
pursuant to 19 C.F.R. § 351.225(k) support Commerce's determination that
TEFLU's products are in-scope.  See Def.'s Resp. at 18–21; Def.-Interv.'s Resp. at
17–19.  Commerce reasoned that TEFLU's merchandise was within the scope of
the Order according to the (k)(1) sources because: (1) the Petition in the original
investigation underlying the Order stated that any product that meets physical
characteristics of the scope is covered regardless of whether it is produced to "an
ASTM, proprietary or other industry specification"; (2) the ITC Report stated that
light-walled rectangular pipe and tube is an intermediate product with "many end-
use applications," including "fences, gates, hand rails, furniture, sports equipment,
and automotive equipment"; (3) the PCS Scope Ruling is not applicable to this
review; and (4) the NAFTA Panel Ruling found that Commerce's determination
that TEFLU's further processed merchandise as in-scope was not contrary to law.
Final IDM at 12–15.

Commerce stated that the Petition and ITC Report supported its
determination that any product that met the physical characteristics of the Order
were in scope, and rejected Maquilacero's administrative argument that the
customization of TEFLU's further processed products caused the merchandise to

be out of scope.  <u>See</u> Final IDM at 13 (citing Petition; ITC Report at 13).

Commerce relied on the ITC Report to support its determination that TEFLU's

products were not downstream products.  <u>Id.</u> ("[The] LWRPT ITC Report states

that [light-walled rectangular pipe and tube] is an intermediate product with 'many

end-use applications,' including 'fences, gates, hand rails, furniture, sports

equipment, and automotive equipment.'").

       Commerce did not provide any substantive explanations regarding how the

information in these sources supported Commerce's determinations.  Commerce

failed to discuss, for example, whether the ITC investigated downstream products

as part of the investigated domestic industry that was injured, and whether further

processed products were interchangeable with raw inputs covered in the <u>Order</u>.

Rather, Commerce simply stated that TEFLU's products were in scope.  <u>See, e.g.</u>,

<u>id.</u> at 13 ("In [<u>LWRPT from Mexico 2016–17 Final IDM</u>], we found that the

specifications of the further-processed product did not exceed the physical or

chemical specifications listed in the scope of the <u>Order</u>.").

       In addition, Commerce failed to provide specific citations or page numbers

for the Petition, and failed to place the Petition and the pages of the ITC Report

cited in the Final IDM on the record filed with the Court.  <u>See</u> Maquilacero's First

Suppl. Sec. A & D QR at S-14 (excerpts from the ITC Report).

Commerce also relied on a NAFTA Panel Ruling to support its determination that TEFLU's further processed merchandise were within the scope because the NAFTA Panel ruled that Commerce's determination was a "reasonable interpretation of the pertinent scope language and a reasonable way of applying the regulation." Final IDM at 15 (citing NAFTA Panel Ruling at 11–15). The Court observes that Commerce failed to provide any substantive analysis as to why the NAFTA Panel Ruling was correct, particularly in the context of how further processed products were interchangeable with the raw input light-walled rectangular pipe and tube or whether downstream products were covered in scope, and Commerce failed to place the NAFTA Panel Ruling document on the record filed with the Court. More importantly, rulings by a NAFTA Panel do not have precedential value on the scope ruling as they are not considered a (k)(1) source. See 19 C.F.R. § 351.225(k).

Therefore, because Commerce did not do a complete and fair substantive analysis of the (k)(1) sources (considering both positive and negative sources), and did not place on the record many of the documents on which it apparently relied for its (k)(1) analysis, Commerce's determinations under the (k)(1) analysis are neither in accordance with law nor supported by substantial evidence and must be remanded.

## II.     Collapsing of Maquilacero and TEFLU

Plaintiffs challenge Commerce's collapsing determination under 19 C.F.R.

