A-201-836
Remand
Slip Op. 24-107
POR: 08/01/2020 - 07/31/2021
**Public Document**
E&C/OIII: CD

***Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V., et al v. United States,***
**Consol. Court No. 23-00091, Slip Op. 24-107 (CIT October 4, 2024)**
**Light-Walled Rectangular Pipe and Tube from Mexico**

## FINAL RESULTS OF REDETERMINATION
## PURSUANT TO COURT REMAND

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand opinion and order of the U.S. Court of International Trade (the Court) issued in *Maquilacero* on October 4, 2024.[1]  These final results of redetermination concern Commerce's final results of the administrative review of the antidumping duty (AD) order on light-walled rectangular pipe and tube (LWRPT) from Mexico covering the period of review (POR) August 1, 2020, through July 31, 2021.[2]  The Court remanded the *Final Results*, finding that Commerce improperly relied on the scope's silence in concluding that further processed and downstream products are covered by the scope of the *Order*, and, in doing so, failed to adequately articulate its findings with respect to the scope's plain language and the sources identified under 19 CFR 351.225.  The further processed LWRPT at issue are products sold by Tecnicas de Fluidos S.A. de C.V. (TEFLU), examined in conjunction with Maquilacero S.A. de C.V. (Maquilacero) as a single, individually-examined,

---

[1] *See Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V., Perfiles LM, S.A. de C.V. v. United States*, Consol. Court No. 23-00091, Slip Op. 24-107 (CIT October 4, 2024) (*Remand Opinion and Order*).
[2] *See Light-Walled Rectangular Pipe and Tube from Mexico, the People's Republic of China, and the Republic of Korea: Antidumping Duty Orders; Light-Walled Rectangular Pipe and Tube from the Republic of Korea: Notice of Amended Final Determination of Sales at Less Than Fair Value,* 73 FR 45403 (August 5, 2008) (*Order*); *see also Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2020–2021,* 88 FR 15665 (March 14, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM), unchanged in *Light-Walled Rectangular Pipe and Tube from Mexico: Amended Final Results of Antidumping Duty Administrative Review; 2020–2021,* 88 FR 30123 (May 12, 2023).

collapsed entity, (collectively, Maquilacero/TEFLU).[3]  On remand, the Court has directed Commerce to:  (1) reexamine its scope determination for TEFLU's further processed products; (2) reconsider whether the products produced by Maquilacero and TEFLU are similar or identical under its collapsing analysis, and thus reconsider its treatment of Maquilacero/TEFLU as a single entity; and (3) reconsider, as appropriate, the decision not to use manufacturer codes and a further processing variable.[4]  The Court deferred ruling on:  (1) Commerce's decision not to use manufacturer codes and further processing variables; (2) Commerce's classification of IMMEX sales; and (3) Commerce's application of the differential pricing analysis.[5]

We have reexamined the record with respect to TEFLU's further processed merchandise and determine that these products remain covered by the scope of the *Order*, relying on the sources provided for in 19 CFR 351.225(k)(1) in the draft results of redetermination.[6]  We also maintain our treatment of Maquilacero/TEFLU as a collapsed entity, and we have not revisited the issues deferred by the Court.  Commerce received and analyzed comments submitted by interested parties on the draft results of redetermination, and we determine that no changes from the draft remand are warranted.

---

[3] *See Light-Walled Rectangular Pipe and Tube from Mexico:  Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2018-2019*, 85 FR 83886 (December 23, 2020), and accompanying Preliminary Decision Memorandum (PDM) at 6, unchanged in *Light Walled Rectangular Pipe and Tube from Mexico:  Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 FR 33646 (June 25, 2021) (*LWRPT from Mexico 2018-2019*), and accompanying IDM at Comment 9.
[4] *See Remand Opinion and Order* at 36-37, 42.
[5] *Id*. at 38-40.
[6] *See* Draft Results of Redetermination Pursuant to Court Remand, *Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V., Perfiles LM, S.A. de C.V. v. United States*, Consol. Court No. 23-00091, Slip Op. 24-107, dated November 20, 2024 (Draft Remand).

## II.    BACKGROUND

On June 27, 2007, the petitioners[7] filed with Commerce an AD petition alleging that imports of LWRPT from Mexico are being imported to the United States at less than fair value.[8] On August 5, 2008, following an affirmative final determination by both Commerce and the U.S. International Trade Commission (ITC), Commerce published the *Order* in the *Federal Register*.[9] Commerce established its treatment of Maquilacero/TEFLU as a single entity in *LWRPT from Mexico 2018-2019*.[10] On August 2, 2021, Commerce initiated the instant administrative review.[11] On October 15, 2021, Commerce selected Maquilacero/TEFLU as one of the mandatory respondents in this review.[12] On December 29, 2022, Maquilacero/TEFLU submitted its case brief requesting that Commerce treat TEFLU's products as non-subject merchandise for all segments involving the *Order*.[13] Nucor Tubular Products Inc. (Nucor), a domestic interested party, also submitted a rebuttal brief opposing Maquilacero/TEFLU's request.[14] On March 14, 2023, Commerce issued the *Final Results*. On appeal, Maquilacero/TEFLU challenged Commerce's *Final Results* concerning the determination that TEFLU's further processed products were determined to be in-scope merchandise; the continued treatment of Maquilacero/TEFLU as a collapsed single entity; Commerce's rejection of the use of a manufacturer code and further processing variable in Commerce's margin calculations; the

---

[7] The petitioners in the underlying investigation are Allied Tube and Conduit; Atlas Tube; Bull Moose Tube Company; California Steel and Tube; Hannibal Industries; Leavitt Tube Company; Maruichi American Corporation; Searing Industries; Southland Tube; Vest Inc.; Welded Tube; and Western Tube and Conduit.
[8] *See* Petitioners' Letter, "Antidumping Dury Petition on Light-Walled Rectangular Pipe and Tube from Korea, Mexico, the People's Republic of China, and Turken and Countervailing Duty Petition on Light-Walled Rectangular Pipe and Tube from the People's Republic of China," dated June 27, 2007 (Petition) (provided to the instant record, in part, in Memorandum, "Memorandum Transmitting Additional Documents," dated November 20, 2024 (Transmittal Memorandum at Attachment 1).
[9] *See Order*.
[10] *See LWRPT from Mexico 2018-2019* IDM at Comment 9.
[11] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 FR 55811 (October 7, 2021).
[12] *See* Memorandum, "Respondent Selection," dated October 27, 2021.
[13] *See* Maquilacero/TEFLU's Letter, "Resubmission of Maquilacero S.A. de C.V.'s Case and Rebuttal Briefs," dated December 29, 2022 (Maquilacero/TEFLU's Case Brief). We acknowledge that Maquilacero/TEFLU maintained its existing stance that TEFLU's products were out of scope in its filings earlier in the proceeding.
[14] *See* Nucor's Letter, "Nucor Tubular's Rebuttal Brief Resubmission," dated December 29, 2022.

inclusion of TEFLU's sales made through the IMMEX program as home market sales; and Commerce's reliance on the Cohen's *d* test as part of its differential pricing analysis.[15]

In the *Remand Opinion and Order*, the Court found that Commerce failed to analyze whether the scope's plain language was unambiguous or whether it needed to examine any other sources identified under 19 CFR 351.225(k)(1) or (k)(2).[16]  Specifically, the Court instructed Commerce to "reconsider whether TEFLU's imported automotive and other parts are downstream products that no longer meet the description of the scope as welded carbon-quality light-walled steel pipe and tube, of rectangular (including square) cross section, having a wall thickness of less than 4 mm."[17]  The Court also found that Commerce inappropriately relied on silence in the scope's plain language regarding whether further processed and downstream products are covered by the *Order* and did not "cite any language suggesting that downstream products or automotive parts may be reasonably included within the scope of the *Order*."[18]  In addition, the Court instructed Commerce to address whether "the further processed products are realistically interchangeable with the merchandise covered by the scope, and whether the ITC investigated the industry of the further processed product."[19]

The Court also remanded Commerce's collapsing determination with respect to Maquilacero/TEFLU, stating that Commerce must "reconsider whether the products produced by Maquilacero and TEFLU are similar or identical under the 19 CFR 351.401(f)(1) collapsing analysis."[20]  The Court deferred on the issues of manufacturer codes and a further processing variable; the classification of IMMEX sales; and the application of Commerce's differential pricing analysis.[21]

---

[15] *See*, *generally*, *Remand Opinion and Order*.
[16] *Id*. at 12.
[17] *Id*. at 16-17.
[18] *Id*. at 19.
[19] *Id*. at 20, 24, and 26.
[20] *Id*. at 37-38.
[21] *Id*. at 38-41.

## III.    SCOPE OF THE *ORDER*

The scope of this *Order* covers certain welded carbon-quality light-walled steel pipe and tube, of rectangular (including square) cross section, having a wall thickness of less than 4 mm.

The term carbon-quality steel includes both carbon steel and alloy steel which contains only small amounts of alloying elements.  Specifically, the term carbon-quality includes products in which none of the elements listed below exceeds the quantity by weight respectively indicated; 1.80 percent of manganese, or 2.25 percent of silicon, or 1.00 percent of copper, or 0.50 percent of aluminum, or 1.25 percent of chromium, or 0.30 percent of cobalt, or 0.40 percent of lead, or 1.25 percent of nickel, or 0.30 percent of tungsten, or 0.10 percent of molybdenum, or 0.10 percent of niobium, or 0.15 percent of vanadium, or 0.15 percent of zirconium.

The description of carbon-quality is intended to identify carbon-quality products within the scope.  The welded carbon-quality rectangular pipe and tube subject to the *Order* is currently classified under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7306.61.50.00 and 7306.61.70.60.  This tariff classification is provided for convenience and Customs purposes; however, the written description of the scope of the *Order* is dispositive.

