## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| MAQUILACERO S.A. de C.V. and TECNICAS DE FLUIDOS S.A. de C.V., | ) ) ) ) |
| *Plaintiffs*, and | ) **NON-CONFIDENTIAL VERSION** ) ) |
| PERFILES LM, S.A. DE C.V. | ) ) Consol. Court No. 23-00091 |
| *Consolidated-Plaintiff*, v. | ) ) **Confidential Business Proprietary** ) **Information Deleted from Page 26.** |
| THE UNITED STATES, | ) |
| *Defendant*, and | ) ) ) |
| NUCOR TUBULAR PRODUCTS, INC., | ) ) |
| *Defendant-Intervenor*. | ) ) ) |

### PLAINTIFFS MAQUILACERO S.A. DE C.V. AND TECNICAS DE FLUIDOS S.A. DE C.V.'S COMMENTS IN OPPOSITION TO THE REMAND REDETERMINATION

Diana Dimitriuc Quaia
John M. Gurley
Christian L. Bush

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6291

*Counsel for Maquilacero S.A. de C.V. and Tecnicas De Fluidos S.A. de C.V.*

February 18, 2025

## <u>TABLE OF CONTENTS</u>

Page

I.    SUMMARY OF THE ARGUMENT .......................................................................... 2

II.   ARGUMENT ...................................................................................................... 4

A.    Commerce's review of the 19 C.F.R. § 351.225(k)(1) sources does not demonstrate that TEFLU's products are in scope merchandise and fails to address the Court's concerns. ............................................................................ 4

1.    The Petition language does not indicate that Petitioners intended for the scope to include customized downstream products made from LWRPT. ..................................................................................... 5

2.    The ITC's analysis was limited to LWRPT, characterized as a commodity product, highly fungible and interchangeable, imported under the primary HTSUS subheadings. ..................................................... 6

3.    Commerce's reliance on the ITC Report in the Second Sunset Review is misplaced. ........................................................................ 10

4.    Commerce persists in its erroneous reliance on the end use of LWRPT to determine in-scope merchandise ........................................ 12

5.    The scope determinations cited by Commerce have limited relevance. ...................................................................................... 17

B.    Commerce's analysis of TEFLU's further-processed, customized auto parts failed to apply the Court's precedent. ................................................... 20

1.    The Court did not instruct Commerce to focus its analysis on the narrow question of whether TEFLU's products appear to have rectangular cross-sections. ....................................................... 21

2.    Commerce failed to examine TEFLU's further-processed products to determine whether the amount of processing transformed them from a raw input into a downstream product. ......................................... 23

3.    The HTSUS subheadings for TEFLU's products show that the further-processed parts are not in scope. ............................................. 27

4.    Commerce's circumvention concerns in this case are unfounded. .......... 28

III.  THE COURT SHOULD REMAND THE CASE TO COMMERCE WITH MORE SPECIFIC INSTRUCTIONS REGARDING TREATMENT OF TEFLU'S PRODUCTS AS NON-SUBJECT MERCHANDISE. .............................. 30

AFSDOCS:301651734.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*A.L. Patterson, Inc. v. United States*
    585 F. App'x 778 (Fed. Cir. 2014) .................................................................3, 9, 10

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
    992 F. Supp. 2d 1285 (Ct. Int'l Trade 2014), *aff'd* 802 F.3d 1339 (Fed. Cir.
    2015) ...........................................................................................................................2

*Am. Schack Co. v. United States*,
    1 CIT 1 (1980) .........................................................................................................16

*Bowman Transp., Inc. v. United States*,
    419 U.S. 281 (1974).................................................................................................25

*Duferco Steel, Inc. v. United States*,
    296 F.3d 1087 (Fed. Cir. 2002)....................................................................28, 29, 30

*Eckstrom Indus. v. United States*,
    254 F.3d 1068 (Fed. Cir. 2001)...............................................................................28

*Honeywell Int'l Inc. v. United States*,
    No. 17-00256, 2025 WL 342865 (Ct. Int'l Trade Jan. 30, 2025) ...........................16

*Maquilacero S.A. de C.V. v. United States*,
    731 F. Supp. 3d 1346 (Ct. Int'l Trade 2024) ("*Maquilacero I*") .................... *passim*

*Mid Continent Nail Corp. v. United States*,
    725 F.3d 1295 (Fed. Cir. 2013)...............................................................................28

*Saha Thai Pipe Pub. Co. v. United States*,
    101 F.4th 1310 (Fed. Cir. 2024) .............................................................................28

*Shanghai Tainai Bearing Co. v. United States*,
    No. 22-00038, 2024 WL 5154032 (Ct. Int'l Trade Dec. 18, 2024), appeal
    docketed, No. 2025-1405 (Fed. Cir. Jan. 24, 2025)................................................25

*Stein Indus. v. United States*,
    365 F. Supp. 3d 1364 (Ct. Int'l Trade 2019) ......................................................3, 23

*TMB 440AE, Inc. v. United States*,
    No. 18-00095, 2020 WL 1672841 (Ct. Int'l Trade Apr. 6, 2020) .......................3, 11

*Trendium Pool Prods., Inc. v. United States*,
    399 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) .............................................3, 15, 28

i

*Universal Camera Corp. v. N.L.R.B.*,
340 U.S. 474 (1951)................................................................10, 25

**Federal Statutes**

19 U.S.C. § 1673d(b) .................................................................11

19 U.S.C. § 1675a(a) .................................................................11

**Regulations**

19 C.F.R. § 351.225(k)(1).....................................................2, 3, 4, 5, 11

19 C.F.R. § 351.225(k)(1)(i) .........................................................11

19 C.F.R. § 351.225(k)(1)(i)(B)..............................................6, 10, 11, 12

19 C.F.R. § 351.225(k)(1)(i)(D) .............................................6, 10, 11, 12

**Administrative Determainations**

*Heavy Wall Rectangular Welded Carbon Steel Pipes and Tubes From Mexico*, 84
Fed. Reg. 24473 (Dept. Commerce May 28, 2019) (final AD results & no
shipments determ.; 2016-2017), and accompanying Issues and Decision
Memorandum .......................................................................19

*Light-Walled Rectangular Pipe and Tube from China, Korea, Mexico, and
Turkey*, Inv. Nos. 701-TA-449 and 731-TA-1118-1121(Second Review),
USITC Pub. 5086 (July 2020) (Final) .......................................10, 12, 15

*Light-Walled Rectangular Pipe and Tube From Mexico*, 83 Fed. Reg. 10664
(Dep't Commerce Mar. 12, 2018) (final AD results; 2015-2018), and
accompanying Issues and Decision Memorandum............................................17

*Light-Walled Rectangular Pipe and Tube from Mexico, the People's Republic of
China, and the Republic of Korea: Antidumping Duty Orders; Light-Walled
Rectangular Pipe and Tube from the Republic of Korea: Notice of Amended
Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 45403
(Dep't Commerce Aug. 5, 2008) .......................................................2

*Light-Walled Rectangular Pipe and Tube from Turkey*, Inv. No. 731-TA-1121,
USITC Pub. 4001 (May 2008) (Final)....................................6, 7, 8, 9, 13

*Notice of Preliminary Determination of Sales at Less Than Fair Value: Light-
Walled Rectangular Pipe and Tube From Mexico*, 73 Fed. Reg. 5515 (Dep't
Commerce Jan. 30, 2008) ...........................................................17

AFSDOCS:301651734.1

**Other Authorities**

HTSUS available at https://hts.usitc.gov/search?query=8431 ........................................................27

Memorandum from E. Greynolds to J. Maeder, re: Antidumping Duty Order on
    Light-Walled Rectangular Pipe and Tube from Mexico: Final Scope Ruling –
    Certain Tubing for Intermediate Bulk Container Cages (Feb. 9, 2021) ............................18, 19

Memorandum from J. Doyle to J. Maeder, re: Antidumping and Countervailing
    Duty Orders on Certain Carbon and Alloy Steel Cut-to-Length Plate from
    Austria, *et al.*: Scope Ruling Request (Oct. 11, 2017)........................................................16, 17

