UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MAQUILACERO S.A. DE C.V. and TECHNICAS DE FLUIDOS S.A. DE C.V., <br><br>        Plaintiffs, <br><br>   and <br><br>PERFILES LM, S.A. DE C.V., <br><br>        Consolidated Plaintiff, <br><br>   v. <br><br>THE UNITED STATES, <br><br>        Defendant, <br><br>   and <br><br>NUCOR TUBULAR PRODUCTS INC., <br><br>        Defendant-Intervenor. | Consol. Court. No. 23-00091 |

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND REDETERMINATION

                          YAAKOV M. ROTH
                          Acting Assistant Attorney General

                          PATRICIA M. McCARTHY
                          Director

                          FRANKLIN E. WHITE, JR.
                          Assistant Director

OF COUNSEL

LESLIE M. LEWIS
Attorney
Office of the Chief Counsel for Trade
   Enforcement & Compliance
U.S. Department of Commerce
Washington, D.C. 20230

                          KRISTIN E. OLSON
                          Trial Attorney
                          U.S. Department of Justice
                          Civil Division
                          Commercial Litigation Branch
                          P.O. Box 480 | Ben Franklin Station
                          Washington, D.C. 20044
                          Tel: (202) 307-6299
                          kristin.olson@usdoj.gov

                          *Attorneys for the United States*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

BACKGROUND ................................................................................................... 1

    I.    Administrative Determination Under Review And Remand Order ....................... 1

    II.    Remand Proceeding and Remand Redetermination ............................... 2

ARGUMENT ...................................................................................................... 5

    I.    Standard Of Review ................................................................................... 5

    II.    The Court Should Sustain The Remand Results Because
        Commerce's Determination That TEFLU's Further-Processed
        Products Are Within The Scope Of The *Order* Is Supported By
        Substantial Evidence and Complies With The Court's Remand
        Order .......................................................................................................... 5

            1.    The Petition Indicates That Any Products Meeting
                 The Physical Characteristics Described In The
                 Petition Are Covered .................................................................... 7

            2.    Commerce's Analysis Of The ITC Report Comports
                 With The ITC Findings ................................................................. 9

            3.    Commerce Lawfully Relied On The ITC Report In
                 The Second Review ...................................................................... 12

            4.    Commerce Did Not Conflate The ITC's End Use
                 Applications With Scope Coverage ............................................. 14

            5.    Commerce's Reliance On Its Prior Determinations Is
                 Lawful .......................................................................................... 15

        B.    Commerce's Scope Determination Complies With The
            Court's Remand Order ........................................................................... 21

CONCLUSION .................................................................................................... 27

# TABLE OF AUTHORITIES

CASES                                                                                          PAGE(S)

*MacLean-Fogg Co. v. United States*,
     100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........................................................... 5

*Maquilacero S.A. de C.V. v. United States*,
     731 F. Supp. 3d 1346 (Ct. Int'l Trade 2024) ............................................... passim

*Saha Thai Steel Pipe Pub. Co. v. United States*,
     101 F.4th 1310 (Fed. Cir. 2024) ............................................................................ 3

*Stein Industries, Inc. v. United States*,
     365 F. Supp. 3d 1364 (Ct. Int'l Trade 2019) ....................................................... 18

*Trendium Pool Products, Inc. v. United States*,
     399 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) ....................................................... 25

STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................................ 5

REGULATIONS

19 C.F.R. § 351.225(k)(1) ............................................................... 6, 13, 16, 17, 20

19 C.F.R. § 351.401(f)(1) ......................................................................................... 4, 5

ADMINISTRATIVE DETERMINATIONS

*Heavy Wall Rectangular Welded Carbon Steel Pipes and Tubes from Mexico*,
     84 Fed. Reg. 24473 (Dep't of Commerce May 28, 2019) ...................................... 19

*Light-Walled Rectangular Pipe and Tube*, Inv. Nos. 701-TA-449 and
     731-TA-1118-1121 (Second Review), USITC Pub. 5086 at 6 (July 2020) .......... 9, 10

*Light-Walled Rectangular Pipe and Tube from Mexico*, 73 Fed. Reg. 45,403
     (Dep't of Commerce Aug. 5, 2008) ............................................................... passim

*Light-Walled Rectangular Pipe and Tube from Mexico: Amended Final Results,
     2020-2021*, 88 Fed. Reg. 30123 (Dep't of Commerce May 12, 2023) .................... 1

*Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of
     Administrative Review; 2020-2021*, 88 Fed. Reg. 15665 (Dep't of Commerce
     March 14, 2023), and accompanying Issues and Decision Memorandum ................ 1

*Light-Walled Rectangular Pipe and Tube from Turkey*,
     Inv. No. 731-TA-1121 (Final), USITC Pub. 4001 at 13 (May 2008) ....................... 9

*Light-Walled Rectangular Pipe and Tube Mexico*, 73 Fed. Reg. 5515, 5523
 (Dep't of Commerce Jan. 30, 2008)........................................................................ 17

*Light-Walled Rectangular Pipe and Tube Mexico; 2015-2016 Administrative Review*,
 83 Fed. Reg. 10664 (Dep't of Commerce Mar. 12, 2018)....................................... 17

Defendant, the United States, respectfully submits this response to comments filed by plaintiffs Maquilacero S.A. de C.V. (Maquilacero) and Tecnicas de Fluidos S.A. de C.V. (TEFLU) (collectively, Maquilacero/TEFLU or plaintiffs), ECF Nos. 67, concerning the United States Department of Commerce's final results of redetermination filed in accordance with this Court's decision and remand order in *Maquilacero S.A. de C.V. v. United States*, 731 F. Supp. 3d 1346 (Ct. Int'l Trade 2024). *See* Final Results of Redetermination Pursuant to Court Remand, Jan. 2, 2025, ECF No. 61-1 (Remand Results). The Court should sustain Commerce's remand redetermination because it complies with the remand order and is supported by substantial evidence and otherwise in accordance with law.

## BACKGROUND

### I.  Administrative Determination Under Review And Remand Order

The administrative determination under review is Commerce's final results of administrative review of the antidumping (AD) duty order on light-walled rectangular pipe and tube from Mexico covering the period (POR) of August 1, 2020, through July 31, 2021. *See Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Administrative Review; 2020-2021*, 88 Fed. Reg. 15665 (Dep't of Commerce March 14, 2023) (Final Results) (P.R. 160), and accompanying Issues and Decision Memorandum (IDM) (P.R. 146), unchanged in *Light-Walled Rectangular Pipe and Tube from Mexico: Amended Final Results, 2020-2021*, 88 Fed. Reg. 30123 (Dep't of Commerce May 12, 2023).[1] In the final results, Commerce found that TEFLU's further-processed merchandise is within the scope of the *Order*. *See* IDM at Comment 2; *see also Light-Walled Rectangular Pipe and Tube from Mexico*, 73 Fed. Reg. 45,403 (Dep't of

---

[1] "P.R." refers to the documents in the public administrative record. "P.R.R." refers to the documents in the public remand record. "C.R." refers to documents in the confidential administrative record; there was no confidential remand record.

