A-201-836
Remand
Court No. 23-91
POR: 08/01/2020 - 07/31/2021
**Public Document**
E&C/OIII: CD

***Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V. and Perfiles LM, S.A. de C.V.***
***v. United States,***
**Consol. Court No. 23-00091 (CIT June 17, 2025)**
**Light-Walled Rectangular Pipe and Tube from Mexico**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.      SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court)

issued in *Maquilacero* on June 17, 2025.[1]  These final results of redetermination concern

Commerce's final results of the administrative review of the antidumping duty (AD) order on

light-walled rectangular pipe and tube (LWRPT) from Mexico covering the period of review

(POR) August 1, 2020, through July 31, 2021.[2]  The products are sold by Maquilacero S.A. de

C.V. (Maquilacero) and Tecnicas de Fluidos S.A. de C.V. (TEFLU), which were reviewed as a

single, individually-examined, collapsed entity, (collectively, Maquilacero/TEFLU).[3]

---

[1] *See Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V., Perfiles LM, S.A. de C.V. v. United States*, Consol. Court No. 23-00091, ECF No. 78 (CIT June 17, 2025) (*Remand Order*).

[2] *See Light-Walled Rectangular Pipe and Tube from Mexico, the People's Republic of China, and the Republic of Korea: Antidumping Duty Orders; Light-Walled Rectangular Pipe and Tube from the Republic of Korea: Notice of Amended Final Determination of Sales at Less Than Fair Value,* 73 FR 45403 (August 5, 2008) (*Order*); *see also Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 88 FR 15665 (March 14, 2023) (*20-21 Final Results*), and accompanying Issues and Decision Memorandum (IDM), unchanged in *Light-Walled Rectangular Pipe and Tube from Mexico: Amended Final Results of Antidumping Duty Administrative Review; 2020–2021*, 88 FR 30123 (May 12, 2023).

[3] Commerce has previously found that Maquilacero S.A. de C.V. (Maquilacero) and Tecnicas de Fluidos S.A. de C.V. (TEFLU) (collectively, Maquilacero/TEFLU) should be treated as a single entity. *See Light-Walled Rectangular Pipe and Tube from Mexico: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2018– 2019,* 85 FR 83886 (December 23, 2020), and accompanying Preliminary Decision Memorandum (PDM) at 6, unchanged in *Light Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review: 2018– 2019,* 86 FR 33646 (June 25, 2021) (*18-19 Final Results*), and accompanying IDM.

The Court remanded to Commerce to reconsider or explain its results, in conformity with the U.S. Court of Appeals for the Federal Circuit (Federal Circuit's) opinion in *Marmen Inc. et al. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025).

As set forth in detail below, pursuant to the Court's *Remand Order*, Commerce reconsidered its application of the Cohen's *d* test as part of its differential pricing analysis.

## II.    BACKGROUND

Commerce published the *20-21 Final Results* on March 14, 2023.[4]  As discussed in the *20-21 Final Results* IDM, Commerce applied the Cohen's *d* test as part of its differential pricing analysis.[5]  The Court issued a prior order on October 4, 2024 remanding Commerce to review: 1) its determination that TEFLU's further processed products are in-scope, 2) its determination that the products produced by Maquilacero and TEFLU are similar or identical in its collapsing analysis and to treat Maquilacero/TEFLU as a single entity, 3) its rejection of the manufacturing code and the further processing variable in its model match methodology, 4) its determination to treat TEFLU's sales made through the IMMEX program as home market sales, and 5) its determination to rely on the Cohen's *d* test to conduct its differential pricing analysis.[6]  The Court deferred ruling on home market sales and use of Cohen's *d* at the time until after Commerce reviews its scope and collapsing determinations.

In its standalone order remanding Commerce's final results prior to ruling on the issues in its prior remand, the Court instructed Commerce to conform its results with *Marmen*, which found use of the Cohen's *d* test was unreasonable when the data groups being compared are small, not normally distributed, and have disparate variances (*i.e.*, the statistical assumptions are not satisfied).[7]

---

[4] *See 20-21 Final Results.*
[5] *See 18-19 Final Results* IDM at Comment 6.
[6] *See Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V., Perfiles LM, S.A. de C.V. v. United States*, Consol. Court No. 23-00091, Slip Op. 24-107 (CIT October 4, 2024).
[7] *See Remand Order* (citing *Marmen Inc., et al. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) (*Marmen*).

On January 9, 2026, Commerce released its Draft Redetermination to interested parties.[8] On January 14, 2026, Commerce received comments from the petitioner.[9]  Additionally, on January 16, 2026, Commerce received comments from Maquilacero/TEFLU and Perfiles LM S.A. de C.V. (Perfiles).[10]

After considering the comments raised by interested parties, Commerce has made no changes to the Draft Results of Redetermination with regard to its revised differential pricing analysis for these final results of redetermination.  As a result, the estimated weighted-average dumping margin for Maquilacero/TEFLU's remains as 10.67 percent.[11]  Additionally, the estimated weighted-average dumping margin for all other producers and exporters remains as 6.06 percent.[12]

## III.    ANALYSIS

### A.    Commerce's Application of the Cohen's *d* Test

As discussed above, in its *Remand Order*, the Court remanded Commerce to conform its results with the Federal Circuit's opinion in *Marmen.*  In *Marmen*, the Federal Circuit had previously held that it is unreasonable for Commerce to use the Cohen's *d* test as part of its differential pricing analysis when the test is applied to data that do not satisfy the statistical criteria of normal distribution, equal variability, and equal and sufficiently numerous data, and

---

[8] *See* Draft Results of Redetermination Pursuant to Court Remand, *Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V. and Perfiles LM, S.A. de C.V. v. United States,* Consol. Court No. 23-00091 (CIT June 17, 2025), dated January 9, 2026 (Draft Redetermination).

