¶UNITED STATES COURT OF INTERNATIONAL TRADE BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| MAQUILACERO S.A. de C.V. and TECNICAS DE FLUIDOS S.A. de C.V., <br><br> *Plaintiffs*, <br> and <br><br> PERFILES LM, S.A. DE C.V. <br><br> *Consolidated-Plaintiff*, <br> v. <br><br> THE UNITED STATES, <br><br> *Defendant*, <br> and <br><br> NUCOR TUBULAR PRODUCTS, INC., <br><br> *Defendant-Intervenor*. | **NON-CONFIDENTIAL VERSION** <br><br> Consol. Court No. 23-00091 <br><br> **Contains Confidential Business Proprietary Information Deleted from Page 16.** |

**PLAINTIFFS MAQUILACERO S.A. DE C.V. AND TECNICAS DE FLUIDOS S.A. DE C.V.'S COMMENTS IN OPPOSITION TO THE SECOND REMAND REDETERMINATION**

Diana Dimitriuc Quaia
John M. Gurley
Yun Gao
Tyler J. Kimberly

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6291

*Counsel for Maquilacero S.A. de C.V. and Tecnicas De Fluidos S.A. de C.V.*

May 11, 2026

## TABLE OF CONTENTS

**Page**

I.  PROCEDURAL BACKGROUND AND HISTORY.................................................................2

II.  SUMMARY OF THE ARGUMENT.................................................................................. 5

III.  ARGUMENT ............................................................................................................. 7

    A.  The Price Difference Test, Which Is Based on a Previously Discarded Rationale, Produces Meaningless Results That Find Targeted Dumping Where None Exists ...................................................................................... 7

    B.  Commerce's "Price Difference Test" Is Not Meaningfully Different From the P/2 Test That Commerce Previously Rejected as an Unreasonable Indicator of Targeted Dumping. ............................................................. 10

    C.  Commerce Failed to Address Evidence and Argument Undermining Its Finding that Maquilacero/TEFLU Masked Dumped Sales ................................ 15

    D.  Commerce's Price Difference Test Does Not Measure "Significant" Price Differences ......................................................................................... 17

    E.  Commerce's Two Percent Threshold Is Not Validated by Its Use in Other Contexts ............................................................................................... 19

    F.  Commerce Unlawfully Discontinued the Application of the Mixed Methodology ........................................................................................... 22

IV.  CONCLUSION............................................................................................................ 24

AFSDOCS:306007413.1

## TABLE OF AUTHORITIES

**Authority**                                                                                                 **Page(s)**

**Cases**

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ........................ 12

*Calgon Carbon Corp. v. United States*, 487 F. Supp. 3d 1359 (Ct. Int'l Trade 2020) ................. 14

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ........................ 15

*Diamond Sawblades Mfrs. Coal. v. United States*, 986 F.3d 1351 (Fed. Cir. 2021) .................... 15

*Dongbu Steel Co. v. United States*, 635 F.3d 1363 (Fed. Cir. 2011) ........................................... 22

*Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313 (Ct. Int'l Trade 2015).... 18

*Greater Bos. Television Corp. v. FCC*, 444 F.2d 841(D.C. Cir. 1970) ........................................ 22

*Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, 413 F. Supp. 3d 1347 (Ct. Int'l Trade 2019) ................................................................................................................. 23

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015) ................................................. 16

*Katunich v. Donovan*, 599 F. Supp. 985 (Ct. Int'l Trade 1984) .................................................. 13

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................................ 23

*Maquilacero S.A. de C.V. v. United States*, 731 F. Supp. 3d 1346 (Ct. Int'l Trade 2024) ............. 2

*Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) ........................................... passim

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............................................................................................................................... 22

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ........................................ 15

*NLRB v. CNN Am., Inc.*, 865 F.3d 740 (D.C. Cir. 2017) ............................................................. 13

*Ramaprakash v. F.A.A.*, 346 F.3d 1121 (D.C. Cir. 2003) ........................................................... 13

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ................................................. 14

*Stupp Corp. v. United States*, No. 23-1663, 2025 WL 1178392 (Fed. Cir. Apr. 23, 2025) ................................................................................................................. ………3, 22, 23, 24

*Stupp Corp. v. United States*, 5 F.4th 1341(Fed. Cir. 2021) ....................................................... 19

*The Timken Co. v. United States*, 179 F. Supp. 3d 1168 (Ct. Int'l Trade 2016) ............... 15, 16, 17

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996) ............................................. 14

**Statutes**

19 U.S.C. § 1673b(b)(3) ......................................................................................................... 14, 20

19 U.S.C. § 1677b(c)(4) ............................................................................................................... 18

19 U.S.C. § 1677b(f)(2) ............................................................................................................... 20

19 U.S.C. § 1677f-1(d)(1)(B) ................................................................................................. passim

AFSDOCS:306007413.1

19 U.S.C. § 3512(d) ............................................................................................................... 8

**Other Authorities**

Cambridge Online Dictionary .............................................................................................. 17

Merriam-Webster Online Dictionary .................................................................................. 17

**Regulations**

19 C.F.R. § 351.403(c).................................................................................................... 14, 20

19 C.F.R. § 351.414(c)(1) ..................................................................................................... 5

**Administrative Determinations**

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8101 (Dep't Commerce Feb. 14, 2012) ................................................................. 5, 7

*Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 33977 (Dep't Commerce June 16, 2008) ........................................... 9, 11, 13, 19

*Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less Than Fair Value*, 73 Fed. Reg. 33985 (Dep't Commerce June 16, 2008).......... passim

*Light-Walled Rectangular Pipe and Tube From Mexico: Amended Final Results of Antidumping Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 30723 (Dep't Commerce May 12, 2023) ............................................................................................................................ 2

*Light-Walled Rectangular Pipe and Tube From Mexico: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 15665 (Dep't Commerce Mar. 14, 2023) .... 2

*Light-Walled Rectangular Pipe and Tube From Mexico: Preliminary Results and Partial Rescission of the Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg. 54965 (Dep't Commerce Sep. 8, 2022) ................................................................. 16, 18, 21

*Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the Republic of Korea*, 72 Fed. Reg. 60630 (Dep't Commerce Oct. 25, 2007).................. 10, 13

*Sodium Metal from France: Notice of Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances*, 73 Fed. Reg. 62252 (Dep't Commerce Oct. 20, 2008)…… .................................................................................................................................. 11, 12, 19