§ 351.401(f), arguing that Commerce improperly relied on its prior administrative

review.  See Pls.' Br. at 12–23; see also LWRPT from Mexico 2018–19 Final

Results.[6]  Commerce determined that TEFLU and Maquilacero should be collapsed

in this case, based in part on Commerce's determination that TEFLU's further

processed merchandise were within the scope of the Order.  Final IDM at 12–15.

Under 19 C.F.R. § 351.401(f), Commerce may treat two or more producers

as a single entity in antidumping proceedings when three requirements are

satisfied: (1) the entities must be affiliated; (2) the affiliated producers must "have

production facilities for *similar or identical products* that would not require

substantial retooling of either facility in order to restructure manufacturing

priorities; and (3) "there is a significant potential for the manipulation of price or

production."  19 C.F.R. § 351.401(f)(1) (emphasis added).  For a collapsing

analysis, "Commerce must consider the 'totality of circumstances' between all

entities when it evaluates whether, for purposes of collapsing entities, there is

---

[6]  The 2018–2019 administrative review was the most recent proceeding in which
Commerce had reviewed Maquilacero individually because Maquilacero was not
selected as a mandatory respondent in the 2019–2020 administrative review.  See
Light-Walled Rectangular Pipe and Tube From Mexico, 87 Fed. Reg. 13,973
(Dep't of Commerce Mar. 11, 2022) (final results of antidumping duty
administrative review; 2019–2020).

significant potential for manipulation of price or production to circumvent antidumping duties." Prosperity Tieh Enters. Co., Ltd. v. United States, 965 F.3d 1320, 1326 (Fed. Cir. 2020) (citing Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,298, 27,346 (May 19, 1997) (noting that collapsing determinations "are very much fact-specific in nature, requiring a case-by-case analysis")).  An analysis of the totality of circumstances requires an evaluation of all pertinent evidence. Id. at 1327.

Because the Court remands Commerce's scope determination of TEFLU's products, and TEFLU's further processed products may not be within the scope of the Order as downstream products, Commerce must reconsider on remand whether the products produced by Maquilacero and TEFLU are similar or identical under the 19 C.F.R. § 351.401(f)(1) collapsing analysis.  Therefore, the Court also remands Commerce's collapsing determination.

### III.    Rejection of Manufacturer Code and Further Processing Variable

Plaintiffs challenge Commerce's determination to not modify the SAS programming by including a manufacturer code and the further processing variable (or the "FURPROCESSH/U" variable) as not in accordance with law or supported by substantial evidence. See Pls.' Br. at 33–38.  Plaintiffs assert that Commerce's failure to incorporate the manufacturer code and the further processing variable was a deviation from prior practice. Id. at 35–38.

Because the Court remands Commerce's scope and collapsing

determinations, the Court defers the issues of the correct manufacturer code and

further processing variable because Commerce must re-evaluate the commercial

and physical differences between standard light-walled rectangular pipe and tube

produced by Maquilacero compared to customized further processed products

produced by TEFLU.  Commerce should reconsider these issues as appropriate

based on the remand redetermination.

## IV.    Classification of IMMEX Sales

Plaintiffs challenge Commerce's determination to treat TEFLU's sales made

through IMMEX (referred to as "virtual exports") as home market sales as not in

accordance with law or supported by substantial evidence.  Id. at 38–43.  Plaintiffs

contend that record evidence demonstrates and the nature of the IMMEX program

suggests that TEFLU had constructive knowledge that its IMMEX sales were

destined to be exported to the United States or a third country due to the nature of

the IMMEX Program.  Pls.' Br. at 38–43; Pls.' Reply at 18–23.

In antidumping proceedings, Commerce determines the export price of the

subject merchandise and assigns sales of that merchandise to the party who sets the

export price for the purpose of calculating that party's antidumping margin.  See

19 U.S.C § 1677a.  Export price is defined as:

the price at which the subject merchandise is *first sold* (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States . . . .