## IV.    ANALYSIS

Pursuant to the Court's opinion, we have reconsidered whether TEFLU's further processed LWRPT is within the scope of the *Order*.  The Court instructed Commerce to answer the following questions:

> {W}hether TEFLU's further manufactured products, which are {LWRPT} that underwent a process of saw-cutting, laser cutting-to-length, drilling, perforation, bending, or other further processing, were downstream products outside of the scope.  Commerce must determine the degree to which TEFLU's products were processed by saw-cutting, laser cutting-to-length, drilling, perforation, bending, or other further manufacturing processes, and whether each product was further processed so as to no longer fall within the scope{.}  Commerce must also address whether TEFLU's further processed products are within an industry that was investigated by the ITC when the ITC determined that certain pipe and tube caused material injury or threat of material injury to domestic producers, and whether

5

TEFLU's further processed products are realistically interchangeable with the pipe and tube covered under the scope.[22]

First, with respect to coverage of further processed products, we find the scope language to be ambiguous.  Second, because the scope language is ambiguous concerning further processed products, upon examining the factors included under 19 CFR 351.225(k)(1)(i), we find that these factors find in favor of including the further processed products under the scope's language.

1.  Whether the Scope Language Is Ambiguous in Its Coverage of Maquilacero/TEFLU's Further Processed Products?

As discussed by the Court's *Remand Opinion and Order*, the plain language of the scope does not address further processed LWRPT.  Specifically, the Court found that "the scope language does not suggest that downstream products or automotive parts should be included in-scope."[23]  Accordingly, we find the plain language of the scope to be ambiguous with respect to TEFLU's specific products as it includes no language concerning further processing or downstream products.   Therefore, we are no longer relying on the scope language's silence and in considering the scope's ambiguity, we have examined primary sources to determine whether the processing of LWRPT performed by TEFLU indicates that the products at issue are no longer "welded carbon-quality light-walled steel pipe and tube," but instead a downstream product not covered by the scope of the *Order*.  The primary sources identified in 19 CFR 351.225(k)(1) include:  (A) the descriptions of the merchandise contained in the petition pertaining to the order at issue; (B) the descriptions of the merchandise contained in the initial investigation pertaining to the order at issue; (C) previous or concurrent determinations of the Secretary, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and (D) determinations of the

---

[22] *Id*. at 42.
[23] *Id*. at 19.

ITC pertaining to the order at issue, including reports issued pursuant to the ITC's initial

investigation.

First, we re-examined the Petition and find that it does not discuss whether the scope or

proposed order would include subject merchandise that undergoes further processing.[24]  Next, we

examined existing ITC publications to describe the industry and products at issue.  The *ITC's*

*Second Review*, the most recent ITC publication at the time of Commerce's instant review

addressing the *Order* and the LWRPT industry more broadly, identifies LWRPT as a "long-

rolled, welded carbon steel product commonly used in applications not involving the conveyance

of liquids or gases and is not designed to be load bearing."[25]  The ITC treats the domestic like

product as coextensive with Commerce's scope, noting that "the characteristics and uses of

domestically produced {LWRPT} have not changed since the original investigations."[26]  The

ITC states that "the {ITC} has previously considered automotive equipment as a known end use

of {LWRPT}."[27]  The ITC states the common applications of LWRPT are such that may prefer

LWRPT with a thinner wall, listing as examples "ornamental fencing, window guards, door

security frames, metal furniture, cattle chutes, railings, furniture components, athletic equipment,

lawn and garden equipment, store display shelves, racks, and other similar items."[28]  The ITC

also states that the "physical properties and specifications often depend on the intended end use,"

providing the example that corrosion-resistant LWRPT is used in applications such as "air-

---

[24] *See* Petition at Volume I pages 2-7 (citing *Certain Pipe and Tube from Argentina, Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 409, 410, 532-534 and 536, (*Second Review*), USITC Pub. 3867 (July 2006) (*ITC 3867*) (provided to the instant record in Transmittal Memorandum at Attachment 2); and *Certain Light-Walled Rectangular Pipes and Tubes from Taiwan*, Inv. No. 731-TA-410 (Final), USITC Pub. 2169 (March 1989) (provided to the instant record in Transmittal Memorandum at Attachment 3).

[25] *See Light-Walled Rectangular Pipe and Tube from China, Korea, Mexico, and Turkey*, Inv. Nos. 701-TA-449 and 731-TA-1118-1121 (Second Review), USITC Pub. 5086 (July 2020) (*ITC's Second Review*) at 6 and I-17 (provided to the instant record in Transmittal Memorandum at Attachment 4).

[26] *Id*. at 6.

[27] *Id*. at footnote 24 (citing *Light-Walled Rectangular Pipe and Tube from Turkey*, Inv. No 731-TA-1121 (Final), USITC Pub. 4001 (May 2008) (*ITC's Turkey Final*) (provided to the instant record in Transmittal Memorandum at Attachment 5).  It should be noted that this comment was separate from the context at footnote 18 in which the ITC addressed Commerce's previous determination with respect to TEFLU's products.

[28] *Id*. at I-17.

conditioning, automotive parts, or certain outdoor signs."[29]  These descriptions are likewise

found in the Petition.[30]

The ITC also specifically noted that LWRPT may be modified to meet design criteria for

specific applications and that LWRPT from one source may not be readily interchangeable with

LWRPT from another source *after bending or other fabrication*, while still being considered

LWRPT.[31]  This finding indicates that even with minimal further processing that would not

otherwise bring the product outside of the scope, it still might have limited interchangeability

with unprocessed LWRPT.  There is no further discussion on further processing in the ITC report

for the initial investigation.  Additionally, the ITC identified both processed and unprocessed

LWRPT shipments from U.S. producers in the *ITC's Second Review*.[32]  Moreover, the same was

true for Mexican producers it surveyed, stating "{t}he responding firms reported that post mill

length activities *included cutting, bending, drilling, and perforation*."[33]  With respect to the

market in United States, the ITC notes that LWRPT end uses include shelving racks, fences,

gates, hand rails, trailers, metal building components, automotive equipment, furniture, and

sports equipment, with a confidential importer reporting "increased use of {LWRPT} in

automotive parts."[34]  Accordingly, based on these statements and the broadness of the products

and end uses mentioned, we find that the ITC report indicates that further processed LWRPT was

considered in its investigation of material injury or threat of material injury for Mexico, as well

as for other countries with LWRPT orders.

---

[29] *Id*.
[30] *See* Petition at Volume I page 5 (citing *ITC 3867*).
[31] *See ITC's Turkey Final* at I-12 ("According to U.S. producers and importers, factors that limit interchangeability *among {LWRPT} from different sources* include severe fabrication such as bending or swaging, steel quality failing to meet specification standards, longer lead times, and availability of vessels {emphasis added}.").
[32] *See ITC's Second Review* at III-10 and III-11 ("The share of processed shipments ranged between *** and *** percent of total U.S. shipments during 2017-19.  The 13 responding firms reported that post mill length activities included cutting to length, epoxy coated tube, and galvanized tube.").
[33] *Id*. at IV-21 (emphasis added).
[34] *Id*. at II-1, II-8, and II-9.

Second, other scope determinations and segments support the inclusion of further processed products within the scope, as considered by 19 CFR 351.225(k)(1)(i).  In *LWRPT from Mexico Investigation Prelim*, a respondent, Productos Laminados de Monterrey S.A. de C.V. (Prolamsa), identified direct sales to automotive and original equipment manufacturers (OEM) and furniture producers as a channel of distribution, reporting that customers in that channel typically order non-stock or made to order subject merchandise.[35]  In *LWRPT from Mexico 2015-2016*, Prolamsa requested that Commerce alter the physical characteristics of LWRPT, which are used to define the product control number, to account for the further processing of LWRPT as subject merchandise.  While Commerce denied the request because it found Prolamsa did not provide compelling evidence to warrant this change, we note that this is an example where another respondent reported further processed products as subject to the *Order*.[36]

We have also considered another scope ruling previously made under this *Order* in IBC Cages.[37]  In that scope ruling, Commerce noted that Maquilacero's intermediate bulk container cages do not meet the scope's plain language because they do not possess cross sections that are rectangular, *i.e.*, possessing four right angles, whether rounded or not, and "{t}he product description, schematics and photographs provided by Maquilacero demonstrate that two opposite

---

[35] *See Notice of Preliminary Determination of Sales at Less Than Fair Value:  Light-Walled Rectangular Pipe and Tube from Mexico*, 73 FR 5515, 5523 (January 30, 2008) (*LWRPT from Mexico Investigation Prelim*), unchanged in *Notice of Final Determination of Sales at Less Than Fair Value:  Light-Walled Rectangular Pipe and Tube from Mexico*, 73 FR 35649 (June 24, 2008).

[36] *See Light-Walled Rectangular Pipe and Tube from Mexico:  Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 FR 10664 (March 12, 2018), and accompanying IDM at Comment 1.

[37] As an administrative note, Maquilacero/TEFLU discussed the PCS Scope Ruling in its arguments and Commerce's arguments relating to it in *LWRPT from Mexico 2016-2017*.  *See* Maquilacero/TEFLU's Case Brief at 12-13 (citing *Light-Walled Rectangular Pipe and Tube from Mexico:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 16646 (April 22, 2019) (*LWRPT from Mexico 2016-2017*), and accompanying IDM at Comment 2).  However, the PCS Scope Ruling is not on this administrative record and this proceeding predated Commerce's subsequent changes to its rules allowing the citation of scope documents, including scope ruling memoranda.  This highlights some of the administrative difficulty of addressing arguments like Maquilacero/TEFLU's scope concerns when raised at the briefing stage of an administrative review when the record for the proceeding is functionally closed and parties cannot amend their arguments and documentation through supplemental questionnaires.  For clarity and to more effectively address parties' comments, we supplied the IBC Cages ruling to the record in a memo released concurrently with the Draft Remand.  *See* Memorandum, "Final Scope Ruling – Certain Tubing for Intermediate Bulk Container Cages," dated February 9, 2021 (IBC Cages) (provided to the instant record in Transmittal Memorandum at Attachment 6).

sides of both tube models at issue bend inwards along the length of the tubes at a {proprietary

information removed} and the four corners are not right angles.[38]  Because we have previously

found inquiry products to be outside of the scope based on the exact same scope language and

criteria, this precedent runs contrary to Maquilacero/TEFLU's arguments that our finding here

means that *any* product could be covered by the scope.