AFSDOCS:301651734.1

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |
|---|---|
| MAQUILACERO S.A. de C.V. and TECNICAS DE FLUIDOS S.A. de C.V., | ) ) ) |
| *Plaintiffs*, and | ) ) ) |
| PERFILES LM, S.A. DE C.V. | ) ) |
| *Consolidated-Plaintiff*, v. | ) ) ) |
| THE UNITED STATES, | ) ) |
| *Defendant*, and | ) ) ) |
| NUCOR TUBULAR PRODUCTS, INC., | ) ) |
| *Defendant-Intervenor*. | ) ) ) |

**NON-CONFIDENTIAL VERSION**

Consol. Court No. 23-00091

**Confidential Business Proprietary Information Deleted from Page 26.**

**PLAINTIFFS MAQUILACERO S.A. DE C.V. AND TECNICAS DE FLUIDOS S.A. DE C.V.'S COMMENTS IN OPPOSITION TO THE REMAND REDETERMINATION**

Pursuant to the U.S. Court of International Trade's ("CIT") opinion dated October 4, 2024 and scheduling order dated November 21, 2024, ECF Nos. 56, 59, Plaintiffs Maquilacero S.A. de C.V. ("Maquilacero") and Tecnicas De Fluidos S.A. de C.V. ("TEFLU") (collectively "Maquilacero/TEFLU" or "Plaintiffs"), respectfully submit these comments in opposition to the U.S. Department of Commerce's ("Commerce") Final Results of Determination Pursuant to Court Remand filed on January 2, 2025, ECF No. 61 ("Remand Redetermination"). The Remand Redetermination was issued pursuant to the October 4, 2024 remand order of the U.S. Court of International Trade. *Maquilacero S.A. de C.V. v. United States*, 731 F. Supp. 3d 1346 (Ct. Int'l Trade 2024) ("*Maquilacero I*"). These comments are timely pursuant to the Court's November 21, 2024 scheduling order, ECF No. 59.

1

## I.    SUMMARY OF THE ARGUMENT

Commerce's Remand Redetermination is unsupported by substantial evidence because the agency failed to address the Court's outstanding questions from its prior opinion and failed to comply with the Court's remand order.[1] *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 992 F. Supp. 2d 1285, 1290 (Ct. Int'l Trade 2014), *aff'd* 802 F.3d 1339 (Fed. Cir. 2015) (noting that the Court reviews determinations made on remand for compliance with the Court's remand order). Specifically, Plaintiffs challenge Commerce's continued determination to include TEFLU's customized parts as in-scope merchandise under the antidumping duty order on *Light-Walled Rectangular Pipe and Tube from Mexico* ("LWRPT"). *Light-Walled Rectangular Pipe and Tube from Mexico, the People's Republic of China, and the Republic of Korea: Antidumping Duty Orders; Light-Walled Rectangular Pipe and Tube from the Republic of Korea: Notice of Amended Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 45403 (Dep't Commerce Aug. 5, 2008) (the "*Order*").

In its prior opinion, the Court faulted Commerce for relying on "silence" in the *Order* to find TEFLU's products as in-scope merchandise and failing to conduct an analysis under 19 C.F.R. § 351.225(k)(1). *Maquilacero I*, 731 F. Supp. 3d at 1355–56, 1362–63. On remand, the Court tasked Commerce with answering the following question: "whether TEFLU's further manufactured products, which are {LWRPT} that underwent a process of saw-cutting, laser cutting-to-length, drilling, perforation, bending, or other further processing, were downstream

---

[1] Because Commerce did not alter its determination that TEFLU's products are in-scope LWRPT, the agency did not revisit its collapsing analysis or any of the other issues deferred by the Court in *Maquilacero I*. Plaintiffs reincorporate by reference their prior arguments with respect to these other issues. *See* Pls.' Mot. J. Agency R. Mem. Law Supp. Mot. J. Agency R. Pursuant to USCIT R. 56.2 ("Pls.' Br."), ECF Nos. 31, 32.

AFSDOCS:301651734.1

products outside of the scope." *Maquilacero I*, 731 F. Supp. 3d at 1365. To answer that question, the Court ordered Commerce to:

1. "address whether TEFLU's further processed products are within an industry that was investigated by the {U.S. International Trade Commission ("ITC")} when the ITC determined that certain pipe and tube caused material injury or threat of material injury to domestic producers";

2. "determine the degree to which TEFLU's products were processed by saw-cutting, laser cutting-to-length, drilling, perforation, bending, or other further manufacturing processes, and whether each product was further processed so as to no longer fall within the scope"; and

3. "address whether TEFLU's further processed products are realistically interchangeable with the pipe and tube covered under the scope."

*Id.* at 1365–66; *see also Stein Indus. v. United States*, 365 F. Supp. 3d 1364, 1373 (Ct. Int'l Trade 2019); *Trendium Pool Prods., Inc. v. United States*, 399 F. Supp. 3d 1335 (Ct. Int'l Trade 2019); *A.L. Patterson, Inc. v. United States* 585 F. App'x 778, 784-85 (Fed. Cir. 2014); *TMB 440AE, Inc. v. United States*, No. 18-00095, 2020 WL 1672841, at **2-7 (Ct. Int'l Trade Apr. 6, 2020). Because Commerce's Remand Redetermination fails to comply with the Court's order, it should be remanded with more specific instructions regarding treatment of TEFLU's further-processed products.

First, Commerce's review of the 19 C.F.R. § 351.225(k)(1) sources does not demonstrate that TEFLU's further processed products are within an industry that was investigated by the ITC at the time of the original investigation. Alternatively, TEFLU's products should be considered part of a class of downstream LWRPT products that the ITC determined "functionally consume" LWRPT, which would be consistent with the Court's questions regarding whether TEFLU's products are "realistically interchangeable" with LWRPT covered by the *Order*.

Second, Commerce failed to fully assess the degree to which TEFLU's products were processed and whether each product was processed so as to no longer fall within scope. Despite

Plaintiffs waiving the confidentiality of TEFLU's products and the Court identifying specific examples in its opinion, Commerce conducted a cursory remand analysis that neither addresses the Court's concerns nor record evidence that detracts from its continued determination that all of TEFLU's products are in-scope. Instead, it claims that it lacks necessary record evidence to assess the degree of further processing but simultaneously dismisses examples of extensive processing as unrepresentative outliers.

Finally, Commerce did not address whether TEFLU's products are realistically interchangeable with the input LWRPT covered by the scope. Substantial evidence shows that TEFLU's further processed products are downstream products, often designed for sole use in a customer's specific product.  This contrasts with the characteristics of LWRPT that the ITC repeatedly found to be a *commodity* product with a very high degree of fungibility and interchangeability among all sources. Commerce's claim that excluding TEFLU's products from the scope of the *Order* opens the door for circumvention is unfounded, especially in light of the Court's prior opinion and record evidence showing that the further processing of TEFLU's products customizes them to a specific application for a specific customer.

Because the agency failed to address the Court's outstanding questions from its prior opinion and failed to comply with the Court's remand order, the Court should again remand the case with instructions for Commerce to reconsider its determination that all of TEFLU's further-processed products are in-scope merchandise.

## II.    ARGUMENT

### A.    Commerce's review of the 19 C.F.R. § 351.225(k)(1) sources does not demonstrate that TEFLU's products are in scope merchandise and fails to address the Court's concerns.

The Court previously held that "{t}he scope language's silence and lack of exclusionary provisions do not permit Commerce to conclude" that TEFLU's further processed automative

products fall within the scope of the *Order* "based upon a plain language reading of the scope provision." *Maquilacero I*, 731 F. Supp. 3d at 1356. On remand, Commerce found that the scope language is ambiguous and analyzed the sources in 19 C.F.R. § 351.225(k)(1) to determine whether TEFLU's further-processed products are within the scope of the *Order*. Commerce's (k)(1) analysis does not support its expansive reading of the scope language. Nor does this analysis support Commerce's determination that TEFLU's further processed products are in scope.