Commerce Aug. 5, 2008) (*Order*).  Plaintiffs appealed Commerce's final results to this Court. *See* Compl., ECF No. 7.

This litigation followed.  Plaintiffs challenged Commerce's Final Results concerning the determination that TEFLU's further-processed products were determined to be in-scope merchandise; the continued treatment of Maquilacero/TEFLU as a collapsed single-entity; Commerce's rejection of the use of a manufacturer code and further-processing variable in Commerce's margin calculations; the inclusion of TEFLU's sales made through the IMMEX program as home market sales; and Commerce's reliance on the Cohen's *d* test as a part of its differential pricing analysis.  *See Maquilacero*, 731 F. Supp. 3d at 1354, 1363-65.

On October 4, 2024, the Court remanded Commerce's final results.  *Maquilacero*, 731 F. Supp. 3d at 1355-56, 1365.  Specifically, the Court remanded Commerce's scope and collapsing determinations, and directed Commerce to (1) reexamine its scope determination for TEFLU's further-processed products; (2) reconsider whether the products produced by Maquilacero and TEFLU are similar or identical under its collapsing analysis, and thus reconsider its treatment of Maquilacero/TEFLU as a single entity; and (3) reconsider, as appropriate, the decision not to use manufacturer codes and a further processing variable.  *Id*. at 1365-66.

II.    Remand Proceeding and Remand Redetermination

On November 19, 2024, Commerce issued its draft remand redetermination and placed additional documents on the record.  *See* Draft Results of Redetermination, dated November 19, 2024 (Draft Results) (P.R.R. 1) and Transmitting Additional Documents Memorandum (P.R.R. 2).  In the draft redetermination, Commerce found, pursuant to section 351.225(k)(1) of the agency's regulations, that TEFLU's products are within the scope of the *Order*.  *See* Draft Results at 20.  Accordingly, because Commerce found that the (k)(1) sources dispositively answered the inquiry, the agency did not consider (k)(2) factors.  *Id*. at 10-11.

In the draft redetermination, Commerce found that the ambiguity of the *Order*'s plain scope language with respect to coverage of TEFLU's products was clarified upon review of (k)(1) sources. *Id.* at 5-6. That is, Commerce determined that the scope's plain language is ambiguous with respect to Maquilacero/TEFLU's scope inquiry and, therefore, Commerce examined other primary sources to determine whether the further processing of the light-walled rectangular pipe and tube (LWRPT) by TEFLU renders its products out of scope. *Id.* at 6. Commerce relied on the petition from the underlying investigation, publications from the U.S. International Trade Commission (ITC) and determinations by Commerce, all of which are (k)(1) sources, to determine that TEFLU's further-processed LWRPT products, described generally as automotive parts, fall within the scope. *Id.* at 10; 19 C.F.R. § 351.225(k)(1)(i)(C) and (D); *see also* Draft Results at 6-11, 16.

Commerce also considered whether the physical characteristics meet the scope description. *See* Draft Results at 11; *see also Maquilacero*, 731 F. Supp. 3d at 1365. Noting that the plain scope language covers light-walled pipe and tube with rectangular (including square) cross-sections, Draft Results at 11, Commerce found that, based on Maquilacero/TEFLU's exhibits, TEFLU's light-walled rectangular pipe and tube products fall within the scope description because they each have "a rectangular cross section, *even if* they are bent, drilled, or pressed." *Id.* at 12 (emphasis added). Commerce noted that there is no further delineation in the scope for the "rectangular (including square) cross section" requirement. That is, Commerce found that the further processing described by Maquilacero/TEFLU does not preclude inclusion in the scope. *Id.* at 13. Commerce also observed that finding these further-processed products as outside of the *Order*'s scope when they otherwise meet the scope description would invite the potential of circumvention. *Id.* at 18 (citing *Saha Thai Steel Pipe Pub. Co. v. United States*, 101

F.4th 1310 (Fed. Cir. 2024)). Accordingly, in consideration of the Court's opinion and record evidence with respect to the physical characteristics of each of the products, *i.e.*, photographs and schematics of products that all contain rectangular and square cross-sections, Commerce concluded that TEFLU's LWRPT products fall within the scope of the *Order*. Draft Results at 19 and 12-19.

Next, Commerce explained that because TEFLU's products fall within the scope of the *Order* and thus constitute subject merchandise, they are similar to those produced by Maquilacero. *See id*. at 19. As such, Commerce determined that Maquilacero and TEFLU "have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities" in accordance with 19 C.F.R. § 351.401(f)(1). Accordingly, in the draft redetermination, Commerce continued to treat Maquilacero and TEFLU as a single entity pursuant to the agency's regulations. *Id*. at 19-20.

On January 2, 2025, Commerce filed its final remand redetermination with the Court. *See* Remand Results, ECF No. 61-1. In the final redetermination, Commerce addressed comments by Maquilacero/TEFLU and Nucor Tubular Products, Inc. (Nucor or domestic interested party). *Id*. at 32. In response to Maquilacero/TEFLU's assertions, Commerce explained that its analysis of (k)(1) sources demonstrates that TEFLU's products fall within the *Order*'s scope, *id*. at 21-31, and that that agency's analysis complies with the Court's remand order and opinion. *Id*. at 32-38. Ultimately, Commerce continued to comply with the Court's remand order and found that TEFLU's further-processed products match the physical description of merchandise subject to the scope and, that TEFLU's products are covered by the scope of the *Order*. Further, with respect to the collapsing determination, Commerce explained that Maquilacero/TEFLU did not report any changes in fact or circumstances related to collapsing

and affiliation since the agency's determination in *LWRPT from Mexico 2018-2019*, and that

Maquilacero had requested that the companies *not* be collapsed based on its claim that TEFLU

does not and cannot produce LWRPT. Remand Results at 19. On remand, because Commerce

found that TEFLU's products are LWRPT subject to the *Order*, the agency also found that the

merchandise TEFLU exports to the United States is similar to the merchandise produced by

Maquilacero such that its facilities would not require substantial retooling. *Id*. at 19 (citing 19

C.F.R. § 351.401(f)(1)). Accordingly, Commerce continued to treat the companies as collapsed.