[9] The petitioner in this proceeding is Nucor Tubular Products Inc. (Nucor);  *See* Nucor's Letter, "Nucor Tubular's Comments on Draft Remand Redetermination," dated January 14, 2026 (Nucor's Draft Redetermination Comments).

[10] *See* Maquilacero/TEFLU's Letter, "Maquilacero S.A. de C.V.'s Comments on the Draft Results of Redetermination Pursuant to the Remand Order in Court No. 23-00091," dated January 16, 2026 (Maquilacero/TEFLU's Draft Redetermination Comments); *see also* Perfiles' Letter, "Comments of Perfiles LM S.A. de C.V. on the Draft Redetermination on Remand," dated January 16, 2026 (Perfiles' Draft Redetermination Comments).

[11] *See* Memorandum, "Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V. Draft Remand Analysis Memorandum," dated January 9, 2026 (Maquilacero/TEFLU Draft Redetermination Analysis).

[12] *Id.*

that Marmen's U.S. sale prices did not meet these criteria.[13]  In doing so, the Federal Circuit held

that "Commerce may re-perform a differential pricing analysis, and *that analysis may not rely on*

*Cohen's d test* for data sets like those here {*i.e.*, the data underlying the differential pricing

analysis in the *Marmen* investigation that the Federal Circuit found do not conform to the three

statistical criteria}," but it also held that Commerce may develop and justify a different

analytical approach for evaluating whether price differences among purchasers, regions, or time

periods are significant.[14]

Following the Federal Circuit's decision in *Marmen*,[15] Commerce sought information and

public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis

under section 777A(d)(1)(B)(i) of the Act, to identify whether prices for comparable

merchandise differ significantly among purchasers, regions, and time periods.[16]  To comply with

the Federal Circuit's holding in *Marmen*, Commerce discontinued the use of the Cohen's *d* test

in administrative proceedings and adopted a new test for evaluating whether price differences

among purchasers, regions, or time periods are significant.[17]  Additionally, and concurrent with

this change, Commerce also discontinued the use of the "mixed method" in administrative

proceedings.   In its revised differential pricing analysis, Commerce adopted the "price

difference test" as part of its differential pricing analysis to determine whether prices differ

significantly.

Accordingly, for these final results of redetermination, in light of Commerce's revised

approach in administrative proceedings pursuant to the Federal Circuit's decision in *Marmen*,

---

[13] *See Marmen*, 134 F.4th at 1334.
[14] *Id.*, 134 F.4th at 1348 (emphasis added).
[15] *Id.*, 134 F.4th at 1348.
[16] *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 FR 21277 (May 19, 2025).
[17] *See, e.g., Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 FR 30050 (July 8, 2025), and accompanying IDM at 2-5.

and in accordance with this Court's *Remand Order*, Commerce reconsidered and discontinued its application of the Cohen's *d* test as part of its differential pricing analysis, and, in the alternative, applied the "price difference test," as detailed below.

### 1.     Comparisons to Normal Value

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether Maquilacero/TEFLU's sales of the subject merchandise from Mexico to the United States were made at less than normal value (NV), Commerce compared the export price (EP) to the NV as described in the "Export Price" and "Normal Value" sections of the *20-21 Preliminary Results*.[18]

### i.     Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates a weighted-average dumping margin by comparing weighted-average NVs to weighted-average export prices (EPs) (or constructed export prices (CEPs) (*i.e.*, the average-to-average (A-to-A) method) unless the Secretary determines that another method is appropriate in a particular situation.  In an LTFV investigation, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales (i.e., the average-to-transaction (A-to-T) method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.

Although section 777A(d)(1)(B) of the Act does not strictly govern Commerce's examination of this question in the context of an administrative review, Commerce nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in an administrative review is, in fact, analogous to the issue in an LTFV investigation.[19]

---

[18] *See Light-Walled Rectangular Pipe and Tube from Mexico:  Preliminary Results and Partial Rescission of the Antidumping Duty Administrative Review; 2020–2021*, 87 FR 54965 (September 8, 2022) (*20-21 Preliminary Results*), and accompanying PDM.

[19] *See Ball Bearings and Parts Thereof from France, Germany, and Italy:  Final Results of Antidumping Duty Administrative Reviews; 2010–2011*, 77 FR 73415 (December 10, 2012), and accompanying IDM at Comment 1; *see also Apex Frozen Foods Private Ltd. v. United States*, 37 F.Supp.3d 1286 (CIT 2014).

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-to-T method is appropriate in a particular situation, consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.  Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method here.  Commerce will continue to evaluate its approach in this area based on comments received and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the A-to-A method in calculating a respondent's weighted-average dumping margin.

Section 777A(d)(1)(B) of the Act permits Commerce to use an alternative, A-to-T method[20] as the basis for a weighted-average dumping margin if the two requirements provided for in section 777A(d)(1)(B)(i) and (ii) of the Act, the "pattern" requirement and the "meaningful difference" requirement, respectively, are met.  The purpose of section 777A(d)(1)(B) of the Act is to address Commerce's concerns that dumping may be masked:

> Section 229 of the bill {*i.e.*, the Uruguay Round Agreements Act} adds new section 777A(d) to implement the provisions of the Agreement regarding the use of average normal values and export prices for purposes of calculating dumping margins. Although current U.S. law permits the use of averages on both sides of the dumping equation, Commerce's preferred practice has been to compare an average normal value to individual export prices in investigations and reviews.  In part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal "targeted dumping." [21]

Accordingly, when Commerce determines whether the subject merchandise is being sold in the United States at less than normal value, and the weighted-average dumping margin calculated based on A-to-A comparisons cannot account for masked, or "targeted," dumping, section

---

[20] *See* 19 CFR 351.414(b)(3).
[21] *See* Statement of Administrative Action (SAA) at 842, H. R. Doc. No. 103-316, Volume 1.

777A(d)(1)(B) provides Commerce with an alternative comparison methodology, *i.e.*, the A-to-T method, to address such distortions to ensure an accurate weighted-average dumping margin.