**Legislative Authorities and Documents**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994) *reprinted in*1994 U.S.C.C.A.N. 4040................................. 6, 8, 9, 18

AFSDOCS:306007413.1

**UNITED STATES COURT OF INTERNATIONAL TRADE BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |
|---|---|
| MAQUILACERO S.A. de C.V. and TECNICAS DE FLUIDOS S.A. de C.V.,     *Plaintiffs*,   and PERFILES LM, S.A. DE C.V.     *Consolidated-Plaintiff*,   v. THE UNITED STATES,     *Defendant*,   and NUCOR TUBULAR PRODUCTS, INC.,     *Defendant-Intervenor*. | **NON-CONFIDENTIAL VERSION** Consol. Court No. 23-00091 **Contains Confidential Business Proprietary Information Deleted from Page 16.** |

**PLAINTIFFS MAQUILACERO S.A. DE C.V. AND TECNICAS DE FLUIDOS S.A. DE C.V.'S COMMENTS IN OPPOSITION TO THE SECOND REMAND REDETERMINATION**

Pursuant to the U.S. Court of International Trade's ("CIT") remand order dated June 17, 2025 and amended scheduling order dated January 26, 2026, *see* Order (June 17, 2025), ECF No. 78; Amended Scheduling Order (Jan. 26, 2026), ECF No. 82, Plaintiffs Maquilacero S.A. de C.V. ("Maquilacero") and Tecnicas De Fluidos S.A. de C.V. ("TEFLU") (collectively "Maquilacero/TEFLU" or "Plaintiffs"), respectfully submit these comments in opposition to the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to

1

AFSDOCS:306007413.1

Court Remand filed on March 16, 2026, ECF No. 83 (Rem2-P.R. 11)[1] ("Second Remand Redetermination"). These comments are timely filed.

## I.    PROCEDURAL BACKGROUND AND HISTORY

This case arises from Commerce's final results in the 2020-2021 administrative review of the antidumping duty order on light-walled rectangular pipe and tube from Mexico. *See Light-Walled Rectangular Pipe and Tube From Mexico: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 15665 (Dep't Commerce Mar. 14, 2023) (P.R. 151) ("*Final Results*"), and accompanying Issues and Decision Mem. (P.R. 146), unchanged by *Light-Walled Rectangular Pipe and Tube From Mexico: Amended Final Results of Antidumping Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 30723 (Dep't Commerce May 12, 2023) (P.R. 160).

On October 4, 2024, the Court issued its opinion remanding the *Final Results* for further consideration of five issues, including Commerce's scope determination with respect to TEFLU's further-processed products, its collapsing analysis, its model match methodology, its treatment of TEFLU's IMMEX sales, and its reliance on the Cohen's *d* test as part of its differential pricing analysis. *Maquilacero S.A. de C.V. v. United States*, 731 F. Supp. 3d 1346 (Ct. Int'l Trade 2024), ECF No. 56.  On January 2, 2025, Commerce issued the first remand redetermination, in which it did not reconsider any of its determinations or findings from the

---

[1] In this submission, the documents in the record associated with the second remand are designated with the prefix "Rem2". *See* Public Record Index for Second Remand Redetermination (Apr. 13, 2026), ECF No. 84-2; Confidential Record Index for Second Remand Redetermination (Apr. 13, 2026), ECF No. 84-3.  The documents in the record associated with the first remand are designated as "Rem1".  *See* Public Record Index for First Remand Redetermination (Jan. 17, 2025), ECF No. 63-2.  And the record associated with the final results is designated using "P.R. __" or "C.R. ___."  *See* Public Record Index for Final Results (June 22, 2023), ECF No. 23-6; Confidential Record Index for Final Results (June 22, 2023), ECF No. 23-5.

AFSDOCS:306007413.1

*Final Results*.  *See* Final Results of Redetermination Pursuant to Court Remand (Jan. 2, 2025), ECF No. 61-1 (Rem1-P.R. 7).

Maquilacero/TEFLU submitted a notice of subsequent authorities drawing the Court's attention to the U.S. Court of Appeals for the Federal Circuit's ("Federal Circuit") decisions in *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025), and *Stupp Corp. v. United States* ("*Stupp II*"), No. 23-1663, 2025 WL 1178392 (Fed. Cir. Apr. 23, 2025). *See* Pls.' Notice of Subsequent Authorities (May 1, 2025), ECF No. 77. Those cases held that Commerce cannot rely on the Cohen's *d* test when the underlying data do not satisfy the statistical assumptions of normal distribution, equal variability, and equally and sufficiently numerous data.  Based on the notice of subsequent authority, the Court issued a standalone order remanding Commerce's first remand redetermination for Commerce to reconsider its use of the Cohen's *d* test as part of its differential pricing methodology in conformity with the Federal Circuit's decisions in *Marmen* and *Stupp II*, prior to ruling on the issues raised in its prior remand. *See* Order (June 17, 2025), ECF No. 78.

On January 9, 2026, Commerce issued the Draft Results of Redetermination in which Commerce applied its "Price Difference Test" as part of its new differential pricing analysis ("DPA").  *See* Draft Results of Redetermination Pursuant to Court Remand (Jan. 9, 2026) (Rem2-P.R. 1) ("Draft Remand Redetermination").[2]  In its differential pricing analysis,

_____

[2] In the first stage of the DPA, Commerce uses the Price Difference Test to compare categories of U.S. prices and determine whether U.S. prices differ significantly across the categories. *See* Second Remand Redetermination at 7–8 (Rem2-P.R. 11).  Comparisons that are two percent more and less than the weighted average of all other U.S. prices "pass" the Price Difference Test. *Id.* at 7–8.  Commerce then applies its ratio test where it calculates the values of the U.S. sales that "passed" the Price Difference Test percentage of the total value of U.S. sales. *See id.* at 8.  If 33% or more of the U.S. sales values pass the Price Difference Test, Commerce finds a "pattern" of differentially priced sales. *See id.* Next, Commerce applies its meaningful difference test, where it purports to determine whether the preferred average-to-average ("A-A") methodology can account for the differences in U.S. prices as found in the first stage of the DPA by comparing

Commerce applied the Price Difference Test.  Commerce found that 98.12 percent of the value of Maquilacero/TEFLU's U.S. sales passed the price difference test, purportedly confirming the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  *See* Draft Remand Redetermination at 8 (Rem2-P.R. 1).  Commerce determined that the A-A methodology could not account for the price differences and applied the A-T methodology (with zeroing) to calculate Maquilacero/TEFLU's margin.  *See id*.  As a result, Commerce calculated a dumping margin of 10.67% for Maquilacero/TEFLU.  *Id.* at 9.  On January 16, 2026, Maquilacero/TEFLU filed comments on the Draft Remand Redetermination. *See* Maquilacero S.A. de C.V.'s Comments on the Draft Results of Redetermination Pursuant to the Remand Order in Court No. 23-00091 (Jan. 16, 2026) (Rem2-P.R. 10) ("Maquilacero/TEFLU's Second Draft Remand Cmts.").