Id. § 1677a(a) (emphasis added).  In assigning sales to the foreign producer or exporter, Commerce focuses on the term "first sold" in the statute, interpreting it as denoting the first party in the sales chain with knowledge of the merchandise's United States destination at the time of sale, which reflects Commerce's view that the party who first sells the subject merchandise destined for the United States is the likely "price discriminator," and thus the one who "may have engaged in dumping."  JA Solar Int'l Ltd. v. United States, 606 F. Supp. 3d 1370, 1373 (2022).

Because the Court remands Commerce's scope and collapsing determinations, the Court also defers ruling on Commerce's determination to classify TEFLU's IMMEX sales as home market sales, which may be affected by possible modification of the SAS programming.

### V.     Differential Pricing Methodology

Plaintiffs challenge Commerce's application of its differential pricing methodology as not in accordance with law because Commerce failed to resolve concerns regarding the Cohen's *d* test articulated by the CAFC in Stupp Corp. v. United States ("Stupp III"), 5 F.4th 1341 (Fed. Cir. 2021) and Mid Continent Steel

Wire, Inc. v. United States ("Mid Continent V"), 31 F.4th 1367 (Fed. Cir. 2022).[7]

See Pls.' Br. at 43–48.[8]  Because the Court remands Commerce's scope

determination of TEFLU's products, the Court defers ruling on the differential

pricing issue at this time.

**CONCLUSION**

For the foregoing reasons, the Court remands the issues of Commerce's

collapsing of Maquilacero and TEFLU and the scope determination of TEFLU's

further processed merchandise for further consideration consistent with this

Opinion.  The Court defers Commerce's rejection of the manufacturer code and the

further processing variable in its SAS programming code, its treatment of

TEFLU's sales made through the IMMEX Program as home market sales, and its

application of the differential pricing analysis with the Cohen's $d$ test pending the

outcome of the scope redetermination on remand.

---

[7]  The Court notes that this case has been abbreviated as "Mid Continent II" in the administrative filings and case briefs.

[8]  Specifically, the CAFC has remanded (1) Commerce's use of a simple average, rather than a weighted average, in its calculation of the denominator when in Mid Continent Steel & Wire, Inc. v. United States ("Mid Continent V"), 31 F.4th 1367 (Fed. Cir. 2022) for its lack of adequate explanation for departing from academic literature and (2) Commerce's application of Cohen's $d$ test without the observation of certain statistical assumptions, including the normality, sufficient size, and roughly equal variances of the considered populations, in Stupp Corp. v. United States ("Stupp III"), 5 F.4th 1341 (Fed. Cir. 2021).

Consol. Court No. 23-00091                                                   Page 42

To summarize, on remand Commerce must answer the following question: whether TEFLU's further manufactured products, which are light-walled rectangular pipe and tube that underwent a process of saw-cutting, laser cutting-to-length, drilling, perforation, bending, or other further processing, were downstream products outside of the scope.  Commerce must determine the degree to which TEFLU's products were processed by saw-cutting, laser cutting-to-length, drilling, perforation, bending, or other further manufacturing processes, and whether each product was further processed so as to no longer fall within the scope, rather than base its scope determination solely on the physical and chemical composition of TEFLU's products.  Commerce must also address whether TEFLU's further processed products are within an industry that was investigated by the ITC when the ITC determined that certain pipe and tube caused material injury or threat of material injury to domestic producers, and whether TEFLU's further processed products are realistically interchangeable with the pipe and tube covered under the scope.

Accordingly, it is hereby

**ORDERED** that that this case shall proceed according to the following schedule:

(1)    Commerce shall file its remand determination on or before December

4, 2024;

(2)     Commerce shall file the administrative record on or before December

18, 2024;

(3)     Comments in opposition to the remand determination shall be filed on

or before January 17, 2025;

(4)     Comments in support of the remand determination shall be filed on or

before February 18, 2025; and

(5)     The joint appendix shall be filed on or before February 25, 2025.

                                                          /s/  Jennifer Choe-Groves
                                                   Jennifer Choe-Groves, Judge

Dated:     October 4, 2024
              New York, New York