Likewise, in the order covering heavy walled rectangular pipe and tube (HWRPT) from

Mexico, which contains a nearly identical scope except for the wall thickness of the pipe and

tube, Maquilacero made identical arguments that further processing placed its products outside

of the scope.[39]  Specifically, Maquilacero argued that its further processed products do not have a

rectangular cross section across the entire length of the pipe.[40]  However, Commerce found that

the scope does not require the existence of a rectangular cross section across the entire length and

does not otherwise contain such a limitation.[41]  Further, Commerce found that although the

product was drilled or perforated, these changes did not remove these products from the scope

and that Maquilacero presented no new information that would alter its previous determinations

in the investigation.[42]  Commerce's findings in the HWRPT review were also made in the

investigation stage for that product.[43]

For the reasons discussed above and pursuant to 19 CFR 351.225(k)(1), we find that

TEFLU's further processed LWRPT products, described generally as automotive parts, are

subject to the scope of the *Order*.  Because we are no longer relying purely on silence in

---

[38] *See* IBC Cages at 16.
[39] *See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Mexico:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 24473 (May 28, 2019) (*HWRPT from Mexico 2016-2017*), and accompanying IDM at Comment 3.
[40] *Id*. at 15-17.
[41] *Id*.
[42] *Id*. at 16 ("Therefore, the fact that the {HWRPT} at issue is drilled or perforated (and thus not have a seamless rectangular cross section across the entire length of the pipe) does not remove these products from the scope.").
[43] *See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Mexico:  Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 81 FR 10587 (March 1, 2016) (*HWRPT from Mexico Investigation Prelim*), and accompanying PDM at 4-6, unchanged in *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Mexico:  Final Determination of Sales at Less Than Fair Value*, 81 FR 47352 (July 21, 2016).

determining whether these further processed products are covered by the scope's language, we find this comports with the standard found in *Duferco*, *i.e.*, that based on these sources, it is reasonable for Commerce to interpret the scope's language to include these products.[44]  Because we find the sources identified in 19 CFR 351.225(k)(1) to be dispositive, we find that further analysis and determination utilizing the additional factors enumerated under 19 CFR 351.225(k)(2) to be unnecessary.

2.  Whether Maquilacero/TEFLU's Further-Processed Products Fit the Language Set Forth in the Scope?

Because we find Maquilacero/TEFLU's further processed products to be within the scope pursuant to the 19 CFR 351.225(k)(1) sources, we now address the physical characteristics of the further processed products and the scope language.  Maquilacero/TEFLU state that TEFLU's products "do not have a uniform cross section because they have been bent, pressed or holes drilled through the input LWRPT."[45]  The scope's plain language establishes the shape of the cross sections covered, "rectangular (including square)," but provides no further delineations. There are no provisions in the language of the scope stating that LWRPT must have a "uniform cross-section" to be covered, similar to the point made concerning the HWRPT review noted above.  In *Stein Industries*, the cross section discussion involved tubing with welded attachments, which rendered the cross sections of the products in question to no longer be rectangular (or square).[46]  Maquilacero/TEFLU highlight that *Stein Industries* addressed processed LWRPT that was perforated,[47] but we note this characteristic was not central to the cross section discussion or considered in Commerce's *Stein Industries Final Redetermination*.[48]  In *Stein Industries*, the

---

[44] *See Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002) (*Duferco*) ("Scope orders may be interpreted as including subject merchandise only if they contain language the specifically includes the subject merchandise or may be reasonably interpreted to include it."); *see also Remand Opinion and Order* at 18.
[45] *See* Maquilacero/TEFLU Case Brief. at 8.
[46] *See Stein Industries Inc. v. United States*, 365 F.3d 1364 (CIT 2019) (*Stein Industries*).
[47] *See* Maquilacero/TEFLU's Case Brief at 8 (citing *Stein Industries,* 365 F.3d at 1371).
[48] *See Final Results of Redetermination Pursuant to Court Remand*, *Stein Industries v. United States*, Court No. 18-00150, Slip Op. 19-29 (CIT March 5, 2019), dated May 30, 2019 (*Stein Industries Final Redetermination*) (provided to the record in Transmittal Memorandum at Attachment 7).

plaintiff contested two of the four further processed LWRPT products Commerce determined to be within the scope of that order; as an example, one of the uncontested determinations was with respect to a mounting bar with numerous holes drilled into it.[49]  Furthermore, the Court took issue with Commerce's assertion that the scope's language covered products that exhibited a rectangular cross section "in most parts" without interpreting the sources identified in 19 CFR 351.225 given the lack of language addressing uniformity in the scope itself.[50]  In *Stein Industries Final Redetermination*, Commerce found the two products to be out of scope for not exhibiting a rectangular cross section since two other parts were welded to the bar in question.[51]  For TEFLU's products, Maquilacero/TEFLU argue that the bending, pressing, or perforation of LWRPT alters the cross section so that it is either no longer uniform or no longer uniformly rectangular.[52]  As support for this claim, Maquilacero/TEFLU state that the drawings and illustrations in its Exhibit A-6 show that TEFLU's parts do not have a uniform cross section.[53]  However, the first four examples in this exhibit are of photos of TEFLU's product from a viewpoint perpendicular to the length, with the cross section not visible.  The second of these examples does not clearly indicate the product has been processed at all, at least by perforation or bending.  The fifth example in this exhibit appears to be a diagram of a length of pipe or tube showing what superficially appears to be a uniform rectangular cross section, at least on the end of the product that is visible.[54]  Furthermore, in an exhibit where Maquilacero/TEFLU do provide drawings and illustrations of products to include a cross section diagram, the cross

---

[49] *See Stein Industries*, 365 F.3d at 1368.
[50] *Id*., 365 F.3d at 1371, footnote 8.
[51] *See Stein Industries Final Redetermination* at 6.
[52] *See* Maquilacero/TEFLU's Case Brief at 8 and 9.
[53] *Id*. at 8 (citing Maquilacero/TEFLU's Letter, "Maquilacero S.A. de C.V.'s Section A Questionnaire Response," dated December 1, 2021 (Maquilacero/TEFLU AQR), at Exhibit A-6).
[54] *See* Maquilacero/TEFLU AQR at Exhibit A-6.

section appears to be rectangular.[55]  Thus, we continue to find that TEFLU's further processed products have a rectangular cross section, even if they are bent, drilled, or pressed.

3.  Whether Maquilacero/TEFLU's Further Processing Brings Its Products Outside The Scope's Coverage?

We have found that Maquilacero/TEFLU's products do fall under the language of the scope.  Thus, we now address whether the further processing precludes inclusion under the scope.  Pursuant to the Court's order to analyze the record evidence provided by Maquilacero/TEFLU concerning their further processed products and whether the further processing precludes inclusion, we note that Maquilacero/TEFLU's request concerns TEFLU's products generally, as they note that the physical characteristics that Commerce uses to define the product control number "do not account for the additional physical characteristics of the custom designed, automotive parts made from processing LWRPT that are sold to OEM customers by TEFLU."[56]  Maquilacero/TEFLU's argument focuses on the further processing they claim transforms the products from LWRPT into non-subject downstream products.  However, based on the record evidence submitted by Maquilacero/TEFLU concerning their products, we are unable to determine a threshold based on the degree of further processing would be enough to bring these products outside of the scope.  For instance, the record does not indicate how LWRPT with a single hole drilled into it and labelled as an automotive part based on the prescribed end use intended by that processing, or a product with a single bend, should be compared to a product undergoing many such customizations and processing steps.  Nor do Maquilacero/TEFLU provide evidence to analyze all further processed products to make such a determination, as a substantial portion of Maquilacero/TEFLU's schematics fail to provide cross

---

[55] *See* Maquilacero/TEFLU's Letter, "Maquilacero S.A. de C.V.'s Post-Preliminary Supplemental Questionnaire Response," dated October 5, 2022 (Maquilacero/TEFLU PSQR), at Exhibit 2S-7.
[56] *See* Maquilacero/TEFLU's Case Brief at 5.

sections, show only one angle or perspective of the product, and include plans for downstream products they do not produce that incorporate Maquilacero/TEFLU's products.

Particularly, Maquilacero/TEFLU identify operations including "saw-cutting, laser cutting-to-length, drilling, perforation and/or bending" and list one to several such operations next to pictures of products in its brochure, which based on context appears to include products not made from LWRPT as compared to a sample of products made from LWRPT provided in a different exhibit.[57]  For example, the "towel bar" as pictured in TEFLU's brochure appears to have an irregular cross section that may vary from flat to circular with a piece either screwed or welded on the end.[58]  The "recliner" part appears to have a circular or rounded triangular cross section with three spokes in the shape and may have a circular cross section further in its length.[59]  Additionally, the "hydraulic lines" appear to be circular in cross section, and the Petition noted that subject LWRPT "are not used for the conveyance of liquid or gas.[60] Maquilacero/TEFLU cite this TEFLU brochure as examples of its automotive parts alongside those contained in exhibits it refences as those processed from LWRPT.[61]

Further, Maquilacero/TEFLU argue that the example TEFLU products as shown in its Exhibit 2S-7 are customized for a single end use and specific product.[62]  In examining this evidence generally,[63] the first sets of examples demonstrate how TEFLU's processed LWRPT is a component intended for further processing, assembly, or manufacture into a finished product as contemplated by the ITC's list of end uses.  However, Maquilacero/TEFLU do not state how this further processing or documentation indicate that TEFLU's products are not subject

---

[57] See Maquilacero/TEFLU AQR at Exhibits A-6 and A-32, comparing the TEFLU brochure in Exhibit A-32 with the sample products identified as products produced by TEFLU from LWRPT in Exhibit A-6.
[58] Id. at Exhibit A-32.
[59] Id.
[60] Id.
[61] See, e.g., Maquilacero/TEFLU's Case Brief at 13 footnote 39.
[62] See Maquilacero/TEFLU PSQR at 6 and Exhibit 2S-7.
[63] Maquilacero/TEFLU waived the confidentiality of TEFLU's product and HTSUS codes under which such products were characterized, but we take a cautious approach here when addressing the existing administrative record.  See Remand Opinion and Order at 26 footnote 5.

merchandise.[64]  Thus, we examine them using the distinguishing factors identified in

Maquilacero/TEFLU's arguments.[65]  Pages 1 through 36 each contain a diagram of a finished

product and an image of a piece of processed LWRPT used in its manufacture or assembly.[66]