> **1.    The Petition language does not indicate that Petitioners intended for the scope to include customized downstream products made from LWRPT.**

First, Commerce acknowledged on remand that the Petition does not discuss whether the scope of the proposed order would include subject merchandise that undergoes further processing. *Compare Maquilacero I*, 731 F. Supp. 3d at 1362 ("Commerce stated that the Petition and ITC Report supported its determination that any product that met the physical characteristics of the Order were in scope{.}"), *with* Remand Redetermination at 7, ECF No. 61 ("{W}e re-examined the Petition and find that it does not discuss whether the scope or proposed order would include subject merchandise that undergoes further processing."). The Petition also makes no mention of downstream products or customized products for a sole end-use. The Petition states that "{T}he LWR pipe and tube that is the subject of this petition is currently classified under Harmonized Tariff Schedule of the United Stated (HTSUS) heading 7306.61.50.00," which covers LWRPT with square or rectangular cross sections. Memorandum from C. Doss To The File, re: Draft Remand Slip Op. 24-107, Memorandum Transmitting Additional Documents, Attach. 1 ("Petition") at 6, Rem-P.R. 2 ("Additional Documents Memo"). The *only* other HTSUS heading contemplated by the Petition was HTSUS heading 7306.69.50.00, which covers LWRPT with "other non-circular cross sections." *Id*. There is no

mention of the HTSUS subheadings applicable to parts for automotive applications such as the

subheadings indicated for TEFLU's products.  The absence of any substantive discussion of

further processed or downstream products supports a conclusion that TEFLU's auto parts were

not intended to be covered by the *Order*.

> ### 2.    The ITC's analysis was limited to LWRPT, characterized as a commodity product, highly fungible and interchangeable, imported under the primary HTSUS subheadings.

Commerce next examined existing ITC publications "to describe the industry and

products at issue," particularly focusing on the ITC's second sunset review of the *Order*.

Remand Redetermination at 7; *compare* 19 C.F.R. § 351.225(k)(1)(i)(B) (allowing Commerce to

consider "descriptions of the merchandise *contained in the initial investigation* pertaining to the

order at issue") (emphasis added), *with id.* § 351.225(k)(1)(i)(D) (allowing Commerce to

consider "{d}eterminations of the {ITC} pertaining to the order at issue, including reports issued

pursuant to the Commission's initial investigation"). Citing the ITC's final report in the

investigation, Commerce states:

> The ITC also specifically noted that LWRPT may be modified to meet design criteria for specific applications and that LWRPT from one source may not be readily interchangeable with LWRPT from another source *after bending or other fabrication*, while still being considered LWRPT.

Remand Redetermination at 8; *id.* n.31 (citing *Light-Walled Rectangular Pipe and Tube from

Turkey*, Inv. No. 731-TA-1121, USITC Pub. 4001, at I-12 (May 2008) (Final), Rem-P.R. 2,

Attach. 5 ("*LWRPT from Turkey*")). Commerce's reading of the ITC's report does not comport

with the actual determination of the Commissioners.  In the original investigation, the ITC

Commissioners described LWRPT as a commodity product,[2] with a high degree of fungibility

---

[2] Notably, both Petitioners and the Mexican respondents agreed that LWRPT is a commodity product. *Id.* at 23 n.142.

AFSDOCS:301651734.1

and interchangeability.  *See e.g. LWRPT from Turkey*, Views of the Commission at 10-11, 14-15, 22-23, Rem-P.R. 2, Attach. 5.  The ITC explained:

> We find that LWR pipe and tube qualifies as a commodity product based upon *Bratsk's* definition of "commodity product" as "meaning that it is generally interchangeable regardless of its source."  No party argues otherwise.  The record indicates that LWR pipe and tube is broadly interchangeable regardless of where it is produced. U.S. producers and most importers and purchasers reported that the U.S. product, the subject imports, and non-subject imports are frequently or always comparable.

*Id.* at 23 (footnotes omitted).

The ITC also noted the fungibility of LWRPT and the fact that "{t}he majority of market participants found domestically produced LWR pipe and tube to be always or frequently interchangeable with LWR pipe and tube from China, Korea, Mexico and Turkey." *Id.* at 10–11.

Commerce's assertion that subject LWRPT may be limited in its interchangeability due to processing or "design criteria for specific applications" (Remand Redetermination at 8, 27 and 39) misinterprets the ITC's report which references "design criteria" as limiting interchangeability of LWRPT *with other products*.  *LWRPT from Turkey* at I-12, Rem-P.R. 2, Attach. 5.  Stated differently, design criteria for specific applications may call for LWRPT and not other products (such as other types of pipes).  This observation has no bearing on whether subject LWRPT in the ITC's analysis includes LWRPT processed into a downstream product.

To support its contention that downstream products were part of the investigation, Commerce also quotes the statement from the ITC Report that "{a}ccording to U.S. producers and importers," LWR pipe and tube that undergoes "severe fabrication such as bending or swaging" has limited interchangeability. Remand Redetermination at 8 n.31. Upon closer review of the data compilation by the ITC it becomes clear that solely "***One*** firm, \*\*\*, stated that severe fabrication, such as bending or swaging, limits interchangeability." *LWRPT from Turkey* at II-

7

11–12, Rem-P.R. 2, Attach. 5 (emphasis added). Notwithstanding the comment of "*one* firm", the ITC did not discuss or conclude whether LWRPT customized through further processing into a specific part and sold as a part (as is the case with the TEFLU products), was considered LWRPT and was reported by this participant in its questionnaire responses to the ITC.

Therefore, a fair reading of the ITC's analysis does not support Commerce's contentions that products made from LWRPT were part of the ITC's analysis. The absence of any substantive discussion of downstream products or parts for automotive applications in the ITC's final determination supports the inference that such products were not part of the analysis. In fact, the pricing information collected by the ITC during its original investigation, as well as the HTSUS descriptions used by the ITC to collect the import data underlying its original injury analysis suggest the contrary. Notably, the ITC's price analysis in the original investigation was based on five types of LWR *(i.e.*, five pricing products) all of which had standard sizes, including standard lengths of 20 foot or 24 foot. *Id.*, Commission Views at 16 n.97, Rem-P.R. 2, Attach. 5. While Commerce dismisses the relevance of the pricing products used by the ITC (Remand Redetermination at 22), defining LWRPT based on standard sizes is consistent with the ITC's characterization of LWRPT as a commodity product. *Id.* at 10, 15, 23. Indeed this is how Maquilacero produces and sells the LWRPT. *See* Maquilacero S.A. de C.V.'s Section A Questionnaire Response at Exh. A-27 (Dec. 1, 2021) ("Section A QR"), C.R. 20, P.R. 37. Yet, none of the further manufactured parts produced and sold by TEFLU during this period of review ("POR") are produced in 20 foot or 24 foot lengths. *See e.g.*, Maquilacero S.A. de C.V.'s Post-Preliminary Supplemental Questionnaire Response at 6 and Exhs. 2S-6.1 through 2S-6.7 (Oct. 5, 2022) ("Post-Prelim. SQR"), C.R. 207-217, P.R. 119. This is evidence that downstream products like the ones sold by TEFLU in this POR, which Commerce claims to have been included in the ITC's investigation, were not part of the ITC's material injury analysis. Many of

TEFLU's items are cut to shorter lengths as part of the further processing that transforms them into downstream products.

Similarly, the ITC Report from the investigation includes a section on the tariff treatment of LWRPT pipe and tube and enumerates only HTS tariff codes under subheading 7306, *i.e.* subheadings 7306.61.50 (subject LWRPT, previously 7306.60.50), 7306.69.50 (non-subject light-walled specialty shapes) and 7306.61.7060 (LWRPT made of alloy steel other than stainless steel), which reasonably suggests that the import data the ITC relied on for its analysis reflected LWRPT classified under these primary HTSUS subheadings. *LWRPT from Turkey* at I-9 and IV-7, Rem-P.R. 2, Attach. 5. As discussed in *Maquilacero I* and as Maquilacero has explained on the record, auto parts produced by TEFLU during this POR were classified in other subheadings of the HTS, such as 8431, 8302 and 9401. *See* Post-Prelim. SQR at 6 and Exhs. 2S-6.1 through 2S-6.7, C.R. 207-217, P.R. 119. Therefore, Commerce's conclusion that further processed LWRPT was encompassed by the ITC investigation is not based on substantial evidence.