ARGUMENT

I.    Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in

accordance with the remand order," and are "supported by substantial evidence, and are

otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349,

1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

II.   The Court Should Sustain The Remand Results Because Commerce's Determination That
      TEFLU's Further-Processed Products Are Within The Scope Of The *Order* Is Supported
      By Substantial Evidence and Complies With The Court's Remand Order

The Court remanded to Commerce its plain scope language determination that TEFLU's

products, or automotive parts, fall within the scope because the scope language "makes no

reference to downstream products or automotive parts."[2] *Maquilacero*, 731 F. Supp. 3d at 1356.

---

[2] The Court also remanded Commerce's collapsing determination. *Maquilacero*, 731 F.
Supp. 3d at 1364. On remand, because Commerce found that TEFLU's products are LWRPT
subject to the *Order*, the agency also found that the merchandise TEFLU exports to the United
States is similar to the merchandise produced by Maquilacero such that its facilities would not
require substantial retooling. Remand Results at 19. Accordingly, Commerce continued to treat
the companies as collapsed. Plaintiffs did not specifically challenge that determination in its
comments in opposition to the remand redetermination. Instead, they reincorporated by
reference their prior arguments with respect to this issue, as well as the issues deferred by the
Court in its Remand Order. Pl. Br. at 2.

The Court explained that the scope's "silence and lack of exclusionary provisions do not permit Commerce to conclude, based upon a plain language reading of the scope provision, that TEFLU's further processed automotive products fall within the scope of the *Order*." *Id.* The Court ordered that, on remand, Commerce must answer whether TEFLU's further manufactured products are downstream products outside of the scope. *Id.* at 1365-66. The Court also ordered Commerce to determine the degree to which TEFLU's products were processed by further manufacturing processes and to address whether TEFLU's further-processed products are within an industry that was investigated by the ITC and whether TEFLU's products are realistically interchangeable with subject merchandise. *Id.*

On remand, Commerce complied with the Court's orders and reconsidered its scope determination. Commerce identified the relevant scope language, which states that products subject to the *Order* are "welded carbon-quality light-walled steel pipe and tube, of rectangular (including square) cross section, having a wall thickness of less than 4 mm." *Order*, 73 Fed. Reg. at 45,404; *see also* Remand Results at 5. Commerce determined that because the *Order* "includes no language concerning further processing or downstream products," the plain language is ambiguous with respect to coverage of further-processed LWRPT. Remand Results at 6. Therefore, Commerce stated that it was "no longer relying on the scope language's silence." Remand Results at 6. And, in light of the ambiguity, Commerce examined primary sources identified in 19 C.F.R. § 351.225(k)(1), including descriptions of the merchandise contained in the petition; descriptions of the merchandise contained in the initial investigation; previous determinations, including prior scope rulings pertaining to the *Order*, as well as other orders with same or similar language; and determinations of the ITC pertaining to the *Order*, including reports issued pursuant to the ITC's initial investigation. *See* 19 C.F.R.

§ 351.225(k)(1); Remand Results at 6 and 6-10. Based on its (k)(1) analysis, Commerce concluded that TEFLU's further-processed LWRPT products are subject to the scope of the *Order*. Remand Results. Commerce's determination complies with the Court's remand order, is supported by substantial evidence, and is otherwise in accordance with law, and therefore it should be sustained.

A.    Commerce's (k)(1) Analysis Supports The Determination That TEFLU's Further-Processed Products Fall Within The Scope Of The *Order*

Plaintiffs argue that Commerce's review of (k)(1) sources does not demonstrate that TEFLU's products are in scope merchandise. Pl. Br. at 4-5. However, Commerce's (k)(1) analysis supports the agency's determination that TEFLU's further-processed LWRPT products fall within the scope. Remand Results at 10.

1.    The Petition Indicates That Any Products Meeting The Physical Characteristics Described In The Petition Are Covered

Commerce began by reviewing the descriptions of the merchandise contained in the petition pertaining to the order at issue. Remand Results 6-7. Commerce noted that the petition did not specifically discuss whether the scope would include further-processed products. *Id.* at 7. It nevertheless found that the petition supports its finding that TEFLU's further-processed products fall within scope language as the petition outlines the petitioner's intent to cover *any* product meeting the physical characteristics described in the petition. *Id.* at 16 (citing Petition at Volume I); *see also id.* at 8 (citing Petition at Volume I).

 Plaintiffs assert that the petition does not indicate that the petitioner intended for the scope to "include customized downstream products made from LWRPT." Pl. Br. at 5. This assertion belies the record. The petition specifies that the scope covers *any* product which meets the physical characteristics described in the petition (*i.e.*, "carbon-quality light-walled steel pipe and tube, of rectangular (including square) cross section, having a wall thickness of less than

4mm (0.156).").  Remand Results at 8, 16 (citing Petition Volume I at 5).  In examining the petition, Commerce also examined existing ITC publications to describe the industry and products at issue.  Commerce observed that the ITC identified common use applications of LWRPT, such as "fencing, window guards, and railing for the construction industry," as well as decorative uses, such as "parts of furniture, athletic equipment, store shelving, towel racks, agricultural equipment frames and other similar items."  Remand Results 7.  The ITC stated that "physical properties and specifications often depend on the intended end use."  *Id*.  Commerce then observed that the petition included those same descriptions and cited to the ITC.  Remand Results 8 and note 30 (citing Petition at Volume I page 5).  Thus, contrary to plaintiffs' argument, the petition demonstrates an intent to cover any product which meets the physical characteristics described in the petition.

Plaintiffs also assert that TEFLU's further-processed products were not intended to be covered because the petition makes no mention of the HTSUS subheadings indicated for them.  Pl. Br. at 5.  However, as Commerce explained, HTSUS subheadings are not dispositive of scope coverage.  Remand Results at 16, 36.  HTSUS subheadings serve convenience and customs purposes only.  As such, that the petition, the very first filing in a proceeding, did not identify a specific HTSUS code under which products meeting the description of the scope could be classified fails to demonstrate that the petitioner did not intend the scope to cover the products.  This is especially true when the petition states that it "covers any product meeting the physical characteristics described herein regardless of whether it is produced to an ASTM, proprietary or other industry specification," *see* Petition at Volume I, and HTSUS subheadings are not dispositive of scope coverage.  In light of the petitioner's demonstrated intent, the absence of certain HTSUS subheadings in the petition does not detract from Commerce's determination.

Nevertheless, in the remand results, Commerce explained that the specific description of the HTSUS codes indicated for TEFLU's products, *i.e.*, pipes, tubes, *etc.*, comports with the agency's analysis of subject further-processed LWRPT. Remand Results at 36, 16; *see also id.* at 23.