The differential pricing analysis used here examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods. The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported consolidated customer codes. Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the POR based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region and time period, comparable merchandise is defined using the product control number (CONNUM) and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "price difference test" is applied to determine whether prices differ significantly. For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region or time period is within two percent of the weighted average net price to all other purchasers, regions or time periods. If the weighted-average net price to the given purchaser, region or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions or time periods, then the prices to that given

7

purchaser, region or time period are found to differ significantly and those sales to the given purchaser, region or time period pass the price difference test.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the POR. If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method. If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the POR. Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method.

If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the A-to-T method could be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can account for such differences. In considering this question, Commerce examines whether using the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de*

8

*minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold.

### ii.        Results of the Differential Pricing Analysis

For Maquilacero/TEFLU, based on the results of the differential pricing analysis, Commerce finds that 98.12 percent of the value of U.S. sales pass the price difference test,[22] and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce determines that the A-to-A method cannot account for such differences because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the A-to-T method.  Thus, for these final results of redetermination, Commerce is applying the A-to-T method to calculate the weighted-average dumping margin for Maquilacero/TEFLU.

### B.        Rates for Companies Not Selected for Individual Examination

In the underlying review, there were two companies for which a review was requested but were not selected for individual review and did not demonstrate that they had no shipments during the POR.  The statute and Commerce's regulations do not address the establishment of a weighted-average dumping margin to be applied to individual companies not selected for individual examination when Commerce limits its examination in an administrative review pursuant to section 777A(c)(2) of the Act.  Generally, Commerce looks to section 735(c)(5) of the Act, which provides instructions for calculating the estimated weighted-average dumping margin for all other producers and exporters, *i.e.*, the all-others rate, in an investigation, for guidance when calculating the weighted-average dumping margin for companies which were not selected for individual examination in an administrative review.  Pursuant to section 735(c)(5)(A) of the Act, the all-others rate shall be an amount equal to the weighted average of

---

[22] *See* Draft Redetermination Analysis at 2.

the estimated weighted average dumping margins established for exporters or producers individually examined, excluding rates that are zero, *de minimis*, or based entirely on facts available under section 776 of the Act.

In the underlying review, we determined the weighted-average dumping margin for each of the non-selected companies based on the weighted-average dumping margins calculated for the mandatory respondents consistent with section 735(c)(5)(A) of the Act.  In the instant final results of redetermination, we have calculated a revised weighted-average dumping margin for Maquilacero/TEFLU.  Therefore, in accordance with section 735(c)(5)(A) of the Act, we recalculated the weighted-average dumping margin for the non-selected companies based on the weighted-average dumping margins calculated for the mandatory respondents.[23]

## IV.    INTERESTED PARTY COMMENTS

On January 9, 2026, Commerce issued its Draft Redetermination and provided interested parties an opportunity to comment.[24]  Commerce received comments from Maquilacero/TEFLU, the petitioner, and Perfiles.[25]  The petitioner's comments support the revisions that Commerce made to the differential pricing analysis in the Draft Redetermination.  Perfiles and Maquilacero/TEFLU support discontinuation of the use of the Cohen's *d* test, but contest Commerce's use of the price difference test and discontinued use of the mixed method.  Perfiles and Maquilacero/TEFLU's arguments are addressed below.  After considering Maquilacero/TEFLU's, the petitioner's, and Perfiles' comments, we have made no changes to our analysis in the Draft Redetermination, and continue to use the revised differential pricing analysis for these final results of redetermination.

---

[23] *See* Memorandum, "Draft Calculation of the Rate for Non-Selected Respondents," dated January 9, 2026.
[24] *See* Draft Redetermination.
[25] *See* Nucor's Draft Redetermination Comments; *see also* Maquilacero/TEFLU's Draft Redetermination Comments; and Perfiles' Draft Redetermination Comments.

**Comment 1:    Commerce's Price Difference Test Is A "Reasonable Indicator" That Prices Differ Significantly**

The following is a verbatim executive summary of the argument submitted by Perfiles. For further details, *see* Perfiles' Draft Remand Comments at 8-10 (internal citations omitted).

> The Draft Redetermination treats price differences between each test and base group as "significant" if the average price to each group differ by more than two percent. The two-percent test was used by {Commerce} in one previous case, {*CFS from Korea Final*}, where {Commerce} demonstrated that the dumping margins for the respondents in question would be *de minimis* even if the two-percent test were applied to identify targeted dumping. Almost immediately after that decision, {Commerce} rejected further use of the two-percent test, finding that the test is not "a reliable indicator " that ... targeted dumping has occurred...." In the absence of reasoned explanation, {Commerce} is bound by that conclusion.

The following is a verbatim executive summary of the argument submitted by Maquilacero/TEFLU. For further details, *see* Maquilacero/TEFLU'S Draft Remand Comments at 7-14 (internal citations omitted).

> {Commerce's} substitution of a "price difference test" for the first step of its differential pricing methodology, under which any price difference exceeding two percent is deemed "significant," is unlawful and unreasonable. {Commerce's} test is contrary to the plain meanings of the statutory terms "significantly" and "significant" and departs from Congress's directive in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act (SAA) that targeted dumping determinations should be conducted on a "case-by-case basis," recognizing that what counts as "significant" is context-dependent and may vary across industries and products. A two-percent threshold is arbitrary as it neither reflects the statutory text nor honors the SAA's instruction that small differences may be significant in one market but not in another.
>
> Compounding this statutory problem, {Commerce} is now embracing a bright-line test that it previously rejected. In prior proceedings, {Commerce} recognized that a mechanical two-percent cutoff fails to account for market realities and results in labeling ordinary price variation as "targeted dumping," thereby finding targeted dumping where none exists.
>
> Inexplicably, the Draft Remand Results do not acknowledge {Commerce's} reliance on a test that it previously disavowed, do not reconcile the agency's changed position with a reasoned explanation, and do not provide any justification based on the record evidence for why a two-percent price difference is "significant" in this case. In the underlying review, {Commerce} has already found that the observed price changes were driven by cost changes rather than by any pricing behavior indicative of targeted dumping. Absent an assessment based on the record evidence, the new price difference test cannot reliably distinguish meaningful pricing patterns from normal commercial dynamics.