On January 26, 2026, the Court granted in part the Government's motion to amend the scheduling order and extended the deadline for Commerce to submit the final remand redetermination from January 30, 2026 to March 16, 2026.  *See* Amended Scheduling Order (Jan. 26, 2026), ECF No. 82.

On March 16, 2026, Commerce issued the Second Remand Redetermination, in which it made no changes to the Draft Remand Redetermination. As a result, Commerce continued to

---

the dumping margin determined by using the A-A methodology to the margin determined by using the average-to-transaction ("A-T") methodology.  *See id.* at 8–9.  In the meaningful difference test, Commerce sets to zero all margins inputted in the A-T methodology where the U.S. price for the transaction is greater than the average normal value.  Note, that prior to *Marmen*, Commerce employed a "mixed methodology." That is, if the value of U.S. sales that passed the test to determine whether prices differ significantly were between 33% and 66%, Commerce would apply the A-T methodology to those sales that passed the first price test and apply the A-A methodology to all other sales.  If 66% or more of the respondent's sales passed the first test (for price differences), then Commerce applied the A-T methodology to all U.S. sales.  Commerce discontinued this practice following the Federal Circuit's decision in *Marmen*. *See id.* at 4, 22–25.

AFSDOCS:306007413.1

calculate Maquilacero/TEFLU's dumping margin to be 10.67%. Second Remand Redetermination at 3 (Rem2-P.R. 11).

## II.    SUMMARY OF THE ARGUMENT

The Court should remand the Second Remand Redetermination for the following reasons.

First, Commerce's substitution of a "price difference test" for the first step of its differential pricing analysis, under which any price difference exceeding two percent is deemed "significant," is unlawful and unreasonable. *See* 19 U.S.C. § 1677f-1(d)(1)(B)(i) (setting forth the criteria for applying the A-T methodology in investigations). For reviews, Commerce has expressly adopted the same default preference for the A-A methodology and the same criteria for use of the A-T methodology as applicable in investigations. *See* 19 C.F.R. § 351.414 (c)(1); *see also Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8101 (Dep't Commerce Feb. 14, 2012) ("*Final Modification*").

Second, Commerce's new "Price Difference Test" is not meaningfully different from the P/2 test that Commerce itself repeatedly rejected as an unreliable indicator of targeted dumping. Both tests rest on the same bright-line, mechanically applied two-percent threshold that Commerce previously found inadequate. The only purported distinction—that the Price Difference Test captures deviations two percent higher or lower, rather than only lower—is a distinction without a difference and, if anything, magnifies problems Commerce identified in the P/2 test.

Third, Commerce's finding that Maquilacero/TEFLU's pricing variations represent targeted dumping is not supported by substantial evidence because Commerce failed to engage with record evidence detracting from that conclusion. In particular, Commerce ignored evidence—which Maquilacero/TEFLU expressly raised in its draft remand comments—that the

5

AFSDOCS:306007413.1

price differences in its U.S. sales were driven almost entirely by significant changes in the cost of manufacturing, not by targeted dumping. Commerce's failure even to acknowledge this evidence is arbitrary and capricious.

Fourth, the Price Difference Test does not measure whether price differences are statistically or commercially "significant" in any meaningful sense. The test merely identifies sales priced two percent above or below a weighted-average price, without any analysis of whether such deviations are significant in the context of the relevant product or market. This mechanical approach violates Congress's directive in the SAA that the analysis under 19 U.S.C. § 1677f-1(d)(1)(B) be conducted on a case-by-case basis, calibrated to the specifics of the product and market in question. Rather than engaging in such a market-sensitive inquiry, Commerce applies a fixed threshold that is untethered from the industry-specific record evidence.

Fifth, Commerce's reliance on the two-percent threshold used in other contexts—the arm's-length test and the *de minimis* standard—is misplaced because those thresholds serve different purposes and operate at different magnitudes, and Commerce itself applies materially higher thresholds (such as 25 percent) when determining "significance" in other areas of its practice.

Six, Commerce has not provided the requisite explanation for discontinuing the mixed methodology that it applied for over a decade. The holdings of *Marmen* and *Stupp II* were limited to Commerce's use of Cohen's *d* and did not authorize Commerce to abandon the mixed methodology. Commerce's sudden and unreasoned change in practice is arbitrary and contrary to law. In the event that Commerce adopts a lawful alternative to its "price difference test," Commerce should also reinstate the mixed-method component of its ratio test.

6

III.    ARGUMENT

In its Second Remand Redetermination Commerce abandoned the use of Cohen's *d* as part of its DPM analysis consistent with the CAFC's decision in *Marmen*.  Second Remand Redetermination at 3 (Rem2-P.R. 11).  The Federal Circuit held that Commerce cannot use the Cohen's *d* coefficient where the respondents' underlying price data do not satisfy the necessary assumptions of normal distributions, equal variability, and equally and sufficiently numerous data. *Marmen*, 134 F.4th at 1343–48.  In this review, no record evidence suggests that these statistical assumptions were met.  Resubmission of Maquilacero S.A. de C.V.'s Case and Rebuttal Briefs (Dec. 29, 2022) ("Maquilacero Case Brief") (C.R. 246, P.R. 140), at 31; Maquilacero 56.2 Brief (Sep. 28, 2023), at 46-47, ECF Nos. 31, 32. Plaintiffs thus agree with Commerce's decision not to rely on Cohen's *d* when the underlying statistical assumptions about the data are not met.  Plaintiffs disagree with Commerce's new Price Difference Test and respectfully request that the Court remand this matter to Commerce for the reasons below.