Each of these 36 pages identifies the products as "tubes."[67]  The processed LWRPT varies in the

number of holes drilled, or sections cut from the wall of the tube.  Pages 37 through 45 include

diagrams of products identified as "tubing" with no depiction or description of the finished

product in which these parts are used.[68]  Additionally, the diagrams include a cross-sectional

view of the product which appears rectangular or square, and it is not apparent how these

products are processed to differentiate them from Maquilacero's products.  The exhibit continues

in this manner with different combinations of images or diagrams, superficially indicating the

drilling of holes, bending, or cutting by examining the diagram, but Maquilacero/TEFLU do not

provide explanations or details as to how each product or group of products is processed.[69]  In

addition, the last page of this exhibit contains a product listed as a variety of "tubing," a picture

of a downstream product in which TEFLU's LWRPT is presumably used, followed by another

subsequent downstream product.  The tubing in question appears to be a rectangular tube with no

readily identifiable processing, dimensions, or explanation as to how it differs from LWRPT

produced by Maquilacero.[70]  These same contentions apply to Exhibit A-6, where

Maquilacero/TEFLU provided examples of TEFLU products in a similar format.[71]

At the administrative stage, Maquilacero/TEFLU argued that TEFLU's products differ

from subject merchandise due to their customization and the expectations of OEM customers.[72]

---

[64] *See* Maquilacero/TEFLU PSQR at 6.
[65] *See* Maquilacero/TEFLU's Case Brief at 6-8.
[66] *See* Maquilacero/TEFLU PSQR at Exhibit 2S-7.
[67] *Id*.
[68] *Id*.
[69] *Id*.
[70] *Id*.
[71] *See* Maquilacero/TEFLU AQR at Exhibit A-6.
[72] *See* Maquilacero/TEFLU's Case Brief at 6-7.

However, made to order LWRPT sold to OEM customers was a channel of distribution identified in Commerce's original investigation when analyzing further processed products produced by Prolamsa, thus showing that TEFLU's products are part of the broader LWRPT industry.[73] Additionally, the Petition states that it "covers any product meeting the physical characteristics described herein regardless of whether it is produced to an ASTM, proprietary or other industry specification."[74]

Additionally, while we maintain the scope's plain language is clear that the HTSUS subheadings are not dispositive as to whether products are covered by the scope of *Order*, the description of the HTSUS subheadings under which TEFLU's products were imported are suggestive of pipes, tubes, and intermediate goods intended for certain end uses as specifically discussed in the ITC's analysis of the industry in question. To wit, one is described as "{p}re-formed pipes for 3D printing machine"; another "Mechanical Tubes for Utility Vehicles"; and another three have the description "{p}re-formed pipes for loaders, level adaptor for loaders."[75] The remainder indicate end use in a finished product: "Joint for vehicles;" "Parts for automobile seats;" and "Forklift arms."[76]

The ITC references end use finished products that functionally represent the consumption of LWRPT, removing them from the scope, *e.g.*, "{t}he category of {LWRPT} encompasses a wide variety of different pipe products whose specifications depend on end use, such as automotive seat frames, bed frames, car ports, fitness equipment, gas grills, mechanical pasts, ornamental fencing, playground equipment, scaffolding, school furniture, racks, railing, tools, and trailers." These finished products would entail the combination of LWRPT with other LWRPT or other components to create a structure that is no longer a distinct length of pipe or

---

[73] *See LWRPT from Mexico Investigation Prelim*, 73 FR at 5523.
[74] *See* Petition at Volume I at page 5.
[75] *See* Maquilacero/TEFLU's Case Brief at 10-11.
[76] *Id*.

tube and would accordingly fall outside of the scope's language.  This analysis comports with the ruling in *Stein Industries*, where the length of LWRPT was processed by the addition of welded parts that altered the cross section of the product so that it was no longer rectangular as required by the scope's language and thus was out of scope, and also where Commerce's determination that a perforated length of LWRPT as in-scope was not contested.[77]  These examples differ from TEFLU's products, which are discrete pieces of LWRPT processed through bending, perforation, *etc.*, but not manufactured into a finished product like the products at issue in *Stein Industries* that were found to be outside of the scope.[78]

In the *Final Results*, Commerce addressed Maquilacero/TEFLU's request broadly with respect to the plain language of the scope due to nature of the request to consider TEFLU's auto parts at the briefing stage where further information could not be solicited.[79] Maquilacero/TEFLU provided a list of product codes with general descriptions in its initial response for TEFLU, and this list was not referenced in Maquilacero/TEFLU's arguments with respect to the scope.[80]  Additionally, the record does not indicate whether the specific examples of TEFLU's further processed products cited in Maquilacero/TEFLU's arguments are representative of the products and processing in this product list and to what extent.  Moreover, the record does not contain information as to how Maquilacero/TEFLU's arguments with respect to cross section and other physical characteristics can be applied individually, universally, or in part to a specific product or groupings of its products.  We thus cannot consider TEFLU's products more granularly to determine to what degree of further processing would bring these products outside of the scope, and as discussed above, the limited record evidence submitted by

---

[77] *See*, *generally*, *Stein Industries*.
[78] *See Stein Industries Final Redetermination* at 6.
[79] *See Final Results* IDM at Comment 2.
[80] *See* Maquilacero/TEFLU's Letter, "Maquilacero S.A. de C.V.'s Downstream Sales Response for Tecnicas De Fluidos S.A. de C.V.," dated December 28, 2021 (TEFLU BQR), at Exhibit BA-4; *see also* Maquilacero/TEFLU's Case Brief at 6-13.

Maquilacero/TEFLU indicates that the record examples of the further processed LWRPT are indeed covered by the scope of the *Order*.

Lastly, we are concerned that a finding that further processed products are outside the scope of the *Order* despite falling under the scope's language would invite the potential for circumvention.  This was a noted concern in *Saha Thai*, which also covered an order on pipe.[81] Specifically, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) stated that "{t}here is no basis to exclude products covered by the plain text of the Order, notwithstanding that the same product has been given a different name or met additional specifications."[82] *Saha Thai* also cites *Mid Continent*, where the court said that "{m}erchandise facially covered by an order may not be excluded from the scope of the order unless the order can reasonably be interpreted so as to exclude it."[83] *Saha Thai* concludes that exclusion of this kind would "take the teeth out of antidumping duty orders, depriving the domestic industry of the very relief from harm posed by unfairly traded imports{.}"[84]  The Federal Circuit in *Duferco* also relies on exclusory language incorporated into the Appendix of the scope in question, specifically that "{o}nly those products whose nonrectangular cross-sections are achieved subsequent to the rolling process are included within the scope of the investigations."[85]  The Federal Circuit in *Duferco* then states that "{t}his language cannot reasonably be interpreted to include floor plate with patterns in relief achieved during the rolling process because the patterns in relief render the cross section nonrectangular."[86]  The Federal Circuit's emphasis on exclusion versus inclusion, in light of the difficulties in establishing a threshold for further processing on

---

[81] *See Saha Thai Steel Pipe Pub. Co. v. United States*, 101 F.4th 1310 (Fed. Cir. 2024) (*Saha Thai*); *see also Saha Thai*, 101 F.4th at 1327-28, where the Federal Circuit also held, that the tariff classifications are not controlling: "The listed tariff codes are thus what the Order instructs them to be, 'for convenience and purposes" of the {Customs and Border Protection}.  They cannot be reasonably read to exclude a subset of standard pipes, contradicting the 'written description' that the Order instructs to be 'dispositive.'"
[82] *Id.*, 101 F.4th at 1331.
[83] *See Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1301 (Fed. Cir. 2013) (*Mid Continent*).
[84] *See Saha Thai*, 101 F.4th at 1331.
[85] *See Duferco*, 296 F.3d at 1095.
[86] *Id.*

Maquilacero/TEFLU's products that fit the scope's language, as well as a lack of the kind of threshold language found in *Duferco*, further leads us to conclude that Maquilacero/TEFLU's products remain within the scope of the LWRPT from Mexico *Order*.

Accordingly, in considering the evidence provided to the provided by Maquilacero/TEFLU to the record concerning each of the further processed products, specifically photographs and schematics of products that all contain rectangular and square cross sections, and the concerns noted above as instructed by the Court, we find that TEFLU's further processed LWRPT remains within the scope of the *Order*.

With respect to the collapsing status of Maquilacero/TEFLU, Commerce asked Maquilacero/TEFLU to present any changes in fact or circumstances related to collapsing and affiliation since its determination in *LWRPT from Mexico 2018-2019*. It did not do so directly by indicating changes in ownership, management, operations, *etc*., but emphasized differences between Maquilacero and TEFLU and closed with "{i}n this case, Maquilacero and TEFLU should not be collapsed because TEFLU does not produce LWRPT and cannot produce LWRPT without, essentially, building a pipe and tube mill."[87] The Court remanded for Commerce to reconsider whether the products produced by Maquilacero and TEFLU are similar or identical under 19 CFR 351.401(f)(1), and in turn, our collapsing determination. Because we find that TEFLU's products are still LWRPT subject to the *Order*, we also find that the merchandise it exports to the United States is similar to the merchandise produced by Maquilacero and would not require substantial retooling as required under 19 CFR 351.401(f)(1).

---

[87] *See* Maquilacero/TEFLU's Letter, "Maquilacero S.A. de C.V.'s First Supplemental Sections A&D Questionnaire Response," dated July 26, 2022 (Maquilacero/TEFLU SQR), at 13-18.

## V.    INTERESTED PARTY COMMENTS

We released the Draft Remand to interested parties on October 24, 2024.[88]  We received comments from Maquilacero/TEFLU[89] and Nucor.[90]  We summarize and address these arguments, in turn.

**Comment 1:   Whether Commerce's Review of 19 CFR 351.225(k)(1) Sources Failed to Demonstrate TEFLU's Products Are within the Scope of the *Order***

*Maquilacero/TEFLU's Comments*

The following is a verbatim summary of the comments submitted by Maquilacero/TEFLU (internal citations omitted).  For further details, *see* Maquilacero/TEFLU's Comments at 5-12.

> Plaintiffs respectfully disagree with Commerce's continued determination:  (1) to include TEFLU's customized parts as in-scope merchandise under the antidumping duty order on *Light-Walled Rectangular Pipe and Tube from Mexico* and (2) to collapse Maquilacero and TEFLU into a single, individually-examined entity. Commerce should reconsider its determination and issue final remand results that comply with the *Court's Remand Opinion* and order.