Commerce argues that the "ITC does not need to investigate every possible variant of a product within the same domestic industry, and Commerce "determined that processed LWRPT was considered as part of the industry investigated by the ITC for the *Order*. Remand Redetermination at 22 (citing *A.L. Patterson*, 585 Fed. Appx. at 785). Commerce also argues that its (k)(1) conclusions "were not based on the subheadings used by the ITC" and the ITC concludes that "{t}he HTS subheadings are provided *for convenience and Customs purposes*, but Commerce's scope of these investigations is dispositive {emphasis added}." *Id.* at 23 (quoting ITC's *LWRPT from Turkey* at I-9), Rem-P.R. 2, Attach. 5.

However, the Court directed Commerce to conduct a fulsome review of the (k)(1) sources. That the agency did not base its conclusions "on the subheadings used by the ITC" does

not relieve it of its obligation to consider evidence that detracts from the reasonableness of its

determination. *Compare* Remand Redetermination at 23, *with Maquilacero I*, 731 F. Supp. 3d at

1363 (remanding Commerce's final determination because the agency "did not do a complete

and fair substantive analysis of the (k)(1) sources," considering both positive and negative

sources), *and Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951) (substantial evidence

requires Commerce to consider record evidence that detracts from its conclusions). As discussed

below, the HTSUS codes for TEFLU's products differ greatly from those considered by the ITC,

which undermines the reasonableness of Commerce's determination that TEFLU's products

were in the industry investigated by the ITC.

### 3. Commerce's reliance on the ITC Report in the Second Sunset Review is misplaced.

As part of its analysis of the (k)(1) factors, Commerce inexplicably relies on the

ITC's Report issued in the second sunset review of the *Order*. Although the ITC's *Second*

*Review* may be the "most recent" ITC publication addressing the *Order* and LWRPT industry,

Commerce fails to explain why this "description{} of the subject merchandise . . . pertaining to

the {*Order*}" is relevant when 19 C.F.R. § 351.225(k)(1)(i)(D) specifically references

"Determinations of the Commission pertaining to the order at issue, including reports issued

pursuant to the Commission's initial investigation" and 19 C.F.R. § 351.225(k)(1)(i)(B) allows

Commerce to consider "descriptions of the merchandise *contained in the initial investigation*

pertaining to the order at issue." Remand Redetermination at 6; *compare id.* at 7 (citing

Additional Documents Memo, Attach. 4, *Light-Walled Rectangular Pipe and Tube from China,*

*Korea, Mexico, and Turkey*, Inv. Nos. 701-TA-449 and 731-TA-1118-1121 (Second Review),

USITC Pub. 5086, at 6 and I-17 (July 2020) (Final) ("*Second Review*"), Rem-P.R. 2, Attach. 4),

*with* 19 C.F.R. § 351.225(k)(1)(i)(B); *see e.g., A.L. Patterson*, 585 F. App'x at 783 ("Commerce,

AFSDOCS:301651734.1

in rendering a scope ruling, 'will take into account' . . . 'the initial investigation . . . .'" (quoting 19 C.F.R. § 351.225(k)(1))); *TMB 440AE*, WL 1672841 at *1 n.1 (also referring to the § (k)(1) sources as "descriptions of the merchandise contained in . . . the *initial investigation*," not a sunset review) (emphasis added). Regardless of Commerce's assertion that "the characteristics and uses of domestically produced {LWRPT} have not changed since the original investigations," Remand Redetermination at 7 (citation omitted), § 351.225(k)(1) still contemplates looking to the investigation, not the most recent ITC publication.

Commerce argues that "there is no such criteria in 19 CFR 351.225(k)(1)(i) or such set by the Court in the *Remand Opinion and Order* that Commerce must prioritize the ITC's investigation report over all other reports" and that the regulation "does not stipulate how Commerce must prioritize such sources in its analysis." Remand Redetermination at 23. Commerce mischaracterizes Plaintiff's argument. By its explicit terms, 19 C.F.R. § 351.225(k)(1)(i)(B) allows Commerce to consider "descriptions of the merchandise" that are "contained in the initial investigation." Commerce claims it relied on the *Second Review* "to describe the industry and products at issue," which appears to invoke § 351.225(k)(1)(i)(B) – although the agency's analysis is not specifically grounded within the regulation's subsections.  Remand Redetermination at 7. Moreover, Commerce's reliance on the *Second Review* conflicts with the Court's remand instructions to discuss if TEFLU's products "are within an industry that was investigated by the ITC *when the ITC determined that certain pipe and tube caused material injury or threat of material injury* to domestic producers." *Maquilacero I*, 731 F. Supp. 3d at 1365-66 (emphasis added). That reference is to the ITC's legal standard in an investigation not a sunset review.[3] It

---

[3] *Compare* 19 U.S.C. § 1675a(a) (legal standard in sunset review), *with* 19 U.S.C. § 1673d(b) (legal standard in original investigation).  In the *Second Review*, the ITC's determination was that revocation of the *Order* would be likely to lead to continuation or recurrence of material

AFSDOCS:301651734.1

follows that Commerce's conclusion — "{W}e find that the ITC report indicates that further processed LWRPT was considered in its investigation of material injury or threat of material injury for Mexico{.}" (Remand Redetermination at 8) — is erroneous because an ITC sunset review report cannot support a material injury determination.

Commerce characterizes its reliance on the *Second Review* as a "determination" of the ITC as contemplated in 19 C.F.R. § 351.224(k)(1)(i)(D). Remand Redetermination at 23. But this approach would reduce subsection (k)(1)(i)(B) to mere surplusage because it allows the agency to consider *any* descriptions of the merchandise made *after* the initial investigation so long as it is contained in an ITC determination. Such a reading is overbroad, and the Court should instruct Commerce to reconsider whether its reliance on a sunset review report to describe the merchandise accords with the division between sections (k)(1)(i)(B) and (k)(1)(i)(D).  Even if the Court were to allow Commerce to rely on the ITC's report in the *Second Review*, Commerce's (k)(1) analysis would remain equally unsupported by substantial evidence.  The conclusions of the ITC in the *Second Review* are consistent with those in the investigation: LWRPT is a commodity product, "generally fungible," with the vast majority of market participants rating it as always or frequently interchangeable. *Second Review*, Views of the Commission at 9, 14-16, 27, Rem-P.R. 2, Attach. 4.  The ITC's analysis in the *Second Review* contains no substantive discussion of downstream products or auto parts.

### 4.    Commerce persists in its erroneous reliance on the end use of LWRPT to determine in-scope merchandise.

A cross-cutting error in Commerce's analysis is that the agency conflates an intended end use of LWRPT with coverage under the *Order*. Remand Redetermination at 7. For example,

---

injury to an industry in the United States within a reasonably foreseeable time.  *ITC's Second Review*, Views of the Commission at 1, Rem-P.R. 2, Attach. 4.

AFSDOCS:301651734.1

Commerce states that the ITC found that LWRPT's common applications include "ornamental fencing . . . railings . . . athletic equipment . . . racks, *and other similar items*" but later states that "{t}he ITC references end use finished products that functionally represent the consumption of LWRPT, *removing them from the scope*, *e.g.*, . . . fitness equipment, . . . ornamental fencing, racks {and} railing . . . ." Compare *id.* (citing *LWRPT from Turkey* at I-17, Rem-P.R., Attach. 5) (emphasis added), *with id.* at 16 (no authority listed) (emphasis added). The list of such finished products is broad, from a simple product such as a railing to fitness equipment. Taken at face value, Commerce found that the ITC identified a class of LWRPT products that are rendered out of scope through further processing. Commerce further reasons that "{t}hese finished products would entail the combination of LWRPT with other LWRPT or other components to create a structure that is no longer a distinct length of pipe or tube and would accordingly fall outside of the scope's language." *Id*. at 16-17. It follows that TEFLU's products made from LWRPT that is fashioned into auto parts for an original equipment manufacturer ("OEM") customer's individual use meet the latter characterization — a known end use for LWRPT that is not in scope because the products "functionally . . . represent the consumption of LWRPT." *Id*. at 16. As demonstrated on the record, TEFLU's products are permanently customized and shaped to be integrated into such end use products. *See* Response to Court's Request (June 28, 2024), ECF Nos. 54, 55.