        2.      Commerce's Analysis Of The ITC Report Comports With The ITC Findings

Commerce considered the ITC publications to describe the industry and products at issue, in finding that TEFLU's further-processed products are within scope. Remand Results at 7. Commerce's analysis of these publications is consistent with the ITC findings.

Plaintiffs argue that Commerce's conclusion that products made from LWRPT were part of the ITC's analysis is not supported by the record. Pl. Br. at 8. According to plaintiffs, the "absence of substantive discussion of downstream products or parts for automotive applications in the ITC's final determination supports the inference that such products were not part of the analysis." Pl. Br. at 8.

In the remand results, Commerce found that the ITC publications indicate that further-processed LWRPT was considered in the ITC investigation, as well as the investigations for other countries with LWRPT orders. For example, the ITC identified LWRPT as "long-rolled, welded carbon steel product commonly used in applications not involving the conveyance of liquids or gases." Remand Results at 7 (quoting *Light-Walled Rectangular Pipe and Tube*, Inv. Nos. 701-TA-449 and 731-TA-1118-1121 (Second Review), USITC Pub. 5086 at 6 (July 2020) (*ITC's Second Review*) (P.R.R. 2 at Attachment 4). Commerce also noted that the ITC had considered automotive equipment as a "known end use of LWRPT." *Id*. at 7 (omitting marks) (citing *ITC's Second Review*, USITC Pub. 5086 at 6, n.24 (P.R.R. 2 at Attachment 4) (citing *Light-Walled Rectangular Pipe and Tube from Turkey*, Inv. No. 731-TA-1121 (Final), USITC

Pub. 4001 at 13 (May 2008) (*Original ITC Determination*) (P.R.R. 2 at Attachment 5)).

According to Commerce, the ITC acknowledged that a product's "physical properties and

specifications often depend on the intended end use," and provided corrosion-resistant LWRPT

used in "air-conditioning, automotive parts, or certain outdoor signs" as an example. Remand

Results at 7-8 (citing *ITC's Second Review* at I-17). Commerce noted that these descriptions of

LWRPT also appear in the petition of the underlying investigation. *Id*. at 8 (citing Petitioner's

Letter, dated June 27, 2007 (Petition) at Volume I, page 5 (P.R.R. 2 at Attachment 1)).

Additionally, Commerce explained that the ITC specifically indicated that LWRPT can

be modified to meet design criteria for specific applications and LWRPT from one source may

not be readily interchangeable with LWRPT from another source *after bending or other*

*fabrication*, while still being considered LWRPT. Remand Results at 8 (citing *Original ITC*

*Determination* at I-12). Moreover, the ITC had included both processed and unprocessed

LWRPT shipments in its industry survey. *Id*. at 8 (*ITC's Second Review* at III-10 and III-11).

Accordingly, Commerce found that the relevant ITC publications indicate that further-processed

LWRPT was considered by the ITC. *Id*. at 8.

Plaintiffs argue that Commerce's reading of the ITC report does not comport with the

actual determination of the ITC commissioners. Pl. Br. at 6, 6-10. According to plaintiffs,

Commerce asserted that "subject LWRPT may be limited in its interchangeability due to

processing or 'design criteria for specific applications.'" Pl. Br. at 7. Plaintiffs claim that this is

a misinterpretation of the ITC report which "references 'design criteria' as limiting

interchangeability of LWRPT with *other products*." *Id*. at 7, 6-7. (emphasis in original).

Commerce did not misinterpret the ITC report. First, to clarify, Commerce stated that the

ITC "specifically noted that LWRPT may be modified to meet design criteria for specific

applications and that LWRPT from one source may not be readily interchangeable with LWRPT

from another source after *bending or other fabrication*, while still being considered LWRPT."

Remand Results at 8 (underline added).  That is, LWRPT may be modified and, after bending or

other fabrication, LWRPT from one source may not be readily interchangeable with LWRPT

from another, while still considered LWRPT.  As such, Commerce concluded that "even with

minimal further processing that would not otherwise bring the product outside of the scope, it

still might have limited interchangeability with unprocessed LWRPT."   Remand Results at 8

(emphasis in original); *see also* Pl. Br. at 6.  Commerce's analysis is consistent with the ITC

report which states that:

> Design criteria for specific applications and price competitiveness,
> key considerations for the use of LWR pipe and tube, reportedly
> limit interchangeability with other products.  According to U.S.
> producers and importers, factors that limit interchangeability
> among LWR pipe and tube from different sources include severe
> fabrication such as bending or swaging, steel quality failing to
> meet specification.

ITC report at I-12.  As Commerce observed, the ITC does not apply any qualification or

stipulation to its reporting on interchangeability.  Remand Results at 27.  Plaintiffs' further

contention with ITC findings as reported by the ITC are irrelevant to plaintiffs' action

concerning Commerce.  The record shows that Commerce's analysis is not inconsistent with the

ITC report.

Plaintiffs allege that Commerce dismissed the relevance of the pricing products used by

the ITC regarding length.  Pl. Br. at 8.  However, in the remand results, Commerce explained

that "{t}he sources identified in the {(k)(1) regulation} and parties' discussion of TEFLU's

products do not consider the length of the product as relevant to scope coverage."  Remand

Results at 22.  Moreover, plaintiffs do not explain why the length is material to the analysis of

further processing beyond the implication that TEFLU's exact products or products possessing identical lengths examined during the POR were not used in the ITC's pricing analysis. Nor do plaintiffs explain how this is clear evidence that further-processed products were not part of the ITC's analysis, or an industry investigated by the ITC. Pl. Br. at 8-9. As Commerce explained, the ITC does not need to investigate every possible variant of a product within the same domestic industry, and Commerce determined that processed LWRPT was considered as part of the industry investigated by the ITC for the *Order*. Remand Results at 22. At bottom, TEFLU's products constitute further-processed LWRPT comprised entirely of LWRPT. Remand Results at 34.

With respect to plaintiffs' contention with the HTSUS subheadings in the ITC report, Commerce explained that its conclusions were not based on HTSUS subheadings used by the ITC. Remand Results at 23. Commerce explained that the language used in the ITC report regarding HTSUS subheadings "does not indicate that LWRPT may be exclusively classified under these subheadings." *Id*. Moreover, the ITC report stated that "{t}he HTS subheadings are provided for convenience and Customs purposes, but Commerce's scope of these investigations is dispositive {emphasis added}." *Id*. As the record shows, contrary to plaintiffs' claim, Commerce considered the subheadings and explained why they did not detract from the agency's conclusion. *Id*. at 23; *see also* Pl. Br. at 9-10.