11

Under this new price difference test, Plaintiffs' margins - now calculated entirely under the A-T methodology - increased, widening the gap between the calculated margins using the normal A-A methodology and the application of the extraordinary A-T methodology.  This arbitrary new test has not only generated a 98.12% pass rate for Plaintiffs, but it has generated high pass rates also in proceedings before the Department, as {Commerce's} own citations demonstrate.  A test for "significance" where nearly all price comparisons "pass" the test is not a meaningful filter; it is an empty formality that does not reveal the presence or absence of targeted dumping.  For the Final Remand Results, {Commerce} must abandon this previously discarded, arbitrary threshold and adopt a test that comports with the statute, the SAA, and the record in this proceeding.

**Commerce's Position:**  We disagree that Commerce cannot use the price difference test simply because Commerce had previously determined that the P/2 test was not a "reliable indicator" that targeted dumping has occurred.

Commerce has not adopted the P/2 test as part of our differential pricing analysis.  The P/2 test and the price difference test are not equivalent to each other.  The P/2 test examined the weighted-average prices of allegedly "targeted" sales that were two percent lower than the weighted-average prices of non-targeted sales with the stated aim of identifying "targeted dumping."  As discussed below, the P/2 test was the basis for the petitioner's targeted dumping allegation in *CFS from Korea Final*.[26]  Given Commerce's lack of experience at that time in addressing section 777A(d)(1)(B) of the Act, Commerce relied on the petitioner's analysis in that investigation.[27]  However, in the following LTFV investigations in which the petitioner submitted a similar targeted dumping allegation, Commerce developed its own analysis to address section 777A(d)(1)(B) of the Act, *i.e.*, the "Nails Test."[28]  As noted by Perfiles, Commerce found "that the {P/2} test is not 'a reliable indicator that {obvious} targeted dumping has occurred…'"[29]

---

[26] *See Notice of Final Determination of Sales at Less Than Fair Value:  Coated Free Sheet Paper from the Republic of Korea*, 72 FR 60630 (October 25, 2007) (*CFS from Korea Final*), and accompanying IDM at Comment 1.
[27] *Id.*
[28] *See Certain Steel Nails from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977 (June 16, 2008) (*Nails from China Final*), and accompanying IDM.
[29] *See* Perfiles' Draft Redetermination Comments at 2  (quoting *Nails from China Final* IDM at 23).

In the *Nails from China Final,* Commerce explained:

Prior to {the *CFS from Korea Final*}, {Commerce's} only experience with analyzing targeted dumping in an antidumping duty investigation was the case-specific analysis in the court remand that followed the antidumping investigation of certain pasta from Italy (*see Borden, Inc., Gooch Foods,Inc., and Hershey Foods Corp. V. United States*, Slip Op. 99-50, CIT, June 4, 1999), also referred to as the "Pasta Test."  The petitioner's allegations of targeted dumping in {*CFS from Korea Final*} presented {Commerce} with a host of issues that it had not previously confronted.  Given the short time available in that proceeding to address these issues, {Commerce} stated:

> In the years since the Pasta Test was developed, {Commerce} has had no further experience analyzing targeting and we are examining how the Pasta Test standards and thresholds could be modified in developing a standard practice for addressing targeting allegations. In view of {Commerce's} uncertainty regarding the general applicability of the Pasta Test standards, the overall lack of case precedent on this matter, and the unique circumstances of this case, {Commerce} accepts the petitioner's targeting allegation without endorsing the petitioner's test standards and procedures as a general practice.

*See* {*CFS from Korea Final*} at General Comment 2.

At the same time, {Commerce} signaled its intention to develop a standardized targeted dumping test to replace the P/2 test for application in subsequent investigations.  Thus, while allowing the petitioner's targeted dumping allegation to proceed to conclusion in {*CFS from Korea Final*}, {Commerce} simultaneously announced in {*CFS from Korea Final*} at Comment 2 that it would develop "a new, more standardized test" (*i.e.*, a replacement for the P/2 test) through a proceeding open to public input, which we initiated simultaneously with the publication of {*CFS from Korea Final*}.  See {*Targeted Dumping in Antidumping Investigations; Request for Comment*, 72 FR 60651 (October 25, 2007)}.

As such, Commerce introduced a new analysis, what became known as the "Nails Test," to

examine whether the statutory requirements under section 777A(d)(1)(B) of the Act were

13

satisfied.[30]  Afterwards, Commerce would replace the Nail Test with a methodology called the

"differential pricing analysis."[31] Specifically, Commerce stated:

> While the Nails test is a statutorily consistent and statistically sound methodology for identifying whether the average-to-transaction method might be appropriate, {Commerce} has continued to seek to refine its approach with respect to the use of an alternative comparison method.  Given {Commerce's} experience over the last several years, and based on {Commerce's} further research, analysis and consideration of the numerous comments and suggestions on what guidelines, thresholds, and tests should be used in determining whether to apply an alternative comparison method based on the average-to-transaction method, {Commerce} is developing a new approach for determining whether application of such a comparison method is appropriate in a particular segment of a proceeding pursuant to 19 CFR 351.414(c)(1) and consistent with section 777A(d)(1)(B) of the Act.  The new approach is referred to as the "differential pricing" analysis, as a more precise characterization of the purpose and application of section 777A(d)(1)(B) of the Act.[32]

After performing the differential pricing analysis since 2013, Commerce has continued to

gain experience in addressing the statutory requirements provided under section 777A(d)(1)(B)

of the Act.  With the issuance of the mandate following *Marmen*,[33] Commerce introduced the

price difference test to determine whether prices for comparable merchandise differ significantly

among purchasers, regions, or time periods.  The price difference test does not stipulate an

absolute value as a threshold (*e.g.*, $5 per kilogram) but a threshold that measures relative

differences (*i.e.*, a percentage) on a case-by-case basis by a comparison to case- and product-

specific averages dependent upon the customer, region, and temporal data provided by the

respondent, specific to the period under examination and to the merchandise, and thus, the

market under consideration.  In contrast to the P/2 test, the price difference test examines

---

[30] *See*, *e.g.*,  *Certain Steel Nails from the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances and Postponement of Final Determination*, 73 FR 3928 (January 23, 2008) (*Nails from China Prelim*) , unchanged in *Nails from China Final* IDM.