A.  **The Price Difference Test, Which Is Based on a Previously Discarded Rationale, Produces Meaningless Results That Find Targeted Dumping Where None Exists**

Commerce applies the A-A methodology to calculate margins unless it determines that another method is appropriate. 19 C.F.R. § 351.414(c)(1).  To determine whether the A-T methodology may be appropriate instead of the normal A-A methodology, Commerce purports to adhere to the criteria set forth in 19 U.S.C. § 1677f-1(d)(1)(B).  *See Final Modification*, 77 Fed. Reg. 8101.  As a threshold matter, before Commerce may resort to the extraordinary A-T methodology, the statute requires that Commerce determine whether there "is a pattern of export prices . . . for comparable merchandise that differ ***significantly*** among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(1)(B)(i) (emphasis added).  The plain language definitions of the term "significantly" confirm that Commerce must reconsider its price

7

difference test and its two percent threshold in favor of an analysis that accounts for the specific product and market in question.

Commerce's substitution of a "Price Difference Test" for the first step of its differential pricing methodology, under which any price difference exceeding two percent is deemed "significant," is unlawful and unreasonable. As Maquilacero/TEFLU argue below and in their comments to Commerce, the test is contrary to the plain meanings of the statutory terms "significantly" and "significant" and departs from Congress's directive in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA")[3] that targeted dumping determinations should be conducted on a "case-by-case basis," recognizing that what counts as "significant" is context-dependent and may vary across industries and products. *See* SAA, H.R. Doc. No. 103-316 (1994) at 843, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178 (recognizing that "small differences may be significant for one industry or one type of product, but not for another."); *see also* Maquilacero/TEFLU's Second Draft Remand Cmts. at 6-14 (Rem2-P.R. 10). A two-percent threshold is arbitrary as it neither reflects the statutory text nor honors the SAA's instruction that small differences may be significant in one market but not in another.

Compounding this statutory problem, Commerce's new Price Difference Test is functionally the same as the P/2 test that the agency previously ejected. In prior proceedings, Commerce recognized that a mechanical two-percent cutoff fails to account for market realities and results in labeling ordinary price variation as "targeted dumping," thereby finding targeted dumping where none exists. *See*, *e.g.*, *Certain Steel Nails from the People's Republic of China:*

---

[3] The SAA constitutes the "authoritative expression by the United States concerning the interpretation and application" of the trade remedies laws. 19 U.S.C. § 3512(d).

AFSDOCS:306007413.1

*Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 33977 (Dep't Commerce June 16, 2008) ("*Nails from China*"), and accompanying Issues and Decision Mem. ("*Nails from China IDM*").

In the Second Remand Redetermination, Commerce attempts to distinguish its Price Difference Test from the P/2 test unsuccessfully, as discussed immediately below. Commerce also fails to provide any justification based on the record evidence for why a two-percent price difference is "significant" in this case.  Second Remand Redetermination at 15 (Rem2-P.R. 11). In the underlying review, Commerce has already found that the observed price changes were driven by cost changes rather than by any pricing behavior indicative of targeted dumping. *PDM* at 15-16 (P.R. 103).[4] Absent an assessment based on the record evidence, the new Price Difference Test cannot reliably distinguish meaningful pricing patterns from normal commercial dynamics.

Under this new Price Difference Test, Plaintiffs' margins - now calculated entirely under the A-T methodology - increased, widening the gap between the calculated margins using the normal A-A methodology and the application of the extraordinary A-T methodology.  This arbitrary new test has not only generated a 98.12% pass rate for Plaintiffs, but it has generated high pass rates also in proceedings before Commerce, as Commerce's own citations demonstrate. Second Remand Redetermination at 9 (Rem2-P.R. 11). A test for "significance" where nearly all price comparisons "pass" the test is not a meaningful filter; it is an empty formality that does not reveal the presence or absence of targeted dumping. The Court should instruct Commerce to abandon this previously discarded, arbitrary threshold and adopt a test that comports with the statute, the SAA, and the record in this proceeding.

---

[4] *See supra* note 2, and accompanying text for a description of the mixed methodology.

**B. Commerce's "Price Difference Test" Is Not Meaningfully Different From the P/2 Test That Commerce Previously Rejected as an Unreasonable Indicator of Targeted Dumping.**

The Price Difference Test shares essential characteristics with the P/2 test, which undermines Commerce's use of the Price Difference Test. As discussed below, Commerce's attempts to distinguish the Price Difference Test from the P/2 test lack merit, and Commerce has not otherwise satisfied its obligation to explain its departure from past practice. Therefore, we ask the Court to remand Commerce's use of the Price Difference Test.

Commerce used the P/2 test (also called the "preponderance at two percent test") in an attempt to identify targeted dumping but quickly abandoned the test. The test worked by comparing the weighted-average net price charged to an allegedly targeted group of purchasers or regions against the weighted-average net price charged to non-targeted purchasers or regions for identical merchandise on a monthly basis. *See Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the Republic of Korea*, 72 Fed. Reg. 60630 (Dep't Commerce Oct. 25, 2007) ("*CFS from Korea*"), and accompanying Issues and Decision Mem. at Cmt. 1 ("*CFS from Korea IDM*"). If the targeted group's net U.S. price was more than two percent lower than the control group's price across a majority of the targeted sales quantity, the test concluded that a "pattern" of "significant" price differences existed. *Id.* The two percent threshold was borrowed from other areas of Commerce's antidumping practice—specifically, the *de minimis* margin threshold and the arm's-length test for affiliated-party transactions. *See id.*; *see also Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less Than Fair Value*, 73 Fed. Reg. 33985 (Dep't Commerce June 16, 2008) ("*Nails from the UAE*"), and accompanying Issues and Decision Mem. at Cmt. 8 ("*Nails from the UAE IDM*") (noting that the domestic industry supported the two-percent threshold "by reference to

10

the definition of *de minimis* in the context of dumping margins in antidumping duty investigations").

Commerce found the P/2 test problematic for several reasons. Most fundamentally, Commerce concluded that the two-percent threshold was arbitrary because it did not account for price variations specific to the market or industry in question. *See Nails from the UAE IDM* at Cmt. 8; *see also Sodium Metal from France: Notice of Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances*, 73 Fed. Reg. 62252 (Dep't Commerce Oct. 20, 2008) ("*Sodium Metal from France*"), and accompanying Issues and Decision Mem. at 10 ("*Sodium Metal from France IDM*").  What constitutes a "significant" price difference for one product may not be significant for another, which could have led to a dumping finding where no dumping was actually occurring.  *See Nails from China IDM* at Cmt. 7 ("{T}he two-percent price difference threshold does not adequately account for price variations specific to the market in question.  In so doing, the P/2 test may find targeted dumping in many cases when arguably no such dumping is occurring.").  While Commerce cited another problem with the test, Commerce's finding that the two-percent threshold was unworkable was the ultimate reason why Commerce discontinued the P/2 test.