> First, Commerce fails to "reconsider whether TEFLU's imported automative and other parts are downstream products that no longer meet the description of the scope . . . ."  TEFLU's products are not covered by the scope of the *Order* unless "the scope language specifically includes the merchandise or may be reasonably interpreted to include it."  Previously, Commerce contended that "{I}t is not reasonable to conclude that simply because a particular type of {light-walled rectangular pipe and tube} is not specially mentioned in the scope, that product is not covered."  The Court disagreed, noting "{t}he scope language does not suggest that downstream products or automative parts should be included in-scope."  Rather than find that TEFLU's auto parts are not covered by the scope of the *Order*, Commerce argues that the *Order* is ambiguous with respect to TEFLU's products and proceeds to review again the scope language relying on the materials specified in its regulations at 19 {CFR} 351.225(k)(1).  Commerce's review of the (k)(1) sources does not show that further manufactured LWRPT products are encompassed by the scope language; to the contrary they suggest that TEFLU's products are not covered by the scope.

---

[88] *See* Draft Remand.
[89] *See* Maquilacero/TEFLU's Letter, "Maquilacero S.A de C.V. and Tecnicas de Fluidos S.A. de C.V.'s Comments on the Draft Results of Redetermination in Consol. Court No. 23-0091 (Slip Op. 24-107)," dated December 2, 2024 (Maquilacero/TEFLU's Comments).
[90] *See* Nucor's Letter, "Nucor Tubular's Comments on Draft Remand Redetermination," dated December 2, 2024 (Nucor's Comments).

*Nucor's Comments*

Nucor did not provide the requested executive summary.  Nucor's argument may be found at pages 1-5 of Nucor's Comments.

**Commerce's Position:**  We disagree with Maquilacero/TEFLU and determine that the sources identified in 19 CFR 351.225(k)(1) demonstrate that TEFLU's products are within the scope of the *Order*.

     While Maquilacero/TEFLU do not contest Commerce's finding that the scope language is ambiguous, Maquilacero/TEFLU contest Commerce's subsequent analysis by arguing that:  (1) the ITC report in the initial investigation contradicts Commerce's findings; (2) Commerce inappropriately relied on ITC reports outside of the initial investigation; (3) Commerce conflates end-use with coverage under the *Order*; and (4) Commerce's reliance on other scope decisions is deficient.[91]  We address each argument in turn.

     With respect to the first argument, Maquilacero/TEFLU argue that Commerce improperly interpreted *ITC's Turkey Final*, stating that Commerce's description of the ITC's interchangeability findings relied on reporting from U.S. producers and importers.[92]  First, Maquilacero/TEFLU do not explain why information gathered from U.S. producers and importers should be discounted when determining the industry and interchangeability examined by the ITC, and we also note that Maquilacero/TEFLU neither contradict this information nor do they cite to conflicting information or reporting from the ITC's determinations.[93]  Also, it is reasonable that the ITC's determinations place more focus on LWRPT that has not been further processed, but that focus does not indicate Commerce should ignore when further processing and customized LWRPT is addressed by the ITC as Maquilacero/TEFLU imply.

---

[91] *See* Maquilacero/TEFLU's Comments at 5-12.
[92] *Id*. 6 (citing Draft Remand at 7-8).
[93] *Id*. at 6.

Maquilacero/TEFLU also cite the length of the products for which the ITC requested pricing data as indicative of whether the ITC considered further processed products in its investigation of the LWRPT industry.[94]  Specifically, Maquilacero/TEFLU note that the five products used for pricing data possess lengths of 20 or 24 feet and TEFLU's products examined during the POR were not 20 or 24 feet in length.[95]  However, Maquilacero/TEFLU do not explain why the length is material to the instant analysis of further processing beyond the implication that TEFLU's exact products or products possessing identical lengths examined during the POR were not used in the ITC's pricing analysis.  The sources identified in 19 CFR 351.225(k)(i) and parties' discussion of TEFLU's products do not consider the length of the product as relevant to scope coverage.[96]  While the specifics are proprietary information, Maquilacero/TEFLU reported many nominal lengths for both Maquilacero's products and TEFLU's products, and, by inference, each company sold LWRPT that is not 20 or 24 feet in length.[97]  Maquilacero/TEFLU do not explain how this is "clear evidence" that further processed products were not part of the ITC's material injury analysis, let alone an industry investigated by the ITC.  The ITC does not need to investigate every possible variant of a product within the same domestic industry, and we have determined that processed LWRPT was considered as part of the industry investigated by the ITC for the *Order*.[98]

---

[94] *Id*. at 6-7 (citing *ITC's Turkey Final* at 16 footnote 97).

[95] *Id*. at 7 (citing *ITC's Turkey Final* at 16 footnote 97; and Maquilacero/TEFLU PSQR at 6 and Exhibits 2S-6.1 through 2S-6.7).  While we do contest Maquilacero/TEFLU's statement that TEFLU's products were not produced in 20- or 24-foot lengths, their comparison to the record here is to seven example products with accompanying sales and design documentation.  In the Draft Remand, Commerce expressed concerns regarding the specificity of Maquilacero/TEFLU's request and the information supplied to the record to support their request, *see* Draft Remand at 17.  Rather than clarify the record or dispel any confusion or misunderstanding on Commerce's part, which we address in full below, Maquilacero/TEFLU continue to cite to this sampling of its products even for this novel argument.

[96] *See*, *generally*, Maquilacero/TEFLU's Case Brief.  *See also* Nucor's Rebuttal Brief; *Remand Opinion and Order*; and Draft Remand.

[97] *See*, *e.g.*, Maquilacero/TEFLU SQR at Exhibits S-6, S-49, and S-50.

[98] *See A.L. Patterson, Inc. v. United States*, 585 Fed. Appx. 785 (Fed. Cir. 2014) ("Of course, the {ITC} does not need to investigate every possible variant of a product—but that assumes the variants are all being sold within the same domestic industry which is under investigation.").

Maquilacero/TEFLU note that the ITC's discussion of the tariff treatment of LWRPT only enumerates subheadings 7306.61.50, 736.69.50, and 7306.61.7060, while TEFLU's products were classified under other subheadings.[99]  They argue that this fact demonstrates that Commerce's conclusions concerning the ITC's investigation are not based on substantial evidence.  However, our conclusions were not based on the subheadings used by the ITC.  The ITC states LWRPT "is classifiable" under 7306.61.50; "was misclassified" under 7306.69.50; and "may be classified" under 7306.61.7060.[100]  This language does not indicate that LWRPT may be exclusively classified under these subheadings, and the ITC concludes that "{t}he HTS subheadings are provided *for convenience and Customs purposes*, but Commerce's scope of these investigations is dispositive {emphasis added}."[101]

With respect to Maquilacero/TEFLU's second argument, there is no such criteria in 19 CFR 351.225(k)(1)(i) or such set by the Court in the *Remand Opinion and Order* that Commerce must prioritize the ITC's investigation report over all other reports.[102]  Although Maquilacero/TEFLU quote the regulation for support, the language itself states that Commerce "may {take} into account{…} {d}eterminations of the {ITC} pertaining to the order at issue, *including* reports issued pursuant to the{} investigation."  Contrary to Maquilacero/TEFLU's argument, 19 CFR 351.225(k)(1)(i) incorporates ITC determinations as a primary interpretive source, but does not stipulate how Commerce must prioritize such sources in its analysis.  The *ITC's Second Review* is a determination of the ITC pertaining to the *Order*.[103]  Also, 19 CFR 351.225(k)(1)(i)(D) specifies that such determinations include reports pursuant to the initial investigation, but does not otherwise include or exclude any determinations of the ITC pertaining

[99] *See* Maquilacero/TEFLU's Comments at 7 (citing *ITC's Turkey Final* at I-9).
[100] *See ITC's Turkey Final* at I-9.
[101] *Id*.
[102] *Id*. at 6.
[103] *See ITC's Second Review* at 1 (Under the section "DETERMINATION," "the {ITC} determines, pursuant to {the Act}, that revocation of the countervailing duty order on {LWRPT} from China and antidumping duty orders on {LWRPT} from China, Korea, Mexico, and Turkey would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.").

to the order at issue.  Maquilacero/TEFLU do not argue that *ITC's Second Review* conflicts with or does not repeat the descriptions identified in *ITC's Turkey Final*.[104]  Commerce considers all record information and, based on comments from parties, takes into account evidence that may be most relevant to its analysis at hand.  In this instance, Commerce found that consideration of the most recent of the ITC's determinations concerning the *Order* allows for the most recent reporting and analysis concerning the LWRPT industry, including responses from U.S. importers and Mexican producers of LWRPT, to inform our analysis and findings.  Accordingly, we find Maquilacero/TEFLU's argument on this point without merit.

With respect to the third argument, Maquilacero/TEFLU misapprehend Commerce's arguments with respect to the common end-use applications of LWRPT identified by the ITC.  Maquilacero/TEFLU contend that TEFLU's products should be considered out of scope because they are consumed through processing into automotive parts.[105]  However, we find that the processing reported for TEFLU's products is evidently less transformative than the downstream applications of LWRPT identified by the ITC.  Maquilacero/TEFLU focus on the example of a "railing" as an end-use, and imply that Commerce singled out this example of ITC's end uses and came to an inappropriate conclusion, stating that "Commerce's distinction here between a railing (as not covered by the scope) and a TEFLU auto part with several perforations/cuts or bending— (as covered by the scope) is entirely arbitrary."[106]  Commerce, however, made no direct comparison to a railing or railings and instead listed end use applications reported by the ITC.[107]  For instance, the *ITC's Turkey Final* notes that "{LWRPT} is used in a wide variety of applications.  Uses cited by questionnaire respondents included automotive applications; doors; commercial greenhouses; fencing and railings; furniture and athletic equipment; horse trailers;

---

[104] *See* Maquilacero/TEFLU's Comments at 7-8.
[105] *Id*. at 8-9 (citing Draft Remand at 7 and 16).
[106] *Id*. at 9.
[107] *See* Draft Remand at 7 and 16.

metal building components; ornamental iron gates, retail garden centers; RV trailers; shelving

systems; scaffolding and racks; uprights for shelving gondola systems; utility cargo trailers; and

window guards and framing."[108]  Thus, Maquilacero/TEFLU's comparison of TEFLU's products

to only railings does not reflect the many applications of LWRPT identified by the ITC.