Commerce cites to "railings" as such an example of a LWRPT product that is outside the scope. Remand Redetermination at 7.[4] Yet, TEFLU's products incorporate at least the same or a higher level of further processing than some of the examples provided. *See Maquilacero I*, 731 F. Supp. 3d at 1359 (noting "{m}any of these customized parts were further processed into distinct

---

[4] Commerce does not explain how a railing would entail the combination of LWRPT with other LWRPT or other components to create a structure. Remand Redetermination at 16 and 24-25.

AFSDOCS:301651734.1

shapes and sizes . . . . For example, TEFLU manufactured a decklid hinge gooseneck, which was twisted into a curved shape with holes punched throughout the product."); Response to Court's Request, Attach. 1, at Exh. A-6, Rem.-P.R. 2, ECF Nos. 54 & 55 (image of the "decklid hinge gooseneck" part and identity of OEM customer). Moreover, the quoted ITC language contemplates a non-exhaustive list of end uses that functionally consume LWRPT.

Commerce argues that Plaintiffs "misapprehend" its arguments and that the agency "made no direct comparison to a railing or railings and instead listed end use applications reported by the ITC." Remand Redetermination at 24. The agency elides over the fact that, according to its own analysis, the ITC considered that further processing could "functionally" consume LWRPT, thus bringing a further-processed product out of scope — which is consistent with the Court's concern that further-processed, downstream products are not "realistically interchangeable" with the merchandise covered by the scope of the Order. *Cf. Maquilacero I*, 731 F. Supp. 3d at 1357, 1360.

Plaintiffs draw attention to this subcategory for two reasons. First, it undermines Commerce's (k)(1) analysis generally because it shows that a category of finished products associated with known end uses for LWRPT, such as a railing or a fence, which require minimal processing, are sufficiently further processed to remove them from the scope. Second, Plaintiffs contend that TEFLU's custom automotive products contain a higher or similar level of further processing as those in this category, such that the products cannot be used for any other purposes than as a part; this degree of further processing should place them out of scope.

Commerce's distinction here between a railing (as not covered by the scope) and a TEFLU auto part with several perforations/cuts or bending— (as covered by the scope) is entirely arbitrary. And Commerce's failure to reconcile this "functional consumption" language

AFSDOCS:301651734.1

with its focus on intended end uses detracts from the reasonableness of its determination. Remand Redetermination at 16.

Commerce cites additional ITC reports to show that "further processed LWRPT was considered in {the Commission's} investigation of material injury . . . for Mexico" and other countries. Remand Redetermination at 8. Likewise, it cites the ITC's second review for a similar proposition. *Id.* (citing *Second Review* at III-10, III-11, IV-21, Rem-P.R. 2, Attach. 4). Although some processing such as galvanizing or epoxy coating was always contemplated in the scope of the *Order*, there is a level of processing at which an intermediate product becomes a finished product. *Compare* Maquilacero S.A. de C.V.'s Section B Questionnaire Response at B-18 and B-19 (Dec. 17, 2021) ("Section B QR"), C.R. 25, P.R. 50, (identifying galvanizing or coating as processes that are part of the product characteristics), *with Maquilacero I*, 731 F. Supp. 3d at 1357 (citing *Trendium*, 399 F. Supp. 3d at 1335), *and* Remand Redetermination at 16 (noting where the ITC found that functional consumption of LWRPT renders a product out of scope). As discussed in greater detail below, Commerce fails to consider the Court's discussion of *Trendium* and other cases addressing this distinction or a lack of interchangeability. *See Maquilacero I*, 731 F. Supp. 3d at 1360 (ordering Commerce "on remand, under the principles articulated in *A.L. Patterson*, *Stein*, *Trendium*, and *TMB 440AE*," to examine the amount of further processing in TEFLU's products, whether the products were within "an industry that was investigated by the ITC when the ITC determined that certain pipe and tube caused material injury or threat of material injury to domestic producers," and whether the products are realistically interchangeable with raw input LWRPT).

Without citation, Commerce posits that "{i}t strains credulity to argue that a piece of LWRPT is bent, perforated and/or cut to length are the automotive applications considered by the ITC, such as a truck body or trailer." Remand Redetermination at 26. To TEFLU's

automotive customers, a piece of LWRPT material that is further processed to a specific part is not a trivial matter but involves testing, engineering, quality control. Commerce may find it instructive to recall that many of TEFLU's parts are not ordered, produced or sold as commodity LWRPT but as auto parts. *Maquilacero I*, 731 F. Supp. 3d at 1354. "In the field of {C}ustoms jurisprudence it is a well-recognized principle that a part of a part is a part for tariff purposes." *Am. Schack Co. v. United States*, 1 CIT 1, 5 (1980). For example, a part as simple as an arc-shaped segment made from fabric, cut to specific shapes/sizes in an engineering specification was classified for HTSUS purposes as parts of aircraft. *Honeywell Int'l Inc. v. United States*, No. 17-00256, 2025 WL 342865, at *10 (Ct. Int'l Trade Jan. 30, 2025). The Government made a similar argument that the fabric segments are not advanced enough to be recognized as a part. *Id.* at *11. The Court explained:

> The question is not, however, whether the segments are recognizable as aircraft brake discs . . . . Rather, the question is whether the segments are finished or unfinished parts at the time of importation in relation to a downstream article that constitutes part of an aircraft{.}

*Id*. Among other findings, the Court found that "the imported segments are identifiable to the downstream article and are used for no other purpose" and "are dedicated to that use and had no other substantial commercial application". *Id*. at *10. While Plaintiffs do not suggest that Commerce must apply the same analysis used in *Honeywell*, at a minimum Commerce needs to provide more than mere speculation.

Finally, the *PSC Scope Ruling* involves a similar scenario. Memorandum from J. Doyle to J. Maeder, re: Antidumping and Countervailing Duty Orders on Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, *et al*.: Scope Ruling Request at 3 (Oct. 11, 2017) (ACCESS barcode 3628547) ("*PSC Scope Ruling")*; Case Br. at 11-12, C.R. 246, P.R. 140. Commerce found that cut-to-length steel plate further processed into mold base parts used

AFSDOCS:301651734.1

in plastic injection molding machines were outside the scope.  *PSC Scope Ruling* at 7.  The parts were processed with drilled holes, slots and bushings.  *Id.* at 3.  Similar to this case, "machine parts (e.g., the body of the machine or its frame{}" were "within the list of possible downstream products manufactured using CTL plate." *Id.*  Commerce reasoned that parts for mold bases represented such downstream products not covered by the scope. Thus, unlike this case, Commerce found that processing the subject plate into a mold base *part* was sufficient to render that *part* outside the scope.  Using that rationale, TEFLU's further processed auto parts should be excluded as downstream products configured for automotive applications.  Commerce's reasoning in *PSC Scope Ruling* is clearly inconsistent with the position it is taking in this case.

### 5.    The scope determinations cited by Commerce have limited relevance.

Finally, Commerce's analysis of other scope determinations is deficient. Commerce cites *Notice of Preliminary Determination of Sales at Less Than Fair Value: Light-Walled Rectangular Pipe and Tube From Mexico*, 73 Fed. Reg. 5515, 5523 (Dep't Commerce Jan. 30, 2008) ("*LWRPT Preliminary Determination*") and *Light-Walled Rectangular Pipe and Tube From Mexico*, 83 Fed. Reg. 10664 (Dep't Commerce Mar. 12, 2018) (final AD results; 2015-2018), and accompanying Issues and Decision Memorandum at Comment 1 ("*LWRPT from Mexico 2015-2016*") as supporting inclusion of further processed products as within scope based on respondent Prolamsa (1) identifying direct sales to automotive and OEM and furniture producers as a channel of distribution in the former and (2) requesting that Commerce alter the physical characteristics of LWRPT in the latter, but otherwise reporting its further processed products. Remand Redetermination at 9 nn. 35, 36. Commerce improperly relied on the *LWRPT Preliminary Determination* as a "description{} of the merchandise in the initial investigation" because the scope was not fixed at the preliminary stage of the original investigation. Remand Redetermination at 27. Moreover, citation to *LWRPT from Mexico 2015-2016* as an "example

where another respondent reported further processed products as subject to the *Order*" has little

value in the (k)(1) analysis. *Id.* at 9. In both cases, as Commerce acknowledges, Prolamsa's

decision to not contest scope does not preclude Plaintiffs from doing so here. *Id.* at 27-28

("{W}e agree with Maquilacero/TEFLU's statement that they are not precluded from arguing

about the coverage of TEFLU's products under the scope after another respondent did not

contest the coverage of further processed LWRPT during the original investigation."). But

Commerce's claim that this "description" of the merchandise is relevant as "one of many (k)(1)

sources" analyzed is unavailing. *Id.* at 28.  Prolamsa's decision to not contest the inclusion of its

products as in scope cannot be reasonably viewed as somehow binding for TEFLU's own further

processed auto parts, custom designed for specific customers.