### 3. Commerce Lawfully Relied On The ITC Report In The Second Review

Plaintiffs next contend that Commerce "inexplicably" relies on the ITC report issued in the second sunset review of the *Order*. Pl. Br. at 10-12. However, in the remand results, Commerce explained its reliance: "In this instance, Commerce found that consideration of the most recent of the ITC's determinations concerning the *Order* allows for the most recent reporting and analysis concerning the LWRPT industry, including responses from U.S. importers

and Mexican producers of LWRPT, to inform our analysis and findings." Remand Results at 24. As Commerce explained in the remand results, there is no requirement that Commerce prioritize the ITC's investigation report over all other reports. *Id*. at 23.

Indeed, the (k)(1) regulation provides that "{i}n determining whether a product is covered by the scope of the order at issue, {Commerce} will consider the language of the scope and may make its determination on that basis alone if the language of the scope … is dispositive." 19 C.F.R. § 351.225(k)(1). The regulation goes on to say that, "{t}he following primary interpretive sources may be taken into account under paragraph (k)(1) … , at the discretion of {Commerce}." 19 C.F.R. § 351.225(k)(1)(i). Commerce "may {take} into account {…} {d}eterminations of the {ITC} pertaining to the order at issue, including reports issued pursuant to the investigation." 19 C.F.R. § 351.225(k)(1)(i)(D); Remand Results at 23.

Commerce explained that the *ITC's Second Review* is a determination of the ITC pertaining to the *Order*. Remand Results at 23. Moreover, as Commerce explained, the ITC noted in its review that "the characteristics of domestically produced LWRPT have not changed since the original investigation." *Id*. at 7. Plaintiffs do not contend that the second review conflicts with or does not repeat the descriptions identified in the ITC report. As Commerce explained, the agency found that consideration of the most recent of the ITC's determinations concerning the *Order* allows for the most recent reporting and analysis concerning the LWRPT industry, including responses from U.S. importers and Mexican producers of LWRPT, to inform its analysis and findings. *Id*. at 23. Therefore, plaintiffs' claims regarding Commerce's reliance on this source, *i.e.*, Pl. Br. at 11-12, are meritless. *Id*. at 23; *see also Maquilacero*, 731 F. Supp. 3d at 1365-66.

4. **Commerce Did Not Conflate The ITC's End Use Applications With Scope Coverage**

Plaintiffs assert that Commerce erred in its analysis, conflating intended end use of LWRPT with scope coverage. Pl. Br. at 12-16. This is incorrect. Rather, in its analysis, Commerce listed end use applications reported by the ITC and distinguished between finished products that functionally represent the consumption of LWRPT, which are out of scope, and TEFLU's further-processed products which Commerce found to be in scope. Remand Results at 16, 24. Commerce explained that the ITC referenced end use finished products that functionally represent the consumption of LWRPT, removing them from scope, *e.g.*, "{t}he category of {LWRPT} encompasses a wide variety of different pipe products whose specifications depend on end use, such as automotive seat frames, bed frames, car ports, fitness equipment, gas grills, mechanical pasts, ornamental fencing, playground equipment, scaffolding, school furniture, racks, railing, tools, and trailers." *Id*. According to Commerce, "these finished products would entail the combination of LWRPT with other LWRPT or other components to create a structure that is no longer a distinct length of pipe or tube and would accordingly fall outside of the scope's language." Remand Results at 16. Commerce concluded that the examples "differ from TEFLU's products, which are discrete pieces of LWRPT processed through bending, perforation, *etc*., but not manufactured into a finished product" like those products found to be out of scope. Remand Results at 17.

Plaintiffs argue that TEFLU's products "made from LWRPT that is fashioned into auto parts for an original equipment manufacturer ("OEM") customer's individual use" are out of scope as "a known end use for LWRPT" because the products functionally represent the consumption of LWRPT. Pl. Br. at 13. Notably, not only are TEFLU's products "made from LWRPT," TEFLU's products are further-processed LWRPT comprised entirely of LWRPT.

Remand Results at 34.  Commerce found that the processing reported for TEFLU's products is evidently less transformative than the downstream applications of LWRPT identified by the ITC. *Id*. at 24.  In fact, Commerce found that the end use downstream products which the ITC found out of scope are "complex products which lose their rectangular cross section after a discrete piece or pieces of LWRPT are combined together or with other inputs, *e.g.*, a trailer, carport, or door are structures which are not comprised of a discrete piece of LWRPT, no matter how much processing could have taken place." *Id*. at 25.

Plaintiffs argue that TEFLU's products incorporate at least the same or a higher level of further processing than some products identified by the ITC.  Pl. Br. at 13.  Yet, Commerce found that the processing reported for TEFLU's products is "evidently less transformative than the downstream applications of LWRPT identified by the ITC."  Remand Results at 24. Commerce "made no direct comparison to a railing or railings and instead listed end use applications reported by the ITC."  *Id*. at 24, 24-25.  As such, plaintiffs' comparison to TEFLU's products to only railings does not reflect the many applications of LWRPT identified by the ITC, as addressed by Commerce.  *Id*. at 25.  Commerce explained that the ITC's list of end uses includes products that are reasonably considered to have much higher degrees of further processing, including trailers, furniture and gas grills.  *Id*.  Commerce also noted that a decklid hinge gooseneck is "perhaps the most complex processing example among TEFLU's products," and some of the example products provided are otherwise indistinguishable from unprocessed LWRPT beside potentially being cut to length.  *Id*. at 26.  Thus, Commerce concluded that it "strains credulity to argue that a piece of LWRPT that is bent, perforated, and/or cut to length are the automotive applications considered by the ITC, such as a truck body or trailer."  *Id*.

5.  Commerce's Reliance On Its Prior Determinations Is Lawful

Plaintiffs argue that Commerce's analysis of scope determinations is deficient.  Pl. Br. at

17-20.  Plaintiffs first assert that Commerce improperly relied on the *LWRPT Preliminary Determination* as a description of merchandise from the initial investigation because "the scope was not fixed at the preliminary stage of the original investigation."  *Id*. at 17.  However, the regulation does not require as much.  In fact, the (k)(1) regulation states that "{i}n determining whether a product is covered by the scope of the order at issue, {Commerce} will consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive."  19 C.F.R. § 351.225(k)(1).  Primary interpretative sources may be taken into account including the descriptions of the merchandise contained in the petition, "descriptions of the merchandise contained in the initial investigation pertaining to the order at issue," or previous or concurrent determinations by Commerce, "including scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with the same or similar language as that of the order at issue"; and determinations of the ITC "pertaining to the order at issue, including reports issued pursuant to the {ITC's} initial investigation."  19 C.F.R. § 351.225(k)(1)(i)(A)-(D).  There is no requirement that the description of merchandise be "fixed."