[31] *See Differential Pricing Analysis; Request for Comments*, 79 FR 26720, 26722 (May 9, 2014) (*Differential Pricing Analysis)*; *see also Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less than Fair Value*, 78 FR 33351 (June 4, 2013).

[32] *See Differential Pricing Analysis*, 79 FR at 26722.

[33] *See Marmen*, 134 F.4th at 1343-1348.

14

whether U.S. prices differ significantly among purchasers, regions, and time periods. Specifically, the price difference test examines whether the weighted-average U.S. price to a given purchaser, region, or time period is within two percent of the weighted-average U.S. price to all other purchasers, regions, or time periods. If the difference between the two weighted-average prices is within two percent of the weighted-average U.S. price to all other purchasers, then the sale prices to the individual purchaser, region, or time period do not differ significantly. Alternatively, if the difference is two percent or greater, or two percent or less, then the sale prices to the individual purchaser, region, or time period do differ significantly.

The only common aspect of the P/2 test and the price difference test is the two percent threshold. However, the P/2 test only examines whether prices to alleged "targets" are at least two percent lower than the prices for all other sales, whereas the price difference test considers whether prices to each purchaser, region, or time period are at least two percent higher or lower than the prices for all other sales. The price difference test shares the two percent threshold with the arms-length test (with the same four percent band around the price), which is the basis for whether the prices of comparison market sales made to an affiliate are at arm's length.[34] Thus, the price difference test is simply a different test than the P/2 test.

Additionally, Commerce finds that two percent is a reasonable threshold to determine a measure of significance. The CIT has held that the language in section 777A(d)(1)(B) of the Act affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences.[35] A two-percent threshold is a reasonable measure of significance, is used by Commerce in other contexts, and is consistent with other aspects of Commerce's practice in antidumping proceedings. For example, in the arm's-length test conducted pursuant to 19 CFR 351.403(c), Commerce finds that sales between affiliated parties in the comparison market are

---

[34] *See Preliminary Determination* PDM at 14.
[35] *See Garg Tube Export LLP v. United States*, 740 F.Supp.3d 1355, 1366 (CIT 2024) (*Garg Tube*).

not at arm's length and fall outside the ordinary course of trade if the average, product-specific, comparison market prices to an affiliated customer are not within a range of 98 percent to 102 percent of the average, product-specific, comparison market prices to unaffiliated customers (*i.e.*, a plus or minus a two-percent difference from the weighted-average price to unaffiliated customers). In fact, Commerce has found that average prices to an affiliated customer that differ by two percent or more, and, therefore, fail the arm's-length test, "differ significantly" from market prices.[36] When the prices to an affiliated customer are to not at arm's length, Commerce finds that such sales are outside of the ordinary course of trade. The distinction between being within or outside of the ordinary course of trade is a significant difference, as sales which are found to be outside the ordinary course of trade are excluded from Commerce's margin calculations, *e.g.*, excluded from the calculation of NV.

Further, pursuant to sections 733(b)(3) and 735(a)(4) of the Act, the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent. In other words, an estimated weighted-average dumping margin of at least two percent is significant, and not zero, whereas an estimated weighted-average dumping margin that is less than two percent, *i.e.*, *de minimis*, results in a determination that sales are not at LTFV. Commerce has synonymously referred to non-*de minimis* levels of dumping as a "significant" amount of dumping.[37] If a weighted-average difference of two percent between U.S. prices and NV is significant enough to warrant an affirmative determination of sales at LTFV, then it is reasonable to conclude that a two-percent price difference is significant within the context of section 777A(d)(1)(B)(i) of the Act. Furthermore, in an administrative review, the *de minimis* threshold

---

[36] *See Large Diameter Welded Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value,* 84 FR 6382 (February 27, 2019), and accompanying IDM at Comment 4 ("the prices at issue differ significantly from the prices charged to an unaffiliated company (*i.e.*, they are not within 98 to 102 percent of the price charged for or by an unaffiliated party), which leads us to conclude that these prices are affected by the relationship between Borusan and Borusan Logistik")).

is one half of one (0.5) percent, which suggests that the two percent threshold from investigations is more conservative and indicates a level of significance that is much greater than the level of significance when the assessment of antidumping duties are at issue.[38]

Therefore, Commerce finds that our history of using different tests for different purposes does not preclude us from adopting the price difference test used in these final results of redetermination.

**Comment 2:   Whether Commerce's Differential Pricing Test Is a Reasonable Basis for Determining if a Pattern of Pricing Exists**

The following is a verbatim executive summary of the argument submitted by Perfiles.  For further details, *see* Perfiles' Draft Remand Comments at 10-17 (internal citations omitted).

> Under the statute, {Commerce} may depart from the normal "average-to-average" comparison methodology only if it finds that "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time...."  The plain-meaning of the term "pattern" requires that the observed differences not result from random processes. Instead, there must be "A mode of behavior or series of acts that are *recognizably consistent*."  As {Commerce's} own past determinations, a "pattern" within the meaning of the statute requires differences "beyond something that occurs by chance."  The two-percent test employed in the Draft Redetermination does not purport to distinguish true "patterns" from random fluctuations.