Following the Federal Circuit's opinion in *Marmen*, Commerce has attempted to resurrect the two-percent threshold of the P/2 test under the guise of the Price Difference Test.  And while Commerce insists that the P/2 test and the Price Difference Test are fundamentally different, it admits that the Price Difference Test shares the same core problem as the P/2 test—the two percent threshold.  Commerce's use of this two-percent threshold must be remanded.

First, Commerce claims that the Price Difference Test "does not stipulate an absolute value as a threshold (*e.g.*, $5 per kilogram) but a threshold that measures relative differences (*i.e.*, a percentage) on a case-by-case basis by comparison to case- and product- specific averages

11

dependent upon customer, region, temporal data." Second Remand Redetermination at 14 (Rem2-P.R. 11). Commerce contrasts this to the P/2 test, which "examine{d} whether U.S. prices differ significantly among purchasers, regions, and time periods." It is not clear why Commerce perceives these characteristics as differences rather than similarities. The P/2 test did not use "an absolute value as a threshold . . . but {used} a threshold that measure{d} relative difference." *Id.* That is, the P/2 test used a two-percent threshold—as does the Price Difference Test. *See Sodium Metal from France IDM* at 10. Further, both tests rely on "customer, region, and temporal data." *Id.* This is not a distinguishing feature but a similarity.

Second, Commerce contends that the Price Difference Test differs from the P/2 test based on how the two-percent threshold is applied. While the P/2 test examined whether prices to alleged pre-identified targets of data (regions or customers) in a given month and only looked at whether the target prices were lower than the weighted-average net U.S. price of all other sales, the Price Difference Test considers "whether prices to each purchaser, region, or time period are at least two percent higher or lower than the prices for all other sales." Second Remand Redetermination at 15 (Rem2-P.R. 11). The only discernable difference is that Price Difference Test considers prices that are two percent *higher* or lower than the average prices of all other U.S. sales, whereas the P/2 test only considered lower prices. *Compare* Second Remand Redetermination at 15, *with Sodium Metal from France IDM* at 8, *and Nails from the UAE IDM* at Cmt. 8. But it is not clear, and Commerce does not explain, why the inclusion of higher prices makes the two-percent threshold in the Price Difference Test more reliable than two-percent threshold in the P/2 test. *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (holding that the agency's reasoning must be reasonably discernable).

In fact, the inclusion of higher and lower prices exacerbates an issue Commerce identified in the P/2 test. By flagging deviations on both sides of the mean, the Price Difference

12

Test doubles the universe of sales that can be deemed "significant" compared to the one-directional P/2 test, which only captured prices that were two percent lower than the comparison group's price. Rather than counter the flaw of the P/2 test, the positive-negative two-percent threshold of the Price Difference Test creates precisely the "many cases" of false positives that Commerce warned against when it abandoned the P/2 test. *Nails from China IDM* at Cmt. 7.

Third, Commerce's attempts to support the two-percent threshold in the Price Difference Test parrot the reasoning that supported the threshold in the P/2 test. Commerce insists that two percent is a reasonable measure of significant price difference based on its use of a two-percent threshold in the arm's-length test and as the *de minimis* threshold to determine dumping in an antidumping duty investigation. *See* Second Remand Redetermination at 15–16 (Rem2-P.R. 11). These are the **exact** explanations that supported using the two-percent threshold in the P/2 test. *See CFS from Korea IDM* at Cmt. 2 (identifying the arguments in support of the P/2 test); *Nails from the UAE IDM* at Cmt. 6 (noting that domestic industry petitioners supported the two-percent threshold "by reference to the definition of *de minimis* in the context of dumping margins in antidumping duty investigations"). Rather than support Commerce's two-percent threshold, its explanations only draw comparisons to the P/2 test.

It is a firmly established principle of administrative law that an agency must "come to grips with conflicting precedent" to avoid "an inexcusable departure from the essential requirement of reasoned decision making." *NLRB v. CNN Am., Inc.*, 865 F.3d 740, 751 (D.C. Cir. 2017) (quoting *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1125 (D.C. Cir. 2003)); *Katunich v. Donovan*, 599 F. Supp. 985, 986 (Ct. Int'l Trade 1984) ("It is a sound principle of administrative law that an administrative agency must either follow or adhere to existing policies and precedents or explain its non-compliance or deviation."). Commerce must explain its "reasons for treating similar situations differently" or its decision is arbitrary and must be remanded. *SKF*

13

*USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)); *Calgon Carbon Corp. v. United States*, 487 F. Supp. 3d 1359, 1365 (Ct. Int'l Trade 2020).

Commerce has not adequately differentiated (and cannot differentiate) its use of the two-percent threshold as part of its Price Difference Test differs from the P/2 test. As discussed above, Commerce's reasoning only draws parallels to the P/2 test. Absent a reasonable explanation for departing from its prior practice of not using a two percent threshold to determine whether U.S. prices differ significantly, Commerce's use of the Price Difference Test cannot stand.

Indeed, the Price Difference Test exhibits the exact same problems that infected the P/2 test. As discussed above, both tests: (1) rely on the identical two-percent threshold to determine whether prices "differ significantly"; (2) measure relative price differences rather than absolute values; (3) rely on the categories of "customer, region, and temporal data"; (4) apply the two percent-threshold without any case-specific or market-specific calibration; and (5) rely on the same argument that two percent thresholds in other areas of dumping proceedings are accepted practice (two-percent figure used in the arm's-length test under 19 C.F.R. § 351.403(c) and the *de minimis* threshold in 19 U.S.C. § 1673b(b)(3)).

The two-percent threshold was not reasonable in the P/2 test and it is not reasonable in the Price Difference Test. Commerce has not provided a reasonable explanation to the contrary or adequately addressed the similarities between the defunct P/2 test and the Price Difference Test. Therefore, we ask that the Court remand Commerce's use of the Price Difference Test.