TEFLU's further processed LWRPT is readily distinguishable from the applications of

LWPRT identified by the ITC, *i.e.*, the downstream automotive parts which Maquilacero/TEFLU

conflate with TEFLU's products.  The ITC surveyed the share of costs attributed to LWRPT in

the production of the end-use products that consume LWRPT.[109]  These costs vary significantly

between products, given the diverse applications of LWRPT, and the ITC does not report what

portion of inputs are LWRPT or the non-input costs involved.  However, the data indicate that

the end use downstream products are complex products which lose their rectangular cross section

after a discreet piece or pieces of LWRPT are combined together or with other inputs, *e.g.*, a

trailer, carport, or door are structures which are not comprised of a discreet piece of LWRPT, no

matter how much processing could have taken place.[110]  The ITC lists certain end uses with the

associated percentage of costs attributed to LWRPT, and those end uses that superficially could

be described as automotive are:  chassis frames, 20-30 percent; RV trailer frames/chassis, 35

percent; trailers, 40 percent; truck body, 20 percent; and utility cargo trailers, eight percent.[111]  In

*ITC 3867*, an ITC determination cited in the Petition and referenced in *ITC's Turkey Final* as a

previous determination regarding the LWRPT industry, the ITC reported that U.S. producers

estimated LWRPT to only account for two to five percent of the final product cost in automotive

uses.[112]  *ITC's Second Review* reported that "{LWRPT}'s share of the cost of the end-use product

varies based on the end use.  {LWRPT} makes up a small share of the cost of a building, while

---

[108] *See ITC's Turkey Final* at II-1.
[109] *Id*. at II-6 and II-7.
[110] *Id*.
[111] *Id*.
[112] *See ITC 3867* at LWR-II-4.

making up a larger share of a *shelving unit* {emphasis added}."[113]  The ITC's example of a end-use downstream product where LWRPT comprises a comparatively large portion of the cost is a shelving unit, where a discrete piece or pieces of LWRPT have been combined, most likely with other inputs, to create a product that would necessarily lose its rectangular cross section.[114]

Maquilacero/TEFLU argue that "TEFLU's products incorporate at least the same or a higher level of further processing than the examples provided."[115]  We disagree—while Commerce did not cite the ITC's language comparing a building to a shelving unit in the Draft Remand, the list of end uses includes products that are reasonably considered to have much higher degrees of further processing, including trailers, furniture, and gas grills.[116]  We also note that to make this comparison, Maquilacero/TEFLU cite to the decklid hinge gooseneck highlighted among TEFLU's example requested products.[117]  This is perhaps the most complex processing example among TEFLU's products, and, as discussed in the Draft Remand, we note that some of the example products provided are otherwise indistinguishable from unprocessed LWRPT besides potentially being cut to length.[118]  It strains credulity to argue that a piece of LWRPT that is bent, perforated, and/or cut to length are the automotive applications considered by the ITC, such as a truck body or trailer.[119]

Additionally, Maquilacero/TEFLU contend that the (k)(1) sources are "distinguishable in that they do not address a situation where the further processing involves customized auto parts for a customer's specific use."[120]  However, Commerce cannot ignore relevant (k)(1) sources simply because TEFLU's products were not specifically considered in them.  The *ITC's Turkey Final* specifically reported that "factors that limit interchangeability *among LWRPT from*

---

[113] *See ITC's Second Review* at II-9.
[114] *See* Maquilacero/TEFLU's Comments at 9.
[115] *Id.*
[116] *See* Draft Remand at 8 and 16 (citing *ITC's Second Review* at II-1, II-8, and II-9; and *ITC 3867* at LWR-III-2).
[117] *See* Maquilacero/TEFLU's Comments at 9 footnote 26.
[118] *See* Draft Remand at 15.
[119] *See* Maquilacero/TEFLU AQR at Exhibit A-6; *see also ITC's Turkey Final* at II-6 and II-7).
[120] *See* Maquilacero/TEFLU's Comments at 10.

*different sources* include severe fabrication such as bending or swaging {…}{emphasis added}."[121]  Maquilacero/TEFLU do not explain why bending, one of the processes applied to TEFLU's products, when discussed by the ITC does not apply to LWRPT processed to create "customized auto parts."[122]  Additionally, the ITC does not apply any qualification or stipulation to its reporting on interchangeability that "{*d*}*esign criteria for specific applications* and price competitiveness, key considerations for the use of {LWRPT}, reportedly limit interchangeability with other products {emphasis added}."[123]  Similarly, concerning *ITC's Second Review*, Maquilacero/TEFLU do not explain why either the *processed* and unprocessed shipments of LWRPT identified by the ITC or Mexican producers reporting "post mill length activities included cutting, bending, drilling, and perforation" should somehow exclude processing to create "customized auto parts."[124]

Maquilacero/TEFLU allude to the appropriateness of Commerce's reference to further processed LWRPT considered in *LWRPT from Mexico Investigation Prelim*, citing language in 19 CFR 351.225(k)(i)(C) as part of Commerce's argument.[125]  Commerce made no such reference and, to clarify, Prolamsa's made to order subject merchandise sold to automotive OEM and furniture producers constitute descriptions of the merchandise in the initial investigation pertaining to the *Order*, a source Commerce may consider pursuant to 19 CFR 351.225 (k)(i)(B).[126]  Furthermore, we agree with Maquilacero/TEFLU's statement that they are not precluded from arguing about the coverage of TEFLU's products under the scope after another respondent did not contest the coverage of further processed LWRPT during the original

---

[121] *See ITC's Turkey Final* at I-12.
[122] *See* Maquilacero/TEFLU's Comments at 9
[123] *See ITC's Turkey Final* at I-12.
[124] *See* Maquilacero/TEFLU's Comments at 9; *see also ITC's Second Review* at IV-21.
[125] *See* Maquilacero/TEFLU's Comments at 10 (citing Draft Remand at 8-9).
[126] *See* Draft Remand at 8-9; *see also LWRPT from Mexico Investigation Prelim*, 73 FR at 5523.

investigation.[127]  We continue to rely on this description as one of many (k)(1) sources for these final results of redetermination.

With respect to the fourth argument, we find that our reliance on other scope decisions is appropriate.  Maquilacero/TEFLU contend that the *IBC Cages* scope ruling is inapposite because Commerce made its determination based on the scope's plain language that the requested products did not have a rectangular cross section as a result of a process at the end of Maquilacero's production process.[128]  However, we find this scope ruling relevant because it involves the same scope language as well as processing that resulted in a finding that Maquilacero's products were not covered by the scope of the *Order*.  Maquilacero/TEFLU argue specifically that TEFLU's products can be distinguished from LWRPT because they do not possess a uniform cross-section.[129]  Regardless of whether the processing at issue is performed as part of the initial production process or as further processing, it is important to consider relevant scope determinations, especially if they establish examples of processing which alters LWRPT such that it is no longer covered by the scope.  Additionally, the discussion of cross sections is relevant in the context of parties' analysis of *Stein Industries*, and Maquilacero/TEFLU offer no arguments against the Draft Remand's interpretation of that case and the *Stein Industries Final Redetermination*.[130]  *Stein Industries* indicates that the drilling of numerous holes into LWRPT characterized as "certain finished components of refrigerated merchandising and display structures" was uncontested as subject LWRPT.[131]  Whereas, in *Stein Industries Final Redetermination*, Commerce found that welding additional tubes or pieces of steel to the

---

[127] *See* Maquilacero/TEFLU's Comments at 10.
[128] *Id*. at 10-11 (citing IBC Cages at 9).
[129] *See* Maquilacero/TEFLU's Brief at 8-9 ("{…}{Commerce} should find that the auto parts produced by TEFLU do not meet the scope requirement of a uniform rectangular cross-section.") and 13 ("The {Court}'s decision in *Stein Industries* reinforces that further processed LWRPT may be outside the scope of the *Order* where, as here, it lacks a uniform rectangular cross-section.").
[130] *See* Draft Remand at 11-12.
[131] *See Stein Industries*, 365 F.3d at 1368.

LWRPT eliminated the rectangular cross section and removed the "finished component" from the coverage of the scope.[132]

In addition, we continue finding *HWRPT from Mexico Investigation Prelim* and *HWRPT from Mexico 2016-2017* to be highly relevant (k)(1) sources. Maquilacero/TEFLU state that the discussion in *HWRPT from Mexico 2016-2017* concerns whether Maquilacero's products had rectangular cross sections and, therefore, is not relevant to the processing of LWRPT to make custom auto parts for specific customers.[133] However, Maquilacero also made arguments concerning customization yielding downstream products.[134] Specifically, Maquilacero argued that further processing to create customized downstream products altered the rectangular cross section, mirroring Maquilacero/TEFLU's arguments about the rectangular cross section of TELFU's products. Commerce determined "{…} the fact that the {HWRPT} at issue is *drilled or perforated* (and thus not have a seamless rectangular cross section across the entire length of the pipe) does not remove these products from the scope {emphasis added}."[135] Furthermore, Commerce found that Maquilacero presented no new information to alter its determination in the underlying investigation.[136]

In the *HWRPT from Mexico* investigation, respondents Prolamsa and Maquilacero each filed scope comments requesting that Commerce find further processed HWRPT outside the scope of the investigation.[137] Prolamsa argued that its products were *custom-designed parts and components* dedicated for use in products made by OEM customers; that the parts were made from input HWRPT that was laser cut, perforated, bent, and/or cut to short lengths; and Prolamsa

---

[132] *See Stein Industries Final Redetermination* at 6.
[133] *See* Maquilacero/TEFLU's Comments at 11-12 (citing Draft Remand at 10),
[134] *See HWRPT from Mexico 2016-2017* IDM at Comment 3, Maquilacero's Arguments ("The parts at issue have been substantially transformed from {HWRPT} into custom-designed downstream products which are fundamentally different from the commercial {HWRPT} that Maquilacero produces. {…} In particular, the input {HWRPT} undergoes several additional operations by which it transforms the {HWRPT} into a different product, with different physical characteristics and customer uses than the {HWRPT} sold by Maquilacero {…}.")
[135] *Id*.
[136] *Id*.
[137] *See HWRPT from Mexico Investigation Prelim* PDM at 4.