Commerce next refers to the *IBC Cages* scope ruling, which involved a product made by

Maquilacero. *Id.* at 9-10, citing Additional Documents Memo, Attach. 6, Memorandum from E.

Greynolds to J. Maeder, re: Antidumping Duty Order on Light-Walled Rectangular Pipe and

Tube from Mexico: Final Scope Ruling – Certain Tubing for Intermediate Bulk Container Cages

(Feb. 9, 2021) ("*IBC Cages*"), Rem-P.R. 2, Attach. 6. In that ruling, Maquilacero's tubing for

intermediate bulk containers was deemed out of scope because it did not possess rectangular

cross sections. Remand Redetermination at 9. The agency states "{b}ecause we have previously

found inquiry products to be outside of the scope based on the exact same scope language and

criteria, this precedent runs contrary to Maquilacero/TEFLU's arguments that our finding here

means that *any* product could be covered by the scope." *Id.* at 10. Commerce's reliance on this

case is flawed in two respects. First, the tubes in the *IBC Cages* were never LWRPT because

they did not have a rectangular cross section and were classified in HTSUS subheading

7306.69.5000 for LWR with other cross-sections. *IBC Cages* at 5-6. They were thus excluded

based on a plain reading of the scope, as the absence of a rectangular or square cross section

18

proved dispositive. *See Order*. More to the point, the non-rectangular cross section in *IBC Cages* was a result of Maquilacero's pipe and tube mills hot-rolling the LWR with the non-rectangular section, not a result of further processing. *IBC Cages* at 9 (noting that the production process to make the LWR with this cross section is due to "one additional rolling process in order to achieve its specific geometry"). Thus, for multiple reasons, the *IBC Cages* ruling is not relevant to the Court's order to consider whether TEFLU's further processed products are in scope.

Commerce's reliance on its finding during the investigation on *HWRPT from Mexico* is also misplaced. Remand Redetermination at 10 (citing *Heavy Wall Rectangular Welded Carbon Steel Pipes and Tubes From Mexico*, 84 Fed. Reg. 24473 (Dept. Commerce May 28, 2019) (final AD results & no shipments determ.; 2016-2017), and accompanying Issues and Decision Memorandum ("*HWRPT from Mexico*"). First, that investigation was based on a different industry – one that produces HWRPT. Second, in that investigation Maquilacero argued that further processed products do not have a rectangular cross section across the entire length of the pipe, with the literal scope language requiring a rectangular cross section. Commerce cites *HWRPT from Mexico* as finding that further processed products could still be considered in scope despite additional processing (*i.e.*, drilling, perforation, or a lack of rectangular cross section across the entire length of the pipe), but as noted above, the argument there centered on whether the product had a rectangular cross sections. *HWRPT from Mexico* at 13-17 (Comment 3). Thus, *HWRPT from Mexico* is also not relevant to addressing whether, *on this record*, the level of TEFLU's further processing of LWRPT to make custom auto parts for specific customers rendered those parts out of scope.

In conclusion, Commerce's (k)(1) determination is not supported by the Petition, the ITC's determination in the original investigation or the *Second Review*. The scope determinations cited are either irrelevant to the question of further processing or of limited

application.  To the extent Commerce has interpreted products that represent the functional

consumption of LWRPT to be sufficiently advanced to be out of scope, it has presented no

justification as to why TEFLU's parts do not represent the functional consumption of LWRPT.

Based on these (k)(1) sources, Commerce erroneously concluded that it is reasonable to include

TEFLU's products in the scope of the Order. This conclusion is unsupported by substantial

evidence because none of the sources Commerce cited support interpretating the scope language

to include TEFLU's downstream products.

### B.    Commerce's analysis of TEFLU's further-processed, customized auto parts failed to apply the Court's precedent.

In its Remand Redetermination, Commerce again "failed to address . . . substantial

contrary evidence suggesting that TEFLU's further processing of the raw {LWRPT} resulted in

TEFLU's 83 products becoming customized, downstream products." *Maquilacero I*, 731 F.

Supp. 3d at 1362. The Court previously discussed TEFLU's products in detail and ordered

Commerce to:

> consider on remand the degree to which each of TEFLU's approximately 83
> products were processed by saw-cutting, laser cutting-to-length, drilling,
> perforation, bending, or other further manufacturing processes, and whether such
> further processing rendered each of the approximately 83 products outside the
> scope of the *Order* as downstream products, particularly within the context of the
> Petition and the ITC investigation, and comparing the interchangeability of
> TEFLU's further processed products with the pipe and tube covered under the
> *Order.*

*Id.* at 1359–60.

Despite Plaintiffs waiving the confidentiality of TEFLU's products and the Court

identifying specific examples in its opinion, *id.* at 1359 n.5, Commerce conducted a cursory

remand analysis that neither addresses the Court's concerns nor record evidence that detracts

from its continued determination that all of TEFLU's products are in-scope. Commerce claims

that it "analyzed the further processing of TEFLU's products and relevant submitted

AFSDOCS:301651734.1

documentation" and "Maquilacero/TEFLU provided no clarity in their comments, including with respect to specific examples highlighted by Commerce." Remand Redetermination at 38–39. To comply with the Court's order, Commerce should have considered the degree of processing for TEFLU's products subject to this review— starting, at the bare minimum, with the examples highlighted in the Court's opinion. *Maquilacero I*, 731 F. Supp. 3d at 1359; Maquilacero's Downstream Sales Response for TEFLU at Exh. BA2-4 (Dec. 28, 2021), C.R. 88, P.R. 57. (identification and short description of the products sold by TEFLU in this review period). Given the breadth of these products and the specificity of the Court's discussion, Commerce's cursory analysis fails to engage with the record evidence or the Court's concerns. Accordingly, the Court should remand the case for Commerce to reconsider its determination for each of TEFLU's products.

1.    **The Court did not instruct Commerce to focus its analysis on the narrow question of whether TEFLU's products appear to have rectangular cross-sections.**

Commerce purported to examine the physical characteristics of TEFLU's products to determine whether they fit the scope language — particularly focusing on whether the products have a rectangular or square cross section. Remand Redetermination at 12–13. However, the central issues of the Court's opinion and order concerned the broader questions of how much processing applies to TEFLU's products and whether further processing transformed TEFLU's products into downstream products that are not realistically interchangeable with in-scope LWRPT. *Maquilacero I*, 731 F. Supp. 3d at 1362 ("In the Final IDM, Commerce failed to

address this substantial contrary evidence suggesting that TEFLU's further processing of the raw

{LWRPT} resulted in TEFLU's 83 products becoming customized, downstream products.").

Commerce examined the drawings and illustrations provided at Exhibit A-6 and

determined that "TEFLU's further processed products have a rectangular cross section, even if

they are bent, drilled, or pressed." Remand Redetermination at 13. The agency also claims that

Plaintiffs "do not contest Commerce's analysis of TEFLU's products in the Draft Remand, only

Commerce's conclusions regarding the status of these products as subject to the scope due to the

further processing contemplated by the (k)(1) sources." Remand Redetermination at 33. But this

determination is unsupported by substantial evidence. As a general matter, even though some of

the illustrations show the product viewed perpendicular to its length, the third example in Exhibit

A-6 shows a front axle piece bent in multiple locations and indented along the length of the part

such that there does not appear to be a rectangular cross section anywhere along the part.