Plaintiffs next take issue with Commerce's citation to *LWRPT from Mexico 2015-2016* as an "example where another respondent has reported further-processed products subject to the *Order*."  Pl. Br. at 17-18 (quoting Remand Results at 9).  Plaintiffs claim this citation has "little value" and should not be "binding."  Pl. Br. at 17-18.  In the remand results, Commerce noted that Prolamsa, a respondent in the underlying investigation and subsequent administrative review, had reported further-processed products, *i.e.*, non-stock or made-to-order product sold to automotive and original equipment manufacturers (OEM) and furniture producers, as

merchandise subject to the *Order*. Remand Results at 9 (citing *Light-Walled Rectangular Pipe and Tube Mexico*, 73 Fed. Reg. 5515, 5523 (Dep't of Commerce Jan. 30, 2008) (*Investigation Preliminary Determination*), and *Light-Walled Rectangular Pipe and Tube Mexico; 2015-2016 Administrative Review*, 83 Fed. Reg. 10664 (Dep't of Commerce Mar. 12, 2018) (*2015-2016 AR LWRPT*). Commerce clarified that Prolamsa's made-to-order subject merchandise sold to automotive OEM and furniture producers constitute descriptions of merchandise in the initial investigation, which Commerce found to be *relevant*. Remand Results at 27. As plaintiffs acknowledge, Commerce did *not* state that Prolamsa's characterization of its products was "binding" on plaintiffs. *See* Pl. Br. at 18; *see also* Remand Results at 27-28. Instead, the description was simply one of many (k)(1) sources that Commerce considered as part of its analysis. *Id.* at 28.

Plaintiff also takes issue with Commerce's consideration of its *IBC Cages* scope determination. *See* Pl. Br. 18 (citing Remand Results at 9-10 (citing Memorandum, "Final Scope Ruling – Certain Tubing for Intermediate Bulk Container Cages," dated February 9, 2021 (*IBC Cages*) at Additional Documents Memorandum, Attachment 6))). As previously explained, Commerce's (k)(1) regulations provide that, in considering the scope language, the agency may take into account "{p}revious or concurrent determinations of {Commerce}, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue." 19 C.F.R. § 351.225(k)(1)(i)(C). Pursuant to the regulation, in the remand results, Commerce considered its *IBC Cages* scope determination, in which it found that Maquilacero's intermediate bulk container (IBC) cages do not fall within the scope's plain language for lack of rectangular cross-sections. In short, it found the inquiry products to be out of scope based on the exact same scope

language and criteria.  Commerce found that the *IBC Cages* scope determination shows that plaintiffs' assertion that the agency's decision regarding TEFLU's products means that any product could fall within scope is wrong.  *Id*. at 10.  Commerce also found *IBC Cages* relevant because it involves the same scope and processing.  Remand Results at 28 (citing *IBC Cages* at 9).

Furthermore, Commerce found the cross-section discussion in *IBC Cages* relevant to parties' analysis of *Stein Industries, Inc. v. United States*, 365 F. Supp. 3d 1364 (Ct. Int'l Trade 2019).  Remand Results at 28.  Commerce explained that in *Stein Industries*, the plaintiff challenged two of its further processed LWRPT products that Commerce determined to be within the scope of the LWRPT order.  However, plaintiff did not contest Commerce's finding that an LWRPT with numerous holes drilled into it—which the plaintiff characterized as "certain finished components of refrigerated merchandising and display structures"— was still subject LWRPT.  *Stein Industries*, 365 F. Supp. 3d at 1367-78.  In contrast, Commerce found in *Stein Industries Final Redetermination* "that welding additional tubes or pieces of steel to the LWPRT eliminated the rectangular cross section and removed the 'finished component' from the coverage of the scope."  Remand Results 28-29 (citing *Final Results of Redetermination Pursuant to Court Remand*, *Stein Industries v. United States*, Court No. 18-00150, Slip Op. 19-29 (CIT March 5, 2019), dated May 30, 2019 (*Stein Industries Final Redetermination*) at 6).  Thus, in prior determinations, Commerce has found some further processed LWRPT products to be within scope but when the further processing eliminates the rectangular cross section, the products are no longer covered by the scope of the *Order*.

Plaintiffs claim that Commerce's reliance on *IBC Cages* is flawed because the tubes were "never LWRPT" as "they did not have a rectangular cross section" and were HTSUS classified

as LWR with other cross-sections. Pl. Br. at 18. However, Commerce based its determination in *IBC Cages* on Maquilacero's description in the underlying proceeding. Remand Results at 28 (citing *IBC Cages* at 9). That production of the LWR involves "one additional rolling process in order to achieve its specific geometry" at the end of the production process fails to render the *IBC Cages* scope determination irrelevant. Pl. Br. at 19 (referencing *IBC Cages* at 9); *see also* Remand Results at 28. Commerce is authorized to consider prior agency determinations including prior scope rulings pertaining to the order at issue. 19 C.F.R. § 351.225(k)(1)(i)(C). According to Commerce, "{r}egardless of whether the processing at issue is performed as part of the initial production process or as further processing, it is important to consider relevant scope determinations, especially if they establish examples of processing which alters LWRPT such that it is no longer covered by the scope." Remand Results at 28.

Next, plaintiffs argue that Commerce's reliance on the *HWRPT from Mexico* determination is misplaced because the investigation was based on a different industry – "one that produces HWRPT" – and because Maquilacero argued that its product was not covered because it did not have a rectangular cross section. Pl. Br. at 19 (citing *Heavy Wall Rectangular Welded Carbon Steel Pipes and Tubes from Mexico*, 84 Fed. Reg. 24473 (Dep't of Commerce May 28, 2019), accompanying IDM (*HWRPT from Mexico*)). First, *HWRPT from Mexico* refers to Commerce's determination in an *administrative review* to include Maquilacero's downstream sales of HWR parts in its final analysis upon finding that the HWR parts are covered by the HWRPT scope. Second, the *HWRPT from Mexico* order covers heavy walled rectangular welded steel pipes and tubes of rectangular (including square) cross section, having a nominal wall thickness of not less than 4 mm. *See HWRPT from Mexico 2016-2017* IDM at 15. The *LWRPT from Mexico* order covers "light-walled steel pipe and tube, of rectangular (including

square) cross section, having a wall thickness of less than 4 mm." *Order*, 73 Fed. Reg. at 45,404. The orders contain nearly identical language so the difference in industries fails to demonstrate how Commerce's consideration is unreasonable when the agency is authorized to consider Commerce's prior determinations, pertaining to both the order at issue as well as other orders with same or similar language. 19 C.F.R. § 351.225(k)(1)(i)(C).