**Commerce's Position:**  We disagree with Perfiles and find that it misunderstands how Commerce's differential pricing analysis functions.  The price difference test determines whether prices differ significantly; the ratio test determines whether there is a pattern.  The ratio test is consistent with the ordinary meaning of the word "pattern," which is "a frequent or widespread incidence."[39]  Therefore, more than 33 percent of the value of the respondent's U.S. sales must pass the price difference test before Commerce determines that there is a pattern.  As such, if 33 percent or less of the sales value for the U.S. sales pass the price difference test, then Commerce will find that there is no evidence that a pattern exists.

---

[39] *See* Pattern, Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/pattern (last visited March 11, 2026).

The Federal Circuit has upheld Commerce's ratio test as a reasonable method for addressing the pattern requirement of section 777A(d)(1)(B)(i) of the Act and has held that Commerce "has discretion to determine a reasonable methodology to implement the statutory directive."[40]

Moreover, the Federal Circuit has rejected the argument that the statute requires Commerce "to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods{.}"[41]  The Federal Circuit agreed with the CIT that there is no intent requirement in the statute and that requiring Commerce to determine the intent of targeted dumping "would create a tremendous burden on Commerce that is not required or suggested by the statute."[42]  Neither the ratio test nor the price difference test is required to determine either the reasons why there is a pattern or why prices differ significantly.  Therefore, Commerce needs not understand the reason or reasons to justify that there is a pattern of prices that differ significantly.

We also disagree with Perfiles that distortions caused when an "inadequate" number of transactions are used are relevant for the price difference test.  For the Cohen's *d* test, Commerce required a minimum of two observations for the test and comparison groups to avoid calculating a value of zero for the group's standard deviation when there was only one observation in a group.  However, the price difference test does not require the calculation of a standard deviation.  Indeed, there is similarly no such requirement in the arm's-length test that the sales of comparable merchandise to the affiliated customer or to all unaffiliated customers have a minimum number of sales.  Moreover, it is possible for there to be one sale to a particular

---

[40] *See Stupp II*, 5 F.4th at 1354; *see also Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020) (*Dillinger France*).
[41] *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) (*JBF RAK*); *see also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 608 Fed. Appx. 948, 949 (Fed. Cir. 2015) (non-precedential); and *Nan Ya Plastics Corp., Ltd. v. United States*, 128 F.Supp.3d 1345 (CIT 2015).
[42] *See JBF RAK*, 790 F.3d at 1368.

customer, region, or within a particular time period the price of which is significantly different than the prices for all other sales.  Consequently, the fact that the Cohen's *d* test required that there be at least two observations in each test or comparison group because of the calculations necessary in that analysis is not relevant to whether the same requirement exists for the price difference test where the analysis is based on different calculations.

Further, we disagree with Perfiles that Commerce must consider alternative methodologies that are based on statistical concepts similar to the Cohen's *d* test and a measure of "effect size."  *Marmen* permits Commerce to use another approach in its differential pricing analysis, but did not require that Commerce do so.[43]  Indeed, Judge Stark's additional views in *Stupp IV* indicate that he might have agreed that Commerce "should be permitted to use something quite like Cohen's *d* as a rough, initial 'measur{e} {of} the practical significance of price difference{s}'" if Commerce had not tried to borrow credibility for its test by reference to the academic literature.[44]  Here, because the price difference test reasonably determines whether prices differ significantly, Perfiles' proposed alternatives are unnecessary.

We disagree with Perfiles' suggestion to broaden the definition of "comparable merchandise" in the differential pricing analysis.  The purpose of the requirement for "a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time" is to determine whether conditions exist in which masked dumping could potentially be occurring when using the A-to-A method. Commerce uses weighted-average U.S. prices which are grouped by CONNUM and other factors such as level of trade that ensure a fair comparison of NV and U.S. price.  Accordingly, Commerce has defined "comparable merchandise" to reflect those averaging groups that are the basis for the comparison of NV and U.S. price.  To "expand" the definition of comparable

---

[43] *See Marmen*, 134 F.4th at 1348.
[44] *See Stupp IV*, 2025 WL 1178392 at 3.

merchandise would deviate from the averaging groups used to compare NV with U.S. price, and, thus, could lead to distortions in the results of the price difference and ratio tests.

We disagree with Perfiles that we improperly disregarded the complexity of the data. In determining whether prices differ significantly for a particular purchaser, region, or time period compared to all other purchasers, regions, and time periods, all prices for the particular purchaser, region, or time period contribute to that determination. Again, Perfiles simply recommends alternative approaches because it does not agree with the results of Commerce's analysis. As explained above, Commerce's use of the price difference test and ratio test is consistent with our practice, the statute, and Court precedent. Further, the data used in the price difference test, *i.e.*, U.S. market prices, are similar to the data used in the arm's length test, *i.e.*, home market prices. We find that the price difference test reasonably analyzes the question whether prices differ significantly among purchasers, regions, or time periods.

We also disagree with Perfiles' suggestion to remove outliers from the comparison group. Commerce uses the entire universe of sales to determine whether prices for a particular customer, region, or time period differ significantly from all other sales. As such, each iteration of the price difference test uses the same universe of sales and Commerce does not prejudge whether a price differs significantly. Moreover, Perfiles does not offer any method for determining what would constitute an outlier, but rather merely implies that their alleged presence would distort the results.