14

**C.**   **Commerce Failed to Address Evidence and Argument Undermining Its Finding that Maquilacero/TEFLU Masked Dumped Sales**

Commerce's finding that Maquilacero/TEFLU's pricing variations represent targeted dumping is not supported by substantial evidence because Commerce did not engage with arguments and evidence detracting from its conclusion.

The substantial evidence standard of the statute requires Commerce to consider "the record as a whole, including evidence that . . . fairly detracts from the substantiality of the evidence" supporting Commerce's conclusions.  *Diamond Sawblades Mfrs. Coal. v. United States*, 986 F.3d 1351, 1362 (Fed. Cir. 2021) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003)).  This includes evidence that the price differences identified by Commerce do not indicate or potentially mask targeted dumping.  *The Timken Co. v. United States*, 179 F. Supp. 3d 1168, 1179 n.12 (Ct. Int'l Trade 2016).  In the Second Remand Redetermination, Commerce did not address evidence that Maquilacero/TEFLU's price differences were the result of cost differences—not targeted dumping—despite Maquilacero/TEFLU raising this issue in its comments on Commerce's Draft Remand Redetermination.  *See* Maquilacero/TEFLU's Second Draft Remand Cmts. at 10–12 (Rem2-P.R. 10).  In fact, Commerce did not even acknowledge this argument or the evidence supporting it in the final Second Remand Redetermination.  Commerce's failure to consider this issue requires a remand. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (finding agency decision to terminate DACA to be arbitrary and capricious where the Department of Homeland Security failed to consider an important aspect of the problem).

Maquilacero/TEFLU's argument is not that Commerce must collect evidence to discern why a respondent's U.S. sales differ.  Indeed, the Federal Circuit has explained that Commerce is not required "to determine the intent of targeted dumping" when doing so would "create a

tremendous burden on Commerce that is not required or suggested by the statute." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363, 1368 (Fed. Cir. 2015). However, the obligation to probe the intent behind apparent pricing disparities is distinct from the obligation to engage with evidence showing that those price differences do not stem from targeted dumping. *See The Timken Co.*, 179 F. Supp. 3d at 1179 n.12. Commerce cannot ignore the latter obligation.

To that point, evidence on the record, which Commerce acknowledged, demonstrates that the price differences in Maquilacero/TEFLU's U.S. sales were driven almost entirely by changes in the cost of manufacture ("COM"). Commerce found that "during a period of 12 months" the changes to Maquilacero/TEFLU's COM were "significant enough to warrant a departure from {Commerce's} standard annual-average cost approach." *See Light-Walled Rectangular Pipe and Tube From Mexico: Preliminary Results and Partial Rescission of the Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg. 54965 (Dep't Commerce Sep. 8, 2022) (P.R. 111), and accompanying Preliminary Decision Memorandum ("*PDM*") at 15 (P.R. 103). "{H}ot-rolled coil prices increased significantly throughout the POR."  Maquilacero/TEFLU Prelim. Analysis Mem. (Sep. 8, 2022) at 15 (P.R. 112, C.R. 202) ("Prelim. Analysis Mem."); *see also id.*, Attach. 6B. Commerce linked the changes in costs to changes in sales prices. *See PDM* at 15–16. Specifically, "the quarterly COM and sale prices were trending in the same direction for [          ] out of [       ] quarters tested during the POR." Prelim. Analysis Mem. at 16 & Attach. 6B. Put another way, there is a [        ] correlation between COM changes and U.S. sales price changes, which is virtually the same percentage of U.S. sales that passed the Price Difference Test (98.12%).

Maquilacero/TEFLU directed Commerce to this information in its comments on the Draft Remand Results, *see* Maquilacero/TEFLU's Second Draft Remand Cmts. at 10–12 (Rem2-P.R. 10), but Commerce simply ignored it. And, since Maquilacero/TEFLU provided the necessary

16

information and Commerce already established a link between fluctuating costs and sales prices, Commerce need not do any substantial additional work to determine the cause of Maquilacero/TEFLU's price differences—Commerce need only acknowledge the conclusion that is apparent from the record.  Commerce lacks any basis to claim that it would incur a "tremendous burden" by determining why Maquilacero/TEFLU's U.S. sales were differently priced. *Cf. The Timken Co.*, 179 F. Supp. 3d at 1179 n.12 ("{S}uch a burden might not exist where a respondent itself provides that information.").

Therefore, Commerce failed to address an important issue and ignored evidence contrary to its conclusion that Maquilacero/TEFLU's supposedly disparately priced U.S. sales were the result of targeted dumping.  We ask that the Court remand Commerce's decision on this issue.

### D.  **Commerce's Price Difference Test Does Not Measure "Significant" Price Differences**

By mechanically relying on a two-percent threshold, Commerce's Price Difference Test does not measure significant price differences as the statute requires.  The statute requires Commerce to identify U.S. prices that "differ significantly" before resorting to an alternative methodology.  19 U.S.C. § 1677f-1(d)(1)(B)(i).  The plain language definitions of the term "significantly" confirm that the Price Difference Test and its two-percent threshold fail to comport with the statute's requirements.  Dictionary definitions of "significant" include "important or noticeable."  Maquilacero/TEFLU's Second Draft Remand Cmts at 9 n.21 (Rem2-P.R. 10) (citing *Significant*, Merriam-Webster Online Dictionary, *available at* https://www.merriamwebster.com/dictionary/significant (last visited May 11, 2026); *Significant*, Cambridge Online Dictionary, *available at* https://dictionary.cambridge.org/us/dictionary/english/significant (last visited May 11, 2026)).  But what is "important or noticeable" (i.e., significant) will depend on the circumstances.

17

Indeed, the CIT has explained that Commerce should determine whether a country is a "significant producer of comparable merchandise" under 19 U.S.C. § 1677b(c)(4), "in relation to world production and trade." *Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313, 1318, 1338 (Ct. Int'l Trade 2015).  The point is this: whether two or more things differ "significantly" depends on the factual circumstances in which the differences are found because what is "important" or worth noticing in one set of circumstances may not be so in others.

Commerce does not support its use of a two-percent threshold with any authority, aside from its use of a two-percent threshold in the arm's-length test and determining *de minimis* thresholds.  But, as discussed above, these explanations closely tie the Price Difference Test to the problematic P/2 test.  Moreover, in other situations Commerce applies a materially higher standard to determine whether a value or difference is significant.  For example, in determining whether there are "significant cost changes" between the high- and low-quarter for the COM, Commerce applies a 25% threshold.  *PDM* at 15 (P.R. 103).  Commerce does not explain why it is acceptable to analogize its two-percent threshold to certain practices that determine significance, but not to others.