conceded that HWRPT only cut to short lengths may still be considered tubes.[138]  Maquilacero argued that its HWRPT sold to an affiliate and further processed by cutting holes, cutting to size, cleaning, and deburring was sufficiently "advanced" such that it was no longer subject merchandise.[139]  Commerce "made no change to the scope with respect to cut-to-length products, as well as {HWRPT} sold as 'parts' because:  1) these products are clearly within the scope; and 2) the petitioners intended that these products be covered.  We further note that this determination is consistent with the definition of the domestic like product for the {HWRPT} industry, which includes 'all {HWRPT within the scope of the investigation.'"[140]  We find the discussion and determination relevant here because:  the respondent companies are the same as the LWRPT investigation; the petitioners largely overlap;[141] the issues raised with respect to further processing to customize rectangular pipe and tube as "parts" are nearly identical; and the products and scope language, particularly insofar that it does not address further processing, are nearly identical.[142]

In conclusion, the (k)(1) sources support the continued inclusion of TEFLU's products as covered by the scope of the *Order*.  The descriptions of the merchandise contained in the Petition do not discuss whether the scope or proposed order would include subject merchandise that undergoes further processing.[143]  However, a respondent during the initial investigation pertaining to the *Order* reported made to order LWRPT that it sold to OEM customers.[144]  Concerning previous scope determinations and analysis by Commerce, the *IBC Cages* scope ruling indicates that LWRPT may be processed such that it is out of scope through the alteration

---

[138] *Id*. at 4-5.
[139] *Id*. at 5.
[140] *Id*. at 5-6.
[141] *See LWRPT from Mexico Investigation Prelim*, 73 FR at 5515; *see also HWRPT from Mexico Investigation* PDM at 1.
[142] We note that no party has objected to or argued against HWRPT from Mexico as a similar product and scope as a point of comparison.
[143] *See* Petition at Volume I pages 2-7
[144] *See LWRPT from Mexico Investigation Prelim*, 73 FR at 5523.

of the cross section as an additional process.[145] *Stein Industries Final Redetermination* reached

the same conclusion for a similar LWRPT order after certain processed LWRPT was considered

subject to the order in *Stein Industries*.[146]  In *LWRPT from Mexico 2016-2017*, Commerce found

that Maquilacero's further processed LWRPT was subject to the scope of *Order*.[147]  In *HWRPT*

*from Mexico Investigation Prelim* and *HWRPT from Mexico 2016-2017*, Commerce found that

further processed and custom-designed HWRPT, argued to be downstream products, were

subject to that order, noting that the petitioners had intended such products to be covered by the

scope.[148]

　　With respect to the ITC's initial investigation, the ITC identified numerous downstream

products as end use applications of LWRPT.[149]  While the ITC mentioned automotive uses

among these applications, the example products identified clearly indicate that TEFLU's

products, described as customized auto parts, are much less complex and do not lose the

rectangular or square cross section through alteration of the piece of LWRPT or combination

with other inputs.[150]  The ITC reported that the industry included processed LWRPT subject to

severe fabrication, including bending.[151]  Additionally, the ITC noted that LWRPT may not be

readily interchangeable from different sources while still being considered LWRPT.[152]

Furthermore, the ITC's determination in *ITC's Second Review* considered data on processed

shipments of LWRPT and specifically identified cutting, bending, drilling, and perforation by

Mexican producers of LWRPT.[153]

---

[145] *See* IBC Cages at 16.
[146] *See Stein Industries Final Redetermination* at 6; *see also*, *generally*, Stein Industries.
[147] *See LWRPT from Mexico 2016-2017* IDM at Comment 2.
[148] *See HWRPT from Mexico Investigation Prelim* PDM at 4; *see also HWRPT from Mexico 2016-2017* IDM at Comment 3.
[149] *See, e.g., ITC's Turkey Final* at 3, I-10, II-1, and II-6.
[150] *Id*. at II-6.
[151] *Id*. at I-12 and I-13.
[152] *Id*. at I-12.
[153] *See ITC's Second Review* at IV-4 and IV-21.

Maquilacero/TEFLU argue Commerce has erred in its interpretation and analysis, but do not provide any citations to the (k)(1) sources that indicate TEFLU's products should be considered downstream products or otherwise excluded from the coverage of the scope.[154] Nucor argues that Commerce's original finding that TEFLU's products were covered by the scope's plain language was correct, but also agrees with Commerce's analysis and conclusions regarding the (k)(1) sources.[155]  For these final results of redetermination, we find the (k)(1) sources clearly demonstrate that TEFLU's further processed LWRPT are subject to the *Order*.

### Comment 2:   Whether Commerce's Analysis of TEFLU's Products Adequately Addresses Questions Raised in the *Remand Opinion and Order*

*Maquilacero/TEFLU's Comments*

The following is a verbatim summary of the comments submitted by Maquilacero/TEFLU (internal citations omitted).  For further details, *see* Maquilacero/TEFLU's Comments at 12-18.

> Second, Commerce fails to follow the Court's order to "determine whether the amount of processing transformed {TEFLU's further-processed products} from a raw input into a downstream product" that renders them out of scope.  Instead, the agency fixates on whether a given product contains a rectangular cross section and fails to address the additional processing TEFLU performs to produce custom parts for its customers.  Instead of answering the Court's questions or addressing the thrust of its remand regarding further processing or the interchangeability of TEFLU's further processed products with commercial LWRPT covered by the scope, Commerce chooses to avoid the questions claiming instead that it cannot determine the threshold for what level of processing renders LWRPT products outside of scope.  If Commerce needed additional information to comply with the Court's order, it could have reopened the record and sought it — especially given the Court's discussion of TEFLU's specific products in its opinion.
>
> Finally, Commerce's argument that finding TEFLU's products are out of scope would invite the potential for circumvention is unfounded.  As Commerce is aware, each of TEFLU's parts is custom-made for a single customer and a single end use, which is different from how commercial {LWRPT} is produced and sold.  Unlike the {Remand Order and Opinion}, none of the cases cited in the {Draft Remand} as supporting Commerce's circumvention concerns involves downstream products. When issuing its final redetermination, Commerce should ensure compliance with the Court's order.  It should also exclude TEFLU's customized parts from the scope and reconsider its collapsing determination.

---

[154] *See*, *generally*, Maquilacero/TEFLU's Comments.
[155] *See*, *generally*, Nucor's Comments.

*Nucor's Comments*

Nucor did not provide the requested executive summary. Nucor's argument may be found at pages 1-5 of Nucor's Comments.

**Commerce's Position:** We disagree with Maquilacero/TEFLU; in the Draft Remand, as ordered by the Court, Commerce addressed and analyzed the limited record exhibits submitted by Maquilacero/TEFLU that they argue demonstrate the purported out-of-scope nature of TEFLU's products, and Commerce discussed the processing and interchangeability considered by the ITC's analysis of the LWRPT industry.[156]

Maquilacero/TEFLU argue that Commerce's assessment of the cross section of TEFLU's products does not align with the main concern of the Court's remand to consider whether the products were further processed to be outside the scope.[157] However, the analysis of the cross section was made in response to Maquilacero/TEFLU's arguments as to why TEFLU's products should be considered outside the scope, *i.e.*, that the cross section was altered.[158] Furthermore, we note that Maquilacero/TEFLU do not contest Commerce's analysis of TEFLU's products in the Draft Remand, only Commerce's conclusions regarding the status of these products as subject to the scope due to the further processing contemplated by the (k)(1) sources.[159] In the Draft Remand, we noted that the exhibits cited by Maquilacero/TEFLU as examples of TEFLU's further processed LWRPT considered to be automotive parts either did not depict the cross section of the product or contained images or diagrams indicating a rectangular or square cross section.[160] Maquilacero/TEFLU do not address this concern.

---

[156] *See* Draft Remand at 8 and 13-15.
[157] *See* Maquilacero/TEFLU's Comments at 12-13 (citing Draft Remand at 11-12; and *Remand Opinion and Order* at 16).
[158] *See* Maquilacero/TEFLU Case Brief at 8-9 and 13.
[159] *See*, *generally*, Maquilacero/TEFLU's Comments.
[160] *See* Draft Remand at 12.

Next Maquilacero/TEFLU claim that Commerce did not address cases discussed in the *Remand Opinion and Order*, citing only to *Trendium*.[161]  First, as discussed above, the Draft Remand addressed how *Stein Industries* supports Commerce's position that further processed LWRPT similar to TEFLU's products remain subject LWRPT.[162]  With respect to *Trendium*, Commerce's determination is in line with the proposition for which the Court cited it, *i.e.*, that further processing can result in a previously in-scope product becoming out of scope.  On the other hand, there are distinguishing facts between this case and *Trendium*.  First, *Trendium* concerned an antidumping duty order on corrosion resistant steel (CORE) and Trendium Pool Products, Inc.'s (Trendium) requested pool products were only partially made from CORE.[163]  TEFLU's products are further processed LWRPT comprised entirely of LWRPT.  Additionally, in *Trendium*, the Court disagreed with Commerce's position that the order on CORE was inclusive of downstream products identified by the ITC, finding that Trendium's requested products were unambiguously excluded by the language of that order, which addressed specific types of processing.[164]  For the further processed LWRPT in this case, we found in line with the Court's analysis that the *Order* is ambiguous and the (k)(1) sources discussed above demonstrate that TEFLU's products are not the automotive applications considered by the ITC and remain.an intermediate product: bent, perforated, and/or cut to length LWRPT.