Maquilacero S.A de C.V. and Tecnicas de Fluidos S.A. de C.V.'s Comments on the Draft

Results of Redetermination in Consol. Court No. 23-0091 (Slip Op. 24-107) at 15 n.55 (Dec. 2,

2024) ("Pls.' Draft Remand Comments"), Rem-P.R. 5 (identifying the front axle and noting the

lack of cross section (citing Section A QR at Exh. A-6, C.R. 13, P.R. 36)).

More importantly, the Court analogized this case to *Stein* based on (1) Commerce's

determination in both cases that "the ITC Report reflected that {LWRPT} was an intermediate

product with a variety of end uses," whereas (2) Plaintiffs in both cases "contend{ed} that

further processing of the subject merchandise rendered the downstream products outside of the

scope of the *Order*. *Maquilacero I*, 731 F. Supp. 3d at 1359. So, while the *Stein* court remanded

on the basis that "Commerce failed to address {whether} subject merchandise were outside of

the scope based on the lack of uniform cross section and that the subject ITC report could not be

reasonably interpreted . . . to suggest that both intermediate and downstream products were

AFSDOCS:301651734.1

within the scope," *Id.* (citing *Stein*, 365 F. Supp. 3d at 1371-74), the Court neither cited *Stein* in its opinion nor confined its remand instructions to only consider the effect of further processing on the rectangular cross section. And as shown below, record evidence supports Plaintiffs' contentions that further processing of LWRPT rendered TEFLU's products outside the scope of the Order.

> **2.    Commerce failed to examine TEFLU's further-processed products to determine whether the amount of processing transformed them from a raw input into a downstream product.**

In its Remand Redetermination, Commerce continued to ignore record evidence showing that further processing rendered TEFLU's products out of scope and are not realistically interchangeable with covered merchandise. Moreover, had Commerce believed that the "substantial record evidence of approximately 83 different custom parts . . . manufactured . . . for several OEM customers" already provided was not enough to address the Court's concerns, it should have sought additional information — especially in light of the concerns raised in the Court's opinion. *Maquilacero I*, 731 F. Supp. 3d at 1359 (the Court's characterization). Regardless, Commerce's Remand Redetermination that *all* of TEFLU's products remain in scope is unsupported by the evidence on the record. To ensure compliance with its original opinion and order, the Court should remand the case again for Commerce to consider the effect of further manufacturing for each of TEFLU's products and whether these further processed products are realistically interchangeable with covered LWRPT.

Instead of "consider{ing} on remand the degree to which each of TEFLU's approximately 83 products were processed . . . and whether further processing rendered {them} outside the scope of the *Order*," *Maquilacero I*, 731 F. Supp. 3d at 1359–60, Commerce provided a cursory analysis of TEFLU's products without even addressing certain products explicitly highlighted in the Court's opinion. *Compare* Remand Redetermination at 15 ("These

23

same contentions apply to Exhibit A-6, where Maquilacero/TEFLU provided examples of TEFLU products in a similar format."), *with Maquilacero I*, 731 F. Supp. 3d at 1359 ("Many of these customized parts were further processed into distinct shapes and sizes . . . . For example, TEFLU manufactured a decklid hinge gooseneck, which was twisted into a curved shape with holes punched throughout the product.") *and* Response to Court's Request, Attach. 1, at Exh. A-6, ECF Nos. 54 & 55 (image of the "decklid hinge gooseneck" part and identity of OEM customer).

Plaintiffs drew Commerce's attention to the decklid hinge gooseneck on remand because it was among the examples specifically mentioned by the Court and is a clear example of how TEFLU's further processing transforms LWRPT into a downstream product. *Maquilacero I*, 731 F. Supp. 3d at 1359. Commerce's dismissal of this example in its Remand Redetermination as the "single most complex product or represent{ing} the greatest amount of processing among TEFLU's products," and therefore an outlier, is not supported by the record evidence. Remand Redetermination at 38 and n.184 (comparing the decklid hinge gooseneck to other TEFLU products on the record at Exhs. A-6 and 2S-7). *See* Response to Court's Request, Attach. 1, at Exh. A-6, ECF Nos. 54 & 55 and Post-Prelim. SQR at Exh. 2S-7, C.R. 217, P.R. 119.

The Court tasked Commerce with evaluating whether further processing takes TEFLU's products out of the *Order's* scope, *Maquilacero I*, 731 F. Supp. 3d at 1359–60, but the agency failed to do so. It claims it is "unable to determine a threshold based on the degree of further processing {that} would be enough to bring these products outside of the scope." Remand Redetermination at 13. At the same time, it insists that the decklid hinge gooseneck is TEFLU's "single most complex product" or "represents the greatest amount of processing among TEFLU's products," but not an amount sufficient to fall out of scope. *Id.* at 38. In differentiating one of TEFLU's products as an outlier, but also not establishing a threshold for when further

24

processing takes a product out of scope, Commerce shifts the goalposts. If the agency has a standard to evaluate TEFLU's further processing, it should articulate it. *See Bowman Transp., Inc. v. United States*, 419 U.S. 281, 286 (1974) (noting the Court will set aside "a decision of less than ideal clarity" when the agency's path cannot be "reasonably discerned"). Likewise, while Plaintiffs maintain that further processing renders TEFLU's products out of scope as a general matter, the Court's instructions to consider "each" of TEFLU's products did not mandate that Commerce make a universal determination. *Cf. Shanghai Tainai Bearing Co. v. United States*, No. 22-00038, 2024 WL 5154032, at *7 (Ct. Int'l Trade Dec. 18, 2024), appeal docketed, No. 2025-1405 (Fed. Cir. Jan. 24, 2025) ("Commerce could have analyzed the data for each supplier individually and determined which suppliers Tainai could control and which suppliers it could not."). Should the Court remand the case again, it should instruct Commerce to make its determination with respect to each product reported by TEFLU in this review.

Commerce also failed to consider record evidence that detracts from its determination that all of TEFLU's products are in scope. *See Maquilacero I*, 731 F. Supp. at 1361 ("The photographs in these documents demonstrated that some of these parts had multiple cuts, were cut at specific angles, had holes drilled, or had cuts with prongs at the ends of the pipes."); *see also Universal Camera Corp.*, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Plaintiffs agree that the decklid hinge gooseneck demonstrates extensive further processing, showing half a dozen bends and nine or more perforations of varying sizes. It is a strong example of bending or perforation, but it is not the outlier Commerce claims. The agency's bare assertion that it is the "single most complex product or represents the greatest amount of processing" is undermined by the record evidence of further processing for TEFLU's other products. Remand Redetermination at 38.

25

For example, Plaintiffs submitted record evidence of TEFLU products with even more extensive bending and perforations than the decklid hinge gooseneck. *Compare* Exh. A-6 (decklid hinge gooseneck), Response to Court's Request, Attach. 1, at Exh. A-6, *with* Section A QR at Exh. A-32, C.R. 21, P.R. 38 ("Automative seating tubular components" having a greater degree of bending) *and* Post-Prelim. SQR at Exh. 2S-7, C.R. 217, P.R. 119 (Part number "[                    ]" having more apparent perforations with greater variance in size).

A fulsome review of TEFLU's products would also account for record evidence of additional types of processing and a degree of transformation not found in the decklid hinge gooseneck. For example, Part No. [                    ] has two rectangular notches, reflecting where portions of the original LWRPT piece were removed entirely. Post-Prelim. SQR at Exh. 2S-7, C.R. 217, P.R. 119. The tube front boom, identified in the same exhibit and the Court's prior opinion, features angular end cuts in service of its ultimate use in a tractor. Response to Court's Request, Attach. 1, at Exh. A-6; *Maquilacero I*, 731 F. Supp. 3d at 1361. As noted above, part number [          ] has an indent across the entire length of the part, giving it a non-rectangular cross section (in addition to being bent at least twice). Response to Court's Request, Attach. 1, at Exh. A-6. Still other products in Exhibit 2S-7 have protrusions or notches at their ends and/or indentation along their lengths that entail a level of additional processing distinguishable from the decklid hinge gooseneck, much less upstream LWRPT. Parts [                    ] and [                    ], in particular, have a protrusion at one end of their lengths and an asymmetrical V-shape cut at the other end, demonstrating more extensive cutting than the decklid hinge gooseneck. Post-Prelim. SQR at Exh. 2S-7. The Court highlighted many of these examples by name in its original opinion. *Maquilacero I*, 731 F. Supp. 3d at 1359. Had Commerce followed the Court's order to consider the further processing for "each of TEFLU's approximately 83 products," it could not reasonably conclude that the decklid hinge gooseneck

26

part is an outlier among TEFLU's products. *Id.* at 1359–60; *see* Remand Redetermination at 38. Nor could it conclude that *none* of these products are rendered out of scope due to further processing. Remand Redetermination at 2. Consistent with its previous opinion, the Court should remand the case again for Commerce to (1) articulate its standard for further processing that will render LWRPT out of scope and (2) apply that standard to each of TEFLU's products.

### 3. The HTSUS subheadings for TEFLU's products show that the further-processed parts are not in scope.

Commerce "improperly rejected the evidentiary value" of the HTSUS subheadings under which TEFLU's products are classified. Remand Redetermination at 36-37. In its Remand Redetermination Commerce contends that the HTSUS subheadings for TEFLU's products support its position because they are "suggestive of pipes, tubes, and intermediate goods intended for certain end uses." *Id.* at 16. However, this line of argumentation is flawed.

The HTSUS subheadings for TEFLU's products continue to support treating the products as out of scope. Not only are the products' HTSUS classifications different at the eight-digit level, but these classifications are in other Chapters of the HTSUS, such as chapters 83, 84 and 94.[5] *Compare* Post-Preliminary Supp. QR at 6 and Exhs. 2S-6.1 through 2S-6.7, C.R. 207-217, P.R. 119, *with* Remand Redetermination at 5 ("The welded carbon-quality rectangular pipe and tube subject to the *Order* is currently classified under {HTSUS} subheadings 7306.61.50.00 and 7306.61.70.60."). Contrary to Commerce, these subheadings are not "suggestive" of "pipes. But even if one were to assume that the subheading might appear "suggestive" of "pipes, tubes, and intermediate goods" to Commerce does not support its determination that TEFLU's products are in scope. Remand Redetermination at 16. In the context of scope determinations, reliance on

---

[5] HTSUS available at https://hts.usitc.gov/search?query=8431 (describing heading 8431 as "Parts suitable for use solely or principally with the machinery of headings 8425 to 8430").

AFSDOCS:301651734.1

HTSUS subheadings as a basis for exclusion is clearly more compelling than the mere presence of descriptive terms in HTSUS subheadings not enumerated in the Order.

### 4. Commerce's circumvention concerns in this case are unfounded.

Finally, Commerce's concern that finding TEFLU's further processed products as out of scope would invite the potential for circumvention is unfounded. *Id.* at 37–38. By contrast, the Court has recognized the risk Commerce could wrongfully "interpret" the *Order* to change its scope, and the Court has directly held that a certain level of processing places a product outside of scope. *Maquilacero I*, 731 F. Supp. 3d at 1352-53 ("It is well-established that 'Commerce cannot "interpret" an antidumping order so as to change the scope of th{e} order{.}'" (quoting *Eckstrom Indus. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001))); *see e.g., Trendium*, 399 F.Supp.3d at 1337. *Saha Thai* and *Mid Continent* are inapposite as neither deal with situations involving customized downstream products like TEFLU's further-processed products. *See Saha Thai Pipe Pub. Co. v. United States*, 101 F.4th 1310, 1328 (Fed. Cir. 2024), petition for cert. filed, No. 24-696 (U.S. Dec. 30, 2024) ("Saha does not dispute that dual-stenciled pipes are certified as standard pipes, meet ASTM specifications for standard pipes, and suit the corresponding standard-pipe applications."); *see also Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1299 (Fed. Cir. 2013) ("Target conceded that the nails were of the type described in the antidumping order."). Instead, analogous to *Trendium*, TEFLU's further processing of LWRPT into custom auto parts yielded downstream products no longer in scope.

Commerce's attempts to distinguish this case from *Duferco Steel, Inc. v. United States*, 296 F.3d 1087 (Fed. Cir. 2002), are contrary to the remand opinion — improperly relying on silence to exclude TEFLU's products. *Compare* Remand Redetermination at 19, *with Maquilacero I*, 731 F. Supp. 3d at 1355–56. Commerce states that the Federal Circuit in *Duferco* "relie{d} on exclusionary language" in the scope's Appendix, finding that the language could not

be reasonably interpreted to include floor plate with patterns in relief as in scope. Draft Results of Redetermination Pursuant to Court Remand at 18 (Nov. 18, 2024). Rem-P.R. 1 ("Only those products whose nonrectangular cross-sections are achieved subsequent to the rolling process are included within the scope of the investigations . . . . This language cannot be reasonably interpreted to include {the} floor plate with patterns in relief achieved during the rolling process because the patterns . . . render the cross section nonrectangular.") (quoting *Duferco*, 296 F.3d at 1095 (citations omitted) (footnotes omitted)); *see also* Remand Redetermination at 18. Commerce then concludes that "The Federal Circuit's emphasis on exclusion versus inclusion, in light of the difficulties in establishing a threshold for further processing . . . , *as well as a lack of the kind of threshold language found in Duferco*, further leads us to conclude that Maquilacero/TEFLU's products remain within the scope{.}" Remand Redetermination at 18-19. The Court already rejected Commerce's argument that "{I}t is not reasonable to conclude that simply because a particular type of {light-walled rectangular pipe and tube} is not specially mentioned in the scope, that product is not covered."*Maquilacero I*, 731 F. Supp. 3d at 1354-55 (citation omitted). Here Commerce makes a similar argument: because the *Order* does not contain exclusionary language for further processed LWRPT products, it is reasonable to conclude TEFLU's products are in scope. The Court's concern that "Commerce's position would allow the agency to read *any* product into the scope of an order if the scope language is silent, which is contrary to the principle articulated in *Duferco*" is apt here. *Id.* at 1356. Moreover, Commerce's renewed "position that the *silence* of the scope language," with respect to exclusionary language like that in *Duferco*, "permits Commerce to interpret TEFLU's products as within the scope of the *Order* is the opposite of the well-established principle set forth in *Duferco*," *id.*, that "subject merchandise may be included in-scope *only* if the scope language specifically *includes* the merchandise or may be reasonably interpreted to include it." *Id.* at

AFSDOCS:301651734.1

1355-56 (citing *Duferco*, 296 F.3d at 1089) (emphasis added). Commerce's continued reliance on silence is incongruous with the Court's opinion and order.

### III.   THE COURT SHOULD REMAND THE CASE TO COMMERCE WITH MORE SPECIFIC INSTRUCTIONS REGARDING TREATMENT OF TEFLU'S PRODUCTS AS NON-SUBJECT MERCHANDISE.

The Court ordered Commerce to reconsider its scope determination, including to assess what level of processing renders TEFLU's LWRPT products out of scope. In failing to address whether further processing took TEFLU's products out of scope, the Remand Redetermination does not comply with the Court's remand opinion and order and is unsupported by substantial evidence. For these reasons, the Court should remand the case to Commerce to reconsider its determination that all of TEFLU's further-processed products are in-scope merchandise.

Respectfully submitted,

February 18, 2025

**/s/ Diana Dimitriuc Quaia**
Diana Dimitriuc Quaia
John M. Gurley
Christian L. Bush

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6291
Fax: (202) 857-6395
Email: diana.dimitriuc-quaia@afslaw.com

*Counsel for Maquilacero S.A. de C.V. and*
*Tecnicas De Fluidos S.A. de C.V.*

30

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies

that Plaintiffs' Comments in Opposition to Remand Redetermination filed on February 18, 2025,

complies with the word limitation requirement. The word count for Plaintiffs' Opposition

Comments, as computed by ArentFox Schiff LLP's word processing system is 9,292.


 **/s/ Diana Dimitriuc Quaia**
Diana Dimitriuc Quaia

AFSDOCS:301651734.1