Furthermore, in *HWRPT from Mexico*, Commerce rejected Maquilacero's argument that its further-processed products are not covered by the scope because they do not have a rectangular cross-section across the entire length of the pipe. Commerce found that the scope does not require a seamless rectangular cross-section and that changes such as drilling and perforating did not remove the product from scope. *Id*. at 10 (citing *HWRPT* IDM at 16). However, Maquilacero also made arguments concerning customization yielding downstream products. As Commerce explained, Maquilacero argued that further processing to create customized downstream products altered the rectangular cross-section, mirroring plaintiffs' arguments about the rectangular cross section of TEFLU's products. In response, Commerce determined that "the fact that the {HWRPT} at issue is *drilled or perforated* (and thus does not have a seamless rectangular cross section across the entire length of the pipe) does not remove these products from the scope {emphasis added}." In the remand results, Commerce found the *HWRPT from Mexico* discussion and determination relevant because the respondent companies are the same as the LWRPT investigation, the petitioners largely overlap, the issues raised with respect to further processing to customize rectangular pipe and tube as "parts" are nearly identical, and the products and scope language, particularly insofar that it does not address further processing, are nearly identical. Remand Results at 30.

Accordingly, Commerce's (k)(1) determination that TEFLU's further-processed products

fall within the scope of the *Order* is supported by the agency's prior determinations in accordance with 19 CFR 351.225(k)(1), as well as the other (k)(1) sources.

      B.    <u>Commerce's Scope Determination Complies With The Court's Remand Order</u>

      Plaintiffs argue that Commerce's review of (k)(1) sources fails to address the Court's remand order. Pl. Br. at 4-5. To the contrary, Commerce's remand results comply with the Court's instructions. As stated above, the Court ordered that, on remand, Commerce must answer whether TEFLU's further manufactured products are downstream products outside of the scope. *Maquilacero*, 731 F. Supp. 3d at 1365-66. The Court also ordered Commerce to determine the degree to which TEFLU's products were processed by further manufacturing processes and to address whether TEFLU's further-processed products are within an industry that was investigated by the ITC and whether TEFLU's products are realistically interchangeable with subject merchandise. *Id*. Commerce's remand results satisfy each of the Court's remand instructions.

      First, in accordance with the Court's remand order, Commerce determined that TEFLU's further-processed products are *not* out-of-scope downstream products. Remand Results at 6. Commerce outlined that TEFLU's products are light-walled rectangular pipe and tube that underwent a process of saw-cutting, laser cutting-to-length, drilling, perforation, bending and other further processing. *See* Remand Results at 5-6; *see also Maquilacero*, 731 F. Supp. 3d at 1357. Notably, Commerce observed that TEFLU's products constitute further-processed LWRPT comprised entirely of LWRPT. *Id*. at 34. Based on evidence including photograph exhibits, diagrams, drawings and illustrations, Commerce found that the further processing described by Maquilacero did not alter the LWRPT products such that they no longer met the physical characteristics of merchandise subject to the scope. *See* Remand Results at 12-13; *see also Order*, 73 Fed. Reg. 45,403 ("The merchandise subject to these orders is certain welded

carbon quality light-walled steel pipe and tube, of rectangular (including square) cross section, having a wall thickness of less than 4mm."). In fact, Commerce explained that "TEFLU's further processed products have a rectangular cross section, even if they are bent, drilled, or pressed." Remand Results at 13. Additionally, Commerce found that in contrast with downstream products as end use applications of LWRPT (including automotive uses) identified by the ITC, TEFLU's products "are much less complex and do not lose the rectangular or square cross section through alteration of the piece of LWRPT or combination with other inputs." *Id*. at 25, 31.

Plaintiffs argue that Commerce failed to address evidence suggesting that TEFLU's further processing of LWRPT resulted in "TEFLU's 83 products becoming customized, downstream products." Pl. Br. at 20 (citing *Maquilacero*, 731 F. Supp. 3d at 1362), 23. However, Commerce addressed and analyzed record exhibits submitted by plaintiffs, which they claim show the purported out-of-scope nature of TEFLU's products. *See* Remand Results at 33; *see also id*. 8, 13-15. Indeed, Commerce explained that the (k)(1) sources indicate that LWRPT made to customer specifications and further processing were considered by the ITC and were among the product from which petitioners sought relief in the investigation and for similar orders. Remand Results at 35. Moreover, Commerce explained that plaintiffs' request with respect to TEFLU's products lacked important specifics as their arguments and references to the record were not clear as to which products were being discussed and plaintiffs did not confirm if the product list exhibit referenced by Commerce is indeed the extent of requested products. As such, Commerce explained that it considered TEFLU's requested products relying on examples used in their arguments, the evidence available on the record as they relate to further-processed products, and the analysis found in (k)(1) sources. *Id*. at 36.

Plaintiffs next argue that Commerce improperly focused on whether TEFLU's products have a rectangular cross section. Pl. Br. at 21-23. The record belies plaintiffs' claim. In the remand results, Commerce explained that its cross section analysis was made in response to plaintiffs' arguments was to why TEFLU's products should be considered out of scope, *i.e.*, that the cross-section was altered. Remand Results at 33. Commerce's analysis of (k)(1) sources, including relevant prior determinations in which the product's cross-section informed whether further processing rendered the product out of scope, speaks to these arguments. For example, as noted above, in the *IBC Cages* scope determination, Commerce found Maquilacero's products out-of-scope because upon processing, they did not have rectangular cross-section. Remand Results at 9, 28. Addressing identical arguments by Maquilacero that further processing placed its products out of the *HWRPT from Mexico* order, Commerce found that the *HWRPT from Mexico* scope does not require the existence of a rectangular cross-section across the entire length (*i.e.*, seamless rectangular cross-section) and although the product was drilled or perforated (and thus does not have a seamless rectangular cross-section across the entire length of pipe), such processing did not remove it from scope. Remand Results at 10 (citing *HWRPT from Mexico 2016-2017* IDM at 16). For the reasons stated above, Commerce's cross-section discussion is lawful.

Plaintiffs also argue that Commerce failed to examine TEFLU's further-processed products to determine whether the amount of processing transformed them from a raw input into a downstream product. Pl. Br. at 24-27. However, in the remand results, Commerce explained that it was unable to determine a threshold based on the degree of further processing which would render the LWRPT products out of scope based on the evidence submitted by Maquilacero/TEFLU. Remand Results at 13. According to Commerce, the record does not

indicate how LWRPT with a single hole drilled into it and labelled as an automotive part based on the prescribed end use intended by that processing, or a product with a single bend, should be compared to a product undergoing many such customizations and processing steps. *Id*. As Commerce explained, the record lacked evidence for the agency to analyze all further-processed products to make such a determination, "as a substantial portion of Maquilacero/TEFLU's schematics fail to provide cross sections, show only one angle or perspective of the product, and include plans for downstream products they do not produce that incorporate Maquilacero/TEFLU's products." *Id*. at 13-14; *see also* 14-15. Still, Commerce identified that made-to-order LWRPT sold to certain customers was a channel of distribution identified in the original investigation indicating that TEFLU's products are part of the broader LWRPT industry. *Id*. at 16. Accordingly, Commerce concluded that the record examples of further-processed LWRPT are covered by the scope. *Id*. at 17-18.

Commerce also determined that further-processed LWRPT was included as an industry investigated by the ITC and that subject LWRPT may be limited in its interchangeability due to processing or design criteria for specific applications based on the record ITC reports, in compliance with the Court's remand order. Remand Results at 31 (citing ITC Report at I-12 and I-13; ITC Second Review). According to Commerce, the ITC reported that the industry included processed LWRPT subject to severe fabrication, including bending, and, in a recent review, the ITC had specifically identified further processing including "cutting, bending, drilling, and perforation," on shipments of LWRPT from Mexico. *Id*. (citing ITC Second Review at IV-4 and IV-21). Commerce considered that the ITC acknowledged LWRPT end uses in the U.S. market including shelving racks, fences, gates, hand rails, trailers, metal building components, automotive equipment, furniture, and sports equipment, with a confidential importer reporting

"increased use {of LWRPT} in automotive parts." Remand Results at 8. Additionally, the ITC also specifically noted that LWRPT may be modified to meet design criteria for specific applications and that LWRPT from one source may not be readily interchangeable with LWRPT from another source after bending or other fabrication, while still being considered LWRPT. *Id.* Based on this record evidence from the ITC, Commerce concluded that further-processed LWRPT was included in the industry investigated by the ITC and that the products may have limited interchangeability. *Id.* Ultimately, Commerce found that the processes and use application do not remove TEFLU's product from the scope of the *Order*.

Plaintiffs argue that Commerce did not consider the Court's discussion of *Trendium Pool Products, Inc. v. United States*, 399 F. Supp. 3d 1335 (Ct. Int'l Trade 2019), or "other cases addressing {the further processing distinction} or a lack of interchangeability." Pl. Br. at 15 (citing *Maquilacero*, 731 F. Supp. 3d at 1360); *see also Trendium*, 365 F. Supp. 3d at 1340. Plaintiffs' claim is incorrect. The Court ordered Commerce, on remand, to examine the amount of further processing in TEFLU's products, whether the products were within "an industry that was investigated by the ITC when the ITC determined that certain pipe and tube caused material injury or threat of material injury to domestic producers," and whether the products are realistically interchangeable with raw input LWRPT, "under the principles articulated in *A.L. Patterson*, *Stein*, *Trendium*, and *TMB 440AE*." *Maquilacero*, 731 F. Supp. 3d at 1360. Commerce did so. *See, e.g.*, Remand Results 13-19, 33-39. First, as previously discussed, Commerce addressed how *Stein Industries* supports Commerce's position that further processed LWRPT similar to TEFLU's products remain subject LWRPT. *See also* Remand Results at 11-12, 34. Second, with respect to *Trendium*, Commerce explained that the agency's determination is in line with the proposition for which the Court cited it, *i.e.*, that further processing can result

in a previously in-scope product becoming out of scope. Remand Results at 34. Yet, Commerce also explained that there are distinguishing factors between the instant case and *Trendium*, including that it concerned an AD order on corrosion resistant steel (CORE) and that Trendium's pool products were only partially made from CORE. *Id.* As stated above, TEFLU's products are further-processed LWRPT comprised entirely of LWRPT. *Id.* Moreover, the *Trendium* Court disagreed with Commerce that the CORE order was inclusive of downstream products identified by the ITC, finding that Trendium's requested products were excluded from the order, which addressed specific types of processing. In the instant case, Commerce found in line with the Court's analysis that the *Order* is ambiguous and the (k)(1) sources demonstrate that TEFLU's products remain an intermediate product: bent, perforated, and/or cut to length LWRPT. Remand Results at 34.

Plaintiffs next argue that the HTSUS subheadings for TEFLU's products show that further-processed parts are not in scope. Pl. Br. at 27-28. Again, in the remand results, Commerce noted how the specific description of the HTSUS codes indicated for TEFLU's products comported with Commerce's analysis of the (k)(1) source's description of subject further-processed LWRPT. Remand Results at 16. Furthermore, Commerce explained that in accordance with the plain language of the scope and ITC determinations, HTSUS codes are not dispositive of scope coverage. Remand Results at 37.

Plaintiffs argue that Commerce's circumvention concerns are unfounded. Pl. Br. at 27-29. However, Commerce explained that circumvention concerns are apparent when the record information and argumentation provide no answers as to how, for example, LWRPT bent once can be considered an out of scope finished product solely because it is customized for a purported end use. Remand Results at 37. Moreover, Commerce highlighted that the

documentation submitted by plaintiffs do not explain or indicate how Commerce or U.S.

Customs and Border Protection should view a piece of LWRPT with a single hole drilled in it if

labelled as made to order for a downstream industry.  *Id*. at 37-38.  Accordingly, Commerce

reasonably explained its circumvention concerns and plaintiffs' preference for a different

outcome here do not render Commerce's explanation unreasonable or unlawful.

Commerce complied with the Court's orders on remand.  Commerce conducted a

thorough (k)(1) analysis and found that the scope language encompasses TEFLU's further-

processed products.  Plaintiffs' disagreement with that conclusion is not sufficient to overturn

Commerce's decision.

## CONCLUSION

For these reasons, the Court should sustain Commerce's remand redetermination and

enter final judgment for the United States.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

 s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL

LESLIE M. LEWIS
Staff Attorney
Office of the Chief Counsel for
Trade Enforcement & Compliance
U.S. Department of Commerce
Washington, D.C. 20230

s/ Kristin E. Olson
KRISTIN E. OLSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Ben Franklin Station
P.O. Box 480
Washington, D.C. 20044
(202) 307-6299
kristin.olson@usdoj.gov

April 3, 2025

*Attorneys for the United States*

CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Defendant's Response to Plaintiff and Plaintiff-Intervenor's Rule 56.2 Motions for Judgment on the Agency Record, filed on April 3, 2025, complies with the word limitation requirement. The word processing software used to prepare this brief indicates there are a total of 8,052 words, excluding the portions of the brief identified in the rules.

s/ Kristin E. Olson
Kristin E. Olson