As explained above, the price difference test does not measure whether there is a pattern but whether the prices differ significantly. Although there may be weighted-average sale prices that are above or below two percent of the weighted-average price of all other sales, the price difference test looks at whether the weighted-average sales price to one customer, region, or time period is above or below two percent of the weighted-average price of all other sales to determine whether prices differ significantly. Commerce then uses the ratio test to determine

20

whether there is a pattern.  We further note that the Federal Circuit has sustained the ratio test as a reasonable interpretation of "a pattern" in section 777A(d)(1)(B)(i) of the Act.[45]

We disagree with Perfiles that our redetermination fails to account for inconsistencies in the relationship of prices by customer, region, and time period.  What Perfiles describes is:  (1) for the same customer, the prices for some products differ significantly and are higher than other prices; (2) for other products, the prices differ significantly and are lower than other prices; and (3) for the remaining products, the prices do not differ significantly.  The fact that some products may be sold at greater profit than others is not illogical, and would result in the price variations Perfiles cites.  We find no logic in Perfiles' alleged "inconsistencies in the relationship of prices by customer, region or time period."[46]  When prices differ significantly, that means there are higher priced sales and lower priced sales.  As such, the fact that some sales are above the two percent threshold and some sales are below the two percent threshold contribute to the existence of a pattern.

**Comment 3:  "Family-Wise" Error Rate**

The following is a verbatim executive summary of the argument submitted by Perfiles.  For further details, *see* Perfiles' Draft Remand Comments at 17 (internal citations omitted).

> The Draft Redetermination's analysis conducts three distinct tests for price correlations: one by purchaser, one by region, and one by time period.  As a matter of mathematics, however, repeated testing of the same data multiples the likelihood of a "false positive" result.  In order to correct this family-wise error, {Commerce's} analysis should reduce the criterion used to assess whether results are significant by one-third (that is, by dividing the desired level of alpha by three).  In the context of {Commerce's} analysis, this would require changing the threshold for the determination of significance from two percent to six percent.

**Commerce's Position:**  Perfiles' argument relies on a flawed premise.  Commerce's price difference test does not look for statistical correlations.  Instead, the price difference test determines whether the weighted-average net price to a given purchaser or region, or during a

---

[45] *See Dillinger France*, 981 F.3d at 1325-26.
[46] *Id.* at 16.

specific time period, falls outside of the plus or minus two percent band around the weighted-average net price of sales to all other purchasers, regions, or time periods. Commerce's price difference test is not a statistical analysis of sampled data where a false positive would indicate a violation of the null hypothesis. No inferences are drawn that the analyzed data is representative of an unknown value. As such, Perfiles' argument about "family-wise" error, which is relevant to statistical correlation, is not applicable here.

Perfiles alleges that Commerce's use of "repeated testing of the same data multiplies the likelihood of a 'false positive' result."[47] However, there is no multiple counting of the results. When Commerce aggregates the results of the price difference test in the ratio test to quantify the extent of the prices that differ significantly, Commerce eliminates the "overlap" where the price for an individual sale is found to differ significantly by more than one of the "multiple tests," *i.e.*, by purchaser, region, or time period. In other words, a passed sale will only count in the ratio test once. Thus, there is no possibility for counting the same sale more than once if it is found to be at a price that differs significantly.

**Comment 4:   No Mixed Methodology**

The following is a verbatim executive summary of the argument submitted by Perfiles. For further details, *see* Perfiles' Draft Remand Comments at 18-20 (internal citations omitted).

> The {Federal Circuit} has previously upheld both {Commerce's} use of the "mixed" methodology when between 33 and 66 percent of U.S. sales "pass" the significant price difference test, and {Commerce's} use of the average-to-transaction methodology for all sales when more than 66 percent of "pass" the significant price difference test. Nothing in the {Federal Circuit}'s decisions in *Marmen* and *Stupp V* called that conclusion into question. Instead, the {Federal Circuit}'s decision {*sic*} addressed only the test used by {Commerce} to determine whether observed price differences were "significant." In the absence of some explanation why the change in the test for "significance" also requires a change in the consequences of finding a 33-perccent "pass" rate in the "Ratio Test," {Commerce's} elimination of the "mixed methodology" is beyond the scope of its authority in this proceeding.

---

[47] *Id.* at 17.

The following is a verbatim executive summary of the argument submitted by Maquilacero/TEFLU. For further details, *see* Maquilacero/TEFLU's Draft Remand Comments at 15-16 (internal citations omitted).

> Although the Court remanded solely for {Commerce} to reconsider its reliance on Cohen's *d* as its test for prices that "differ significantly," in the Draft Remand Results {Commerce} also announced that it has discontinued the use of the "mixed method" to calculate Plaintiffs' margin. In effect, as a feature of its revised DPM, on remand {Commerce} also changed the ratio test by abandoning the intermediate result of that test, the mixed methodology.

> Whereas {Commerce} had applied its mixed methodology to calculate Plaintiffs' margin for the final results, in the Draft {Redetermination} {Commerce} announced without any substantiated explanation that it has discontinued the "mixed method" component of its ratio test. The {Federal Circuit}'s decision in *Marmen* provides no basis for {Commerce's} sudden and unreasoned change in practice.

> In the event that {Commerce} adopts a lawful alternative to its "price difference test," {Commerce} should also reinstate the mixed method component of its ratio test.

**Commerce's Position:** The statute does not require Commerce to use a "mixed method" as an alternative comparison methodology. While the statute permits Commerce's previous policy that adopted a hybrid version of the A-to-A method and the A-to-T method, Commerce's revision to the differential pricing analysis aligns more closely with the statutory text, which permits Commerce to use the A-to-T method when certain conditions set forth in section 777A(d)(1)(B) of the Act are satisfied. In light of the foregoing, Commerce does not consider it necessary to continue to use the mixed method, particularly when discontinuation of the mixed method enhances the ability to address masked dumping, which is consistent with the objective of the statute, and more closely aligns with the statutory language that expressly authorizes the use of the A-to-T comparison method when the conditions set forth in section 777A(d)(1)(B) of the Act are satisfied. The Federal Circuit has recognized Commerce's "growing experience" in applying section 777A(d)(1)(B) of the Act as a basis for establishing what ratio justifies the application of

an alternative methodology.[48]  Regarding the price difference test, its use is consistent with the statute.  The CIT has held that the language in section 777A of the Act affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences.[49]  As such, when Commerce revised its differential pricing methodology in response to *Marmen* and *Stupp IV,* replacing the Cohen's *d* test with the price difference test, Commerce also discontinued the use of the mixed method.

Perfiles and Maquilacero/TEFLU argue that discontinuing the mixed method is beyond the scope of this remand in the absence of an explanation as to why a change in the test for determining significance would require the elimination of the mixed method.[50]  As an initial matter, the Federal Circuit found that Commerce's use of the Cohen's *d* test in Commerce's differential pricing methodology was unreasonable, and remanded the issue to Commerce, stating that Commerce "may re-perform a differential pricing analysis without relying on Cohen's *d*" and explaining Commerce's discretion in choosing to use the A-to-A method or reperforming its differential pricing methodology, "which may result in the use of the {A-to-T} comparison or a hybrid methodology."[51]  Therefore, while Commerce does not presume to speak for the Federal Circuit, because the Federal Circuit used "may," the Federal Circuit permitted Commerce to reconsider its differential pricing analysis and permitted that the result of the differential pricing analysis could be the use of the A-to-T method.

Moreover, the fact that *Stupp II* upheld Commerce's use of the 33 percent and 66 percent cutoffs in the ratio test for the previous version of Commerce's differential pricing analysis does not prevent Commerce from discontinuing the mixed method.  Perfiles concedes that

---

[48] *See Stupp II*, 5 F.4th at 1355.
[49] *See Garg Tube*, 740 F.Supp.3d at 1366.
[50] *See* Perfiles' Draft Redetermination Comments at 18-20; *see also* Maquilacero/TEFLU's Draft Redetermination Comments at 15-16.
[51] *See Stupp IV,* No. 2023-1663, 2025 WL 1178392 at *3 n.1.

Commerce's authority is not constrained only to the significance portion of the differential pricing analysis.[52] As explained above, the mixed method was not statutorily required, and to align more closely with the statute, Commerce has discontinued the mixed method as a matter of policy to simplify the differential pricing analysis. Therefore, Commerce is applying its revised differential pricing analysis, including its discontinuation of the mixed method, consistently, including in these final results of redetermination.[53] To apply only a portion of Commerce's revised differential pricing analysis here would be an inconsistent application of the new policy and methodology.

**Comment 5: Whether Commerce Was Bound to Open the Record**

The following is a verbatim executive summary of the argument submitted by Perfiles. For further details, *see* Perfiles' Draft Remand Comments at 20-21 (internal citations omitted).

> The Draft Redetermination fails to provide a reasoned explanation how adoption of the two-percent test of "significance" in conjunction with the "Ratio Test" comports with the statutory requirement that {Commerce} distinguish true "patterns" from random fluctuations. Furthermore, {Commerce} failed to provide sufficient notice to the parties of this proposed change prior to the deadline for submitting new factual information in this case. It would be manifestly unfair for {Commerce} to deny Perfiles an opportunity to comment in full on the new methodology — and to provide relevant factual information in support of those comments. Due process requires that Perfiles be given an opportunity now to address the issues raised by the new methodology proposed in the Draft Redetermination.

**Commerce's Position:** Commerce has given additional explanation for its changes above. The decision of whether or not to reopen a record following an order remanding an agency decision is a matter within the agency's discretion.[54] Perfiles has had full opportunity to comment on the price difference test and the changes to the differential pricing methodology. On January 13, 2026, Commerce granted an extension to all interested parties including Perfiles for draft remand

---

[52] *See* Perfiles' Draft Redetermination Comments at 19-20.

[53] *See e.g.*, *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping duty Administrative Review; 2022-2023*, 90 FR 30050 (July 8, 2025), and accompanying IDM; *see also SKF USA Inc. v. United States*, 630 F.3d 1365, 1377 (Fed. Cir. 2011) (affirming Commerce's change in practice because of its reasoned explanation); and *Cf. SKF USA, Inc. v. United States*, 254 F.3d 1022 (granting a remand request when an agency has materially changed its policy).

[54] *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012).

comments.[55]  The price difference test is not a statistical test, and Commerce did not place any new factual information on the record to establish the price difference test.  As such, reopening the record to allow parties to provide new factual information is not required to provide Perfiles a full opportunity to comment on Commerce's revised differential pricing methodology. Reopening the record "is not something the court will require simply based on a plaintiff's argument that better information is available."[56]  As long as Commerce's revised differential pricing methodology is reasonable, Commerce is permitted to use it to determine whether the statutory requirements to use A-to-T have been met.[57]

## V.   FINAL RESULTS OF REDETERMINATION

Consistent with the Court's *Remand Order*, we have discontinued the use of the Cohen's *d* test and adopted the "price difference test" to determine whether prices differ significantly.  As a result of these changes, Maquilacero/TEFLU's estimated weighted-average dumping margin is 10.67 percent.  In addition, because of the change in Maquilacero/TEFLU's calculated margin, the non-selected companies' rate has also changed.  As a result, the two companies not selected for individual examination, Perfiles LM, S.A. de C.V. and Productos Laminados de Monterrey S.A. de C.V. are each assigned a weighted-average dumping margin of 6.06 percent in accordance with section 735(c)(5)(A) of the Act.  Because Maquilacero/TEFLU's calculated dumping margin and the non-selected rate are different from those calculated in the underlying *Final Results*, we intend to issue a *Timken*[58] notice with the amended final results should the

---

[55] *See* Memorandum, "Extension of Time for Draft Remand Comments for All Interested Parties," dated January 13, 2026.
[56] *See Pro-Team Coil Nail Enter. Inc. v. United States*, 587 F. Supp. 3d 1364, 1374 (CIT 2022).
[57] *See Stupp II* at 1351 – 54.
[58] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).

Court sustain these final results of redetermination, and will issue relevant instructions, as

appropriate, to U.S. Customs and Border Protection.

3/16/2026

X _Chris J Abbott_

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

27