Further, Commerce's reliance on a mechanical, bright-line two-percent threshold is inconsistent with Congress's directive in the SAA that the analysis under 19 U.S.C. § 1677f-1(d)(1)(B) be conducted on a case-by-case basis and grounded in the specifics of the product and market in question.  SAA, H.R. Doc. No. 103-316 at 843, 1994 U.S.C.C.A.N at 4176.  The SAA explains that, "in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another."  SAA, H.R. Doc. No. 103-316 at 843, 1994 U.S.C.C.A.N at 4176.

18

Commerce's Price Difference Test ignores that Congressional directive. Rather than calibrating its analysis to the relevant product and market, Commerce applies a fixed two-percent threshold that is untethered from the industry-specific record evidence and that—as Commerce has acknowledged in prior cases—does not account for price variations specific to the market in question. *See Nails from China IDM* at Cmt. 7; *see also Nails from the UAE IDM* at Cmt. 8; *Sodium Metal from France IDM* at 9–10. Indeed, this was a prominent concern articulated by the Federal Circuit in *Stupp Corp. v. United States* ("*Stupp I*"), 5 F.4th 1341, 1359 (Fed. Cir. 2021). The Federal Circuit expressed concern about the mechanical application of a statistical formula to data exhibiting only minimal variance because such a test could cause Commerce to find that sales are differentially priced, while "{a}n objective examiner inspecting those export sales prices would be unlikely to conclude that they embody a 'pattern' of prices that 'differ significantly.'" *Id*. (quoting 19 U.S.C. § 1677f-1(d)(1)(B)(i)). In short, substituting a one-size-fits-all numerical cutoff for the case-by-case, market-sensitive inquiry that the SAA demands risks precisely what *Stupp I* warned against: treating ordinary, commercially insignificant price variation as a "pattern" of prices that "differ significantly" within the meaning of 19 U.S.C. § 1677f-1(d)(1)(B)(i).

### E. Commerce's Two Percent Threshold Is Not Validated by Its Use in Other Contexts

Commerce contends that the two-percent threshold used in the Price Difference Test is "a reasonable measure of significance" because Commerce applies a similar threshold in two other contexts: the arm's-length test and the *de minimis* dumping margin in investigations. Second Remand Redetermination at 15–16. This argument is unconvincing because it ignores the context in which each threshold operates, which is the very consideration that the statute and SAA demand. The arm's-length test and the *de minimis* standard each measure different things

19

and operate at different magnitudes.  In the arm's-length test, conducted pursuant to 19 U.S.C.

§ 1677b(f)(2) and 19 C.F.R. § 351.403(c), Commerce devised the two-percent band to assess

whether prices between affiliated parties in the comparison market can be used in calculating

normal value.  That test compares prices charged to affiliated customers against prices charged to

unaffiliated customers for the same product in the same market, a narrow inquiry into pricing

among related companies. The *de minimis* standard in investigations, for its part, is a statutory

threshold (19 U.S.C. § 1673b(b)(3)) that defines when a calculated dumping margin is too small

to warrant imposition of an antidumping order. It measures two percentage points of the overall

margin, not a two-percent difference in individual sale prices. Congress chose that level

legislatively; Commerce did not derive it from any case-by-case assessment. Neither example

measures what the price difference test purports to measure: whether prices of comparable

merchandise "differ significantly" among purchasers, regions, or time periods within the

meaning of 19 U.S.C. § 1677f-1(d)(1)(B).  Whether a two-percent price difference is

"significant" under 19 U.S.C. § 1677f-1(d)(1)(B) depends on the industry and product in

question and the factual record here, a contextual determination that cannot be answered by

pointing to unrelated statutory or regulatory uses of the same numeral.

Moreover, Commerce's own practice demonstrates that it regularly selects different

numerical thresholds tailored to the particular question at hand. In its "meaningful difference"

test (*i.e.* the second stage of the very same differential pricing analysis), Commerce applies a 25-

percent relative change threshold to determine whether using the A-T methodology yields a

meaningfully different dumping margin compared to the A-A methodology. Second Remand

Redetermination at 8 (Rem2-P.R. 11).  If a 25-percent difference is required to establish that the

comparison methodology makes a meaningful difference, it is arbitrary to conclude that a mere

two-percent variation in prices is categorically "significant" as discussed *supra* <u>Section III.C.</u>

20

Tellingly, in this very review, Commerce itself determined that Maquilacero/TEFLU experienced "significant cost changes (*i.e.,* changes that exceed 25 percent)," and that these changes in Maquilacero/TEFLU's COM and selling prices between and among quarters was so significant that Commerce applied the quarterly-cost methodology. *PDM* at 15–16 (P.R. 103). In other words, Commerce required a 25-percent variation in costs before it would treat cost changes as "significant" enough to alter its methodology—yet in the price difference test, Commerce deems a mere two-percent variation in prices to be categorically "significant." This internal inconsistency is striking: Commerce's own quarterly cost analysis shows that the observed price variation in this case tracks changes in cost of production, yet Commerce ignores this record evidence and treats a two-percent price fluctuation as dispositive of targeted dumping.

Similarly, Commerce's standard antidumping questionnaire instructs respondents that "{i}f in any month during the period of review the annual inflation rate in the foreign market was in excess of 25 percent," the respondent must contact Commerce so that Commerce may issue a modified questionnaire to address "high inflation rates that might require adjustments to costs." *See e.g.*, Letter from P. Zukowski to Maquilacero, Re: Request for Information (Nov. 1, 2021) (P.R. 22) at A-11. In other words, Commerce has determined that only when inflation exceeds 25 percent does it rise to the level requiring special treatment of a respondent's cost data—yet Commerce treats a mere two-percent price variation as categorically "significant" for purposes of the price difference test. These thresholds—25 percent in the meaningful difference test and in Commerce's own quarterly cost analysis—show that Commerce routinely calibrates numerical tests to the circumstances and the analytical question being asked. Commerce has failed to explain why a two-percent test is "significant" under 19 U.S.C. § 1677f-1(d)(1)(B).

AFSDOCS:306007413.1

### F. **Commerce Unlawfully Discontinued the Application of the Mixed Methodology**

Commerce has not explained its decision to eliminate the mixed methodology as part of its ratio test and meaningful difference test. In the Second Remand Redetermination, Commerce attempted to justify abandoning the mixed methodology on the grounds that: (1) discontinuing the mixed methodology aligns more closely with the statutory text, which expressly authorizes use of the A-to-T method when the conditions in section 19 U.S.C. § 1677f-1(d)(1)(B) are satisfied; (2) eliminating the mixed method "enhances the ability to address masked dumping" and simplifies the differential pricing analysis as a matter of policy; and (3) a passage from the Federal Circuit's opinion in *Stupp II*, 2025 WL 1178392—which refers to Commerce's options for fashioning a new test for price differences—endowed Commerce with the discretion to change virtually any aspect of the DPA. *See* Second Remand Redetermination at 23–25 (Rem2-P.R. 11). The Court should reject all of these arguments.

The primary issue with Commerce's decision to discontinue the mixed methodology is that Commerce has not provided the requisite explanation for abandoning a practice or policy. Again, Commerce must provide a reasoned explanation for departing from an established practice. *See*, *e.g.*, *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) (holding that when "an agency chang{es} its course," it "must supply a reasoned analysis" for doing so) (quoting *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)); *Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1371 (Fed. Cir. 2011) ("We have indicated that an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently."). It is uncontested that Commerce applied the mixed methodology for over a decade. And the central holdings of *Marmen* and *Stupp II* were that Commerce cannot "use the Cohen's *d* test to justify the A-to-T methodology" when the assumptions underlying Cohen's *d* are not satisfied. *Marmen*, 135 F.4th at 1348; *see*

22

AFSDOCS:306007413.1

*also Stupp II*, 2025 WL 1178392, at *2.  Neither case opened the door for Commerce to change anything else about the DPA.  Consequently, this Court's order remanding the First Remand Redetermination (which order Commerce to conform to *Marmen*) did not permit Commerce to revisit its use of the mixed methodology.  *See* Order (June 17, 2025), ECF No. 78.

Nor are the reasons that Commerce provided for changing ratio test by abandoning the mixed methodology persuasive.  Commerce claims that the statute does not require the use of a mixed methodology, such that abandoning it more closely aligns with Congress's intent.  *See* Second Remand Redetermination at 23 (Rem2-P.R. 11).  Such an explanation—purporting to interpret the statute—is due no deference under *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).  Further, the mere absence of a directive does not provide a basis for Commerce to change its position without an explanation.

Next, Commerce suggests that eliminating the mixed methodology "enhances {its} ability to address masked dumping."  Second Remand Redetermination at 23 (Rem2-P.R. 11).  But Commerce provides no explanation of how its ability is enhanced or why applying the A-to-T method to all sales—rather than only to those sales that "pass" the Price Difference Test— yields more accurate results.  Such a conclusory assertion does not satisfy Commerce's obligation to provide a reasoned explanation for departing from prior practice.  *See Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, 413 F.Supp.3d 1347, 1358 (Ct. Int'l Trade 2019) (finding that "a bald assertion" did not constitute "a reasonable explanation").

Finally, Commerce reads too much into the Federal Circuit's use of the word "may" in *Stupp II*.  The Federal Circuit stated that Commerce could "re-perform a differential pricing analysis without using Cohen's *d*, which may result in the use of the average-to-transaction comparison or a hybrid methodology."  *Stupp II*, 2025 WL 1178392, at *2 n.1.  The context of this quote demonstrates that the Federal Circuit was directing Commerce to change its test for

23

AFSDOCS:306007413.1

measuring price differences and acknowledging that this change may affect the subsequent tests in the DPA.  In other words, the Federal Circuit merely recognized that the test for price differences is an input in the other parts of the DPA—changes to the input will affect the output of the other tests.  But that recognition does not permit Commerce to change anything about the ratio test or the meaningful-difference test.  Therefore, *Stupp II* (and *Marmen*) provide no basis for Commerce's sudden and unreasoned change in practice regarding the mixed methodology. In the event that Commerce adopts a lawful alternative to its Price Difference Test, it should also reinstate the mixed-method component of its ratio test.

## IV.    CONCLUSION

For the foregoing reasons, Maquilacero/TEFLU respectfully request that the Court remand the Second Remand Redetermination to Commerce. First, Commerce's Price Difference Test is unlawful and unreasonable, as it deems any price difference exceeding two percent to be "significant" without any case-specific or market-sensitive analysis.  Second, the Price Difference Test suffers from the same fundamental defects as the previously abandoned P/2 test and cannot serve as a reasoned basis for finding that prices differ significantly—both tests rest on the identical, mechanically applied two-percent threshold that Commerce previously rejected. Third, Commerce failed to engage with record evidence demonstrating that Maquilacero/TEFLU's U.S. price variations were driven by significant changes in the cost of manufacturing rather than targeted dumping.  Fourth, the Price Difference Test does not measure whether price differences are statistically or commercially "significant" in any meaningful sense, instead relying on an arbitrary two-percent threshold untethered from the specific product or market at issue. Fifth, Commerce's reliance on the two-percent threshold used in other contexts—the arm's-length test and the *de minimis* standard—is misplaced because those thresholds serve different purposes and operate at different magnitudes, and Commerce itself

24

applies materially higher thresholds when determining "significance" in other areas of its practice. Sixth, Commerce has not provided a reasoned explanation for its decision to abandon the mixed methodology that it applied for over a decade. For all of these reasons, Commerce's determination is unsupported by substantial evidence and contrary to law.

Respectfully submitted,

May 11, 2026

**/s/ Diana Dimitriuc Quaia**
Diana Dimitriuc Quaia
John M. Gurley
Yun Gao
Tyler J. Kimberly

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6291
Fax: (202) 857-6395
Email: diana.dimitriuc-quaia@afslaw.com

*Counsel for Maquilacero S.A. de C.V. and
Tecnicas De Fluidos S.A. de C.V.*

25

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiffs' Comments in Opposition to the Second Remand Redetermination filed on May 11, 2026, complies with the word limitation requirement. The word count for Plaintiffs' Opposition Comments, as computed by ArentFox Schiff LLP's word processing system is 7,372.


  **/s/ Diana Dimitriuc Quaia**
Diana Dimitriuc Quaia

1

AFSDOCS:306007413.1