With respect to the PCS Scope Ruling, in the Draft Remand, Commerce noted that it erred in addressing Maquilacero/TEFLU's citation and discussion of the PCS Scope Ruling in the underlying review, despite the fact it had not been placed on the record prior to the briefing stage and no interested parties had opportunity to comment.[165]  Maquilacero/TEFLU continue to discuss and cite the PCS Scope Ruling, and because we had addressed this ruling previously, to

---

[161] *See* Maquilacero/TEFLU's Comments at 13 (citing *Remand Opinion and Order* at 28; and *Trendium Pool Products., Inc. v. United States*, 399 F. Supp. 3d at 1335 (CIT 2019) (*Trendium*)).
[162] *See* Draft Remand at 11-12 (citing *Stein Industries*, 365 F.3d at 1368, 1371).
[163] *See Trendium*, 365 F. Supp. 3d at 1340.
[164] *Id*., 365 F. Supp. 3d at 1346.
[165] *See* Draft Remand at 9 footnote 35.

address Maquilacero/TEFLU's  arguments now, we are responding broadly but without specific reference to the facts of the PCS Scope Ruling.[166]  Maquilacero/TEFLU argue that Commerce should be able to establish a definitive point in which LWRPT is further processed to the extent that it is out of scope because Commerce did so in the PCS Ruling, addressing the orders on cut-to-length steel plate.[167]  However, Maquilacero/TEFLU do not compare the scopes of these respective orders; how Commerce analyzed the processing and downstream products described in the (k)(1) sources in that ruling; or note the extent to which the requested products were documented and described on the record.  Thus, based on characterization of the PCS Scope Ruling provided by Maquilacero/TEFLU, the PCS Scope Ruling is not a useful (k)(1) source, and we note that unlike in the PCS Scope Ruling, Commerce does not find TEFLU's products to be different downstream products from LWRPT based on the record evidence describing the products supplied by Maquilacero/TEFLU.  Maquilacero/TEFLU contend that Commerce's analysis of TEFLU's approximately 83 products is cursory and thus is not in compliance with the Court's orders in the *Remand Opinion and Order*.[168]  However, as Commerce explained, the (k)(1) sources indicate that LWRPT made to customer specifications and further processing were considered by the ITC and among the relief sought in the investigation and for similar orders.[169] Further, in the Draft Remand, Commerce noted Maquilacero/TEFLU's request with respect to TEFLU's further processed LWRPT lacked important specifics as their arguments and references to the record were not clear as to which products were being discussed.[170]  Maquilacero/TEFLU do not engage with the specifics of Commerce's analysis in the Draft Remand, which addressed the exact exhibits upon which Maquilacero/TEFLU relied as examples of TEFLU's requested

---

[166] *See* Maquilacero/TEFLU's Comments at 13-14.
[167] *Id*.
[168] *Id*. at 15 (citing *Remand Opinion and Order* at 26-28).
[169] *See ITC's Turkey Final* at I-12; *see also LWRPT from Mexico Investigation Prelim*, 73 FR at 5523; and *HWRPT from Mexico Investigation Prelim* PDM at 4-6.
[170] *See* Draft Remand at Draft Remand at 12-15 (citing Maquilacero/TEFLU AQR Exhibits A-6 and A-32; and Maquilacero/TEFLU PSQR at Exhibit 2S-7).

products, and they provide minimal discussion and little clarification of the record evidence about TEFLU's products to rebut our determination beyond citing a single example across two footnotes.[171]  Maquilacero/TEFLU also do not confirm if the product list exhibit referenced by Commerce is indeed the extent of requested products.[172]  Thus, we have considered TEFLU's further requested products relying on the examples used in their arguments, the evidence available on the record as they relate to the further processed products, and the analysis found in the (k)(1) sources.[173]

At the same time, Maquilacero/TEFLU argue that Commerce should have solicited additional information by reopening the record if Commerce lacked information it deemed necessary to address the processing associated with each of TEFLU's requested products.[174] Maquilacero/TEFLU had adequate opportunity in the underlying administrative proceeding to place relevant information and documentation on the record.  It is the responsibility of interested parties to build the record, not Commerce.[175]  Accordingly, we found no reason to reopen the record here.

Maquilacero/TEFLU also allege that Commerce improperly rejected the evidentiary value of the HTSUS codes assigned to TEFLU's products.[176]  However, in the Draft Remand, we noted how the specific description of these codes comported with Commerce's analysis of the (k)(1) source's description of subject further processed LWRPT.[177]  Furthermore, we maintain our position, in accordance with the plain language of the scope and the determinations of the

---

[171] *See* Maquilacero/TEFLU's Comments at 14-17, and footnotes 26 and 54.
[172] *See* Draft Remand at 17 (citing TEFLU BQR at Exhibit BA-4).
[173] *See* Maquilacero/TEFLU AQR at Exhibit A-6; *see also* Maquilacero/TEFLU PSQR at Exhibits 2S-6.1 through 2S-6.7 and 2S-7.  In the Draft Remand, we noted that Maquilacero/TEFLU cited to Exhibit A-32 as examples of TEFLU's automotive parts but that this exhibit contained products that appeared not to be made from LWRPT; *see* Draft Remand at 13-14 (citing Maquilacero/TEFLU AQR at Exhibit A-32).  Maquilacero/TEFLU provide no clarification or other comment on the relevance of this exhibit in Maquilacero/TEFLU's Comments.
[174] *See* Maquilacero/TEFLU's Comments at 14.
[175] *See QVD Food Co., Ltd. v. United States*, 653 F.3d 1318, 1324 (Fed. Cir. 2011).
[176] *See* Maquilacero/TEFLU's Comments at 16 (citing Draft Remand at 16).
[177] *See* Draft Remand at 16.

ITC, that HTSUS codes are not dispositive of scope coverage.[178]  Maquilacero/TEFLU state that the plain language of the HTSUS descriptions under which TEFLU's products were classified do not support Commerce's in-scope determination but do not provide any argumentation besides that "these subheadings are not 'suggestive' of 'pipes.'"[179]  In the Draft Remand, Commerce noted that the subheadings were "suggestive of pipes, tubes, and intermediate goods intended for certain end uses as specifically promulgated by the ITC's analysis of the industry in question" and then proceeded to cite subheading descriptions provided by Maquilacero/TEFLU that include "pipes" and "tubes."[180]

Finally, Maquilacero/TEFLU argue that Commerce's circumvention concerns are unfounded.[181]  However, they do not engage with the specific examples in the Draft Remand where Commerce concluded that TEFLU's example products appear indistinguishable from unprocessed LWRPT in some instances.[182]  Also, Maquilacero/TEFLU do not explain how the processing applied to TEFLU's products differentiates them from LWRPT beyond their status as customized for certain end uses.  As discussed above, we find that the ITC noted the variety of applications of LWRPT and that TEFLU's products remain intermediate LWRPT and not a downstream product based on the (k)(1) sources.  Circumvention concerns are apparent when the record information and argumentation provide no answers as to how, for example, LWRPT bent once can be considered an out of scope finished product solely because it is customized for a purported end use.  Similarly, Maquilacero/TEFLU and the documentation they have submitted do not explain or indicate how Commerce or U.S. Customs and Border Protection should view a piece of LWRPT with a single hole drilled in it if labelled as made to order for a downstream industry.  The further processing requested by Maquilacero/TELFU includes cutting to length,

---

[178] *See Order*, 73 FR 45404; *see also ITC's Turkey Final* at I-9.
[179] *See* Maquilacero/TEFLU's Comments at 16-17 (citing Draft Remand at 16).
[180] *See* Draft Remand at 16 (citing Maquilacero/TEFLU's Case Brief at 10-11).
[181] *See* Maquilacero/TEFLU's Comments at 17.
[182] *See* Draft Remand at 12 and 15 (citing Maquilacero/TEFLU at Exhibit A-6; and Maquilacero/TEFLU PSQR at Exhibit 2S-7).

but beyond the 20- and 24-foot length argument novel to Maquilacero/TELFU's Comments, there is no evidence addressing what lengths of LWRPT remain LWRPT and which lengths are customized downstream products. If Commerce were to assume TEFLU's requested products were the same as the product list suggested in the Draft Remand, which contains more than 83 products, then approximately 40 percent of the products Maquilacero/TEFLU reported under "Potentially Subject Product Codes and Descriptions" are the result of a single processing operation performed by TEFLU.[183] Furthermore, the decklid hinge gooseneck cited by Maquilacero/TEFLU appears to be the single most complex product or represents the greatest amount of processing among TEFLU's products.[184] While the exact product code listed for that product does not appear in TEFLU's product list, products with similar processing steps are very limited and do not appear to be reflective of TEFLU's products generally.[185] If it is assumed that the further processing indicated in this list is the same further processing identified by Maquilacero/TEFLU in their case brief, then it is reasonable to conclude that this is the same basic level of processing considered in TEFLU's example products discussed herein and in the Draft Remand, *i.e.*, bending, perforation, and cutting to length, and supports a determination that the processing of each of TEFLU's products does not transform them to such a degree that they are no longer subject to the scope.

In the Draft Remand, Commerce indicated that the record lacked clarity with respect to TEFLU's requested products and that the record supported a determination that the processing performed by TEFLU did not remove its products from the coverage of the scope. Maquilacero/TEFLU provided no clarity in their comments, including with respect to specific examples highlighted by Commerce. For these final results of redetermination, Commerce

---

[183] *See* Draft Remand at 17 (citing TEFLU BQR at Exhibit BA-4).
[184] Compare the depiction of the hinge with the other examples in Maquilacero/TEFLU AQR Exhibit A-6 and Maquilacero/TEFLU PSQR Exhibit 2S-7.
[185] *See* TEFLU BQR at Exhibit BA-4.

analyzed the further processing of TEFLU's products and relevant submitted documentation, and we determine that the processing and products identified are within the LWRPT industry investigated by the ITC.

## VI.    FINAL RESULTS OF REDETERMINATION

Consistent with the Court's remand holding and order, Commerce now finds the scope language of the *Order* to be ambiguous and thus reviewed the sources identified under 19 CFR 351.225(k)(1).  We reviewed the ITC's initial investigation and determinations pertaining to the *Order* and determine that further processed LWRPT was included in the industry investigated by the ITC and that subject LWRPT may be limited in its interchangeability due to processing or design criteria for specific applications.  We also considered scope rulings made under the *Order* and orders covering similar products; descriptions of the merchandise contained in Commerce's initial investigation of LWRPT from Mexico; and Commerce's previous determinations pertaining to the *Order* and orders covering similar products.  Thus, the processing of TEFLU's products as customized automotive parts, limiting their use in specific downstream products, limits their interchangeability in a manner contemplated part of the LWRPT industry by the ITC. This is supported by specific examples from the other (k)(1) sources.  We also determine that Maquilacero/TEFLU's status as a single entity should be maintained.

1/2/2025

X *Elouaradia*

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance